

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NORTHLAND INSURANCE COMPANY,

Plaintiff,

vs.

LINCOLN GENERAL INSURANCE COMPANY,: J.H.M. ENTERPRISES, INC., VERNICE L. STATTS, ROBERT E. KRAPF and UTE L. HETLAND CLARK, as Administrators of the Estate of Karin Clifford and ROBERT E. KRAPF and PATRICIA R. CLIFFORD, as Administrators of the Estate of Robert R. Clifford, SHERRILL J. MULLIGAN, DENIS A. MULLIGAN,

Defendants.

Civil Action No.: 01 CV 763
**(Hon. Yvette Kane, USDJ)**

FILED
HARRISBURG, PA
MAY 2 4 2002
MARY E. D'ANDREA, CLERK
Per
Deputy Clerk

**AFFIDAVIT IN SUPPORT OF MOTION OF NORTHLAND INSURANCE COMPANY FOR SUMMARY JUDGMENT**

Ira S. Lipsius, being duly sworn, deposes and says:

1. I am a member of the firm of SCHINDEL, FARMAN & LIPSIUS, LLP, counsel to plaintiff Northland Insurance Company ("Northland") in connection with this action. By order of this Court dated, October 19, 2001, I am admitted to practice in the Federal District Court, Middle District of Pennsylvania in connection with this matter. I submit this affidavit in support of the motion of Northland for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

2. In support of its motion, Northland relies upon the pleadings and upon the transcripts of two depositions, including the exhibits thereto. The Northland's complaint is attached as **Exhibit A** to this affidavit. The Answer of Lincoln General Insurance Company ("Lincoln") is attached as **Exhibit B** to this affidavit.

3. This is an action for a declaration of rights involving two automobile liability insurance policies. One of the policies was issued by plaintiff Northland and the other by Lincoln. Relevant portions of the two policies are annexed to Lincoln's answer to Northland's complaint.

4. The sole issue before this court in the instant motion whether Northland and Lincoln General reached a settlement of this declaratory judgment action.

5. Attached hereto as **Exhibit C** is a copy of the entire transcript of the deposition of Northland's adjuster Traci Slane, together with the exhibits marked at that deposition.

6. Attached hereto as **Exhibit D** is a copy of the entire transcript of the deposition of Lincoln's adjuster Michael McGovern, together with the exhibits marked at that deposition

7. Attached hereto as **Exhibit E** is a copy of Northland's amended answer to Lincoln's counterclaim, which asserts the affirmative defense of "Accord and Satisfaction."

Ira S. Lipsius
Counsel for Northland Insurance Company

Sworn to before me this
23rd day of May, 2002.

Notary Public
LORIENTON N. A. PALMER
Notary Public, State of New York
No. 02PA4983745
Qualified in Nassau County
Commission Expires July 8, 2003

Exh A

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

Northland Insurance Company
1295 Northland Drive
St. Paul, MN 55120-1146

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Ramsey
(EXCEPT IN U.S. PLAINTIFF CASES)

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

David Ira Rosenbaum, Esquire
Ruthrauff & Armbrust, P.C.
1601 Market Street, 16th Floor
Philadelphia, PA 19103 (215) 567-3675

**DEFENDANTS**

Lincoln General Insurance Co.
3350 Whiteford Road
York, PA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT York
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED (see attached list for other defendants)

ATTORNEYS (IF KNOWN)

Unknown

**II. BASIS OF JURISDICTION** (PLACE AN × IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (For Diversity Cases Only) (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☑ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This is a declaratory judgment action premised upon diversity jurisdiction under 28 U.S.C. Section 1332.

**V. NATURE OF SUIT** (PLACE AN × IN ONE BOX ONLY)

CONTRACT
☑ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

TORTS

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury—Med Malpractice
☐ 365 Personal Injury—Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Other

FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

**VI. ORIGIN** (PLACE AN × IN ONE BOX ONLY)

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

**DEMAND $**

Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☑ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ____ DOCKET NUMBER ____

DATE 06/21/00

SIGNATURE OF ATTORNEY OF RECORD [signature]

UNITED STATES DISTRICT COURT

J. H. M. Enterprises, Inc.
1200 Valmont Drive, N.W.
Williamsport, Lycoming County, Pennsylvania.

Vernice Lee Statts
489 East Academy Street
Hughesville, Lycoming County, Pennsylvania.

Sherrill J. Mulligan and Denis A. Mulligan
568 North Locust Street
Hazleton, Luzerne County, Pennsylvania.

Robert E. Krapf
305 East Broad Street
Tamaqua, Schuylkill County, Pennsylvania.

Ute L. Hetland Clark
1022 Villa Ridge Drive
Las Vegas, Clark County, Nevada..

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

# CASE MANAGEMENT TRACK DESIGNATION FORM

Northland Insurance Company : CIVIL ACTION

v.

Lincoln General Ins. Co., JHM Enterprises, Inc. Vernice L. Statts, Robert E. Krapf and Ute L. Hetland Clark, et. al. : NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus -- Cases brought under 28 U.S.C. §2441 through §2255. ( )

(b) Social Security -- Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration -- Cases required to be designated for arbitration under Local Civil Rule 8. ( )

(d) Asbestos -- Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management -- Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management -- Cases that do not fall into any one of the other tracks. (XX)

06/21/00
(Date)

[signature]
Attorney-at-law

Northland Insurance Company
Attorney for

(Civ. 660)
12/91

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

NORTHLAND INSURANCE COMPANY,

Plaintiff,

v.

C.A. No. 00-cv-3174

LINCOLN GENERAL INSURANCE COMPANY, J.H.M. ENTERPRISES, INC., VERNICE L. STATTS, ROBERT E. KRAPF and UTE L. HETLAND CLARK, as Administrators of the Estate of Karin Clifford and ROBERT E. KRAPF and PATRICIA R. CLIFFORD, as Administrators of the Estate of Robert R. Clifford, SHERRILL J. MULLIGAN, DENIS A. MULLIGAN,

Defendants.

The plaintiff Northland Insurance Company ("Northland"), for its complaint against the Defendants herein, alleges as follows:

**THE PARTIES AND JURISDICTION**

1. Northland is a Minnesota corporation with its principal place of business in Minnesota.

2. Upon information and belief, Lincoln General Insurance Company is a Pennsylvania corporation with its principal place of business at 3350 Whiteford Road, York, Pennsylvania.

3. Upon information and belief, J.H.M. Enterprises, Inc. ("JHM") is a Pennsylvania corporation with its offices located at 1200 Valmont Drive, N.W., Williamsport, Lycoming County, Pennsylvania, and it engaged in the business of transporting merchandise and products via trailer in the Commonwealth of Pennsylvania.

4. Upon information and belief, Vernice Lee Statts ("Statts") is an adult individual residing at 489 East Academy Street, Hughesville, Lycoming County, Pennsylvania.

5. Upon information and belief, Sherrill J.Mulligan and Denis A. Mulligan, are adult individuals who reside at 568 North Locust Street, Hazleton, Luzerne County, Pennsylvania.

6. Upon information and belief, Robert E. Krapf, is an individual residing at 305 East Broad Street, Tamaqua, Schuylkill County, Pennsylvania, and Ute L. Hetland Clark, is an individual residing at 1022 Villa Ridge Drive, Las Vegas, Nevada.

7. Upon information and belief, Krapf and Clark are the Administrators of the Estate of Karin Clifford, deceased, having been appointed by the Register of Wills of Schuylkill County, Pennsylvania, on November 22, 1995.

8. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 as the amount in controversy exceed the sum of value of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and is between citizens of different states and pursuant to 28 U.S.C. §2201.

9. Venue is appropriate in this forum pursuant to 28 U.S.C. §1391(a) & (c).

**GENERAL ALLEGATIONS**

10. On November 17, 1995 Statts was an employee and/or agent of JHM.

11. On November 17, 1995 Statts was dispatched by JHM to pick up a load on behalf of JHM.

12. On November 17, 1995, Statts was driving a 1979 Freightliner with Serial Number CA213HM160222 ("the Tractor") and a 1980 Great Dane Trailer ("the Trailer").

13. On November 17, 1995, the Tractor and Trailer driven by Statts was involved in an accident with a vehicle operated by Robert Clifford and a vehicle operated by Sherill Mulligan ("the Accident").

14. At the time of the Accident, the Tractor and Trailer were owned by Jay McCormick of JHM.

15. At the time of the Accident, Statts was not operating the Tractor or Trailer in the business of Woolever Brothers Transportation Inc. ("Woolever").

16. Krapt and Clark, as administrators of the Estate of Karin Clifford, and Krapt and Patricia R. Clifford as administrator of the Estate of Robert R. Clifford have brought a lawsuit against JHM, Vince Lee Stats, Woolever among others ("the Clifford action") arising out of the accident.

17. The accident resulted in the deaths of Karin Clifford and Robert R. Clifford.

18. The plaintiffs in the Clifford Action have demanded a total of $2 million.

19. Sherrill J. Mulligan and Denis A. Mulligan have brought a lawsuit against JHM, Vince Lee Stats and Woolever ("the Mulligan action") arising out of the accident.

20. The plaintiffs in the Mulligan action have demanded $175,000.

21. Lincoln General issued a policy of insurance bearing policy number PAP 1857700495 to JHM that was in effect at the time of the Accident (the "Lincoln General Policy").

22. Northland issued a policy of insurance bearing policy number TF209197 to Woolever that was in effect at the time of the Accident (the "Northland Policy").

**COUNT ONE**

23. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 19 with the same force and effect as though fully set forth at length herein.

24. The Lincoln General Policy lists the Tractor as a covered auto.

25. The Lincoln General Policy provides coverage for the Tractor.

26. The Lincoln General Policy lists the Trailer as a covered auto.

27. The Lincoln General Policy provides coverage for the Trailer

28. Pursuant to the terms of the Lincoln General Policy, JHM is an insured under the Lincoln policy.

29. Pursuant to the terms of the Lincoln General Policy, Statts is an insured under the Lincoln policy.

30. Pursuant to the terms of the Lincoln General Policy, Woolever is an insured under the Lincoln policy.

31. The Lincoln General Policy provides coverage for the liability, if any, of JHM, Statts and Woolever arising from the Accident.

WHEREFORE, Northland requests a judicial declaration that:

1. Lincoln General provides coverage for JHM, Statts and Woolever in the Clifford Action and the Mulligan Action (collectively "the Underlying Actions").

2. Any coverage obligation owed by the Northland policy in the Underlying Actions is excess to the Lincoln policy and is not triggered until the Lincoln policy is exhausted.

3. Northland is entitled to reimbursement from Lincoln for all costs in defending the Underlying Actions.

## COUNT TWO

32. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 28 with the same force and effect as though fully set forth at length herein.

33. The Lincoln Policy and the Northland Policy both contain the following "other insurance" provision:

**5. OTHER INSURANCE —PRIMARY AND EXCESS INSURANCE PROVISIONS**

a. This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto" while hired or borrowed from you by another "trucker". However, while a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Liability Coverage is:

(1) On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto".

(2) Excess if the power unit is not a covered "auto".

b. Any Trailer Interchange Coverage provided by this Coverage Form is primary for any covered "auto".

c. Except as provided in paragraphs a. and b. above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

d. Regardless of the provisions of paragraphs a, b and c above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract".

e. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering the same basis.

34. At the time of the Accident, the Tractor and Trailer were being operated in the business of JHM.

35. At the time of the Accident, the Tractor and Trailer were not being operated in the business of Woolever.

36. The Lincoln General Policy provides primary coverage.

37. Any coverage provided by Northland for the Accident is excess to the coverage provided by Lincoln General.

WHEREFORE, Northland requests a judicial declaration that:

1. Lincoln General provides coverage for JHM, Statts and Woolever in the Clifford Action and the Mulligan Action (collectively "the Underlying Actions").

2. Any coverage obligation owed by the Northland policy in the Underlying Actions is excess to the Lincoln policy and is not triggered until the Lincoln policy is exhausted.

3. Northland is entitled to reimbursement from Lincoln for all costs in defending the Underlying Actions.

**COUNT THREE**

35. Northland has spent $ 51,769.94 defending Woolever in the Clifford Action and the Mulligan Action.

1. Lincoln General provides coverage for JHM, Statts and Woolever in the Clifford Action and the Mulligan Action (collectively "the Underlying Actions").

2. Any coverage obligation owed by the Northland policy in the Underlying Actions is excess to the Lincoln policy and is not triggered until the Lincoln policy is exhausted.

3. Northland is entitled to reimbursement from Lincoln for all costs in defending the Underlying Actions.

By: ______________________

David Ira Rosenbaum, Esquire (52859)
Ruthrauff & Armbrust, P.C.
1601 Market Street
16th Floor
Philadelphia, PA 19103
(215) 567-3700

Of Counsel:

Ira Lipsius, Esquire
Schindel Farman & Lipsius
225 West 34th Street
New York, NY 10122

Attorneys for Plaintiff Northland Insurance Company

Dated: June 22, 2000

# Judge William H. Yohn, Jr.

**The Honorable William H. Yohn, Jr. received an A.B. from Princeton University in 1957, and a J.D. from Yale Law School in 1960. He was an Assistant District Attorney for Montgomery County from 1962 to 1965. Judge Yohn was a member of the Pennsylvania House of Representatives from 1968 to 1980, and a judge in the Montgomery County Court of Common Pleas from 1981 to 1991. He was engaged in private practice from 1961 to 1981. Judge Yohn was appointed United States District Judge on September 16, 1991, and entered into duty on September 23, 1991.**

## PRELIMINARY GENERAL MATTERS

### 1. *Correspondence With the Court*

Correspondence with the Court is permitted so long as the initiating attorney has discussed his or her request with other counsel and the letter notes their agreement or disagreement with the writer's request. See also the standard Notice to Counsel which is routinely sent to counsel promptly after assignment of a case to the Judge.

### 2. *Communications With Law Clerks*

Communications are permitted with the law clerks concerning administrative aspects of cases, but they are discouraged. Counsel may not communicate with the law clerks on the merits of any case, and law clerks are not permitted to render advice to counsel and have no authority to grant continuances or to speak on behalf of the Court.

### 3. *Telephone Conferences*

Telephone conferences with all counsel are a preferred method of handling disputes concerning discovery, scheduling and requests for extensions of time. However, prior to the telephone conference, initiating counsel should discuss the dispute with other counsel and send the Court a letter setting forth his or her position and the position of opposing counsel.

### 4. *Oral Arguments and Evidentiary Hearings*

The Judge determines in any given case whether to schedule oral argument or an evidentiary hearing. If counsel prefer oral argument or an evidentiary hearing, they should request it. The scheduling of all such matters is handled by the Judge. Although the Judge does not set aside any certain days for oral arguments or evidentiary hearings, they are usually scheduled at 9:00 a.m. or 4:15 p.m.

**5. *Pro Hac Vice Admissions***

The Judge does not have a preference as to how counsel should submit a *pro hac vice* motion to the Court. He will usually grant the motion upon its presentation subject to the right of other counsel to object at a later date.

## CIVIL CASES

### Pretrial Procedure

**1. *Pretrial Conferences***

The Judge regularly conducts a preliminary pretrial conference, and, if requested by all parties, he will conduct settlement conferences. Preliminary pretrial conferences are usually held early in a case. Among the regular agenda items at a preliminary pretrial conference are pleadings, service, joinder, settlement, jurisdictional defects, and the setting of discovery deadlines and a trial date. The Judge uses a standard pretrial order to notify counsel of a conference. He also uses a standard scheduling order pursuant to Rule 16, which is issued at the conclusion of a preliminary pretrial conference. Sample copies of these orders are attached.

### Continuances and Extensions

**1. *General Policy***

The Judge has a general policy of adhering to originally scheduled dates unless a compelling reason is presented that justifies a change and opposing counsel consents. This policy applies to briefing schedules, oral argument, evidentiary hearings and discovery deadlines. Trial dates will rarely be changed.

**2. *Requests for Extensions and Continuances***

Requests for extension of discovery deadlines or trial dates can be made by letter, stating the reasons and noting the agreement or disagreement of all other counsel and the period of delay requested, or by telephone conference with all counsel participating.

### General Motion Practice

**1. *Oral Argument on Motions***

Normally, oral argument on motions will be scheduled only when it is requested by counsel and the Court believes it would be helpful in its decision-making process. Occasionally, the Court will schedule oral argument without counsel's request.

**2. *Reply and Surreply Briefs***

Reply and surreply briefs are discouraged and should be filed only on those rare occasions where the parties wish to draw the Court's attention to controlling authority not previously cited by the parties.

### 3. *Chambers Copies of Motion Papers*

Although not required, the Judge encourages counsel to send a courtesy copy of motion papers to chambers.

## Discovery Matters

### 1. *Length of Discovery Period of Extensions*

In non-complex litigation, the Judge usually allows 120 days to complete discovery, measured from the entry of appearance by defense counsel. If counsel have been diligent and genuinely need more time for discovery, he will usually grant additional time so long as it does not interfere with the trial date. In arbitration cases, discovery must be completed prior to the arbitration date.

### 2. *Discovery Conferences and Dispute Resolution*

The parties should make every effort to resolve discovery disputes without the Court's assistance. The Judge will convene a discovery conference, usually by telephone, to assist if the parties are unable to resolve disputes without the Court's assistance. Where the discovery dispute is complex, a motion should be filed.

### 3. *Confidentiality Agreements*

The Judge does not favor confidentiality agreements, and begins consideration of any confidentiality agreement with a presumption that all litigation materials are open to the public. In the event that a confidentiality agreement becomes necessary, the Judge prefers that counsel submit a stipulated order for consideration along with a memorandum setting forth proposed findings to meet the requirements of *Pansy v. Stroudsburg*.

### 4. *Expert Witnesses*

Expert witness discovery is covered at the pretrial conference and is the subject of a scheduling order. In most cases, the plaintiff must serve expert reports and/or responses to expert witness discovery before defendant is required to do so. Generally, all expert witness discovery must be completed by the time all other discovery is concluded.

## Settlement

### 1. *General Approach to Settlement and Non-jury Cases*

The Judge believes that the Court's involvement in settlement conferences is generally helpful and will become involved in jury cases at the request of counsel. In non-jury cases, he will refer settlement negotiations to a Magistrate Judge.

2. *Referral of Settlement Negotiations to Another District Court Judge*

The Judge will not refer settlement negotiations to another District Court Judge unless the parties present a compelling reason to do so and the Judge to whom the negotiations are to be referred consents.

**Arbitration**

1. *General Approach to Arbitration Cases*

Preliminary pretrial conferences normally are not held in cases eligible for arbitration, and, except in unusual cases, scheduling orders are not issued. An order will be issued, however, prohibiting discovery after the arbitration hearing except upon order of the Court upon good cause shown as to why the discovery requested could not have been reasonably anticipated and completed prior to the arbitration.

2. *Scheduling of Trial De Novo From Arbitration*

Upon demand for trial *de novo* after an arbitration award, the case will be scheduled for trial immediately. Plaintiff's pretrial memorandum will be filed within seven (7) days of the filing of the demand for trial *de novo* and defendant's pretrial memorandum within fourteen (14) days thereof.

**Proposed Final Pretrial Memoranda**

1. *Required Form of Pretrial Memoranda*

All pretrial memoranda shall be in accordance with Local Rule of Civil Procedure 21(c) unless the scheduling order provides otherwise in a particular case.

**Injunctions**

1. *Scheduling and Expedited Discovery*

Any injunction matters assigned to the Judge will be promptly listed for a hearing; however, the amount of time available for the hearing may be limited. The scheduling of the injunction hearing will be fixed at an initial conference attended by all counsel. In appropriate cases, expedited discovery will be required.

When plaintiff requests a temporary restraining order, plaintiff's counsel should contact the Judge's secretary for a conference date and serve the motion, complaint and notice of the conference date upon the opposing party and counsel prior thereto unless, for good cause shown, this is impossible.

2. *Proposed Findings of Fact and Conclusions of Law*

Proposed findings of fact and conclusions of law must be submitted at the start of an injunction hearing.

## Trial Procedure

### 1. *Scheduling of Cases*

Cases are scheduled for a date certain. Generally cases will be set to commence on a Monday. Complex, multi-party cases are specially listed. The Judge will review the cases listed for each week during the latter part of the prior week and determine which will proceed to trial first depending upon the needs of all parties, witnesses and counsel.

### 2. *Conflicts of Counsel*

Counsel should notify the Judge of any professional or personal conflicts affecting the trial schedule by telephoning or writing to his courtroom deputy. Opposing counsel must also be notified promptly.

### 3. *Cases Involving Out-of-Town Parties or Witnesses*

Trial scheduling does not generally change by the presence of out-of-town parties or witnesses although counsel should notify the Court of any particular problem. The scheduling of witnesses is normally left to counsel.

### 4. *Notetaking by Jurors*

Jurors are permitted to take notes.

### 5. *Trial Briefs*

The submission of trial briefs is encouraged, particularly in unusual or complex cases and in cases where unusual evidentiary problems are anticipated.

### 6. *Voir Dire*

The Judge conducts *voir dire* in civil cases. He permits counsel to submit special questions to him before *voir dire* begins. At the conclusion of his questions, he usually will allow counsel themselves to direct additional questions to the panel or to any individual member of the panel.

### 7. *Side Bars*

The Judge permits side-bar conferences, but tries to limit them because they distract the jury and interrupt the flow of the trial.

### 8. *In Limine Motions*

*In limine* motions involving complex legal issues should be presented in sufficient time so that they can be considered in advance of trial. Routine *in limine* motions will ordinarily be disposed of on the first day of trial or during the course of the trial.

### 9. *Examination of Witnesses Out of Sequence*

The Judge will generally grant a request by counsel to take the testimony of a witness out of turn for the convenience of the witness subject to objection by opposing counsel.

10. *Opening Statements and Summations*

No time limits are placed on opening statements or summations by counsel. However, fifteen (15) minutes is usually adequate for an opening statement and thirty (30) to forty-five (45) minutes is usually adequate for a summation. Opening statements are not for argument, but are for presentation of an outline of what the parties intend to prove.

11. *Examination of Witnesses or Argument by More Than One Attorney*

More than one attorney for a party may examine different witnesses or argue different legal points. Ordinarily, not more than one attorney for a party may examine a single witness or argue the same legal point.

12. *Offers of Proof*

The attorneys should inquire of each other privately as to anticipated offers of proof regarding any witness or exhibit. If counsel cannot resolve such matters, the Court will rule on them before a witness testifies or an exhibit is offered into evidence and at a time when the jury will not be inconvenienced.

13. *Examination of Witnesses Beyond Redirect or Recross*

Examination of witnesses beyond redirect and recross will ordinarily not be allowed.

14. *Videotaped Testimony*

Counsel are required to discuss in advance of trial all objections to the presentation of videotaped testimony and to attempt to resolve all conflicts. If they cannot resolve their disagreements, counsel should present any outstanding disagreements to the Court for decision, well in advance of the offering of such evidence. The videotape should then be edited to eliminate pauses and speed-ups to the maximum extent such final editing is possible. Videotape playback equipment should be brought into the courtroom at the beginning of the morning or afternoon session at which the videotape will be played. It must never block the view of counsel or the jury when not in use.

15. *Reading of Material Into the Record*

There is no special practice or policy for reading stipulations, pleadings, or discovery material into the record.

16. *Preparation of Exhibits*

Exhibits must be pre-marked and pre-exchanged. A bench copy of trial exhibits should be provided to the Court on the first day of trial. The trial exhibits should be accompanied by an exhibit list which describes each exhibit.

17. *Offering Exhibits Into Evidence*

So long as each exhibit is offered and admitted into evidence before it is shown to the jury, the Judge has no particular preference as to when counsel should offer exhibits into evidence. At the conclusion of a party's case-in-chief, counsel should make sure that all exhibits intended to be offered into evidence either have been or are offered into evidence. Counsel who wait until the end of their case-in-chief to offer all of their exhibits into evidence should review them with opposing counsel in advance so that the agreed upon exhibits can be admitted into evidence quickly and the disputed exhibits can be presented to the Court at a time that will not impose on the jury.

18. *Motions for Judgment as a Matter of Law and Motions for Judgment on Partial Findings*

Motions for judgment as a matter of law and motions for judgment on partial findings may be either oral or written. Oral argument will be permitted if counsel requests it.

19. *Proposed Jury Instructions and Verdict Forms*

Counsel will meet and discuss proposed jury instructions and verdict forms and submit to the Court at least ten (10) business days before the trial date a complete set of agreed upon jury instructions and verdict forms.

If counsel cannot agree, proposed alternatives shall be submitted to the Court at least five (5) business before the trial date.

20. *Proposed Findings of Fact and Conclusions of Law*

Counsel will meet and discuss proposed findings of fact and conclusions of law and submit to the Court at least ten (10) business days before the trial date a complete set of agreed upon proposed findings of fact and conclusions of law.

## Jury Deliberations

1. *Written Jury Instructions*

The Judge does not give the jury a copy of the written jury instructions, but may do so in an appropriate case.

2. *Exhibits in the Jury Room*

After the close of the charge, counsel will review the exhibits to determine which exhibits will go out with the jury. Any disputes will be resolved by the Court.

3. *Handling of Jury Requests to Read Back Testimony or Replay Tapes*

If the jury requests that testimony be read back or that tapes be replayed, the Judge will confer with counsel, consider the extent of the jury's request, and, if it is reasonable, comply with it.

#### 4. *Availability of Counsel During Jury Deliberations*

Counsel should be available on fifteen (15) minutes notice during jury deliberations. As a practical matter, this means that counsel must stay in or very near the courthouse or have an associate present.

#### 5. *Taking the Verdict and Special Interrogatories*

The courtroom deputy will take the verdict. Special interrogatories are submitted to the jury in most civil cases.

#### 6. *Polling the Jury*

Polling of the jury is normally unnecessary in a civil case, but will be permitted if requested. Polling of the jury is always allowed in criminal cases.

#### 7. *Interviewing the Jury*

After a verdict has been recorded and a jury has been discharged, counsel may interview jurors. The jurors are told that they are permitted to talk to counsel and others, if they desire, but they need not do so.

### CRIMINAL CASES

#### 1. *Oral Argument on Motions*

Oral argument on motions in a criminal case is permitted upon request of counsel.

#### 2. *Pretrial Conferences*

Pretrial conferences will be held only in complex criminal cases.

#### 3. *Voir Dire*

The Judge conducts *voir dire* in criminal cases. Counsel may suggest questions to him in advance of *voir dire*. At the conclusion of his questions, he usually will allow counsel to direct additional questions to the panel or of any individual member of the panel.

#### 4. *Sentencing Memoranda*

The Judge permits and encourages the submission of sentencing memoranda by both the Government and the defense. Letters from others on behalf of the defendant should not be sent to chambers. Rather, such letters should be accumulated by defendant's counsel, shown to the Government's attorney and offered into evidence at the sentencing hearing.

### OTHER GENERAL MATTERS

1. At the close of counsel's business with the Court, it is not necessary that counsel request permission to be excused.

2. Copies of appellate briefs should not be sent to the Judge in the event of an appeal.

JUDGE WILLIAM H. YOHN, JR.

3. The Judge expects punctuality, as well as courtesy, from counsel regarding each other, both in the presence of the court and otherwise. He is of the view that vigorous, robust advocacy need not be rude.

503

Exh B

201567

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORTHLAND INSURANCE COMPANY<br>Plaintiff | : |
| v. | : No. 1:01-CV-763 |
| LINCOLN GENERAL INSURANCE COMPANY, J.H.M. ENTERPRISES, INC., VERNICE L. STATTS, ROBERT E. KRAPF and UTE L. HETLAND CLARK, as Administrators of the Estate of Karin Clifford and ROBERT E. KRAPF and PATRICIA R. CLIFFORD, as Administrators of the Estate of Robert R. Clifford, SHERRILL J. MULLIGAN, DENIS A MULLIGAN<br>Defendants | : (JUDGE KANE) |

FILED
HARRISBURG
AUG 2 2001
MARY E. D'ANDREA, CLERK
Per ________
DEPUTY CLERK

**DEFENDANT LINCOLN GENERAL INSURANCE COMPANY'S ANSWER WITH AFFIRMATIVE DEFENSES TO THE COMPLAINT, AND CROSS-CLAIM AGAINST J.H.M ENTERPRISES, INC. AND VERNICE L. STATTS AND COUNTERCLAIM AGAINST NORTHLAND INSURANCE COMPANY**

AND NOW COMES, Defendant Lincoln General Insurance Company, ("Lincoln General"), by and through its attorneys, McNees, Wallace & Nurick, and makes the following Answer with Affirmative Defenses to the Complaint, and cross-claim against J.H.M. Enterprises, Inc. ("JHM") and Vernice L. Statts ("Statts), and Counterclaim against Northland Insurance Company ("Northland").

THE PARTIES AND JURISDICTION

1. Admitted.

2. Admitted.

3. Admitted.

4. Admitted.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

9. Admitted that the United States District Court for the Middle District of Pennsylvania is the appropriate forum for this action.

GENERAL ALLEGATIONS

10. Denied. It is denied that Statts was an employee of JHM. Prior to November 17, 1995, Statts and JHM had entered into an agreement whereby JHM agreed to sell the 1979 Freightliner to Statts. As of November 17, 1995, JHM was treating Statts as an Owner-Operator of the 1979 Freightliner, and treating Statts as a leased driver. Plaintiff's averment that Statts was an agent of JHM is a conclusion of law which requires no response.

11. Denied. The 1979 Freightliner was permanently leased to Woolever Brothers Transportation, Inc. ("Woolever") on November 17, 1995, and any load to be hauled would have been for Woolever since it maintained exclusive possession, control and use of the 1979 Freightliner on November 17, 1995. Lincoln General cannot admit or deny at this time who provided Statts with instructions as to what he was to do on November 16 and 17,

1995. However, to the extent JHM provided Statts with instructions, JHM was acting on behalf of Woolever.

12. Admitted.

13. Admitted.

14. Admitted in part; Denied in part. It is admitted that the trailer was owned by JHM. As set forth in response to paragraph 10 above, Statts and JHM had entered into an agreement whereby JHM agreed to sell the 1979 Freightliner to Statts. Accordingly, there are factual and legal issues regarding the actual ownership of the Tractor on November 17, 1995, and Lincoln General cannot admit or deny at this time that JHM was the owner of the Tractor.

15. Denied. To the contrary, at the time of the Accident, Statts was operating the Tractor in accordance with a permanent lease agreement between Woolever and JHM, and the Tractor was under Woolever's exclusive possession, control, and use at the time of the Accident.

16. Admitted.

17. Admitted.

18. Admitted that at one point the plaintiffs in the Clifford Action demanded $2,000,000. However, the Clifford Action has now been settled for a total payment of $1,225,000.

19. Admitted.

20. Admitted that at one point the plaintiffs in the Mulligan Action demanded $175,000. However, the Mulligan Action has now been settled for a total payment of $125,000.

21. Admitted.

22. Admitted.

COUNT ONE

23. Lincoln General incorporates herein by reference its response to paragraphs 1 - 22 above.

24. Admitted.

25. Denied. This paragraph states a conclusion of law which requires no response. To the extent a response is required, Lincoln General avers that a fraud was committed by JHM and Woolever which permits Lincoln General to void coverage for the claim.

26. Admitted.

27. Denied. This paragraph states a conclusion of law which requires no response. To the extent a response is required, Lincoln General avers that a fraud was committed by JHM and Woolever which permits Lincoln General to void coverage for the claim.

28. Admitted.

29. Admitted that Statts would be considered an insured for purposes of the Accident at issue.

30. Admitted that Woolever would be considered an insured for purposes of the Accident at issue to the extent Woolever is liable for Statts' conduct.

31. Denied. This paragraph states a conclusion of law which requires no response. To the extent a response is required, Lincoln General avers that a fraud was committed by JHM and Woolever which permits Lincoln General to void coverage for the claim as to JHM, Woolever, and Statts.

WHEREFORE, Lincoln General demands judgment in its favor and against Northland Insurance Company on the claims asserted in Count One of the Complaint.

COUNT TWO

32. Lincoln General incorporates herein by reference its response to paragraphs 1 - 31 above.

33. Admitted.

34. Denied. To the contrary, at the time of the Accident, the Tractor was being operated pursuant to a permanent lease agreement between JHM and Woolever which provided Woolever with exclusive possession, control and use of the Tractor.

35. Denied. To the contrary, at the time of the Accident, the Tractor was being operated pursuant to a permanent lease agreement between JHM and Woolever which provided Woolever with exclusive possession, control and use of the Tractor.

36. Denied. The Lincoln General Policy provides no coverage because of the fraud committed by Woolever and JHM. In the alternative, the Lincoln General Policy provides excess coverage to Northland's coverage.

37. Denied. Northland's coverage is primary. In the event Lincoln General must provide any coverage, it is excess to Northland. In the alternative, Lincoln General's coverage is co-primary or co-excess with Northland and the two companies must pay their respective shares of the settlement based on the proportion the limits of coverage set forth in respective policies bears to the combined limits of coverage of the two policies.

WHEREFORE, Lincoln General demands judgment in its favor and against Northland Insurance Company on the claims asserted in Count Two of the Complaint.

COUNT III

35. (This is the second paragraph designated 35. For the purposes of consistency, Lincoln General will use the same number as Northland). Denied. Lincoln General is without sufficient information and knowledge to form a belief as to the truth of this averment, and as such, it is denied.

1. Denied. The Lincoln General Policy provides no coverage because of the fraud committed by Woolever and JHM. In the alternative, the Lincoln General Policy provides excess coverage to Northland's coverage.

2. Denied. The Lincoln General Policy provides no coverage because of the fraud committed by Woolever and JHM. In the alternative, the Lincoln General Policy provides excess coverage to Northland's coverage. In the further alternative, Lincoln General's and Northland's coverage is co-primary or co-excess and the two companies must pay their respective shares of the settlement based on the proportion the limits of coverage set forth in respective policies bears to the combined limits of coverage of the two policies.

3. Denied. This paragraph states a conclusion of law which requires no response.

FIRST AFFIRMATIVE DEFENSE

JHM and Woolever committed fraud by misrepresenting to Lincoln General that the Tractor was trip-leased by JHM to

Woolever, and that the alleged trip-lease expired a few hours before the accident. JHM and Woolever committed this fraud in an attempt to impose upon Lincoln General primary coverage for the claims arising out of the Accident. Lincoln General learned for the first time almost two years after the Accident that the purported trip lease was prepared after the Accident, and at the time of the Accident, there was a permanent lease for the Tractor from JHM to Woolever. In accordance with the terms of Lincoln General's Policy, it is entitled to void coverage for all claims arising out of the Accident as a result of this fraud, misrepresentation, and/or concealment. Accordingly, Lincoln General has no obligation to Northland, since it provides no coverage for this claim.

**SECOND AFFIRMATIVE DEFENSE**

At the time of the Accident, the Tractor was under the exclusive possession, control and use of Woolever in accordance with a permanent lease agreement between JHM and Woolever. Regardless of what Statts was doing at the time of the Accident, since he had just completed delivering a load for Woolever and the Tractor was still under lease to Woolever, Northland provides primary coverage for the claims arising out of the Accident. Since the amount of the settlements paid by Northland is less than the limits of coverage in its policy, it is not entitled to receive anything from Lincoln General, even if it is determined that Lincoln General provides coverage to JHM, Woolever, and/or Statts.

**THIRD AFFIRMATIVE DEFENSE**

JHM, Statts and Woolever are insureds under Northland's Policy. In accordance with the terms of Northland's Policy, it provides primary coverage for the claims arising out of the Accident since the Tractor was leased by JHM to Woolever at the time of the Accident.

**FOURTH AFFIRMATIVE DEFENSE**

If it is determined that Lincoln General provides primary coverage to JHM, Woolever, and/or Statts, then Lincoln General's coverage is co-primary with Northland, or if it is determined that Northland provides excess coverage, then Lincoln General's coverage is also excess, and the two companies must pay their respective shares of the settlement based on the proportion the limits of coverage set forth in respective policies bears to the combined limits of coverage of the two policies. Since Northland only paid fifty percent of the settlements, and its proportionate share would be 72.73 percent, Lincoln General would not owe Northland anything, and to the contrary, Northland would owe Lincoln General $306,855 for the amount paid to settle the claims, not including defense and other costs.

**FIFTH AFFIRMATIVE DEFENSE**

Northland provides coverage for Woolever. Even if it is determined that Northland does not provide any coverage for JHM and Statts, it is still responsible to pay the full amount of the settlements since Lincoln General does not provide coverage to Woolever, JHM or Statts since the policy is void as a result of the fraud committed by Woolever and JHM. In the alternative, in

the event it is determined that Lincoln General must provide coverage to JHM, Woolever, and/or Statts, Northland should still pay the full amount of the settlements and/or pay its proportionate share of 72.73 percent, depending on whether Northland's coverage is determined to be excess or co-primary.

**SIXTH AFFIRMATIVE DEFENSE**

Lincoln General has already paid $675,000, in indemnity payments against its limits of coverage of $750,000. Accordingly, the most Lincoln General can be held liable to pay Northland is $75,000.

**SEVENTH AFFIRMATIVE DEFENSE**

Northland is barred from recovering against Lincoln General as a result of its unclean hands. Northland was a willing participant in the fraud perpetrated upon Lincoln General by JHM and Woolever. Woolever sent Northland a copy of the Permanent Lease on November 17, 1995, after the Accident and before the Trip Lease was prepared. Although Lincoln General does not know if Northland was involved in the decision to prepare the Trip Lease and fraudulently represent that it was in effect at the time of the Accident, Northland was well aware that the Trip Lease was not prepared until after the Accident, and the Permanent Lease was the only agreement in effect at the time of the Accident. Northland concealed this fraud from Lincoln General, and cooperated in the perpetration of this fraud until it was discovered two years after the Accident at the deposition of Hazel Sinclair. As a result of its improper conduct, Northland should not recover anything from Lincoln General.

## CROSS-CLAIM AGAINST JHM AND STATTS

### PARTIES

1.   Defendant/Cross-Claim Plaintiff Lincoln General Insurance Company (hereinafter "Lincoln General") is an insurance company licensed to do business in Pennsylvania with a principal place of business at 3350 Whiteford Road, P.O. Box 3709, York, York County, Pennsylvania 17402-0136.

2.   Defendant J.H.M. Enterprises, Inc. (hereinafter "JHM") is a Pennsylvania corporation with its offices located at 1200 Valmont Drive, N.W. Williamsport, Lycoming County, Pennsylvania.

3.   Defendant Vernice Lee Statts (hereinafter "Statts") is an adult individual residing at 489 East Academy Street, Hughesville, Lycoming County, Pennsylvania.

### JURISDICTION AND VENUE

4.   This Court has supplemental jurisdiction over Lincoln General's cross-claim in accordance with 28 U.S.C. §1367(a) in that the cross-claim is related to the Plaintiff's claim.

5.   Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) in that a substantial part of the events giving rise to the cross-claim occurred in this District.

### FACTUAL BACKGROUND

6.   Lincoln General incorporates herein by reference its Answer with Affirmative Defenses to the Complaint.

7.   Lincoln General issued a Primary Auto Package insurance policy to JHM, Policy Number PAP 185770 0495 covering the period April 18, 1995 through April 18, 1996 (hereinafter "Lincoln

General Policy"). A true and correct copy of the Lincoln General Policy is attached hereto as Exhibit A.

8. One of the vehicles scheduled under the Policy is a 1979 Freightliner, Serial Number CA213HM160222 (hereinafter "Tractor").

9. The Lincoln General Policy provides $750,000 in liability coverage for each accident or loss.

10. On March 1, 1990, JHM and Woolever entered into an "Agreement Of Lease Of Motor Vehicle Equipment" (hereinafter "Permanent Lease") whereby JHM leased the Tractor to Woolever. A copy of the Permanent Lease is attached hereto as Exhibit B.

11. The Permanent Lease provides that: "The term of this lease shall begin at 10 A.M. o'clock on 3/1/90, and terminate at the end of thirty (30) days, or at 10 A.M. o'clock 4/1/90, at which time the term of this lease is automatically extended for additional like thirty (30) day periods, unless terminated by either party giving to the other party five (5) days written notice of cancellation."

12. The Permanent Lease provides that: "During the term of this lease, the motor vehicle equipment described herein shall be in the exclusive possession, control and use of Lessee and Lessee hereby assumes complete responsibility for operation thereof."

13. The Permanent Lease provides that: "During the term of this lease, Lessee shall furnish and pay the costs of all public liability, property damage and cargo insurance upon the motor vehicle equipment issued hereunder only when such is operated in the services of Lessee."

14. Prior to June 7, 1995, JHM and Statts entered into an agreement whereby JHM agreed to sell the Tractor to Statts.

15. It is believed that Statts made payments or provided other consideration to JHM for the purchase of the Tractor.

16. Statts became the equitable owner of the Tractor after he agreed to purchase it from JHM and began making payments or providing other consideration to JHM, even though JHM continued to hold title to the Tractor

17. On or about November 16 - 17, 1995, Statts was the owner-operator of the Tractor.

18. On or about November 16, 1995, Statts drove the Tractor, which was pulling a van trailer, to Watkins Glen, New York to pick up a load of salt for Woolever. After the trailer was loaded, Statts returned to his home in Pennsylvania for the night.

19. In the morning of November 17, 1995, Statts drove the tractor and loaded trailer to Ephrata, Pennsylvania in order to deliver the load of salt for Woolever.

20. After delivering the load of salt for Woolever, Statts allegedly began driving toward Berwick, Pennsylvania, where he intended to drop off the van trailer used to haul the load of salt for Woolever, and then pick up another load.

21. As Statts traveled toward Berwick to drop off the van trailer used to haul the load of salt for Woolever, he was involved in an accident on State Route 309 in Rush Township, Schuylkill County, Pennsylvania (hereinafter "Accident").

22. Statts drove into the rear of a vehicle being driven by Robert R. Clifford, and in which Karin Clifford was a passenger.

As a result of the collision, both Robert and Karin Clifford were killed.

23.   The Clifford vehicle struck a vehicle driven by Sherrill Mulligan.  As a result of the collision between the Clifford vehicle and the Mulligan vehicle, Sherrill Mulligan allegedly suffered personal injuries.

24.   There were placards affixed to the Tractor at the time of the Accident which identified Woolever and set forth Woolever's federal and state operating authority number.

25.   As a result of the Accident, the Estates of Robert and Karin Clifford filed a suit against Statts, JHM, and Woolever in the Court of Common Pleas of Schuylkill County at Docket No. S-650-1996 (hereinafter "Clifford Action").

26.   As a result of the Accident, the Mulligans filed a suit against Statts, JHM, and Woolever in the Court of Common Pleas of Schuylkill County at Docket No. S-1689-1997 (hereinafter "Mulligan Action").

27.   Lincoln General defended Statts and JHM in the Clifford Action and Mulligan Action.

28.   Northland issued a Truckers insurance policy to Woolever covering the period from September 1, 1995 through September 1, 1996 (hereinafter "Northland Policy").  A copy of the portion of the Northland Policy provided by Northland to Lincoln General is attached hereto as Exhibit C.

29.   The Northland Policy provides $2,000,000 in liability coverage for each accident.

30.   Northland defended Woolever in the Clifford Action and Mulligan Action under the Northland Policy.

31. After the Accident, Lincoln General demanded that Northland provide coverage to all of the Defendants.

32. Northland refused to provide a defense to Statts and JHM.

33. Lincoln General and Northland eventually agreed to each advance $675,000 (a total of $1,350,000) to settle the Clifford and Mulligan Actions, while reserving all rights to seek reimbursement from the other pending a determination of the coverage issues involved in this case.

34. The Lincoln General Policy expressly states that:

> This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:
>
> a. This Coverage Form;
>
> b. The covered "auto";
>
> c. Your interest in the covered "auto"; or
>
> d. A claim under this Coverage Form.

35. JHM, Statts and Woolever all qualify as insureds under the Lincoln General policy. JHM is the named insured. Statts is an "insured" under the Lincoln General Policy since he was using the Tractor with JHM's permission. Woolever is an insured since the Lincoln General Policy defines an "insured" to include anyone who is liable for the conduct of an "insured" described in the Lincoln General Policy; and, since Woolever admitted in the underlying actions that it was liable for Statts' conduct, it qualifies as an insured under the Lincoln General Policy.

36. After the Accident, JHM and Woolever represented to Lincoln General that the load of salt hauled for Woolever from

Watkins Glen, New York to Ephrata, Pennsylvania was the subject of a trip lease between JHM and Woolever.

37. JHM and Woolever provided Lincoln General with an "Agreement of Lease Of Motor Vehicle Equipment" dated November 16, 1995, for the Tractor (hereinafter "Trip Lease"). A copy of the Trip Lease is attached as Exhibit "D".

38. The Trip Lease provides that: "The term of this lease shall begin at 4:00 P.M. o'clock on 11/16/95 and terminate at the end of thirty (30) days, or at 8:00 A.M. o'clock 11/17/95, at which time the term of this lease is automatically extended for additional like thirty (30) day periods, unless terminated by either party giving to the other party five (5) days written notice of cancellation."

39. The Trip Lease is signed by Jay McCormick, President of JHM, and Hazel Sinclair, Secretary/Treasurer of Woolever.

40. JHM and Woolever represented on the face of the Trip Lease that it was signed on November 16, 1995.

41. The Trip Lease further provides a certification by Harold Sinclair, a part-owner of Woolever, that on 11/16/95, he "carefully inspected the equipment described herein and that this is a true and correct report of the result of such inspection, and the Lessee's identification placard was displayed on each side of the power unit."

42. In accordance with the Trip Lease, it appeared as if Woolever's lease of the Tractor and van trailer ended prior to the Accident.

43. JHM and Woolever represented to Lincoln General that the Trip Lease was in effect at the time the Accident occurred.

44.   JHM and Woolever failed to disclose the existence of the Permanent Lease for the Tractor to Lincoln General until almost two years after the Accident.

45.   Jay McCormick, the owner of JHM, and Hazel Sinclair, a part owner of Woolever, were deposed for purposes of the Clifford and Mulligan Actions on November 4, 1997.  Jay McCormick testified first.  Jay McCormick testified that the load of salt which was hauled by Statts immediately before the Accident was covered by a trip lease.  He further testified that the only arrangement he had with Woolever prior to the Accident was through trip leases.  Jay McCormick never mentioned the Permanent Lease on the Tractor, or that JHM had entered into permanent leases with Woolever for other vehicles.

46.   Hazel Sinclair was deposed immediately after Jay McCormick.  She disclosed for the first time that the Trip Lease was not in existence on November 16 - 17, 1995, and that there was a Permanent Lease for the Tractor that had been executed in 1990.  The Permanent Lease was produced for the first time at Hazel Sinclair's deposition.

47.   At her deposition, Hazel Sinclair testified that she made up the Trip Lease on November 18, 1995, after the Accident had occurred.

48.   JHM and Woolever were well aware of the Permanent Lease at the time of the Accident.  On November 17, 1995, the day of the Accident and before the Trip Lease was even prepared, Hazel Sinclair of Woolever faxed to Northland a copy of the Permanent Lease.  (See fax notation on Exhibit C).

49. Although Northland knew that the Permanent Lease was in effect at the time of the Accident, it concealed this information from Lincoln General and cooperated in JHM and Woolever's misrepresentations to Lincoln General that the Trip Lease was in effect at the time of the Accident.

50. The statements made by JHM and Woolever in the Trip Lease that it was executed on 11/16/95 are false.

51. The statement made by Woolever in the Trip Lease that Harold Sinclair carefully inspected the equipment on 11/16/95 is false.

52. JHM and Woolever knew that the statements made in the Trip Lease as to the date it was executed and the alleged careful inspection of the equipment by Harold Sinclair on 11/16/95 were false.

53. JHM and Woolever attempted to deceive Lincoln General into believing that there was a Trip Lease which had expired a few hours before the Accident, when it knew that there was a Permanent Lease in effect at the time of the Accident which required Woolever to provide liability coverage for the Tractor.

54. JHM's and Woolever's calculated plan to deceive Lincoln General about the nature of the lease of the Tractor was an attempt to impose on Lincoln General primary liability coverage for the Accident when it appropriately belonged with Northland.

55. JHM and Woolever committed a fraud upon Lincoln General, and intentionally concealed and/or misrepresented material facts concerning their interest in the Tractor and the claim for the Accident.

56. The identity of the Permanent Lease was a material fact involving Woolever's, JHM's and Statts' claim for coverage under the Lincoln General Policy, and whether Lincoln General or Northland was required to provide primary coverage.

57. JHM and Woolever intentionally concealed the existence of the Permanent Lease in an attempt to impose on Lincoln General primary liability coverage for the Accident when it appropriately belonged with Northland.

58. Woolever was contractually obligated in accordance with the terms of the Permanent Lease to furnish and pay the costs of all public liability, property damage and cargo insurance upon the Tractor.

59. Lincoln General believes that JHM and Woolever were concerned that Woolever's insurance rates would go up if its insurance carrier was required to provide primary coverage, and developed a calculated plan to shift responsibility for the Accident to JHM's insurance carrier.

60. Lincoln General believes that JHM did not care if its insurance rates went up as a result of its insurance carrier providing primary coverage for the Accident, since JHM did not intend to continue its own trucking insurance after the Policy expired on April 18, 1996, but rather planned to begin hauling exclusively for Woolever as an owner-operator, using Woolever's insurance to cover JHM's operations.

61. JHM's and Woolever's deception and fraud involving their failure to disclose the existence of the Permanent Lease and misrepresentations as to the Trip Lease executed after the Accident were all part of its plan to manipulate insurance

coverage and impose on JHM's liability insurance carrier responsibility for incidents that should have been covered by Woolever's liability insurance carrier.

62. The liability coverage afforded under the Lincoln General Policy is void as to JHM, Woolever and/or Statts for the claims arising out of the Accident as a result of the fraud, intentional concealment, and misrepresentations of material facts committed by JHM and Woolever.

WHEREFORE, Lincoln General Insurance Company respectfully requests that the Court declare that the liability coverage provided under the Lincoln General Policy is void as to JHM and Statts as a result of the fraud, intentional concealment, and misrepresentations of material fact committed by JHM and Woolever, and declare that Lincoln General had no obligation to provide a defense or indemnity to JHM and Statts, for the claims arising out of the Accident.

**COUNTERCLAIM AGAINST NORTHLAND**

**PARTIES**

63. Lincoln General Insurance Company is an insurance company licensed to do business in Pennsylvania with a principal place of business at 3350 Whiteford Road, P.O. Box 3709, York, York County, Pennsylvania 17402-0136.

64. Northland Insurance Company is an insurance company licensed to do business in Pennsylvania with its principal place of business at 1295 Northland Drive, St Paul, Minnesota.

JURISDICTION AND VENUE

65. This Court has jurisdiction over Lincoln General's counterclaim in accordance with 28 U.S.C. §1332 in that there is complete diversity of citizenship between Lincoln General and Northland, and in accordance with 28 U.S.C. §1367(a) in that the counterclaim is related to the Plaintiff's claim.

66. Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) in that a substantial part of the events giving rise to the counterclaim occurred in this District.

COUNT I

67. Lincoln General incorporates herein by reference its Answer with Affirmative Defenses to the Complaint, and paragraphs 1 through 62 above of its cross-claim against JHM and Statts as if set forth herein at length.

68. Lincoln General and Northland reserved all rights to seek reimbursement from the other for all indemnity payments made arising out of the Accident pending a determination of the coverage issues involved in this case.

69. To the extent the Court determines that Lincoln General has no obligation to provide coverage to JHM, Woolever and Statts as a result of JHM and Woolever's fraud, intentional concealment, and misrepresentations of material facts, then Woolever is required to reimburse Lincoln General for all indemnity payments made in the amount of $675,000, since Woolever is solely liable for all indemnity payments if Lincoln General has no obligation.

WHEREFORE, Lincoln General demands judgment in its favor and against Northland for $675,000, together with interest and costs.

**COUNT II**

70. Plaintiff incorporates herein by reference its Answer with Affirmative Defenses to the Complaint, and paragraphs 1 through 62 of its cross-claim as if set forth herein at length.

71. In the event the Court does not void the Lincoln General Policy as to JHM, Woolever, and Statts, then Lincoln General claims in the alternative as follows.

72. Woolever is the named "insured" under the Northland Policy.

73. The Northland Policy defines an "insured" to include anyone while using with Woolever's permission a covered "auto" hired by Woolever.

74. The Tractor constitutes a covered "auto" since under Federal Law and the Permanent Lease, Woolever was required to provide liability coverage on the Tractor.

75. Statts qualifies as an "insured" under the Northland Policy since he was using the Tractor with Woolever's permission.

76. The Northland Policy defines an "insured" to include anyone who is liable for the conduct of an "insured" described in the Northland Policy.

77. JHM qualifies as an "insured" under the Northland Policy since the plaintiffs in the Clifford and Mulligan Actions claimed that JHM is liable for Statts' conduct, and Statts is an insured under the Northland Policy.

78. The Northland Policy expressly states:

> This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority.

79. The Lincoln General Policy expressly states:

> This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto" while hired or borrowed from you by another "trucker".

80. In accordance with the other insurance clauses in both the Northland Policy and the Lincoln General Policy, Northland's coverage for Woolever, Statts, and JHM is primary since the Tractor was hired by Woolever and used exclusively in its business as a "trucker" and pursuant to operating rights granted to Woolever by both the federal and state public authorities.

81. Northland had the primary obligation to defend and indemnify Woolever, Statts and JHM from all claims arising out of the Accident.

82. Northland breached its Policy by refusing to provide primary liability coverage to Statts and JHM.

83. As a result of Northland's refusal to provide primary liability coverage to Statts and JHM, Lincoln General incurred $91,511.35 in expenses to defend Statts and JHM which should have been incurred by Northland.

84. As a result of Northland's refusal to provide primary liability coverage to Statts and JHM, Lincoln General paid $675,000 in claims associated with the Accident.

85. Northland is obligated to reimburse Lincoln General for all expenses it has incurred to defend Statts and JHM, and all payments it has made to claimants arising from the Accident.

WHEREFORE, Lincoln General demands judgment in its favor and against Northland for $766,511.35, together with interest and costs.

COUNT III

86. Plaintiff incorporates herein by reference its Answer with Affirmative Defenses to the Complaint, paragraphs 1 through 62 of its cross-claim, and paragraphs 63 - 85 of its counterclaim as if set forth herein at length.

87. In the event it is determined that Northland does not provide coverage for JHM and Statts, Lincoln General avers in the further alternative.

88. Woolever is liable for Statts' conduct at the time of the Accident.

89. Woolever maintained exclusive possession, control and use of the Tractor at the time of the Accident.

90. As between Woolever and JHM, Woolever should bear primary responsibility for Statts' conduct since Statts was operating the Tractor under Woolever's operating authority and under its exclusive control at the time of the Accident.

91. Since the amount of the payments made by Lincoln General and Northland arising out of the Accident fall within the Northland's limits of coverage of $2,000,000, Northland should reimburse Lincoln General for the payments it made to settle the Clifford and Mulligan Actions of $675,000.

WHEREFORE, Lincoln General demands judgment in its favor and against Northland for $675,000, together with interest and costs.

COUNT IV

92. Plaintiff incorporates herein by reference its Answer with Affirmative Defenses to the Complaint, paragraphs 1 through

62 of its cross-claim, and paragraphs 63 - 92 of its counterclaim as if set forth herein at length.

93. In the event it is determined that Lincoln General and Northland both provide coverage to JHM, Statts, and Woolever, the respective policies both provide primary or excess coverage, and Woolever and JHM bear equal responsibility for Statts' conduct, then Lincoln General avers in the further alternative.

94. The Lincoln General and Northland Policies contain identical provisions on the apportionment of payments if their respective policies cover a claim on an equal basis, either primary or excess. In accordance with this provision, Lincoln General and Northland agreed to apportion payments based on the proportion that the limits of insurance in each policy bears to the combined limits of insurance of the two policies.

95. The limits of insurance in the Lincoln General Policy is $750,000, and the limits of insurance in the Northland Policy is $2,000,000, for a combined limits of insurance of $2,750,000. Lincoln General's proportion of the combined limit is 27.27 percent, and Northland's proportion of the combined limit is 72.73 percent.

96. Lincoln General and Northland each paid $675,000 to settle the Clifford and Mulligan Actions. To the extent each is responsible for its proportionate share, Lincoln General's share is $368,145, and Northland's share is $981,855.

97. Lincoln General paid $306,855 in excess of its proportionate share to settle the Clifford and Mulligan Actions.

98. Northland claims it spent $51,769.94 in defending Woolever in the Clifford and Mulligan Actions.

99. Lincoln General spent $91,511.35 to defend JHM and Statts in the Clifford and Mulligan Actions.

100. The total amount spent by Northland and Lincoln General to defend Woolever, JHM and Statts in the Clifford and Mulligan Actions is $143,281.29.

101. Lincoln General's proportionate share of the total defense costs is $39,072.80, and Northland's proportionate share is $104,208.49.

102. Lincoln General paid $52,438.55 in excess of its proportionate share of defense costs in the Clifford and Mulligan Actions.

103. To the extent it is determined that Lincoln General and Northland must provide coverage on the same basis, either primary or excess, than Lincoln General is entitled to recover from Northland $359,293.55 in payments it made in excess of its proportionate share.

WHEREFORE, Lincoln General demands judgment in its favor and against Northland for $359,293.55, together with interest and costs.

Respectfully submitted,

McNEES WALLACE & NURICK LLC

By [signature]

Jonathan H. Rudd, Esq.
Attorney I.D. No. 56880
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 237-5405

Attorneys for Lincoln General Insurance Company

Dated: 8/2/01

**Exhibit A**

No. PAP 185770 0495 ewal of Number 1857700494

**LINCOLN GENERAL INSURANCE COMPANY**
3350 WHITEFORD ROAD, YORK, PENNSYLVANIA 17402

**PRIMARY AUTO PACKAGE DECLARATIONS**

**ITEM ONE:**

ISSUED TO: JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701

CORPORATION

POLICY PERIOD: FROM: 04/18/95 TO: 04/18/96

MCS-90

AGENT OR BROKER: SUSQUEHANNA INS. ASSOC., INC.
5520 6 E. 18TH STREET
SELINSGROVE PA 17870

KIND OF BUSINESS: TRUCKMAN
LOCATION OF BUSINESS: SAME AS ABOVE

**THIS POLICY DOES NOT PROVIDE COLLISION DAMAGE TO RENTAL VEHICLES**

80957

**ITEM TWO**
SCHEDULE OF COVERAGES AND COVERED AUTOS

This policy provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those "autos" shown as covered "autos". "Autos" are shown as covered "autos" for a particular coverage by the entry of one or more of the symbols from the COVERED AUTO Section of the Truckers Coverage Form next to the name of the coverage.

| COVERAGES | COVERED AUTOS (Entry of one or more symbols from the COVERED AUTOS Section of Truckers Coverage Form show which autos are covered autos.) | ---- LIMIT ---- THE MOST WE WILL PAY FOR ANY ONE ACCIDENT OR LOSS | PREMIUM |
|---|---|---|---|
| LIABILITY INSURANCE | 46,47 | $ 750,000 | 21,681 |
| PERSONAL INJURY PROTECTION (or equivalent) | 46 | Separately stated in each PIP endorsement - minus $ deductible | 285 |
| ADDED PERSONAL INJURY PROTECTION (or equivalent) | 46 | Separately stated in each added PIP endorsement | 45 |
| AUTO MEDICAL PAYMENTS | | $ | |
| UNINSURED MOTORISTS | 46 | $ 35,000 | 35 |
| UNDERINSURED MOTORISTS (when not incl. in UM Cov) | 46 | $ 35,000 | 10 |
| PHYSICAL DAMAGE COMPREHENSIVE COVERAGE | 46 | Actual cash value or cost of repair, whichever is less, minus $(See Schl) ded for each covered auto but no ded applies to loss caused by fire or lightning. See ITEM FOUR For hired or borrowed autos. | 2,758 |
| PHYSICAL DAMAGE SPECIFIED CAUSES OF LOSS COVERAGE | | Actual cash value or cost of repair, whichever is less, minus $(See Schl) ded for each covered auto. See ITEM FOUR for hired or borrowed autos. | |
| PHYSICAL DAMAGE COLLISION COVERAGE | 46 | Actual cash value or cost of repair, whichever is less, minus $(See Schl) ded for each covered auto. See ITEM FOUR for hired or borrowed autos. | 5,368 |
| PHYSICAL DAMAGE TOWING & LABOR (N/A in CA) | | $ for each disablement of a private passenger auto. | |

FORMS AND ENDORSEMENTS CONTAINED IN THIS POLICY AT ITS INCEPTION: SEE ENDORSEMENT SCHEDULE

| | |
|---|---|
| GENERAL LIABILITY COVERAGE | |
| PREMIUM FOR ENDORSEMENTS | 1 |
| MISCELLANEOUS CHARGES * | |
| ESTIMATED PREMIUM | 30,183 |

* None at time of issue.

PAP 0002 08 93

ISSUE DATE: 04/27/95
UNDERWRITER: ERIC HIMES
TECHNICIAN: DMUMMERT

HOME OFFICE COPY

DECLARATIONS -- PRIMARY AUT~ ~AGE POLICY

ITEM THREE

SCHEDULE OF COVERED AUTOS YOU OWN - SEE SEPARATE SCHEDULE OF COVERED "AUTOS"

ITEM FOUR

| STATE | ESTIMATED COST OF HIRE FOR EACH STATE | RATE PER EACH $100 COST OF HIRE | FACTOR | PREMIUM |
|---|---|---|---|---|
| PA | 8,400 | 13.558 | | 1,139 |

PHYSICAL DAMAGE - SCHEDULE OF HIRED OR BORROWED COVERED AUTO COVERAGE AND PREMIUM

| COVERAGES | LIMIT OF INSURANCE THE MOST WE WILL PAY - DEDUCTIBLE | | RATE | MAX. NO. OF AUTOMOBILES IN POSSESSION | COVERAGE DAYS | ESTIMATED PREMIUM |
|---|---|---|---|---|---|---|
| COMPREHENSIVE - | Actual Cash Value, Cost of Repair or | $ whichever is less minus $ ded. for each covered automobile but no deductible applies to loss caused by fire or lightning. | | | | |
| SPECIFIED CAUSES OF LOSS | | $ whichever is less minus $ ded. for each covered automobile. | | | | |
| COLLISION | | $ whichever is less minus $ ded. for each covered automobile. | | | | |
| | | | | TOTAL PREMIUM | | |

ITEM FIVE

SCHEDULE FOR NON-OWNERSHIP LIABILITY

| NAMED INSURED'S BUSINESS | RATING BASIS | NUMBER | PREMIUM |
|---|---|---|---|
| Other than a Social Service Agency | Number of Employees | | $ |
| | Number of Partners | | $ |
| Social Service Agency | Number of Employees | | $ |
| | Number of Volunteers | | $ |
| | | | $ |

ITEM SIX

GENERAL LIABILITY

| COVERAGES | LIMIT | TOTAL GENERAL LIABILITY PROVISIONAL ANNUAL POLICY PREMIUM |
|---|---|---|
| GENERAL AGGREGATE LIMIT (other than products & completed operations) | $ | |
| PRODUCT & COMPLETED OPERATIONS AGGREGATE LIMIT | $ | |
| PERSONAL & ADVERTISING INJURY LIABILITY LIMIT | $ | |
| EACH OCCURENCE LIMIT | $ | |
| FIRE DAMAGE LIMIT (any one fire) | $ | |
| MEDICAL EXPENSE LIMIT (any one person) | $ | |
| | | $ |

The estimated policy premium is based on the exposures you told us you would have when this policy began. We will compute your final premium due when we determine your actual exposures. The estimated policy premium will be credited against the final premium due and you will be billed for the balance, if any. If the estimated total premium exceeds the final premium due you will get a refund. To determine your final premium due we may examine your records at any time during the period of coverage and up to three years afterward. If this policy is issued for more than one year the premium shall be computed annually based on our rates or premiums in effect at the beginning of each year of the policy. Your Policy Period begins 12:01 A.M. standard time at the address shown above.

Countersigned ______________________ By: ______________________

(Date) (Authorized Representative)

PAP 0002 08 93

HOME OFFICE COPY

Insureds Name: JHM ENTERPRISES, IN

SCHEDULE OF COVERED AUTOS

LIABILITY COVERAGE AFFORDED TO A SCHEDULED POWER UNIT A L S O APPLIES TO A N Y ATTACHED TRAILER O R SEMI-TRAILER S U B J E C T TO ALL CONDITIONS AND OTHER TERMS OF THE POLICY.

| :T# | Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1985 | WHITE | TRACTOR | 1WUYDCFE4FN071239 | C | 73280 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 2 | 1969 | FRUEHAUF | TRAILER -S | UNJ325403 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 3 | 1969 | FRUEHAUF | TRAILER -S | UNJ325404 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 4 | 1974 | TRLMOBILE | TRAILER -S | K41315 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| ~~5~~ | ~~1967~~ | ~~FRUEHAUF~~ | ~~TRAILER -S~~ | ~~UNEF290102~~ | ~~C~~ | ~~50000~~ | ~~IN~~ | ~~67521~~ | ~~380~~ | ~~PA~~ | ~~81~~ | | ~~10~~ | ~~WILLIAMSPORT~~ D#3 |
| 6 | 1969 | FRUEHAUF | TRAILER -S | UNJ325401 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT — C#4 |
| 7 | 1969 | FRUEHAUF | TRAILER -S | UNJ325402 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 8 | 1974 | TRLMOBILE | TRAILER -S | K41316 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT } C# |
| 9 | 1974 | TRLMOBILE | TRAILER -S | K41317 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 10 | 1974 | TRLMOBILE | TRAILER -S | K41318 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 11 | 1993 | J & J L | TANK TRLR -S | 1J9P4AT21P2001084 | C | 50000 | IN | 67521 | 220 | PA | 81 | | 10 | WILLIAMSPORT |
| 12 | 1988 | WHITE | TRACTOR | 4V3YZBZZXJN601032 | C | 80000 | IN | 50521 | 220 | PA | 81 | | 10 | WILLIAMSPORT } #4 |
| ~~14~~ | ~~1986~~ | ~~FREIGHTLIN~~ | ~~TRACTOR~~ | ~~1FUPYDYD9GP287269~~ | ~~C~~ | ~~50000~~ | ~~IN~~ | ~~50521~~ | ~~380~~ | ~~PA~~ | ~~81~~ | | ~~10~~ | ~~WILLIAMSPORT~~ |
| 15 | 1981 | BUTLER | TRAILER -S | 1TB114028BM452714 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 16 | 1979 | F-LINER | TRACTOR | CA213HM160222 | C | 80000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 17 | 1988 | F-LINER | TRACTOR | 1FUP2DYBXJH340788 | C | 50000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |

Handwritten annotations: "Chg #1" (rows 1–6), "Chg #2" (rows 6–11), "Chg #4" (rows 12–17).

1980 Fruehauf Trailer # C04309
1980 Great Dane Trailer # B17876 } A #4

HOME OFFICE COPY

olicy # PAP 185770 0495 Insureds Nam .1 ENTERPRISES, INC. Page: 2

---- COVERAGE and PREMIUM BREAKDOWN ---

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ompany Unit Number | 1 | | 2 | | 3 | | 4 | | 5 | |
| nsureds Unit Number | 1 | | 4 | | 5 | | 6 | | 7 | |
| IABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | 750,000 | 3840 | UNHOOKED COVERAGE | 122 | UNHOOKED COVERAGE | 122 | UNHOOKED COVERAGE | 122 | UNHOOKED COVERAGE | 122 |
| Personl Injury Protection | 5,000 | 57 | | | | | | | | |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | 5,000 | 9 | | | | | | | | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | 35,000 | 7 | | | | | | | | |
| UNDERinsured Motorist | 35,000 | 2 | | | | | | | | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 63 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Z.. Group/Trailer Discnt | 1 N | | 1 N | | 1 N | | 1 N | | 1 N | |
| ..ITY TOTAL -----> | | 3,915 | | 122 | | 122 | | 122 | | 122 |
| HYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
| Cost New | 30,000 | | 25,000 | | 25,000 | | 25,000 | | 25,000 | |
| Estimated Value | 16,000 | | 4,000 | | 4,000 | | 5,000 | | 4,000 | |
| Depreciated Value | 10,678 | | 6,371 | | 6,371 | | 6,371 | | 6,371 | |
| Dumping Code | N | | N | | N | | N | | N | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 63 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 3,000 | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (.. ..m. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Comprehensive | 1,000 | 416 | 1,000 | 74 | 1,000 | 74 | 1,000 | 93 | 1,000 | 74 |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | 932 | 1,000 | 133 | 1,000 | 133 | 1,000 | 165 | 1,000 | 133 |
| PHYSICAL DAMAGE TOTAL -> | | 1348 | | 207 | | 207 | | 258 | | 207 |
| Premium to Value % | 8.43 | | 5.18 | | 5.18 | | 5.16 | | 5.18 | |
| PREMIUM TOTAL per UNIT -> | | 5263 | | 329 | | 329 | | 380 | | 329 |
| State Surchg/Tax - Code | | | | | | | | | | |
| Co. Surchg/Tax - Code | | | | | | | | | | |
| City Surchg/Tax - Code | | | | | | | | | | |
| TOTAL per UNIT -> | | | | | | | | | | |

1063 03 93

----- Continued on next page -----

HOME OFFICE COPY

olicy # PAP 185770 0495 Insureds Nam .IM ENTERPRISES, INC. Page: 3

---- COVERAGE and PREMIUM BREAKDOWN ---

| UNITS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ompany Unit Number | 6 | | 7 | | 8 | | 9 | | 10 | |
| nsureds Unit Number | 8 | | 9 | | 10 | | 11 | | 12 | |
| IABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | UNHOOKED COVERAGE | 122 | UNHOOKED COVERAGE | 122 | UNHOOKED COVERAGE | 122 | UNHOOKED COVERAGE | 122 | UNHOOKED COVERAGE | 122 |
| Personl Injury Protection | | | | | | | | | | |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | | | | | | | | | | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | | | | | | | | | | |
| UNDERinsured Motorist | | | | | | | | | | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Zo Group/Trailer Discnt | 1 N | | 1 N | | 1 N | | 1 N | | 1 N | |
| LI ITY TOTAL -----> | | 122 | | 122 | | 122 | | 122 | | 122 |

| HYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cost New | 20,000 | | 20,000 | | 25,000 | | 25,000 | | 25,000 | |
| Estimated Value | 4,000 | | 4,000 | | 5,000 | | 5,000 | | 5,000 | |
| Depreciated Value | 5,096 | | 5,096 | | 6,371 | | 6,371 | | 6,371 | |
| Dumping Code | N | | N | | N | | N | | N | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 3,000 | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (r- -m. included in comp) | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Comprehensive | 1,000 | 73 | 1,000 | 73 | 1,000 | 93 | 1,000 | 93 | 1,000 | 93 |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | 149 | 1,000 | 149 | 1,000 | 165 | 1,000 | 165 | 1,000 | 165 |
| PHYSICAL DAMAGE TOTAL -> | | 222 | | 222 | | 258 | | 258 | | 258 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Premium to Value % | 5.55 | | 5.55 | | 5.16 | | 5.16 | | 5.16 | |
| PREMIUM TOTAL per UNIT -> | | 344 | | 344 | | 380 | | 380 | | 380 |

| | | | | | |
|---|---|---|---|---|---|
| State Surchg/Tax - Code | | | | | |
| Co. Surchg/Tax - Code | | | | | |
| City Surchg/Tax - Code | | | | | |
| TOTAL per UNIT -> | | | | | |

HOME OFFICE COPY

olicy # PAP 185770 0495 Insureds Nam I ENTERPRISES, INC. Page: 4

---- COVERAGE and PREMIUM BREAKDOWN ---

| | UNITS 11 | | 12 | | 14 | | 15 | | 16 | |
|---|---|---|---|---|---|---|---|---|---|---|
| ompany Unit Number<br>nsureds Unit Number | | | | | | | | | | |
| IABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | UNHOOKED | 122 | 750,000 | 3840 | 750,000 | 3840 | UNHOOKED | 122 | 750,000 | 3840 |
| Personl Injury Protection | COVERAGE | | 5,000 | 57 | 5,000 | 57 | COVERAGE | | 5,000 | 57 |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | | | 5,000 | 9 | 5,000 | 9 | | | 5,000 | 9 |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | | | 35,000 | 7 | 35,000 | 7 | | | 35,000 | 7 |
| UNDERinsured Motorist | | | 35,000 | 2 | 35,000 | 2 | | | 35,000 | 2 |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 63 | | 63 | | 65 | | 63 | |
| Rating Factor % | | | | | | | | | | |
| Zone Group/Trailer Discnt | 1 N | | 1 N | | 1 N | | 1 N | | 1 N | |
| L ITY TOTAL -----> | | 122 | | 3,915 | | 3,915 | | 122 | | 3,915 |
| HYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
| Cost New | 36,312 | | | | 55,000 | | 32,000 | | 20,000 | |
| Estimated Value | 36,312 | | | | 19,000 | | 10,000 | | 7,500 | |
| Depreciated Value | 28,119 | | | | 21,275 | | 8,155 | | 5,096 | |
| Dumping Code | N | | | | N | | N | | N | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 65 | | | | 63 | | 65 | | 63 | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | | | Y 00-00 | | Y 00-00 | | Y 00-00 | |
| Owned/Hired | OWNED | | | | OWNED | | OWNED | | OWNED | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | 3,000 | | | | 3,000 | | 3,000 | | 3,000 | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (prem. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Co.. .ehensive | 1,000 | 379 | | | 1,000 | 401 | 1,000 | 210 | 1,000 | 220 |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | 564 | | | 1,000 | 770 | 1,000 | 314 | 1,000 | 677 |
| PHYSICAL DAMAGE TOTAL -> | | 943 | | | | 1171 | | 524 | | 897 |
| Premium to Value % | 2.60 | | | | 6.16 | | 5.24 | | 11.96 | |
| PREMIUM TOTAL per UNIT -> | | 1065 | | 3915 | | 5086 | | 646 | | 4812 |
| State Surchg/Tax - Code | | | | | | | | | | |
| Co. Surchg/Tax - Code | | | | | | | | | | |
| City Surchg/Tax - Code | | | | | | | | | | |
| TOTAL per UNIT -> | | | | | | | | | | |

----- Continued on next page -----

HOME OFFICE COPY

---- COVERAGE and PREMIUM BREAKDOWN --

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company Unit Number<br>Insureds Unit Number | 17 | | | | | | | | | |
| **LIABILITY** | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | 750,000 | 3840 | | | | | | | | |
| Personl Injury Protection | 5,000 | 57 | | | | | | | | |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | 5,000 | 9 | | | | | | | | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | 35,000 | 7 | | | | | | | | |
| UNDERinsured Motorist | 35,000 | 2 | | | | | | | | |
| Owned/Hired | OWNED | | | | | | | | | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 63 | | | | | | | | | |
| Rating Factor % | | | | | | | | | | |
| Zone Group/Trailer Discnt | 1 N | | | | | | | | | |
| L[illegible]ITY TOTAL -----> | | 3,915 | | | | | | | | |

| PHYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cost New | 60,000 | | | | | | | | | |
| Estimated Value | 24,000 | | | | | | | | | |
| Depreciated Value | 27,422 | | | | | | | | | |
| Dumping Code | N | | | | | | | | | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 63 | | | | | | | | | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | | | | | | | | |
| Owned/Hired | OWNED | | | | | | | | | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | 3,000 | | | | | | | | | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value (prem. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Co[illegible]ehensive | 1,000 | 392 | | | | | | | | |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | 754 | | | | | | | | |
| PHYSICAL DAMAGE TOTAL -> | | 1146 | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Premium to Value % | 4.78 | | | | | | | | | |
| PREMIUM TOTAL per UNIT -> | | 5061 | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| State Surchg/Tax - Code | | | | | |
| Co. Surchg/Tax - Code | | | | | |
| City Surchg/Tax - Code | | | | | |
| TOTAL per UNIT -> | | | | | |

Attached to and forming part Policy Number PAP 1857700495 EI .IIVE 4/18/95 TO 4/18/96
ENDORSED 9/19/95
ISSUED TO: JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701

DRIVER SCHEDULE

The following individuals are operators under this policy.
Any changes during the policy period should be endorsed.

| # | Driver Name | Date of Birth | Operator Number | St Lic | SS No | M' |
|---|---|---|---|---|---|---|
| 1 | BARTLOW, DALE A | 7/13/58 | 18263871 | PA | | |
| 2 | BROWN, BARRY L | 3/01/59 | 18424697 | PA | | |
| 3 | BROWN, WILLIAM T | 12/29/60 | 19052931 | PA | 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 | |
| 4 | CONNER, LEBERT | 1/18/35 | 08890771 | PA | | |
| 5 | DANLEY, WILLIAM L. | 12/03/42 | 11833013 | PA | | |
| 6 | DILTZ, DALE | 11/03/54 | 16615826 | PA | | |
| 7 | EASTON, GEORGE C | 2/06/53 | 15903700 | PA | | |
| 8 | EVANS, CRAIG EUGENE | 4/03/60 | 18989568 | PA | | |
| 10 | FROME, EMERY | 1/20/51 | 14900911 | PA | | |
| 12 | FUOSS, CLYDE | 6/22/57 | 17750412 | PA | | |
| 13 | FUOSS, MILTON S | 6/19/32 | 07276695 | PA | | |
| 14 | GARLICK, KENNETH RAYMOND | 7/19/54 | 15176214 | PA | | |
| 16 | HILLIS, RICHARD F | 8/01/37 | 09529139 | PA | | |
| | LAMEY, DEAN EDWIN | 4/17/48 | 11188837 | PA | | |
| | RAAB, JEFFREY | 5/16/57 | 17744809 | PA | | |
| 19 | REYNOLDS, MARTIN J. JR. | 12/19/42 | 13238010 | PA | | |
| 20 | SINCLAIR, HAROLD | 7/12/55 | 16554533 | PA | | |
| 21 | SMITH, JAMES S | 3/26/55 | 23564027 | PA | | |
| 22 | SONES, MICHAEL | 12/24/67 | 21441365 | PA | | |
| 23 | STATTS, VERNICE L | 10/18/34 | 08975318 | PA | | |
| 24 | THOMAS, ARTHRU B. JR. | 7/24/34 | 08132269 | PA | | |
| 25 | WALIZER, GREGORY | 3/26/56 | 15244865 | PA | | |
| 26 | WISE, WILLIAM H. | 9/21/29 | 07942850 | PA | | |
| 27 | WOOLEVER, ARTHUR R. | 1/25/53 | 15716955 | PA | | |
| 28 | WOOLEVER, DONALD | 5/15/24 | 05109262 | PA | | |
| 29 | WOOLEVER, E. COLEMAN | 3/31/26 | 05684093 | PA | | |
| 30 | WOOLEVER, MARK ARTHUR | 8/17/51 | 15345696 | PA | | |
| 31 | WOOLEVER, SCOTT C. | 12/16/54 | 16653787 | PA | | |
| 33 | COCHRAN, CHARLES | 7/01/67 | 21284745 | PA | | |
| 35 | FREEZER, MICHAEL | 1/15/55 | 16547100 | PA | | |
| 36 | HEATH, THOMAS | 6/09/51 | 15282772 | PA | | |
| 37 | HERB, DAVID L SR | 4/19/53 | 16842177 | PA | | |
| 38 | JONES, RALPH | 5/24/64 | 20452332 | PA | | |
| 39 | KIRESKI, JOHN S | 1/15/49 | 15535045 | PA | | |
| 40 | NICHOLS, RICHARD | 1/16/54 | 16394860 | PA | | |
| | REED, DAVID | 10/08/60 | 19107192 | PA | | |
| | SUMMER, KEITH | 11/22/55 | 16983979 | PA | | |
| 43 | FREDERICKS, RICHARD A | 3/22/31 | 06835773 | PA | | |

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**STATED AMOUNT INSURANCE**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated above.

SCHEDULE
Designation or Description of Covered "Autos"

| UNIT # | YEAR, MAKE AND MODEL | SERIAL NUMBER | COVERAGE | LIMIT OF INSURANCE | POLICY PREMIUM |
|---|---|---|---|---|---|
| | SEE POLICY SCHEDULE OF COVERED AUTOS | | | | |

A. This endorsement provides only those coverages where a premium is shown in the Schedule. Each of these coverages applies only to the vehicles shown as covered "autos".

B. For a covered "auto" described in the Schedule, the PHYSICAL DAMAGE COVERAGE Limit of Insurance is replaced by the following:

C. **LIMIT OF INSURANCE**

The most we will pay for "loss" in any one "accident" is the least of:

1. The actual cash value of the damaged or stolen property as of the time of the "loss";
2. The cost of repairing or replacing the damaged or stolen property; or
3. The amount shown in the Schedule.

Countersigned by: ______________________________

Copyright, Insurance Services Office, Inc., 1991

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

# TRUCKERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION VI – DEFINITIONS.**

## SECTION I – COVERED AUTOS

**ITEM TWO** of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS**

**SYMBOL** **DESCRIPTION**

41 = ANY "AUTO".

42 = OWNED "AUTOS" ONLY. Only the "autos" you own (and for Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those "autos" you acquire ownership of after the policy begins.

43 = OWNED COMMERCIAL "AUTOS" ONLY. Only those trucks, tractors and "trailers" you own (and for Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those trucks, tractors and "trailers" you acquire ownership of after the policy begins.

44 = OWNED "AUTOS" SUBJECT TO NO-FAULT. Only those "autos" you own that are required to have No-Fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the No-Fault law in the state where they are licensed or principally garaged.

45 = OWNED "AUTOS" SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW. Only those "autos" you own that, because of the law in the state where they are licensed or principally garaged, are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement.

46 = SPECIFICALLY DESCRIBED "AUTOS". Only those "autos" described in **ITEM THREE** of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in **ITEM THREE**).

47 = HIRED "AUTOS" ONLY. Only those "autos" you lease, hire, rent or borrow. This does not include any "private passenger type auto" you lease, hire, rent or borrow from any member of your household, any of your employees, partners or agents or members of their households.

48 = "TRAILERS" IN YOUR POSSESSION UNDER A WRITTEN TRAILER OR EQUIPMENT INTERCHANGE AGREEMENT. Only those "trailers" you do not own while in your possession under a written "trailer" or equipment interchange agreement in which you assume liability for "loss" to the "trailers" while in your possession.

49 = YOUR "TRAILERS" IN THE POSSESSION OF ANYONE ELSE UNDER A WRITTEN TRAILER INTERCHANGE AGREEMENT. Only those "trailers" you own or hire while in the possession of anyone else under a written "trailer" interchange agreement. When Symbol "49" is entered next to a Physical Damage Coverage in **ITEM TWO** of the Declarations, the Physical Damage Coverage exclusion relating to "loss" to a "trailer" in the possession of anyone else does not apply to that coverage.

50 = NONOWNED "AUTOS" ONLY. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "private passenger type autos" owned by your employees or partners or members of their households but only while used in your business or your personal affairs.

Copyright, Insurance Services Office, Inc., 1993

B. OWNED AUTOS YOU ACQUIRE AFTER THE POLICY BEGINS

1. If symbols 41, 42, 43, 44 or 45 are entered next to a coverage in ITEM TWO of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if symbol 46 is entered next to a coverage in ITEM TWO of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

C. CERTAIN TRAILERS, MOBILE EQUIPMENT AND TEMPORARY SUBSTITUTE AUTOS

If Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Liability Coverage.

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered auto.

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

a. Breakdown;

b. Repair;

c. Servicing;

d. "Loss"; or

e. Destruction.

## SECTION II - LIABILITY COVERAGE

A. COVERAGE

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

1. WHO IS AN INSURED

The following are "insureds":

a. You for any covered "auto".

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

(1) The owner or anyone else from whom you hire or borrow a covered "private passenger type auto".

(2) Your employee or agent if the covered "auto" is a "private passenger type auto" and is owned by that employee or agent or a member of his or her household.

(3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

(4) Anyone other than your employees, partners, a lessee or borrower or any of their employees, while moving property to or from a covered "auto".

(5) A partner of yours for a covered "private passenger type auto" owned by him or her or a member of his or her household.

c. The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected:

(1) Is being used exclusively in your business as a "trucker"; and

(2) Is being used pursuant to operating rights granted to you by a public authority.

Copyright, Insurance Services Office, Inc., 1993

d. The owner or an; else from whom you hire or borro. a covered "auto" that is not a "trailer" while the covered "auto":

(1) Is being used exclusively in your business as a "trucker"; and

(2) Is being used pursuant to operating rights granted to you by a public authority.

e. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

However, none of the following is an "insured":

a. Any "trucker" or his or her agents or employees, other than you and your employees:

(1) If the "trucker" is subject to motor carrier insurance requirements and meets them by a means other than "auto" liability insurance.

(2) If the "trucker" is not insured for hired "autos" under an "auto" liability insurance form that insures on a primary basis the owners of the "autos" and their agents and employees while the "autos" are being used exclusively in the "truckers" business and pursuant to operating rights granted to the "trucker" by a public authority.

b. Any rail, water or air carrier or its employees or agents, other than you and your employees, for a "trailer" if "bodily injury" or "property damage" occurs while the "trailer" is detached from a covered "auto" you are using and:

(1) Is being transported by the carrier; or

(2) Is being loaded on or unloaded from any unit of transportation by the carrier.

2. COVERAGE EXTENSIONS

a. Supplementary Payments. In addition to the Limit of Insurance, we will pay for the "insured":

(1) All expenses we incur.

(2) Up to $250 for the cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any "suit" we defend, but only for bond amounts within our Limit of Insurance.

(4) Al; sonable expenses incurred by "insured" at our request, including actual loss of earnings up to $100 a day because of time off from work.

(5) All costs taxed against the "insured" in any "suit" we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

b. Out-of-State Coverage Extensions.

While a covered "auto" is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limit specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

B. EXCLUSIONS

This insurance does not apply to any of the following:

1. EXPECTED OR INTENDED INJURY

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

2. CONTRACTUAL

Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages:

a. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

b. That the "insured" would have in the absence of the contract or agreement.

Copyright, Insurance Services Office, Inc., 1993

3. **WORKERS' COMPENSATION**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

4. **EMPLOYEE INDEMNIFICATION AND EMPLOYER'S LIABILITY**

"Bodily injury" to:

a. An employee of the "insured" arising out of and in the course of employment by the "insured"; or

b. The spouse, child, parent, brother or sister of that employee as a consequence of paragraph a. above.

This exclusion applies:

(1) Whether the "insured" may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic employees not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract".

5. **FELLOW EMPLOYEE**

"Bodily injury" to any fellow employee of the "insured" arising out of and in the course of the fellow employee's employment.

6. **CARE, CUSTODY OR CONTROL**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

7. **HANDLING OF PROPERTY**

"Bodily injury" or "property damage" resulting from the handling of property:

a. Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

b. After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

8. **MOVEMENT OF PROPERTY BY MECHANICAL DEVICE**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand tr[illegible] unless the device is attached [illegible] the covered "auto".

9. **OPERATIONS**

"Bodily injury" or "property damage" arising out of the operation of any equipment listed in paragraphs 6.b. and 6.c. of the definition of "mobile equipment".

10. **COMPLETED OPERATIONS**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In the exclusion, your work means:

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in paragraphs a. or b. above.

Your work will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

11. **POLLUTION**

"Bodily injury" or "property damage" arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured"; or

Copyright, Insurance Services Office, Inc., 1993

(3) Being stored, disposed of, treated or processed in or upon the covered "auto";

b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured."

Paragraph a. above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

(1) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(2) The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in paragraphs 6.b. and 6.c of the definition of "mobile equipment".

Paragraphs b. and c. above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

12. WAR

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

13. RACING

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

C. LIMIT OF INSURANCE

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined, resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

## SECTION III – TRAILER INTERCHANGE COVERAGE

A. COVERAGE

1. We will pay all sums you legally must pay as damages because of "loss" to a "trailer" you don't own or its equipment under:

a. Comprehensive Coverage. From any cause except:

(1) The "trailer's" collision with another object; or

(2) The "trailer's" overturn.

b. Specified Causes of Loss Coverage. Caused by:

(1) Fire, lightning or explosion;

(2) Theft;

(3) Windstorm, hail or earthquake;

(4) Flood:

(5) Mischief or vandalism; or

(6) The sinking, burning, collision or derailment of any conveyance transporting the "trailer".

c. Collision Coverage Caused by:

Copyright, Insurance Services Office, Inc., 1993

(1) The "trailer's" collision with another object

(2) The "trailer's" overturn.

2. We have the right and duty to defend any "insured" against a "suit" asking for these damages. However, we have no duty to defend any "insured" against a "suit" seeking damages for any "loss" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends for a coverage when the Limit of Insurance for that coverage has been exhausted by payment of judgments or settlements.

3. COVERAGE EXTENSIONS

Supplementary Payments. In addition to the Limit of Insurance, we will pay for you:

a. All expenses we incur.

b. The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance.

c. All reasonable expenses incurred at our request, including actual loss of earnings up to $100 a day because of time off from work.

d. All costs taxed against the "insured" in any "suit" we defend.

e. All interest on the full amount of any judgment that accrues after entry of the judgment; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

B. EXCLUSIONS

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

a. Nuclear Hazard.

(1) The explosion of any weapon employing atomic fission or fusion; or

(2) Nuclear reaction or radiation, or radioactive contamination, however caused.

b. War or Military Action.

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for loss of use.

3. Other Exclusions.

We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

a. Wear and tear, freezing, mechanical or electrical breakdown.

b. Blowouts, punctures or other road damage to tires.

C. LIMIT OF INSURANCE AND DEDUCTIBLE

The most we will pay for "loss" to any one "trailer" is the least of the following amounts minus any applicable deductible shown in the Declarations:

1. The actual cash value of the damaged or stolen property at the time of the "loss".

2. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

3. The Limit of Insurance shown in the Declarations.

## SECTION IV - PHYSICAL DAMAGE COVERAGE

A. COVERAGE

1. We will pay for "loss" to a covered "auto" or its equipment under:

a. Comprehensive Coverage. From any cause except:

(1) The covered "auto's" collision with another object; or

(2) The covered "auto's" overturn.

b. Specified Causes of Loss Coverage. Caused by:

(1) Fire, lightning or explosion;

(2) Theft;

(3) Windstorm, hail or earthquake;

(4) Flood;

(5) Mischief or vandalism; or

(6) The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

c. Collision Coverage. Caused by:

Copyright, Insurance Services Office, Inc., 1993

(1) The covered "auto's" collision with another o... ...t, or

(2) The covered "auto's" overturn.

2. **Towing - Private Passenger Autos.**

We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the "private passenger type" is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage - Hitting a Bird or Animal - Falling Objects or Missiles.**

If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

a. Glass breakage;

b. "Loss" caused by hitting a bird or animal; and

c. "Loss" caused by falling objects or missiles.

However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

4. Coverage Extension. We will also pay up to $15 per day to a maximum of $450 for transportation expense incurred by you because of the total theft of a covered "auto" of the "private passenger type". We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

B. **EXCLUSIONS**

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

a. **Nuclear Hazard.**

(1) The explosion of any weapon employing atomic fission or fusion; or

(2) Nuclear reaction or radiation, or radioactive contamination, however caused.

b. **War or Military Action.**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hin...ng or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for "loss" to any of the following:

a. Any covered "auto" while in anyone else's possession under a written trailer interchange agreement. But this exclusion does not apply to a loss payee, however if we pay the loss payee; you must reimburse us for our payment.

b. Any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for any such contest or activity.

c. Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

d. Equipment designed or used for the detection or location of radar.

e. Any electronic equipment, without regard to whether this equipment is permanently installed, that receives or transmits audio, visual or data signals and that is not designed solely for the reproduction of sound.

f. Any accessories used with the electronic equipment described in paragraph e. above.

Exclusions 2.e. and 2.f. do not apply to:

a. Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the covered "auto" at the time of the "loss" or such equipment is removable from a housing unit which is permanently installed in the covered "auto" at the time of the "loss", and such equipment is designed to be solely operated by use of the power from the "auto's" electrical system, in or upon the covered "auto"; or

b. Any other electronic equipment that is:

(1) Necessary for the normal operation of the covered "auto"

Copyright, Insurance Services Office, Inc., 1993

or the monito[illegible] of the covered "auto's" oper[illegible]g system; or

(2) An integral part of the same unit housing any sound reproducing equipment described in a. above and permanently installed in the opening of the dash or console of the covered "auto" normally used by the manufacturer for installation of a radio.

3. Other Exclusions

We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

a. Wear and tear, freezing, mechanical or electrical breakdown.

b. Blowouts, punctures or other road damage to tires.

C. LIMITS OF INS[illegible]CE

The most we will pay for "loss" in any one "accident" is the lesser of:

1. The actual cash value of the damaged or stolen property as of the time of the "loss"; or

2. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

D. DEDUCTIBLE

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

## SECTION V – TRUCKERS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

A. LOSS CONDITIONS

1. APPRAISAL FOR PHYSICAL DAMAGE LOSS

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

2. DUTIES IN THE EVENT OF ACCIDENT, CLAIM, SUIT OR LOSS

a. In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the accident or "loss". Include:

(1) How, when and where the "accident" or "loss" occurred;

(2) The "insured's" name and address; and

(3) To the extent possible, the names and addresses of any injured persons and witnesses.

b. Additionally, you and any other involved "insured" must:

(1) Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

(2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit".

(4) Authorize us to obtain medical records or other pertinent information.

(5) Submit to examination at our expense, by physicians of our choice, as often as we reasonably require.

c. If there is a "loss" to a covered "auto" or its equipment you must also do the following:

(1) Promptly notify the police if the covered "auto" or any of its equipment is stolen.

(2) Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

(3) Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

(4) Agree to examination under oath at our request and give us a statement of your answers.

Copyright, Insurance Services Office, Inc., 1993

3. LEGAL ACTION AGAINST

No one may bring a legal action against us under this Coverage Form until:

a. There has been full compliance with all the terms of this Coverage Form; and

b. Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trail. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

4. LOSS PAYMENT – PHYSICAL DAMAGE COVERAGES

At our option we may:

a. Pay for, repair or replace damaged or stolen property;

b. Return the stolen property at our expense. We will pay for any damage that results to the "auto" from the theft; or

c. Take all or any part of the damaged or stolen property at an agreed or appraised value.

5. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

B. GENERAL CONDITIONS

1. BANKRUPTCY

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligation under this Coverage Form.

2. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

a. This Coverage Form;

b. The covered "auto";

c. Your interest in the covered "auto"; or

d. A claim under this Coverage Form.

3. LIBERALIZATION

If we revise this Coverage Form to provide more coverage without additional premium [illegible]rge, your policy will automatic[illegible]y provide the additional coverage as of the day the revision is effective in your state.

4. NO BENEFIT TO BAILEE – PHYSICAL DAMAGE COVERAGES

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

5. OTHER INSURANCE – PRIMARY AND EXCESS INSURANCE PROVISIONS

a. This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto" while hired or borrowed from you by another "trucker". However, while a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Liability Coverage is:

(1) On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto".

(2) Excess if the power unit is not a covered "auto".

b. Any Trailer Interchange Coverage provided by this Coverage Form is primary for any covered "auto".

c. Except as provided in paragraphs a. and b. above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

d. For Hired Auto Physical Damage coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

e. Regardless of the provisions of paragraphs a., b. and c. above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract".

f. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

Copyright, Insurance Services Office, Inc., 1993

6. **PREMIUM AUDIT**

a. The estimated premium for this Coverage Form is based on the exposures you told us you have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

b. If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

7. **POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Form, we cover "accidents" and "losses" occurring:

a. During the policy period shown in the Declarations; and

b. Within the coverage territory.

The coverage territory is:

a. The United States of America;

b. The territories and possessions of the United States of America;

c. Puerto Rico; and

d. Canada.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

8. **TWO OR MORE COVERAGE FORMS OR POLICIES ISSUED BY US**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

## SECTION VI – DEFINITIONS

A. "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

B. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include "mobile equipment".

C. "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

D. "Covered pollution cost or expense" means any cost or expense arising out of:

1. Any request, demand or order; or

2. Any claim or "suit" by or on behalf of a governmental authority demanding.

that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured";

(3) Being stored, disposed of, treated or processed in or upon the covered "auto"; or

b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph a. above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

(1) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(2) The "bodily injury", "property damage" or "covered pollution

cost or expen[illegible] does not arise out of [illegible]ration of any equipment listed in paragra 6.b. or 6.c. of the definition of "mobile equipment".

Paragraphs b. and c. above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

E. "Insured" means any person or organization qualifying as an insured in the Who is an Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

F. "Insured Contract" means:

1. A lease of premises;

2. A sidetrack agreement;

3. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

5. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

6. That part of any contract or agreement, entered into, as part of your business, pertaining to the rental or lease, by you or any of your employees, of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your employees to pay for "property damage" to any "auto" rented or leased by you or any of your employees.

An "insured contract" does not include that part of any contract or agreement:

a. That [illegible]mnifies any person or organi[illegible] on for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing; or

b. That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

c. That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

G. "Loss" means direct and accidental loss or damage.

H. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

a. Power cranes, shovels, loaders, diggers or drills; or

b. Road construction or resurfacing equipment such as graders, scrapers or rollers;

5. Vehicles not described in paragraphs 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

a. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

b. Cherry pickers and similar devices used to raise or lower workers.

6. Vehicles not described in paragraphs 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

Copyright, Insurance Services Office, Inc., 1993

a. Equipment designec marily for:

(1) Snow removal;

(2) Road maintenance, but not construction or resurfacing; or

(3) Street cleaning;

b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

I. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

J. "Private passenger type" means a private passenger or station wagon type "auto" and includes an "auto" of the pickup or van type if not used for business purposes.

K. "Property damage" means damage to or loss of use of tangible property.

L. "Suit" means a il proceeding in which:

1. Damages because of "bodily injury" or "property damage"; or

2. A "covered pollution cost or expense", to which this insurance applies, are alleged.

"Suit" includes:

a. An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" submits with our consent.

M. "Trailer" includes semitrailer or a dollie used to convert a semitrailer into a trailer. But for Trailer Interchange Coverage only, "trailer" also includes a container.

N. "Trucker" means any person or organization engaged in the business of transporting property by "auto" for hire.

Copyright, Insurance Services Office, Inc., 1993

COMMERCIAL AUTO

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## LOSS OF USE COVERAGE

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
TRUCKERS COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM

### A. COVERAGE/CONDITIONS

1. This endorsement applies to covered "autos" for which collision coverage is provided.

2. This coverage begins 14 days after you notify us.

3. We will pay you for your loss of use in the event a covered "auto" is disabled and removed from service, for a period greater than 14 days, as a result of a collision "loss".

4. This coverage will terminate when the covered "auto" is returned to service. We shall determine when the covered "auto" is returned to service.

5. Payment will be made if, and only if, the "loss" exceeds the collision deductible.

6. Our payment to you, per covered "auto", will be calculated on a daily basis at a rate equal to 1/90 of the MAXIMUM LIMIT OF COVERAGE. The most we will pay you, per covered "auto", is the limit of coverage for the period of coverage indicated below:

**MAXIMUM LIMIT OF COVERAGE**
$3,000

**MAXIMUM PERIOD OF COVERAGE**
90 days

### B. EXCLUSIONS

1. This insurance does not apply to any of the following:

   a. Any covered "auto" with a gross vehicle weight (GVW) under 20,001 pounds.

   b. Any NONOWNED "AUTOS" (See coverage form)

   c. ANY HIRED "AUTOS" (See coverage form)

   d. Any "TRAILERS" IN YOUR POSSESSION UNDER A WRITTEN TRAILER OR EQUIPMENT INTERCHANGE AGREEMENT.

   e. Any of YOUR "TRAILERS" IN THE POSSESSION OF ANYONE ELSE UNDER A WRITTEN TRAILER INTERCHANGE AGREEMENT.

2. This insurance does not apply if you fail to exercise due diligence and dispatch to repair or replace the covered "auto".

3. This insurance does not apply if you receive any loss of income payment from us as a result of "bodily injury".

---

**DESCRIPTION OF COVERED AUTOS**

Refer to your SCHEDULE OF COVERED AUTOS.

---

**ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR AUTOMOBILE BODILY INJURY AND PROPERTY DAMAGE LIABILITY UNDER SECTION 10927, TITLE 49 OF THE UNITED STATES CODE**

The policy to which this endorsement is attached is an automobile bodily injury and property damage liability policy and is amended to assure compliance by the insured as a motor carrier of passengers or property, with Section 10927, Title 49 of the United States Code and the pertinent rules and regulations of the Interstate Commerce Commission.

In consideration of the premium stated in the policy to which this endorsement is attached, the Company agrees to pay, within the limits of liability prescribed herein, any final judgment recovered against the insured for bodily injury to or death of any person, or loss of or damage to property of others (excluding injury to or death of the insured's employees while engaged in the course of their employment, and property transported by the insured, designated as cargo), resulting from negligence in the operation, maintenance, or use of motor vehicles under certificate or permit issued to the insured by the Interstate Commerce Commission, or otherwise in interstate or foreign commerce subject to Subchapter II, Chapter 105, Subtitle IV of Title 49 of the United States Code, regardless of whether or not such motor vehicles are specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized by the Interstate Commerce Commission to be served by the insured or elsewhere.

It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the insured, shall relieve the Company from liability or from the payment of any final judgment, irrespective of the financial responsibility or lack thereof or insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached are to remain in full force and effect as binding between the insured and the Company, and the insured agrees to reimburse the Company for any payment made by the Company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the Company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is understood and agreed that, upon failure of the Company to pay any final judgment recovered against the insured as prescribed herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the Company to compel such payment.

The Company's liability for the amounts provided in this endorsement apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the Company for the payment of final judgments resulting from any other accident.

The liability of the Company on each motor vehicle shall be the limits prescribed in 49 CFR 1043.2(b)(1), governing minimum amounts of insurance.

This endorsement may not be canceled without notification to the Commission. Such cancellation may be effected by the Company or the insured giving thirty (30) days' notice in writing to the Interstate Commerce Commission at its office in Washington, D.C., said thirty (30) days' notice commencing from the date notice is received by the Commission.

Issued to ______________________ of ______________________

Dated at ______________________ this ______ day of ______________________, 19 ____

Amending Policy No. ______________________ Effective Date ______________________

Name of Insurance Company ______________________

Countersigned by ______________________
Authorized Company Representative

OMB 3120 0086 (Form B.M.C. 90 Rev. 1982)

xxxxxxxxxxxxxx

COMMERCIAL AUTO

FORM F

UNIFORM MOTOR CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY INSURANCE ENDORSEMENT

It is agreed that:

1. The certification of the policy, as proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction with respect thereto, amends the policy to provide insurance for automobile bodily injury and property damage liability in accordance with the provisions of such law or regulations to the extent of the coverage and limits of liability required thereby; provided only that the insured agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except by reason of the obligation assumed in making such certification.

2. The Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance has been filed with the State Commission(s) indicated below.

3. This endorsement may not be cancelled without cancellation of the policy to which it is attached. Such cancellation may be effected by the company or the insured giving thirty (30) days' notice in writing to the State Commission with which such certificate has been filed, such thirty (30) days' notice to commence to run from the date the notice is actually received in the office of such Commission.

X -- INDICATES STATE COMMISSIONS WITH WHOM UNIFORM MOTOR CARRIER BODILY INJURY AND PROPERTY DAMAGE LIABILITY CERTIFICATE OF INSURANCE HAS BEEN FILED

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ALABAMA | | ILLINOIS | | MONTANA | | RHODE ISLAND | |
| ALASKA | | INDIANA | | NEBRASKA | | SOUTH CAROLINA | |
| ARIZONA | | IOWA | | NEVADA | | SOUTH DAKOTA | |
| ARKANSAS | | KANSAS | | NEW HAMPSHIRE | | TENNESSEE | |
| CALIFORNIA | | KENTUCKY | | NEW JERSEY | | TEXAS | |
| COLORADO | | LOUISIANA | | NEW MEXICO | | UTAH | |
| CONNECTICUT | | MAINE | | NEW YORK | | VERMONT | |
| DELAWARE | | MARYLAND | | NORTH CAROLINA | | VIRGINIA | |
| DISTRICT OF COLUMBIA | | MASSACHUSETTS | | NORTH DAKOTA | | WASHINGTON | |
| FLORIDA | | MICHIGAN | | OHIO | | WEST VIRGINIA | |
| GEORGIA | | MINNESOTA | | OKLAHOMA | | WISCONSIN | |
| HAWAII | | MISSISSIPPI | | OREGON | | WYOMING | |
| IDAHO | | MISSOURI | | PENNSYLVANIA | X | | |

Attached to and forming part of policy No. PAP 1857700495

issued by LINCOLN GENERAL INSURANCE COMPANY, herein called

Company, of YORK, PA 17402

to JHM ENTERPRISES, INC. of WILLIAMSPORT, PA

Dated at YORK, PA 17402 this 27 day of APRIL, 1995

Countersigned by ______________________
Authorized Representative

(System Date 04 92)

IRB 3538A

HOME OFFICE COPY

COMMERCIAL AUTO

**ENDORSEMENT FOR**
**MOTOR CARRIER POLICIES OF INSURANCE FOR PUBLIC LIABILITY**
**UNDER SECTIONS 29 AND 30 OF THE MOTOR CARRIER ACT OF 1980**

Issued to JHM ENTERPRISES, INC. of WILLIAMSPORT, PA

Dated at YORK, PA 17402 this 27 day of APRIL, 1995

Amending Policy No. PAP 1857700495 Effective Date 04/18/95

Name of Insurance Company LINCOLN GENERAL INSURANCE COMPANY

Telephone Number (____) ____________________. Countersigned by ____________________
Authorized Company Representative

The policy to which this endorsement is attached provides primary or excess insurance, as indicated by "X" for the limits shown:

(X) This insurance is primary and the company shall not be liable for amounts in excess of $ 750,000 for each accident.

(_) This insurance is excess and the company shall not be liable for amounts in excess of $ 0 for each accident in excess of the underlying limit of $ 0 for each accident.

Whenever required by the Federal Highway Administration (FHWA) or the Interstate Commerce Commission (ICC), the company agrees to furnish the FHWA or the ICC a duplicate of said policy and all its endorsements. The company also agrees, upon telephone request by an authorized representative of the FHWA or the ICC, to verify that the policy is in force as of a particular date.

Cancellation of this endorsement may be effected by the company or the insured by giving (1) thirty-five (35) days notice in writing to the other party (said 35 days notice to commence from the date the notice is mailed, proof of mailing shall be sufficient proof of notice), and (2) if the insured is subject to the ICC's jurisdiction, by providing thirty (30) days notice to the ICC (said 30 days notice to commence from the date the notice is received by the ICC at its office in Washington, D.C.).

DEFINITIONS AS USED IN THIS ENDORSEMENT

ACCIDENT includes continuous or repeated exposure to conditions which results in bodily injury, property damage, or environmental damage which the insured neither expected nor intended.

MOTOR VEHICLE means a land vehicle, machine, truck, tractor, trailer,or semitrailer propelled or drawn by mechanical power and used on a highway for transporting property, or any combination thereof.

BODILY INJURY means injury to the body, sickness or disease to any person, including death resulting from any of these.

ENVIRONMENTAL RESTORATION means restitution for the loss, damage, or destruction of natural resources arising out of the accidental discharge, dispersal, release or escape into or upon the land, atmosphere, watercourse, or body of water, of any commodity transported by a motor carrier. This shall include the cost of removal and the cost of necessary measures taken to minimize or mitigate damage to human health, the natural environment, fish, shellfish and wildlife.

PROPERTY DAMAGE means damage to or loss of use of tangible property.

PROPERTY LIABILITY means liability for bodily injury, property damage, and environmental restoration.

==========================================================================

The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration (FHWA) and the Interstate Commerce Commission (ICC).

OMB 2125 0074 (MCS-90)

HOME OFFICE COPY

In consideration of the pre[illegible] stated in the policy to which this endors[illegible]nt is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured.

However, all term[illegible]onditions, and limitations in the policy t[illegible]hich the endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

The limits of the company's liability for the amounts prescribed in this endorsement apply separately, to each accident, and any payment under the policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

---

The Motor Carrier Act of 1980 required limits of financial responsibility according to the type of carriage and commodity transported by the motor carrier. It is the MOTOR CARRIER'S obligation to obtain the required limits of financial responsibility. The SCHEDULE OF LIMITS SHOWN BELOW DOES NOT PROVIDE COVERAGE. The limits shown in the schedule are for information purposes only.

SCHEDULE OF LIMITS
Public Liability

| Type of Carriage | Commodity Transported | Minimum Insurance |
|---|---|---|
| (1) For-hire (in interstate or foreign commerce). | Property (nonhazardous). | $ 750,000 |
| (2) For-hire and Private (in interstate, foreign, or intrastate commerce). | Hazardous substances as defined in 49 CFR 171.8, transported in cargo tanks, portable tanks, or hoppertype vehicles with capacities in excess of 3,500 water gallons; or in bulk Class A or B explosives, poison gas (Poison A), liquefied compressed gas or compressed gas, or highway route controlled quantity radioactive materials as defined in 49 CFR 173.403. | 5,000,000 |
| (3) For-hire and Private (in interstate or foreign commerce; in any quantity) or (in intrastate commerce in bulk only) | Oil listed in 49 CFR 172.101;hazardous materials and hazardous substances defined in 49 CFR 171.8 and listed in 49 CFR 172.101, but not mentioned in (2) above or (4) below. | 1,000,000 |
| (4) For-hire and Private (in interstate or foreign commerce). | Any quantity of Class A or B explosives, any quantity of poison gas (Poison A), or highway route controlled quantity radioactive materials as defined in 49 CFR 173.403. | 5,000,000 |

NOTE: The type of carriage listed under (1), (2) and (3) applies to vehicles with a gross vehicle weight rating of 10,000 pounds or more. The type of carriage listed under number (4) applies to all vehicles with a gross vehicle weight rating of less than 10,000 pounds.

OMB 2125 0074 (MCS-90)

XXXXXXXXXXXXXX

COMMERCIAL AUTO

Attached to and forming a part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

## PENNSYLVANIA BASIC FIRST PARTY BENEFIT

For a covered "auto" licensed or principally garaged in , or "garage operations" conducted in, Pennsylvania, this endorsement modifies insurance provided under the following:

BUSINESS AUTO NON-TRUCKING COVERAGE FORM.
BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

SCHEDULE

| Benefits | Limit of Liability (per insured) |
|---|---|
| Medical Expense Benefits | Up to $ 5,000 |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

A. COVERAGE

We will pay the Basic First Party Benefit in accordance with the "Act" to or for an "insured" who sustains "bodily injury" caused by an "accident" arising out of the maintenance or use of an "auto."

BENEFITS

Subject to the limit shown in the Schedule or Declarations, the Basic First Party Benefit consists of Medical Expense Benefits. These benefits consist of reasonable and necessary medical expenses incurred for an "insured's":

1. Care;

2. Recovery; or

3. Rehabilitation.

This includes remedial care and treatment rendered in accordance with a recognized religious method of healing.

Medical expenses will be paid if incurred within 18 months from the date of the "accident" causing "bodily injury." If within 18 months from the date of the "accident" causing "bodily injury" it is ascertainable with reasonable medical probability that further expenses may be incurred as a result of the bodily injury, medical expenses will be paid without limitation as to the time such further expenses are incurred.

B. WHO IS AN INSURED

1. You.

2. If you are an individual, any "family member."

3. Any person while "occupying" a covered "auto."

4. Any person while not "occupying" an "auto" if injured as a result of an "accident" in Pennsylvania involving a covered "auto."

If a covered "auto" is parked and unoccupied, it is not an "auto" involved in an "accident" unless it was parked in a manner as to create an unreasonable risk of injury.

C. EXCLUSIONS

We will not pay First Party Benefits for "bodily injury:"

1. Sustained by any person injured while intentionally causing or attempting to cause injury to himself or herself or any other person.

2. Sustained by any person while committing a felony.

3. Sustained by any person while seeking to elude lawful apprehension or arrest by a law enforcement official.

4. Sustained by any person while maintaining or using an "auto" knowingly converted by that person. However, this exclusion does not apply to:

a. You; or

b. any "family member."

5. Sustained by any person at the time of the "accident."

a. Is the owner of one or more currently registered "autos" and none of those "autos" is covered by the financial responsibility required by the "Act;" or

b. is "occupying" an "auto" owned by that person for which the financial responsibility required by the "Act" is not in effect.

6. Sustained by any person maintaining or using an "auto" while located for use as a residence or premises.

7. Sustained by a pedestrian if the "accident" occurs outside of Pennsylvania. This exclusion does not apply to:

a. You; or

b. Any "family member."

8. Sustained by any person while "occupying:"

a. A recreational vehicle designed for use off public roads; or

b. A motorcycle, moped or similar type vehicle.

9. Caused by or as a consequence of:

a. discharge of a nuclear weapon (even if accidental);

b. War (declared or undeclared);

c. Civil war;

d. Insurrection; or

e. Rebellion or revolution.

10. From or as a consequence of the following whether controlled or uncontrolled or however caused:

a. nuclear reaction;

b. radiation; or

c. radioactive contamination.

D. LIMIT OF INSURANCE

1. Regardless of the number of covered "autos,"premiums paid, claims made, "autos" involved in the "accident" or insurers providing First Party Benefits, the most we will pay to or for an "insured" as the result of any one "accident" is the limit shown in the Schedule or in the Declarations.

2. Any amount payable under First Party Benefits shall be excess over any sums paid, payable or required to be provided under any workers' compensation law or similar law.

E. CHANGES IN CONDITIONS

The CONDITIONS are changed for FIRST PARTY BENEFITS as follows:

1. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US does not apply.

2. The following CONDITIONS are added:

NON-DUPLICATION OF BENEFITS

No person may recover duplicate benefits for the same expenses or loss under this or any other similar automobile coverage including self-insurance.

PRIORITIES OF POLICIES

We will pay First Party Benefits in accordance with the order of priority set forth by the "Act." We will not pay if there is another insurer at a higher level of priority. The "First" category listed below is the highest level of priority and the "Fourth" category listed below is the lowest level of priority. The priority order is:

First - The insurer providing benefits to the "insured" as a named insured.

Second - The insurer providing benefits to the "insured" as a family member who is not a named insured under another policy providing coverage under the "Act."

Third - The insurer of the "auto" which the "insured" is "occupying" at the time of the "accident."

Fourth - The insurer providing benefits on any "auto" involved in the "accident" if the "insured" is:

a. Not "occupying" an "auto;" and

b. not provided First Party Benefits under any other policy.

If two or more policies have equal priority within the highest applicable number in the priority order:

1. The insurer against whom the claim is first made shall process and pay the claim as if wholly responsible:

2. If we are the insurer against whom the claim is first made, our payment to or for an "insured" will not exceed the applicable limit shown in the Schedule or Declarations;

3. The insurer thereafter is entitled to recover pro rata contribution from any other insurer for the benefits paid and the costs of processing the claim. If contribution is sought among insurers under the Fourth priority, proration shall be based on the number of involved motor vehicles; and

Copyright, Insurance Services Office, Inc. 1992

4. The maximum recovery [illegible] all policies shall not exceed the amo[illegible] payable under the policy with the highest dollar limits of benefits.

**F. ADDITIONAL DEFINITIONS**

1. The definition of "auto" in the DEFINITIONS Section is replaced by the following:

a. By muscular power; or

b. On rails or tracks.

2. The followi[illegible] e added to the DEFINITIONS Section:

a. The "Act" means the Pennsylvania Motor Vehicle Financial Responsibility Law.

b. "Family member" means a resident of your household who is:

(1) Related to you by blood, marriage or adoption; or

(2) A minor in your custody or in the custody of any other "family member."

c. "Occupying" means in, upon, getting in, on, out or off.

Copyright, Insurance Services Office, Inc. 1992

COMMERCIAL AUTO

Attached to and forming a part of Policy Number PAP 185770 0495 EFFECTIVE 04/18/95 TO 04/18/96

ISSUED TO: JHM ENTERPRISES, INC.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

**PENNSYLVANIA ADDED AND COMBINATION FIRST PARTY BENEFITS ENDORSEMENT**

For a covered "auto" licensed or principally garaged in Pennsylvania, this endorsement modifies insurance provided under the following:

PENNSYLVANIA BASIC FIRST PARTY BENEFITS.

BASIC FIRST PARTY BENEFIT is changed as follows:

SCHEDULE

As indicated below, Added First Party Benefits or Combination First Party Benefits apply instead of the Basic First Party Benefit. The limits of liability shown for the benefits selected below replace the limits of liability shown in the Schedule for the Basic First Party Benefit.

| Benefits | Limit of Liability (per insured) |
|---|---|
| (X) Added First Party Benefits | |
| Medical Expense Benefits | Up to $_________ |
| Work Loss Benefits | Up to $ 5,000 subject to a maximum of $ 1,000 per month |
| Funeral Expense Benefits | Up to $ _________ |
| Accidental Death Benefits | $ _________ |
| (_) Combination First Party Benefits | |
| Maximum Total Limit for All Benefits | Up to $ _________ |
| Subject to the following individual limits: | |
| Medical Expense Benefits | No specific dollar amount |
| Work Loss Benefits | No specific dollar amount |
| Funeral Expense Benefits | Up to $ 2,500 |
| Accidental Death Benefits | $ _________ |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

Copyright, Insurance Services Office, Inc. 1990

A. COVERAGE

We will pay Added First Party Benefits or Combination First Party Benefits in accordance with the "Act" up to the limits stated in the Schedule or Declarations to or for an "insured" who sustains "bodily injury" caused by an "accident" and arising out of the maintenance or use of an "auto." We will only pay Combination First Party Benefits for expenses or loss incurred within 3 years from the date of the "accident."

In addition to the Medical Expense Benefits described in the Basic First Party Benefits endorsement, Added First Party Benefits and Combination First Party Benefits also consist of:

1. Work Loss Benefits consisting of:

a. loss of income. Up to 80% of the gross income actually lost by an "insured."

b. reasonable expenses actually incurred to reduce loss of income by hiring:

(1) special help,thereby enabling the "insured" to work; or

(2) a substitute to perform the work of a self-employed "insured" would have performed.

However, Work Loss Benefits do not include:

a. loss of expected income for any period following the death of an "insured;" or

b. expenses incurred for services performed following the death of an "insured;" or

c. any loss of income, or expenses incurred for services performed, during the first 5 working days the "insured" did not work after the "accident" because of the "bodily injury."

2. Funeral Expense Benefits. Actual expenses incurred for an "insured's" funeral or burial if "bodily injury" resulting from the "accident" causes his or her death within 24 months from the date of the "accident."

3. Accidental Death Benefits. A death benefit paid if "bodily injury" resulting from an "accident" causes the death of you or any "family member" within 24 months from the date of the "accident."

B. EXCLUSIONS

In addition to the exclusions in the Basic First Party Benefit endorsement, the following exclusion also applies.

We will not pay:

Accidental Death Benefits on behalf of any person who intentionally caused or attempted to cause "bodily injury" to himself, herself or any other person.

C. LIMIT OF INSURANCE

1. Regardless of the number of covered "autos,"premiums paid, claims made,"autos" involved in the accident or insurers providing First Party Benefits, the most we will pay to or for an "insured" as the result of any one "accident" is the limit shown in the Schedule or the Declarations. Combination First Party Benefits are subject to a maximum total single limit of liability with individual limits for specific benefits as shown in the Schedule or Declarations.

2. If Combination First Party Benefits are afforded, we will make available at least the minimum limit required by the "Act" for Basic First Party Benefits. This provision will not change our total limit of liability.

D. CHANGES IN CONDITIONS

In addition to the CONDITIONS applicable to the Basic First Party Benefit endorsement the following CONDITION also applies:

PAYMENT OF ACCIDENTAL DEATH BENEFITS

The Accidental Death Benefit under this policy will be paid to the executor or administrator of the deceased "insureds" eatate. If there is no executor or administrator, benefits shall be paid to:

1. The deceased "insured's" surviving spouse or

2. If there is no surviving spouse, the deceased "insured's" surviving children, or

3. If there is no surviving spouse or surviving children, the deceased "insured's" estate.

Attached to and forming a part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PENNSYLVANIA UNINSURED MOTORISTS COVERAGE – NONSTACKED

For a covered "auto" licensed or principally garaged in Pennsylvania, this endorsement modifies insurance provided under the following:

BUSINESS AUTO NON-TRUCKING COVERAGE FORM.
BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

A. COVERAGE

1. We will pay all sums the "insured" is legally entitled to recover as damages from the owner or driver of an "uninsured" motor vehicle." The damages must result from "bodily injury" sustained by the "insured" caused by an "accident." The owner's or driver's liability for these damages must result from the ownership, maintenance or use of an "uninsured motor vehicle."

2. No judgment for damages arising out of a "suit" brought against the owner or operator of an "uninsured motor vehicle" is binding on us unless we:

a. Received reasonable notice of the pendency of the "suit" resulting in the judgment; and

b. Had a reasonable opportunity to protect our interests in the "suit."

B. WHO IS AN INSURED

1. You.

2. If you are an individual, any "family member."

3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered"auto." The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured."

C. EXCLUSIONS

This insurance does not apply to any of the following:

1. Any claim settled without our consent.

2. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability benefits or similar law.

3. Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

D. LIMIT OF INSURANCE

1. Regardless of the number of covered "autos," "insureds," premiums paid, claims made or vehicles involved in the "accident," the most we will pay for all damages resulting from any one "accident" is the LIMIT OF INSURANCE for UNINSURED MOTORISTS COVERAGE shown in the Declarations.

However, no "insured" will be entitled to receive duplicate payments for the same elements of loss.

2. Any amount payable for damages under this coverage shall be reduced by all sums paid by or for anyone who is legally responsible, including all sums paid for the same damages under this Coverage Form's LIABILITY COVERAGE.

3. Any amount paid under this coverage will reduce any amount an "insured" may be paid for the same damages under this Coverage Form's LIABILITY COVERAGE.

E. CHANGES IN CONDITIONS

The CONDITIONS are changed for PENNSYLVANIA UNINSURED MOTORISTS COVERAGE-NONSTACKED as follows:

1. DUTIES IN THE EVENT OF ACCIDENT, CLAIM, SUIT OR LOSS is changed by adding the following:

a. Promptly notify the police if a hit-and-run driver is involved, and

b. Promptly send us copies of the legal papers is a "suit" is brought.

2. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US is changed by adding the followig:

If we make any payment due to an "accident" involving an "uninsured motor vehicle" and the "insured" recovers from another party, the "insured" shall hold the proceeds in trust for us and pay us back the amount we have paid to the extent such payment duplicates any amount we have paid under this coverage.

Copyright, Insurance Services Office, Inc. 1990

3. OTHER INSURANCE is [illegible]ced by the following:

a. If there is other applicable similar insurance available under more than one Coverage Form or policy, the following priorities of recovery apply:

First - The Uninsured Motorists Coverage applicable to the vehicle the "insured" was "occupying" at the time of the "accident."

Second - The Coverage Form or policy affording Uninsured Motorists Coverage to the "insured" as a named insured or family member.

b. Where there is no applicable insurance available under the first priority, the maximum recovery under all Coverage Forms or policies in the second priority shall not exceed the highest applicable limit for any one vehicle under any one Coverage Form or policy.

c. Where there is applicable insurance available under the first priority:

(1) The LIMIT OF INSURANCE applicable to the vehicle the "insured" was "occupying" under the Coverage Form or policy in the first priority, shall first be exhausted; and

(2) The maximum recovery under all Coverage Forms or policies in the second priority shall not exceed the amount by which the highest limit for any one vehicle under any one Coverage Form or policy in the second priority exceeds the limit applicable under the Coverage Form or policy in the first priority.

d. If two or more Coverage Forms or policies have equal priority:

(1) The insurer against whom the claim is first made shall process and pay the claim as if wholly responsible for all insurers with equal priority;

(2) The insurer thereafter is entitled to recover pro rata contribution from any other insurer on the same level of priority for the benefits paid and the costs of processing the claim; and

(3) If we are the insurer against whom the claim is first made, we will pay, subject to the limit of insurance for Uninsured Motorists Coverage shown in the Declarations, after all contributing insurers agree as to:

(a) whether the "insured" is legally entitled to recover damages from the owner or driver of an "uninsured motor vehicle;" and

(b) the amount of damages.

5. The following Condition is added:

ARBITRATION

a. If we and [illegible] insured" disagree whether the "insure[illegible] is legally entitled to recover damages from the owner or driver of an "uninsured motor vehicle" or do not agree as to the amount of damages, either party may make a written demand for arbitration. Each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will pay the expenses it incurs and bear the expenses of the third arbitrator equally.

b. Arbitration shall be conducted in accordance with the Pennsylvania Uniform Arbitration Act. Unless both parties agree otherwise, arbitration will take place in the county in which the "insured" lives. Local rules of law as to arbitration procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

F. **ADDITIONAL DEFINITIONS**

The following are added to the DEFINITIONS Section:

1. "Family member" means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

2. "Occupying" means in, upon, getting in, out or off.

3. "Uninsured motor vehicle" means a land motor vehicle or trailer:

a. For which no liability bond or policy applies at the time of an "accident."

b. For which an insuring or bonding company:

(1) denies coverage;

(2) is or becomes insolvent; or

(3) is or becomes involved in insolvency proceedings.

c. That is a hit-and-run vehicle and neither the driver nor owner can be identified. The vehicle must:

(1) hit an "insured," a covered "auto" or a vehicle an "insured" is "occupying;" or

(2) cause an "accident" resulting in "bodily injury" to an "insured" without hitting an "insured," a covered "auto" or a vehicle an "insured" is "occupying."

If there is no physical contact with the hit-and-run vehicle, the facts of the "accident" must be proved.

However, an "uninsured motor vehicle" does not include any vehicle:

a. Owned or operated by a self-insurer under

Copyright, Insurance Services Office, Inc. 1990

XXXXXXXXXXXXXX

any applicable motor veh[illegible] law, except a self-insurer who is or who becomes insolvent and cannot provide the amounts required by that motor vehicle law.

b. Owned by a [illegible]nmental unit or agency; or

c. Designed for use mainly off public roads while not on public roads.

Copyright, Insurance Services Office, Inc. 1990

COMMERCIAL AUTO

Attached to and forming a part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

**PENNSYLVANIA UNDERINSURED MOTORISTS COVERAGE - NONSTACKED**

For a covered "auto" licensed or principally garaged in Pennsylvania, this endorsement modifies insurance provided under the following:

BUSINESS AUTO NON-TRUCKING COVERAGE FORM.
BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

A. **COVERAGE**

1. We will pay all sums the "insured" is legally entitled to recover as damages from the owner or driver of an "underinsured motor vehicle." The damages must result from "bodily injury" sustained by the "insured" caused by an "accident." The owner's or driver's liability for these damages must result from the ownership, maintenance or use of an "underinsured motor vehicle."

2. We will pay all sums the "insured" is legally entitled to recover as damages from the owner or driver of an "underinsured motor vehicle" only after all liability bonds or policies have been exhausted by judgments or payments

3. No judgment for damages arising out of a "suit" brought against the owner or operator of an "underinsured motor vehicle" is binding on us unless we:

a. Received reasonable notice of the pendency of the "suit" resulting in the judgment; and

b. Had a reasonable opportunity to protect our interests in the "suit."

B. **WHO IS AN INSURED**

1. You.

2. If you are an individual, any "family member."

3. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto." The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

4. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured."

C. **EXCLUSIONS**

This insurance does not apply to any of the following:

1. Any claim settled without our consent.

2. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability or similar law.

3. Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

D. **LIMIT OF INSURANCE**

1. Regardless of the number of covered "autos," "insureds," premiums paid, claims made or vehicles involved in the "accident," the most we will pay for all damages resulting from any one "accident" is the LIMIT OF INSURANCE for UNDERINSURED MOTORISTS COVERAGE shown in the Declarations.

However, no "insured" will be entitled to receive duplicate payments for the same elements of loss.

2. Any amount payable for damages under this coverage shall be reduced by all sums paid by or for anyone who is legally responsible, including all sums paid for the same damages under this Coverage Form's LIABILITY COVERAGE.

3. Any amount paid under this coverage will reduce any amount an "insured" may be paid for the same damages under this Coverage Form's LIABILITY COVERAGE.

E. **CHANGES IN CONDITIONS**

The CONDITIONS are changed for PENNSYLVANIA UNDERINSURED MOTORISTS COVERAGE - NONSTACKED as follows:

1. DUTIES IN THE EVENT OF ACCIDENT, CLAIM, SUIT OR LOSS is changed by adding the following:

Promptly send us copies of the legal papers if a "suit" is brought.

2. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US is changed by adding the following:

If we make any payment due to an "accident"involving an "underinsured motor vehicle" and the "insured" recovers from another party,the "insured" shall hold the proceeds in trust for us and pay us back the amount we have paid to the extent such payment duplicates any amount we have paid under this coverage.

3. OTHER INSURANCE is replace by following:

Copyright, Insurance Services Office, Inc. 1990

XXXXXXXXXXXXXX

a. If there is other applicable similar insurance available under more than one Coverage Form or policy, the following priorities of recovery apply:

First - The Underinsured Motorists Coverage applicable to the vehicle the "insured" was "occupying" at the time of the "accident."

Second- The Coverage Form or policy affording Underinsured Motorists Coverage to the"insured" as a named insured or family member.

b. Where there is no applicable insurance available under the first priority, the maximum recovery under all Coverage Forms or policies in the second priority shall not exceed the highest applicable limit for any one vehicle under any one Coverage Form or policy.

c. Where there is applicable insurance available under the first priority:

(1) The LIMIT OF INSURANCE applicable to the vehicle the "insured" was "occupying" under the Coverage Form or policy in the first priority, shall first be exhausted; and

(2) The maximum recovery under all Coverage Forms or policies in the second priority shall not exceed the amount by which the highest limit for any one vehicle under any one Coverage Form or policy in the second priority exceeds the limit applicable under Coverage Form or policy in the first priority.

d. If two or more Coverage Forms or policies have equal priority:

(1) The insurer against whom the claim is first made shall process and pay the claim as if wholly responsible for all insurers with equal priority.

(2) The insurer thereafter is entitled to recover pro rate contribution from any othe insurer for the benefits paid and the costs of processing the claim; and

(3) If we are the insurer against whom the claim is first made, we will pay, subject to the limit of insurance for Underinsured Motorists Coverage shown in the Declaration after all contributing insurers agree as to:

(a) whether the "insured" is legally entitled to recover damages from the owner or driver of an "underinsured motor vehicle;" and

(b) the amount of damages

5. The following Condition is added:

**ARBITRATION**

If we and an "insured"disagree whether the "insured" is legally entitled to recover damages from the owner or driver of an "underinsured motor vehicle" or do not agree as to the amount of damages, either party may make a written demand for arbitration. Each party will select an arbitrator. The two arbitrators will select a third. If they cannot agree within 30 days, either may request that selection be made by a judge of a court having jurisdiction. Each party will pay the expenses it incurs and bear the expenses of the third arbitrator equally.

b. Arbitration shall be conducted in accordance with the Pennsylvania Uniform Arbitration Act. Unless both parties agree otherwise, arbitration will take place in the county in which the "insured" lives. Local rules of law as to arbitration procedure and evidence will apply. A decision agreed to by two of the arbitrators will be binding.

F. **ADDITIONAL DEFINITIONS**

The following are added to the DEFINITIONS Section:

1. "Family member" means a person related to you by blood, marriage or adoption who is a resident of your household, including a ward or foster child.

2. "Occupying" means in, upon, getting in, on, out or off.

3. "Underinsured motor vehicle" means vehicle for which the sum of all liability bonds or policies that apply at the time of an "accident" do not provide at least the amount an "insured" is legally entitled to recover as damages.

However, an "underinsured motor vehicle does not include any vehicle

a. Owned or operated by a self-insurer under any applicable motor vehicle law;

b. Owned by a governmental unit or agency; or

c. Designed for use mainly off public roads while not on public roads.

Copyright, Insurance Services Office, Inc. 1990

xxxxxxxxxxxxxx

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## PUNITIVE, EXEMPLARY AND EXTRACONTRACTUAL DAMAGE EXCLUSION

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO NON-TRUCKING LIABILITY COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

The following exclusion is added:

PUNITIVE, EXEMPLARY AND EXTRACONTRACTUAL DAMAGE

This policy does not insure against or provide indemnity for fines, penalties, exemplary or punitive damages or any other type or kind of judgment or award which does not compensate the party benefiting from the award or judgment for any actual loss or damage sustained.

This exclusion applies to all coverages provided under this policy.

COMMERCIAL AUTO

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## WRONG DELIVERY OF LIQUID PRODUCTS

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
TRUCKERS COVERAGE FORM

LIABILITY COVERAGE is changed by adding the following exclusion:

This insurance does not apply to:

"Bodily injury" or "property damage" resulting from the delivery of any liquid into the wrong receptacle or to the wrong address, or from the delivery of one liquid for another, if the "bodily injury" or "property damage" occurs after delivery has been completed.

Delivery is considered completed even if further service or maintenance work, or correction, repair or replacement is required because of wrong delivery.

Copyright, Insurance Services Office, Inc., 1985

Attached to and forming part of Policy Number EFFECTIVE TO
ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**
(Broad Form)

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
SPECIAL PROTECTIVE AND HIGHWAY LIABILITY POLICY NEW YORK DEPARTMENT OF TRANSPORTATION

1. The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage:"

(1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance, Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1945, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreeemnt entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from the "hazardous properties" of "nuclear material," it:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of an "insured" or (b) has been discharged or dispersed therefrom:

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an "insured;" or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility," but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damge" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

"Hazardous properties" include radioactive, toxic or explosive properties;

"Nuclear material" means "source material," "special nuclear material" or by-product material;"

"Source material," "special nuclear material," and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

Copyright, Insurance Services Office, Inc. 1983, 1984 

XXXXXXXXXXXXXXXXXX

"Spent fuel" means any el element or fuel component, solid or . uid, which has been used or exposed to radiation in a "nuclear reactor;"

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility."

"Nuclear facility" means:

(a) Any "nuclear reactor;"

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or packaging "waste;"

(c) Any equipmen r device used for the processing, . icating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste;"

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"Property damage" includes all forms of radioactive contamination of property.

Copyright, Insurance Services Office, Inc. 1983, 1984

LINCOLN GENERAL INSURANCE COMPANY
3350 WHITEFORD ROAD
YORK, PENNSYLVANIA 17402

COMMERCIAL AUTO

Attached to and forming part of Policy Number PAP 1857700495 EFFECTIVE 04/18/1995 TO 04/18/1996

ISSUED TO: JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701

LOSS PAYEE: JERSEY SHORE STATE BANK
300 MARKET STREET
WILLIAMSPORT PA 17701

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

LOSS PAYABLE CLAUSE

This endorsement modifies insurance provided under this policy.

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

A. We will p a y, as interst may appear, you and the loss payee named in the policy for "loss" to covered "auto."

B. The insurance covers the interest of the loss payee unless the "loss" results from conversion, secretion or embazzlement on your part.

C. We may cancel the policy as allowed by the CANCELLATION Common Policy Conditions.

Cancellation ends this agreement as to the loss payee's interest. If we cancel the policy we will mail you and the loss payee the same advance notices.

D. If we make any payments to the loss payee, we will obtain his or her rights against any other party.

THIS CLAUSE IS APPLICABLE TO THE FOLLOWING COVERED "AUTO(S)":

| UNIT# | YEAR | TRADE NAME | BODY TYPE | SERIAL # | INSURED VALUE* | DEDUCTIBLES: OTHERTHAN COLLISION | DEDUCTIBLES: COLLISION | DEDUCTIBLES: DUMPING LOSS ** |
|---|---|---|---|---|---|---|---|---|
| 1 | 1985 | WHITE | TRACTOR | 1WUYDCFE4FN071239 | 16,000 | 1,000 | 1,000 | |
| 2 | 1969 | FRUEHAUF | TRAILER | UNJ325403 | 4,000 | 1,000 | 1,000 | |
| 3 | 1969 | FRUEHAUF | TRAILER | UNJ325404 | 4,000 | 1,000 | 1,000 | |
| 4 | 1974 | TRLMOBILE | TRAILER | K41315 | 5,000 | 1,000 | 1,000 | |
| 6 | 1969 | FRUEHAUF | TRAILER | UNJ325401 | 4,000 | 1,000 | | |
| 7 | 1969 | FRUEHAUF | TRAILER | UNJ325402 | 4,000 | 1,000 | 1,000 | |
| 8 | 1974 | TRLMOBILE | TRAILER | K41316 | 5,000 | 1,000 | | |
| 9 | 1974 | TRLMOBILE | TRAILER | K41317 | 5,000 | 1,000 | | |

* If value is shown, coverage is limited to lesser of Insured Value or ACV.

** If the "BODY TYPE" indicated above is a "dump" unit, a special deductible is applicable to each and every loss which occurs while loading and/or unloading in the course of any dumping operation.

Copyright, Insurance Services Offices, Inc. 1993

LINCOLN GENERAL INSURANCE COMPANY
3350 WHITEFORD ROAD
YORK, PENNSYLVANIA 17402

COMMERCIAL AUTO

Attached to and forming part of Policy Number PAP 1857700495 EFFECTIVE 04/18/1995 TO 04/18/1996

ISSUED TO: JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701

LOSS PAYEE: JERSEY SHORE STATE BANK
300 MARKET STREET
WILLIAMSPORT PA 17701

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

LOSS PAYABLE CLAUSE

This endorsement modifies insurance provided under this policy.

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

A. We will p a y, as interst may appear, you and the loss payee named in the policy for "loss" to covered "auto."

B. The insurance covers the interest of the loss payee unless the "loss" results from conversion, secretion or embazzlement on your part.

C. We may cancel the policy as allowed by the CANCELLATION Common Policy Conditions.

Cancellation ends this agreement as to the loss payee's interest. If we cancel the policy we will mail you and the loss payee the same advance notices.

D. If we make any payments to the loss payee, we will obtain his or her rights against any other party.

THIS CLAUSE IS APPLICABLE TO THE FOLLOWING COVERED "AUTO(S)":

| UNIT# | YEAR | TRADE NAME | BODY TYPE | SERIAL # | INSURED VALUE* | DEDUCTIBLES: OTHERTHAN COLLISION | COLLISION | DUMPING LOSS ** |
|---|---|---|---|---|---|---|---|---|
| 10 | 1974 | TRLMOBILE | TRAILER | K41318 | 5,000 | 1,000 | | |
| 11 | 1993 | J & L | TANK TRLR | 1J9P4AT21P2001084 | 36,312 | 1,000 | 1,000 | |
| 15 | 1981 | BUTLER | TRAILER | 1TB114028BM452714 | 10,000 | 1,000 | 1,000 | |
| 16 | 1979 | F-LINER | TRACTOR | CA213HM160222 | 7,500 | 1,000 | 1,000 | |
| 17 | 1988 | F-LINER | TRACTOR | 1FUP2DYBXJH340788 | 24,000 | 1,000 | 1,000 | |

* If value is shown, coverage is limited to lesser of Insured Value or ACV.

** If the "BODY TYPE" indicated above is a "dump" unit, a special deductible is applicable to each and every loss which occurs while loading and/or unloading in the course of any dumping operation.

Copyright, Insurance Services Offices, Inc. 1993

COMMERCIAL AUTO

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**CHANGES - OTHER INSURANCE**
**HIRED AUTO PHYSICAL DAMAGE COVERAGE**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
BUSINESS AUTO PHYSICAL DAMAGE COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

**A.** Paragraph **5. b.** of the OTHER INSURANCE Condition in the Business Auto, Business Auto Physical Damage and Garage Coverage Forms is replaced by the following:

**5.** OTHER INSURANCE

**b.** For Hired Auto Physical Damage coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own.

**B.** Paragraph **5. d.** of the OTHER INSURANCE - PRIMARY AND EXCESS INSURANCE PROVISIONS Condition in the Truckers Coverage Form and Truckers Endorsement is replaced by the following:

**5.** OTHER INSURANCE - PRIMARY AND EXCESS INSURANCE PROVISIONS

**d.** For Hired Auto Physical Damage coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own.

Includes copyrighted material of Insurance Services Office, Inc.
with its permission. Copyright, Insurance Services Office, Inc., 1991

Attached to and forming part of Policy Number EFFECTIVE TO
ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

## COMMON POLICY CONDITIONS

All Coverage Parts included in this policy are subject to the following conditions.

A. CANCELLATION

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. CHANGES

This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

C. EXAMINATION OF YOUR BOOKS AND RECORDS

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

D. INSPECTIONS AND SURVEYS

We have the right but are not obligated to:

1. Make inspections and surveys at any time;

2. Give you reports on the conditions we find; and

3. Recommend changes.

Any inspections, surveys, reports or recommendations relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

1. Are safe or healthful; or

2. Comply with laws, regulations, codes or standards.

This condition applies not only to us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

E. PREMIUMS

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

F. TRANSFER OF YOUR RIGHTS AND DUTIES UNDER THIS POLICY

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

Copyright, Insurance Services Office, Inc. 1982, 1983

Attached to and forming part of Policy Number EFFECTIVE TO
ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PENNSYLVANIA CHANGES – CANCELLATION AND NONRENEWAL**

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
BUSINESSOWNERS POLICY
COMMERCIAL AUTO COVERAGE PARTS
COMMERCIAL CRIME COVERAGE PART*
COMMERCIAL GENERAL LIABILITY COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
POLLUCTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

* This endorsement does not apply to coverage provided for employee dishonesty (Coverage Form A) or public employee dishonesty (Coverage Forms O and P).

A. The CANCELLATION Common Policy Condition is replaced by the following:

**CANCELLATION**

1. The first Named Insured shown in the Declarations may cancel this policy by writing or giving notice of cancellation.

2. **CANCELLATION OF POLICIES IN EFFECT FOR LESS THAN 60 DAYS.**

   We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least 30 days before the effective date of cancellation.

3. **CANCELLATION OF POLICIES IN EFFECT FOR 60 DAYS OR MORE**

   If this policy has been in effect for 60 days or more or if this policy is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

   a. You have made a material misrepresentation which affects the insurability of the risk. Notice of cancellation will be mailed or delivered at least 15 days before the effective date of cancellation.

   b. You have failed to pay a premium when due, whether the premium is payable directly to us or our agents or indirectly under a premium finance plan or extension of credit. Notice of cancellation will be mailed at least 15 days before the effective date of cancellation.

   c. A condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the policy period. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

   d. Loss of reinsurance or a substantial decrease in reinsurance has occurred, which loss or decrease, at the time cancellation, shall be certified to the Insurance Commissioner as directly affecting inforce policies. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

   e. Material failure to comply with policy terms, conditions or contractual duties. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

   f. Other reasons that the Insurance Commissioner may approve. Notice of cancellation will be mailed or delivered at least 60 days before the effective date of cancellation.

   This policy may also be cancelled from inception upon discovery that the policy was obtained through fraudulent statements, omissions or concealment of facts material to the acceptance of the risk or to the hazard assumed by us.

4. We will mail or deliver our notice to the first Named Insured's last mailing address known to us. Notice of cancellation will state the specific reasons for cancellation.

Copyright, Insurance Services Office, Inc., 1986, 1989
Copyright, ISO Commercial Risk Services, Inc., 1986, 1989

xxxxxxxxxxxxxxx

5. Notice of cancellati will state the effective date of ca...ellation. The policy period will end on that date.

6. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata and will be returned within 10 business days after the effective date of cancellation. If the first Named Insured cancels, the refund may be less than pro rata and will be returned within 30 days after the effective date of cancellation. The cancellation will be effective even if we have not made or offered a refund.

7. If notice is mailed, it will be by registered or first class mail. Proof of mailing will be sufficient proof of notice.

B. The following are added and supersede any provisions to the contrary:

1. **NONRENEWAL**

If we decide not to renew this policy, we will mai - deliver written notice of nonrene. , stating the specific reasons for nonrenewal, to the first Named Insured at least 60 days before the expiration date of the policy.

2. **INCREASE IN PREMIUM**

If we increase your renewal premium, we will mail or deliver to the first Named Insured:

a. Written notice of our intent to increase the premium at least 60 days before the effective date of the premium increase; and

b. An estimate of the increase at least 30 days before the effective date of premium increase.

Any notice of nonrenewal or renewal premium increase will be mailed or delivered to the first Named Insured's last known address. If notice is mailed, if will be by registered or or first class mail. Proof of mailing will be sufficient proof of notice.

Copyright, Insurance Services Office, Inc., 1986, 1989
Copyright, ISO commercial Risk Services, Inc., 1986, 1989

xxxxxxxxxxxxxxx

Attached to and forming a part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

**PENNSYLVANIA CHANGES**

This endorsement modifies insurance provided under the following:

BUSINESS AUTO NON-TRUCKING COVERAGE FORM.
BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
TRUCKERS COVERAGE FORM

For a covered "auto" licensed or principally garaged in, or "garage operations" conducted in, Pennsylvania, the Coverage Form is changed as follows:

A. CHANGES IN CONDITIONS

The following is added to the GENERAL CONDITIONS section:

CONSTITUTIONALITY CLAUSE

The premium for, and the coverages of, this Coverage Form have been established in reliance upon the provisions of the Pennsylvania Motor Vehicle Financial Responsibility Law.

In the event a court, from which there is no appeal, declares or enters a judgment, the effect of which is to render the provisions of such statute invalid or unenforceable in whole or in part, we shall have the right to recompute the premium payable for the Coverage Form and void or amend the provisions of the Coverage Form, subject to the approval of the Insurance Commissioner.

Copyright, Insurance Services Office, Inc. 1990

COMMERCIAL AUTO

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULY.

**PENNSYLVANIA NOTICE**

An Insurance Company, its agents, employees, or service contractors acting on its behalf, may provide services to reduce the likelihood of injury, death or loss. These services may include any of the following or related services incident to the application for, issuance, renewal or continuation of, a policy of insurance:

1. Surveys;

2. Consultation or advice; or

3. Inspections.

The "Insurance Consultation Services Exemption Act" of Pennsylvania provides that the Insurance Company, its agents, employees or service contractors acting on its behalf is not liable for damages from injury, death or loss occurring as a result of any act of omission by any person in the in the furnishing of or the failure to furnish these services.

The Act does not apply:

1. If the injury, death or loss occurred during the actual performance of the services and was caused by the negligence of the Insurance Company, its agents, employees or services contractors;

2. To consultation services required to be performed under a writtenn service contract not related to a policy of insurance; or

3. If any acts or omissions of the Insurance Company, its agents, employees or service contractors are judicially determined to constitute a crime, actual malice, or gross negligence.

Copyright, Insurance Services Office, Inc. 1981

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:

**MOTOR TRUCK CARGO INSURANCE**
**TRANSIT AND LOCATION COVERAGE**
**(Broad Form)**

**PROPERTY COVERED**
This policy covers all lawful goods and merchandise, except as excluded or restricted by this or any other policy, while loaded for shipment and in transit in or on a "described vehicle."

**COVERED RADIUS OF OPERATION**
The radius of operation is the radius shown in this policy or any other policy to which this insurance applies.

**TERRITORY WHERE COVERAGE APPLIES**
Coverage applies only while the property is in the United States, Canada and Puerto Rico. This includes property that is in transit except to or from Alaska, Hawaii or Puerto Rico.

**COVERAGE AMOUNT**
The most "we" will pay for all covered property is $2,000.00 (two thousand dollars) on any one item, any one loss, catastrophe or disaster, either in case of partial loss or total loss, salvage charges or expenses or all combined. This amount is excess over any other collectible insurance. If there is other collectible insurance that applies to a covered loss, or would have applied in the absence of this Inland Marine coverage, "we" will pay for the loss only after the full amount from the other insurance has been paid.

**DEDUCTIBLE**
$1,000.00 (one thousand dollars) deductible applies to each loss after all other adjustments have been made.

**EXTENSION OF COVERAGE**
This extension of coverage does not increase the coverage amount stated above.

Substitute Vehicles - If a "described vehicle" is disabled, "you" may use a replacement vehicle to complete the transit of the covered cargo. This coverage applies only until the covered cargo reaches its original destination. "You" do not have to report the use of these replacement vehicles.

**PROPERTY EXCLUDED**
"We" do not cover:

1. cargo on a vehicle after it has remained at any location for more than 72 hours. This includes locations that "you" own or use.
2. cargo in a detached truck body, trailer or semi-trailer if not a "described vehicle" on the policy.
3. money. This means currency, coins, bank notes, money orders, traveler's checks, bullion and similar items.
4. securities. These are any negotiable or nonnegotiable agreements in writing that have value. They include revenue stamps, other stamps in current use, tokens and tickets.
5. accounts, manuscripts, mechanical drawings and other records and documents.
6. fine arts. "We" do cover these losses if they are caused by fire; lightning; windstorm; earthquake; flood; smoke; explosion; aircraft, spacecraft; self-propelled missiles and objects that fall from these items; vehicles, collision; upset or overturn of a "described vehicle;" collapse of a bridge or culvert; vandalism; theft; attempted theft; or collapse of buildings.
7. livestock or poultry. "We" do cover losses for total death or injury rendering death immediately necessary in consequence of a covered peril.
8. breakage of eggs. "We" do cover losses if two (2) conditions are met. First, the breakage must be caused by a covered peril, secondly, fifty percent (50%) or more of the eggs within each damaged shipping package or crate must be broken. The most "we" will pay for any one (1) package or crate is $ 200.00.
9. damage to a "described vehicle"
10. tarpaulins, or wrapping materials
11. cargo for which "you" are legally liable while it is in the custody of another carrier. "We" do cover this property if "you" have not waived "your" right to recover for a loss against that carrier.
12. freight charges. "We" do cover freight charges earned prior to a shipment if "you" are legally liable for this charge.

**PERILS COVERED**
"We" cover direct physical loss to covered cargo unless the loss is caused by a peril that is excluded. The loss must be due to an external cause.

**PERILS EXCLUDED**
"We" do not pay for a loss if one or more of the following excluded perils apply to the loss, regardless of other causes or events that contribute to or aggravate the loss, whether such causes or events act to produce the loss before, at the same time as, or after the excluded peril.

"We" do not pay for a loss that results from:

1. a dishonest or illegal act, alone or in collusion with another, by:
 a. "you;"
 b. others who have an interest in the property;
 c. others to whom "you" entrust the property; or
 d. the employees or agents of a., b. or c., whether or not they are at work.
 "We" do cover loss caused by dishonest acts by carriers or other bailees or hire.

2. mysterious disappearance.

3. theft of a part of the contents of any shipping package.

4. misdelivery.

5. corrosion or rust.

6. the following:
 a. breakage;
 b. marring or scratching;
 c. leakage, evaporation or shrinkage;
 d. mold or rot.
 e. property becoming soured, scented, discolored or changed in flavor.
 f. contact with oil; and
 g. the contact of one commodity with another.
 "We" do cover these losses if they are caused by fire; lightning; windstorm, earthquake; flood smoke; explosion; aircraft, spacecraft; self-propelled missiles and objects that fall from these items; vehicles, collision; upset or overturn of a described vehicle; collapse of a bridge or culvert; vandalism; theft; attempted theft; or collapse of buildings.

7. mechanical or electrical breakdown or failure. If a fire or explosion results, "we" do cover the loss caused by the fire or explosion.
8. breakdown or failure of a refrigerating unit.
9. breakdown or failure of heating equipment installed in a cargo compartment.
10. loading cargo onto or unloading it from a "described vehicle."
 "We" do provide coverage for these perils if "you" carry primary insurance for these type hazards.
11. rough handling or poor packing.
12. strike, riot or civil commotion.

There are other perils that are not covered. These are listed in the Inland Marine General Terms.

**VALUATION**
This replaces the "Valuation" provision in the Inland Marine General Terms. The value of the property will be based on the following amounts

1. If there is an invoice, the property will be valued at the cost shown on the invoice.
2. If there is no invoice:
 a. property that is sold but not delivered will be valued at its n e t selling price after all discounts and allowances have been taken.
 b. all other property will be valued at its actual cash value.
3. The property of others will be valued at the amount that "you" are liable for to the owner. This includes the cost of labor and materials that "you" have invested in the property. However, the value of this property will never be more than its actual cash value.
4. exhibitions and displays will be valued at "your" cost if they belong to "you."
5. negatives and film prints will be valued at the cost to replace these items with an equal amount of raw stock.
6. if exclusion #5 under "PROPERTY EXCLUDED" has b e e n deleted than accounts, manuscripts, mechanical drawings and other records and documents will be valued at the c o s t to replace them with an equal amount of raw stock, plus the cost to duplicate them from original materials if they can be duplicated.
7. all other property will be valued at its actual cash value.

**BRANDS AND LABELS**

If covered property that has a brand or label is damages by a covered peril and "we" agree to take all or part of the property at an agreed or appraised value, "you" must:

1. stamp "salvage" on the property or its container; or
2. remove the label.

Stamping "Salvage" or removing the label must not cause further physical damage to property. The expense of "stamping" or removal will be charged to salvaging expense.

**AMOUNT WE PAY**

This replaces the "Amount We Pay" provision in the Inland Marine General Terms. The smallest of the amounts shown below is the most that "we" will pay "you" for a loss.

1. the amount of "your" interest in the property.
2. the value shown in the tariff document, bill of lading or shipping receipt.
3. the amount determined by the valuation clause.
4. the cost to repair, rebuild or replace the property with material of like kind and quality.
5. the coverage amount shown.

In all cases, the amount "we" pay will be excess over any collectible insurance "you" carry. "We" will pay for the loss only after the full amount from the other insurance has been paid.

**PREMISES PROTECTION**

"You" m u s t maintain in proper working order the protective devices that were in operation on the effective date of this coverage. "Your" failure to do so will void coverage at the premises where the the device is located. Coverage will not be void if the operation of the device is suspended because of:

1. a maintenance, repair, adjustment or service operation; or
2. an event that is beyond "your" control.

**DEFINITIONS**

In addition to the definitions in the Inland Marine General Terms, the following definitions apply :

"described vehicle" - a unit described under SECTION I - COVERED AUTOS of the Commercial Automobile division of this package policy. For the purpose of this coverage a described vehicle of the Commercial Tractor type shall include any undescribed attached trailer(s) or semi-trailer(s).

commercial tractor - is a unit not designed to carry or transport any property,goods or merchandise in and of its self except by the use of a trailer or semitrailer

**DEDUCTIBLE WAIVER**

The deductible for this coverage shall be waived if at the time of loss "we" provided cargo coverage for "you" under a separate Inland Marine Floater Policy.

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

## AGREEMENT

In return for "your" payment of the required premium, "we" provide the Inland Marine coverage described in this policy during the policy period subject to the:

1. Inland Marine General "Terms."
2. Inland Marine coverage "terms."
3. Policy "terms" that relate to cancellation, changes made to the policy, examination of books and records, inspections and surveys, and assignment or transfer of rights or duties.

## INLAND MARINE GENERAL TERMS

### DEFINITIONS

1. The words "you" and "your" mean the person, persons or organization named on the Declarations.

2. The words "we," "us" and "our" mean the company providing this insurance.

3. "Insured" means "you." With respect to covered property that is not used for business, the insured also means:

 a. "your" spouse;

 b. "your" relatives if residents of "your" household;

 c. persons under the age of 21 in "your" care or the care of "your" resident relatives; or

 d. "your" legal representative if "you" die while insured by this policy.(This person is an "insured" only for the covered property.)

4. "Business" means a trade, profession or occupation whether full or part time. This includes:

 a. the rental of property to others; and

 b. farming.

5. "Described premises" means that part of the building and grounds which "you" occupy at the location shown.

6. "Terms" means the conditions, definitions, exclusions, limitations and provisions used in this policy.

### PERILS EXCLUDED

"We" do not pay for a loss if one or more of the following excluded perils apply to the loss, regardless of other causes or events that contribute to or aggravate the loss whether such causes or events act to produce the loss before, at the same time as or after the excluded peril. "We" do not pay for a loss that results from:

1. wear and tear to covered property.

2. gradual deterioration of covered property.

3. a fault or weakness that is intrinsic to the property which causes it to break, spoil, become defective or destroy itself.

4. insects or vermin damage to covered property.

5. delay, loss of market, loss of use, or "business" interruption.

6. obsolescence or depreciation of covered property.

7. war. This means:

 a. declared war, undeclared war, civil war, insurrection, rebellion or revolution;

 b. a warlike act by a military force or by military personnel;

 c. the destruction, seizure or use of the property for a military purpose; or

 d. the discharge of a nuclear weapon even if it is accidental.

8. civil authority. This means:

 a. seizure of destruction under quarantine or customs regulations;

 b. confiscation or destruction by order of a government or public authority; or

 c. risks of contraband or illegal transportation or trade.

9. nuclear hazard. This means nuclear reaction, nuclear radiation or radioactive contamination:

 a. whether controlled or uncontrolled; or

 b. caused by, contributed to or aggravated by a peril covered by this policy. A loss caused by nuclear hazard will not be

COPYRIGHT 1984 AAIS

considered to be a lo[illegible] caused by fire, explosion or smoke. If t[illegible] is covered by this policy, "we" do cover the loss caused by a fire that results from the nuclear hazard.

10. other perils that are not covered. These are listed for each coverage.

"We" do not pay for such excluded loss even if the following contribute to, aggravate or cause the loss:

1. the act or decision of a person, group, organization or governmental body. This includes the failure to act or decide.

2. a fault, defect or error, negligent or not, in:

a. planning, zoning, surveying, siting, grading, compacting, land use, or development of property.

b. the design, blueprint, specification, workmanship, construction, renovation, remodeling or repair of property. This includes the materials needed to construct, remodel or repair the property.

c. maintenance of property.

These apply whether or not the property is covered by this policy.

3. a condition of the weather.

4. the collapse of a building or structure.

**WHAT MUST BE DONE IN CASE OF LOSS**

1. **Protect the Property.** The "insured" must take all reasonable steps to protect or recover the covered property after a loss has occurred.

2. **Notice.** The "insured" must promptly notify "us" or "our" agent,in writing if requested.

3. **Notice to Police.** The "insured" must promptly notify the police if the loss results from a violation of the law.

4. **Proof of Loss.** The "insured" must send "us" a statement of loss, under oath if requested within 90 days after the loss occurs. The following information must be included:

a. the date, time, place and details of the loss.

b. other insurance that may cover the loss.

c. "your" interest and the interest of all others in the property involved in the loss. This includes all mortgages and liens.

d. changes in the title to the covered property during the policy period.

e. detailed estimates for the repair or replacement of the covered property.

f. an inventory of lost, damaged and all remaining covered property. This must show in deta[illegible] he quantity, description, cost and actu[illegible] cash value of the property and the amount of the loss. Copies of all bills, receipts and related documents that substantiate the inventory must be attached.

5. **Additional Duties.** As often as "we" may reasonably request, an "insured" must:

a. submit to an examination under oath.

b. assist "us" in obtaining the attendance of employees for examination under oath.

c. exhibit damaged and undamaged property.

d. produce all records that relate to value, loss and cost, and permit copies and abstracts to be made from them.

6. **Cooperation.** The "insured" must cooperate with "us" in performing all acts that are required by this Inland Marine coverage.

7. **Volunteer Payments.** The "insured" may not voluntarily make payments, assume obligations, pay or offer rewards or incur other expenses, except at the "insured's" own expense.

8. **Abandonment.** The "insured"may not abandon the property to "us" without "our" written consent.

**HOW MUCH WE PAY**

1. **Actual Cash Value.** Actual cash value includes a deduction for depreciation, however caused.

2. **Valuation.** Valuation is based on the actual cash value of the property at the time of loss.

3. **The Amount We Pay.** The smallest of the amounts shown below is the most that "we" will pay for a loss:

a. the amount determined under "Valuation."

b. the cost to repair, replace or rebuild the property with material of like kind and quality.

c. the amount of "your' interest in the property.

d. the coverage amount shown.

This amount will be adjusted by the deductible amount, coinsurance penalty or other limitation which may apply.

4. **Loss to Pairs or Sets.** If there is a loss to an item that is part of a pair or set, at "your" option "we" will pay the full actual cash value up to the coverage amount shown for the pair or set. "You" will give "us" the remainder of the pair or set. If "you" do not choose this option,"we" will pay only for a reasonable part of the actual cash value of the pair or set.

5. **Loss to Parts.** If there is a loss to an

COPYRIGHT 1984 AAIS

item that consists of [illegible]al parts, "we" will pay only for the loss to that part. A loss to a part is not considered to be a loss to the whole item.

6. **Insurance Under More Than One Policy.** If there is other collectible insurance that applies to a covered loss, or would have applied in the absence of this Inland Marine coverage, "we" will pay for the loss only after the full amount from the other insurance has been paid.

7. **Insurance Under More Than One Coverage.** If more than one coverage applies to the same loss, "we" will pay no more than the actual amount of the loss.

8. **Losses Paid By Others.** "We" will not pay for that part of a loss that has been paid by someone else.

9. **Restoring the Coverage Amount.** The payment of a claim will not reduce the coverage amount. If "we" pay a loss for items that are separately listed and the coverage amount that applies to these items is reduced at "your" request, "we" will return the unearned premium for these items to "you."

**LOSS PAYMENT**

1. **Our Options.** "We" may:

a. pay the loss in money; or

b. repair, replace or rebuild the property. "We" must give the "insured" notice of "our" intent to do so within 30 days after "we" received a satisfactory proof of loss.

"We" may take all or a part of the damaged property at the agreed or appraised value. Property that "we" have paid for or replaced will become "our" property.

2. **Your Property.** "We" will adjust all losses with "you." Payment will be made to "you" unless a loss payee is named with respect to this Inland Marine coverage.

3. **Property of Others.** Loss to property of others may be adjusted with "you." "We" reserve the right to adjust the loss with the owner. "Our" payment to the owner will satisfy "our" obligation to "you" for loss to this property. At "our" option, withous cost to "you," "we" may choose to defend "you" from suits which result from a covered loss to the property of others.

4. **When We Pay.** "We" will pay for a loss within 30 days after a satisfactory proof of loss is received and the amount of the loss has been agreed to in writing.

**CLAIMS AGAINST OTHERS**

1. **Subrogation.** If "we" pay for a loss, "we" may require the "insured" to assign to "us" the right of recovery against others. "We" will not pay for a loss if the "insured" impairs this right to recover. The "insured's" right to recover from others may be waived in writing before a loss occurs.

2. **Loan Receipt.** When we believe that a loss can be recovered from others;

a. "we" may make an advance payment to "you" in the form of a loan.

b. at "our" expense, "we" will be allowed to bring suit in the "insured's" name against those who are responsible for the loss.

c. the loan will be repaid from the amount recovered.

3. **Recoveries.** The "insured" must notify "us" or "we" must notify the "insured" promptly if either receives a recovery for a loss which "we" have paid. The costs that are incurred by either party in making the recovery are to be reimbursed first. "We" are entitled to the surplus up to the amount that "we" have paid for the loss. The "insured" may then keep any excess.

**DISAGREEMENTS**

1. **Appraisal.** If "you" and "we" do not agree on the amount of the loss, the actual cash value of the property or the cost to repair or replace the property, either party may demand that these amounts be determined by appraisal. If either party makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days after the receipt of the written demand. The two appraisers will select a competent, impartial umpire. If the two appraisers are unable to agree upon an umpire within 15 days, "you" or "we" can ask a judge of a court in the state where the appraisal is pending to select an umpire.

The appraisers will determine:

a. the amount of the loss;

b. the actual cash value of the property; and

c. the cost to repair or replace the property.

Each amount will be stated separately.

If the appraisers submit a written report of an agreement to "us," the agreement will establish these amounts. If the appraisers fail to agree within a reasonable time, they will submit only their differences to the umpire. A written agreement by any two of these three will establish the amounts stated above.

Each appraiser will be paid by the party selecting that appraiser. The compensation of the umpire and other expenses of the appraisal will be shared equally by "you" and "us."

2. **Suit Against Us.** No suit to recover for a loss may be brought against us unless:

a. all the "terms" of this Inland Marine coverage have been complied with; and

b. the suit is commenced within one year after the loss.

COPYRIGHT 1984 AAIS

xxxxxxxxx

OTHER POLICY CONDITIONS

1. **Conformity With Statutes.** The "terms" of this Inland Marine coverage in conflict with statutes of the state where this policy is issued are changed to conform to those statutes.

2. **Continuous Policies.** If this policy is issued on a continuous basis (with no specific date of expiration), "we" may substitute or "we" may add at each anniversary date the forms and endorsements then authorized for use with this Inland Marine coverage.

3. **Liberalization.** If a revision of a form endorsement which would broaden coverage without an additional premium is adopted during the policy period,or within 6 months before the Inland Marine coverage is effective, the broadened coverage will apply.

4. **Mispresentation, Concealment or Fraud.** This Inland Marine Coverage is void if before or after a loss:

a. the "in ... red" has concealed or misrepresente...

(1) a material fact or circumstance that relates to this insurance or the subject thereof; or

(2) an "insured's" interest herein.

b. there has been fraud or false swearing by an "insured' with regard to a matter that relates to this insurance or the subject thereof.

5. **No Benefit to Bailee.** This Inland Marine coverage will not benefit those who are paid to assume custody of the covered property.

6. **Reporting Terms Only.** This Inland Marine coverage may be subject to reporting "terms." If it is cancelled, "you" must report the required amounts as of the cancellation date.

INLAND MARINE

Attached to and forming part of Policy Number EFFECTIVE TO

ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

## COMMON POLICY CONDITIONS

1. **Assignment** - This policy is void if it is assigned without "our" written consent.

2. **Cancellation** - "You" may cancel this policy by returning it to "us" or by giving "us" a written notice and statement at what future time coverage is to cease.

   "We" may cancel this policy, or one or more of its parts, by giving "you" a written notice at least 10 days before the cancellation is to take effect. The notice will state the time that the cancellation is to take effect. The notice will be sent to "your" mailing address last known to "us."

   "Your" return premium, if any, will be calculated according to "our" rules. It will be refunded to "you" with the cancellation notice or within a reasonable time. Payment or tender of the unearned premium is not a condition of cancellation.

3. **Change, Modification or Waiver of Policy Terms** - A change or waiver of terms of this policy must be issued by "us" in writing to be valid.

4. **Inspections** - "We" have the right, but are not obligated, to inspect "your" property and operations. This inspection may be made by "us" or may be made on "our" behalf. An inspection or its resulting advice or report does not warrant that "your" property or operations are safe, healthful or in compliance with laws,rules or regulations. Inspections or reports are for "our" benefit only.

5. **Examination of Books and Records** - "We"may examine and audit "your" books and records that relate to this policy during the policy period and within three years after the policy has expired.

COPYRIGHT 1984 AAIS

XXXXXXXX

Attached to and forming part; olicy Number EFFE( TO
ISSUED TO:
(If no entry appears above, refer to the Policy Declarations for the information.)

NOTICE

We advise that an investigation may be made regarding information as to character, general reputation, personal characteristics and mode of living. Information on the nature and scope of the report is available upon written request.

LINCOLN GENERAL INSURANCE COMPAN
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here with, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

==========================================================================================

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 1
Endorsement Effective: 05/15/1995

UNIT # 1 CHANGED ***************************************************************************

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 19( | ITE | TRACTOR | 1WUYDCFE4FN071239 | C | 73280 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

THIS LOSS PAYEE IS ADDED TO UNIT # 1

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

UNIT # 2 CHANGED ***************************************************************************

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1969 | FRUEHAUF | TRAILER | UNJ325403 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

THIS LOSS PAYEE IS ADDED TO UNIT # 2

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

UNIT # 3 CHANGED ***************************************************************************

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1969 | FRUEHAUF | TRAILER | UNJ325404 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

THIS LOSS PAYEE IS ADDED TO UNIT # 3

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

UNIT # 4 CHANGED ***************************************************************************

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1974 | TRLMOBILE | TRAILER | K41315 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMPAN.
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here with, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

==========================================================================================

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 1
Endorsement Effective: 05/15/1995

THIS LOSS PAYEE IS ADDED TO UNIT # 4

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

NIT # 5 CHANGED ****************************************************************************************

| ear | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 967 | FRUEHAUF | TRAILER | UNEF290102 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

THIS LOSS PAYEE IS ADDED TO UNIT # 5

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

NIT # 6 CHANGED ****************************************************************************************

| ear | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 969 | ..JEHAUF | TRAILER | UNJ325401 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

THIS LOSS PAYEE IS ADDED TO UNIT # 6

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

NIT # 7 CHANGED ****************************************************************************************

| ear | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 969 | FRUEHAUF | TRAILER | UNJ325402 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

THIS LOSS PAYEE IS ADDED TO UNIT # 7

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMPAN.
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

his endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here ith, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 1
Endorsement Effective: 05/15/1995

IT # 8 CHANGED ****************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 74 | TRLMOBILE | TRAILER | K41316 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

HI. .OSS PAYEE IS ADDED TO UNIT # 8

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

IT # 9 CHANGED ****************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 74 | TRLMOBILE | TRAILER | K41317 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

HIS LOSS PAYEE IS ADDED TO UNIT # 9

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

IT # 10 CHANGED ****************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 74 | TRLMOBILE | TRAILER | K41318 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

HIS LOSS PAYEE IS ADDED TO UNIT # 10

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

IT # 11 CHANGED ****************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 93 | J & J | TANK TRLR | 1J9P4AT21P2001084 | C | 50000 | IN | 67521 | 220 | PA | 81 | | 10 | WILLIAMSPORT | |

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMPAN
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

his endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here ith, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

==========================================================================================

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.

WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 1
Endorsement Effective: 05/15/1995

HIS LOSS PAYEE IS ADDED TO UNIT # 11

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

IT # 14 CHANGED ************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 36 | FREIGHTLIN | TRACTOR | 1FUPYDYB9GP287269 | C | 50000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

HIS LOSS PAYEE IS ADDED TO UNIT # 14

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

IT # 15 CHANGED ************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 31 | ..ILER | TRAILER | 1TB114028BM452714 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

HIS LOSS PAYEE IS ADDED TO UNIT # 15

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

IT # 16 CHANGED ************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 79 | F-LINER | TRACTOR | CA213HM160222 | C | 80000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

HIS LOSS PAYEE IS ADDED TO UNIT # 16

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMPA
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent he with, and when countersigned by an authorized representative of the company, forms a part of the policy described herein

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.

WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 1
Endorsement Effective: 05/15/1995

UNIT # 17 CHANGED ****************************************************************************

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1988 | F-LINER | TRACTOR | 1FUP2DYBXJH340788 | C | 50000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

TH... LOSS PAYEE IS ADDED TO UNIT # 17

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| ADDED | L 1063 03 93 | SCHEDULE OF COVERED AUTOS |
| AD' | CA9944 12 93A | LOSS PAYABLE CLAUSE FOR: JERSEY SHORE STATE BANK |

ENDORSEMENT TOTAL 0

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET

SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 5/26/95

SYOUNG

FORM# L-6023 (REV 04/88)

HOME OFFICE COPY

Insureds Name: JHM ENTERPRISES, I?

SCHEDULE OF COVERED AUTO CHANGES
(Per Endorsement No: 1 )

LIABILITY COVERAGE AFFORDED TO A SCHEDULED POWER UNIT A L S O APPLIES TO A N Y ATTACHED TRAILER O R SEMI-TRAILER S U B J E C T TO ALL CONDITIONS AND OTHER TERMS OF THE POLICY.

| UNIT# | Year | Trade Name | Body Type | | Serial Number | Bus Use | GVW GCW | Codes Dis | Class | Pc | St | Cnty | City | Terr | Garaging City |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1985 | WHITE | TRACTOR | | 1WUYDCFE4FN071239 | C | 73280 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 2 | 1969 | FRUEHAUF | TRAILER | -S | UNJ325403 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 3 | 1969 | FRUEHAUF | TRAILER | -S | UNJ325404 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 4 | 1974 | TRLMOBILE | TRAILER | -S | K41315 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 5 | 1967 | FRUEHAUF | TRAILER | -S | UNEF290102 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 6 | 1969 | FRUEHAUF | TRAILER | -S | UNJ325401 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 7 | 1969 | FRUEHAUF | TRAILER | -S | UNJ325402 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 8 | 1974 | TRLMOBILE | TRAILER | -S | K41316 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 9 | 1974 | TRLMOBILE | TRAILER | -S | K41317 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 10 | 1974 | TRLMOBILE | TRAILER | -S | K41318 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 11 | 1993 | J & J | TANK TRLR | -S | 1J9P4AT21P2001084 | C | 50000 | IN | 67521 | 220 | PA | 81 | | 10 | WILLIAMSPORT |
| 14 | 1986 | FREIGHTLIN | TRACTOR | | 1FUPYDYB9GP287269 | C | 50000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 15 | 1981 | BUTLER | TRAILER | -S | 1TB114028BM452714 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 16 | 1979 | F-LINER | TRACTOR | | CA213HM160222 | C | 80000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 17 | 1988 | F-LINER | TRACTOR | | 1FUP2DYBXJH340788 | C | 50000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |

----- Continued on next page -----

Policy # PAP 185770 0495 Insureds Nam[illegible] IM ENTERPRISES, INC. 

---- COVERAGE and PREMIUM BREAKDOWN ----
(Per Endorsement No: 1 )

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company Unit Number | 1 | | 2 | | 3 | | 4 | | 5 | |
| Insureds Unit Number | 1 | | 4 | | 5 | | 6 | | 7 | |
| | CHANGE | | CHANGE | | CHANGE | | CHANGE | | CHANGE | |
| LIABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | 750,000 | | UNHOOKED COVERAGE | | UNHOOKED COVERAGE | | UNHOOKED COVERAGE | | UNHOOKED COVERAGE | |
| Personl Injury Protection | 5,000 | | | | | | | | | |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | 5,000 | | | | | | | | | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | 35,000 | | | | | | | | | |
| UNDERinsured Motorist | 35,000 | | | | | | | | | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 63 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Zo[illegible] Group/Trailer Discnt | 1 N | | 1 N | | 1 N | | 1 N | | 1 N | |
| L[illegible]LITY TOTAL -----> | | | | | | | | | | |

| PHYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cost New | 30,000 | | 25,000 | | 25,000 | | 25,000 | | 25,000 | |
| Estimated Value | 16,000 | | 4,000 | | 4,000 | | 5,000 | | 4,000 | |
| Depreciated Value | 10,678 | | 6,371 | | 6,371 | | 6,371 | | 6,371 | |
| Dumping Code | N | | N | | N | | N | | N | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 63 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 3,000 | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (prem. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Comprehensive | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| PHYSICAL DAMAGE TOTAL -> | | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Premium to Value % | 8.43 | | 5.18 | | 5.18 | | 5.16 | | 5.18 | |
| PREMIUM TOTAL per UNIT -> | | | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| State Surchg/Tax - Code | | | | | |
| Co. Surchg/Tax - Code | | | | | |
| City Surchg/Tax - Code | | | | | |
| TOTAL per UNIT -> | | | | | |

----- Continued on next page -----

HOME OFFICE COPY

olicy # FAP 185770 0495 Insureds Nam .M ENTERPRISES, INC. Page: 3

---- COVERAGE and PREMIUM BREAKDOWN ----
(Per Endorsement No: 1 )

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| ompany Unit Number | 6 | | 7 | | 8 | | 9 | | 10 | |
| nsureds Unit Number | 8 | | 9 | | 10 | | 11 | | 12 | |
| | CHANGE | | CHANGE | | CHANGE | | CHANGE | | CHANGE | |
| IABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | UNHOOKED | | UNHOOKED | | UNHOOKED | | UNHOOKED | | UNHOOKED | |
| Personl Injury Protection | COVERAGE | | COVERAGE | | COVERAGE | | COVERAGE | | COVERAGE | |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | | | | | | | | | | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | | | | | | | | | | |
| UNDERinsured Motorist | | | | | | | | | | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Zon-- Group/Trailer Discnt | 1 N | | 1 N | | 1 N | | 1 N | | 1 N | |
| L- -ITY TOTAL -----> | | | | | | | | | | |
| HYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
| Cost New | 20,000 | | 20,000 | | 25,000 | | 25,000 | | 25,000 | |
| Estimated Value | 4,000 | | 4,000 | | 5,000 | | 5,000 | | 5,000 | |
| Depreciated Value | 5,096 | | 5,096 | | 6,371 | | 6,371 | | 6,371 | |
| Dumping Code | N | | N | | N | | N | | N | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | 65 | | 65 | | 65 | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 3,000 | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (r--em. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Comprehensive | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| PHYSICAL DAMAGE TOTAL -> | | | | | | | | | | |
| Premium to Value % | 5.55 | | 5.55 | | 5.16 | | 5.16 | | 5.16 | |
| PREMIUM TOTAL per UNIT -> | | | | | | | | | | |
| State Surchg/Tax - Code | | | | | | | | | | |
| Co. Surchg/Tax - Code | | | | | | | | | | |
| City Surchg/Tax - Code | | | | | | | | | | |
| TOTAL per UNIT -> | | | | | | | | | | |

icy # PAP 185770 0495 Insureds Nam ..M ENTERPRISES, INC. Page: 4

---- COVERAGE and PREMIUM BREAKDOWN ----
(Per Endorsement No: 1 )

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| pany Unit Number<br>ureds Unit Number | 11 | | 14 | | 15 | | 16 | | 17 | |
| | CHANGE | | CHANGE | | CHANGE | | CHANGE | | CHANGE | |
| BILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| ability | UNHOOKED | | 750,000 | | UNHOOKED | | 750,000 | | 750,000 | |
| rsonl Injury Protection | COVERAGE | | 5,000 | | COVERAGE | | 5,000 | | 5,000 | |
| ditional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | | | 5,000 | | | | 5,000 | | 5,000 | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| mbined First Party | | | | | | | | | | |
| tastrophic Medical | | | | | | | | | | |
| dical Payments | | | | | | | | | | |
| nitive Damage | | | | | | | | | | |
| insured Motorist | | | 35,000 | | | | 35,000 | | 35,000 | |
| DERinsured Motorist | | | 35,000 | | | | 35,000 | | 35,000 | |
| ned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| operty Dmg Deductible | | | | | | | | | | |
| Deductible Factor | | | | | | | | | | |
| ting Code/Line Code | 65 | | 63 | | 65 | | 63 | | 63 | |
| ting Factor % | | | | | | | | | | |
| Group/Trailer Discnt | 1 N | | 1 N | | 1 N | | 1 N | | 1 N | |
| LITY TOTAL -----> | | | | | | | | | | |
| SICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
| st New | 36,312 | | 55,000 | | 32,000 | | 20,000 | | 60,000 | |
| timated Value | 36,312 | | 19,000 | | 10,000 | | 7,500 | | 24,000 | |
| preciated Value | 28,119 | | 21,275 | | 8,155 | | 5,096 | | 27,422 | |
| mping Code | N | | N | | N | | N | | N | |
| mping Deductible | | | | | | | | | | |
| ating Capacity | | | | | | | | | | |
| ting Code/Line Code | 65 | | 63 | | 65 | | 63 | | 63 | |
| ting Factor % | | | | | | | | | | |
| ated Amount/Zones | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | |
| ned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| ss of Use | 3,000 | | 3,000 | | 3,000 | | 3,000 | | 3,000 | |
| ntal Reimbursement | | | | | | | | | | |
| rps/Chains (cost new) | | | | | | | | | | |
| /Telephone Value | | | | | | | | | | |
| m. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| mprehensive | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| ecified Causes of Loss | | | | | | | | | | |
| llision | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | |
| YSICAL DAMAGE TOTAL -> | | | | | | | | | | |
| emium to Value % | 2.60 | | 6.16 | | 5.24 | | 11.96 | | 4.78 | |
| EMIUM TOTAL per UNIT -> | | | | | | | | | | |
| ate Surchg/Tax - Code | | | | | | | | | | |
| . Surchg/Tax - Code | | | | | | | | | | |
| ty Surchg/Tax - Code | | | | | | | | | | |
| TAL per UNIT -> | | | | | | | | | | |

LINCOLN GENERAL INSURANCE COMPANY
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

PAGE: 1

his endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here-
ith, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996
Endorsement Number...: 2
Endorsement Effective: 04/18/1995

IIT # 11 CHANGED ****************************************************************************************

| ar | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 93 | L | TANK TRLR | 1J9P4AT21P2001084 | C | 50000 | IN | 67521 | 220 | PA | 81 | | 10 | WILLIAMSPORT | |

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| DDED | L 1063 03 93 | SCHEDULE OF COVERED AUTOS |
| EPLACE | CA9944 12 93A | LOSS PAYABLE CLAUSE FOR: JERSEY SHORE STATE BANK |

ENDORSEMENT TOTAL 0

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET
SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 6/12/95

THANNING

Insureds Name: JIIM ENTERPRISES, IN

SCHEDULE OF COVERED AUTO CHANGES
(Per Endorsement No: 2 )

LIABILITY COVERAGE AFFORDED TO A SCHEDULED POWER UNIT ALSO APPLIES TO ANY ATTACHED TRAILER OR SEMI-TRAILER SUBJECT TO ALL CONDITIONS AND OTHER TERMS OF THE POLICY.

| T# | Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Codes: Dis | Class | Pc | St | Cnty | City | Terr | Garaging City |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 1993 | J & L | TANK TRLR -S | 1J9P4AT21P2001084 | C | 50000 | IN | 67521 | 220 | PA | 81 | | 10 | WILLIAMSPORT |

Continued on next page

icy # PAP 185770 0495 Insureds Nam .1 ENTERPRISES, INC. Page: 2

---- COVERAGE and PREMIUM BREAKDOWN ----
(Per Endorsement No: 2 )

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| pany Unit Number | 11 | | | | | | | | | |
| reds Unit Number | | | | | | | | | | |
| | CHANGE | | | | | | | | | |
| ILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| bility | UNHOOKED | | | | | | | | | |
| sonl Injury Protection | COVERAGE | | | | | | | | | |
| litional Benefits | | | | | | | | | | |
| ledical Expense | | | | | | | | | | |
| lork Loss | | | | | | | | | | |
| ccidental Death | | | | | | | | | | |
| 'uneral Expense | | | | | | | | | | |
| bined First Party | | | | | | | | | | |
| astrophic Medical | | | | | | | | | | |
| lical Payments | | | | | | | | | | |
| itive Damage | | | | | | | | | | |
| nsured Motorist | | | | | | | | | | |
| ERinsured Motorist | | | | | | | | | | |
| ed/Hired | OWNED | | | | | | | | | |
| perty Dmg Deductible | | | | | | | | | | |
| Deductible Factor | | | | | | | | | | |
| ing Code/Line Code | 65 | | | | | | | | | |
| ing Factor % | | | | | | | | | | |
| Group/Trailer Discnt | 1 N | | | | | | | | | |
| ITY TOTAL -----> | | | | | | | | | | |

| ICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
|---|---|---|---|---|---|---|---|---|---|---|
| t New | 36,312 | | | | | | | | | |
| imated Value | 36,312 | | | | | | | | | |
| reciated Value | 28,120 | | | | | | | | | |
| ping Code | N | | | | | | | | | |
| ping Deductible | | | | | | | | | | |
| ting Capacity | | | | | | | | | | |
| ing Code/Line Code | 65 | | | | | | | | | |
| ing Factor % | | | | | | | | | | |
| ted Amount/Zones | Y 00-00 | | | | | | | | | |
| ed/Hired | OWNED | | | | | | | | | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| s of Use | 3,000 | | | | | | | | | |
| tal Reimbursement | | | | | | | | | | |
| ps/Chains (cost new) | | | | | | | | | | |
| Telephone Value | | | | | | | | | | |
| m. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| prehensive | 1,000 | | | | | | | | | |
| cified Causes of Loss | | | | | | | | | | |
| lision | 1,000 | | | | | | | | | |
| SICAL DAMAGE TOTAL -> | | | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| mium to Value % | 2.60 | | | | | | | | | |
| MIUM TOTAL per UNIT -> | | | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| te Surchg/Tax - Code | | | | | |
| Surchg/Tax - Code | | | | | |
| y Surchg/Tax - Code | | | | | |
| AL per UNIT -> | | | | | |

LINCOLN GENERAL INSURANCE COMP
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

is endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here th, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

==========================================================================================

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.

WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 3
Endorsement Effective: 06/01/1995

*************************************************** DRIVER(S) CHANGED ***************************************************

: NAME OF A CURRENTLY INCLUDED DRIVER ON FORM L1025 HAS BEEN CHANGED TO READ AS FOLLOWS:

CHANGED - SEQ # 0003

| )RIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| ILLIAM T BROWN | 12/29/60 | 19052931 | PA | 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 | Y |

*************************************************** DRIVER(S) DELETED ***************************************************

M L1025 IS REPLACED ON THE POLICY BECAUSE OF THE DELETION OF ACTIVE DRIVER:

VER DELETED - SEQ # 0011

| RIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| USTY FRY | 11/26/58 | 18329847 | PA | | R |

*************************************************** DRIVER(S) DELETED ***************************************************

M L1025 IS REPLACED ON THE POLICY BECAUSE OF THE DELETION OF ACTIVE DRIVER:

DELETED - SEQ # 0015

| RIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| HRIS HABERSTROH | 12/25/54 | 17789257 | PA | | R |

*************************************************** DRIVER(S) ADDED ***************************************************

M L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

VER ADDED - SEQ # 0032

| RIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| OBERT BROWN | 12/20/32 | RD309311 | OH | | N |

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMP
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

his endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here ith, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

==========================================================================================

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.

WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 3
Endorsement Effective: 06/01/1995

****************************************************** DRIVER(S) ADDED ******************************************************

ORM L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

RIVER ADDED - SEQ # 0033

| ' ER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| C.. .RLES COCHRAN | 7/01/67 | 21284745 | PA | | Y |

****************************************************** DRIVER(S) ADDED ******************************************************

ORM L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

RIVER ADDED - SEQ # 0034

| DRIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| RICHARD E FREDERICK | 12/16/53 | 16331001 | PA | | Y |

****************************************************** DRIVER(S) ADDED ******************************************************

ORM L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

RIVER ADDED - SEQ # 0035

| I ER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| M. .AEL FREEZER | 1/15/55 | 16547100 | PA | | Y |

****************************************************** DRIVER(S) ADDED ******************************************************

ORM L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

RIVER ADDED - SEQ # 0036

| DRIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| THOMAS HEATH | 6/09/51 | 15282772 | PA | | Y |

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMP
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

is endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here th, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

==========================================================================================

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.

WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 3
Endorsement Effective: 06/01/1995

****************************************** DRIVER(S) ADDED ******************************************

3M L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

:VER ADDED - SEQ # 0037

| ER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| ...ID L HERB, SR | 4/19/53 | 16842177 | PA | | Y |

****************************************** DRIVER(S) ADDED ******************************************

M L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

VER ADDED - SEQ # 0038

| RIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| ALPH JONES | 5/24/64 | 20452332 | PA | | Y |

****************************************** DRIVER(S) ADDED ******************************************

M L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

VER ADDED - SEQ # 0039

| R NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| ... S KIRESKI | 1/15/49 | 15535045 | PA | | Y |

****************************************** DRIVER(S) ADDED ******************************************

M L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

VER ADDED - SEQ # 0040

| RIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| ICHARD NICHOLS | 1/16/54 | 16394860 | PA | | Y |

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMP
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here , and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

==========================================================================================

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.

WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 3
Endorsement Effective: 06/01/1995

*************************************************** DRIVER(S) ADDED ***************************************************

L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

ER ADDED - SEQ # 0041

| ER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| .D REED | 10/08/60 | 19107192 | PA | | Y |

*************************************************** DRIVER(S) ADDED ***************************************************

L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

ER ADDED - SEQ # 0042

| IVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| ITH SUMMER | 11/22/55 | 16983979 | PA | | Y |

# 5 DELETED ****************************************************************************************************

| Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Codes Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FRUEHAUF | TRAILER | UNEF290102 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

. - Liability Coverage DELETED from UNIT # 5 ANNUAL $ 122 . . . . 107-
.ysical Damage Coverage DELETED from UNIT # 5 ANNUAL $ 207 . . . . 182-
FOLLOWING LOSS PAYEE REMOVED FROM UNIT # 5

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMP
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

PAGE: 5

is endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here th, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 3
Endorsement Effective: 06/01/1995

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| DED | L 1063 03 93 | SCHEDULE OF COVERED AUTOS |
| DED | L 1025 02 92 | DRIVER SCHEDULE |
| PLACE | CA9944 12 93A | LOSS PAYABLE CLAUSE FOR: JERSEY SHORE STATE BANK |

ENDORSEMENT TOTAL 289-

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET
SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 8/01/95

SYOUNG

LINCOLN GENERAL INSURANCE COMPANY
3350 WHITEFORD ROAD
YORK, PA 17402

8/01/95

JERSEY SHORE STATE BANK
300 MARKET STREET
WILLIAMSPORT PA 17701

Re: Policy Number: PAP 1857700495
Insured......: JHM ENTERPRISES, INC.

Gentlemen:

Please be advised that the unit described below has been DELETED from the subject policy effective 06/01/1995:

| Unit# | Mdl Yr | ---Make--- | ---Type--- | ------Serial Number----- |
|---|---|---|---|---|
| 5 | 1967 | FRUEHAUF | TRAILER | UNEF290102 |

Therefore, your interest is NULL and VOID effective 06/01/1995.

Sincerely
LINCOLN GENERAL INSURANCE COMPANY

UNDERWRITING DEPARTMENT

cc: SUSQUEHANNA INS. ASSOC., INC.

Insureds Name: JHM ENTERPRISES, INC.

SCHEDULE OF COVERED AUTO CHANGE
(Per Endorsement No: 3 )

LIABILITY COVERAGE AFFORDED TO A SCHEDULED POWER UNIT ALSO APPLIES TO ANY ATTACHED TRAILER OR SEMI-TRAILER SUBJECT TO ALL CONDITIONS AND OTHER TERMS OF THE POLICY.

---

| T# | Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Codes Dis | Class | Pc | St | Cnty | City | Terr | Garaging City |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | 1967 | FRUEHAUF | TRAILER | -S UNEF290102 | C | 50000 | TN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |

'olicy # PAP 185770 0495 Insureds Name. JIM ENTERPRISES, INC. Page: 2

---- COVERAGE and PREMIUM BREAKDOWN
(Per Endorsement No: 3 )

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company Unit Number | 5 | | | | | | | | | |
| Insureds Unit Number | 7<br>DELETED | | | | | | | | | |
| LIABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | UNHOOKED | 107- | | | | | | | | |
| Personl Injury Protection | COVERAGE | | | | | | | | | |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | | | | | | | | | | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | | | | | | | | | | |
| UNDERinsured Motorist | | | | | | | | | | |
| Owned/Hired | OWNED | | | | | | | | | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 65 | | | | | | | | | |
| Rating Factor % | | | | | | | | | | |
| Zone Group/Trailer Discnt | 1 N | | | | | | | | | |
| LIABILITY TOTAL -----> | | 107- | | | | | | | | |

| PHYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cost New | 25,000 | | | | | | | | | |
| Estimated Value | 4,000 | | | | | | | | | |
| Depreciated Value | 6,371 | | | | | | | | | |
| Dumping Code | N | | | | | | | | | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 65 | | | | | | | | | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | | | | | | | | |
| Owned/Hired | OWNED | | | | | | | | | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | | | | | | | | | | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (prem. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Comprehensive | 1,000 | 65- | | | | | | | | |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | 117- | | | | | | | | |
| PHYSICAL DAMAGE TOTAL -> | | 182- | | | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Premium to Value % | 5.18 | | | | | | | | | |
| PREMIUM TOTAL per UNIT -> | | 289- | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| State Surchg/Tax - Code | | | | | |
| Co. Surchg/Tax - Code | | | | | |
| City Surchg/Tax - Code | | | | | |
| TOTAL per UNIT -> | | | | | |

LINCOLN GENERAL INSURANCE COMPA
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

is endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent hereth, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.

WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 4
Endorsement Effective: 07/10/1995

# 6 CHANGED ************************************************************

| Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FEHAUF | TRAILER | UNJ325401 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

| Coverage | Action | Unit | | Premium | Pro-Rated |
|---|---|---|---|---|---|
| PAL - Liability Coverage | DELETED from UNIT # | 6 | ANNUAL $ | 122 . . . . | 94- |
| Physical Damage Coverage | CHANGED on UNIT # | 6 | ANNUAL $ | 73 . . . . | 115- |

# 8 CHANGED ************************************************************

| Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TRLMOBILE | TRAILER | K41316 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

| Coverage | Action | Unit | | Premium | Pro-Rated |
|---|---|---|---|---|---|
| PAL - Liability Coverage | DELETED from UNIT # | 8 | ANNUAL $ | 122 . . . . | 94- |
| Physical Damage Coverage | CHANGED on UNIT # | 8 | ANNUAL $ | 93 . . . . | 128- |

# 9 CHANGED ************************************************************

| Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TRLMOBILE | TRAILER | K41317 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

| Coverage | Action | Unit | | Premium | Pro-Rated |
|---|---|---|---|---|---|
| PAL - Liability Coverage | DELETED from UNIT # | 9 | ANNUAL $ | 122 . . . . | 94- |
| Physical Damage Coverage | CHANGED on UNIT # | 9 | ANNUAL $ | 93 . . . . | 128- |

10 CHANGED ************************************************************

| Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TRLMOBILE | TRAILER | K41318 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

| Coverage | Action | Unit | | Premium | Pro-Rated |
|---|---|---|---|---|---|
| PAL - Liability Coverage | DELETED from UNIT # | 10 | ANNUAL $ | 122 . . . . | 94- |
| Physical Damage Coverage | CHANGED on UNIT # | 10 | ANNUAL $ | 93 . . . . | 128- |

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMP'
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent he with, and when countersigned by an authorized representative of the company, forms a part of the policy described herein

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 4
Endorsement Effective: 07/10/1995

UNIT # 14 DELETED

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1986 | FREIGHTLIN | TRACTOR | 1FUPYDYB9GP287269 | C | 50000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

| Coverage | Action | | Unit | Basis | Amount | Pro-Rated Premium |
|---|---|---|---|---|---|---|
| - Liability Coverage | DELETED | from UNIT # | 14 | ANNUAL $ | 3915 | 3026 |
| Physical Damage Coverage | DELETED | from UNIT # | 14 | ANNUAL $ | 1171 | 905 |

THE FOLLOWING LOSS PAYEE REMOVED FROM UNIT # 14

JERSEY SHORE STATE BANK
300 MARKET STREET

WILLIAMSPORT PA 17701-0000

UNIT # 18 ADDED

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1980 | FRUEHAUF | TRAILER | OMT004309 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

| Coverage | Action | | Unit | Basis | Amount | Pro-Rated Premium |
|---|---|---|---|---|---|---|
| PAL - Liability Coverage | ADDED | to UNIT # | 18 | ANNUAL $ | 122 | 94 |
| Physical Damage Coverage | ADDED | to UNIT # | 18 | ANNUAL $ | 1039 | 803 |

UNIT # 19 ADDED

| Year | Trade Name | Body Type | Serial Number | Bus Use | GVW GCW | Dis | Class | Pc | St | Cnty | City | Terr | Garaging City | Pro-Rated Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1980 | GREAT DANE | TRAILER | B17876 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT | |

| Coverage | Action | | Unit | Basis | Amount | Pro-Rated Premium |
|---|---|---|---|---|---|---|
| PAL - Liability Coverage | ADDED | to UNIT # | 19 | ANNUAL $ | 122 | 94 |
| Physical Damage Coverage | ADDED | to UNIT # | 19 | ANNUAL $ | 712 | 550 |

*** CONTINUED ***

LINCOLN GENERAL INSURANCE COMP[illegible]
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here with, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996
Endorsement Number...: 4
Endorsement Effective: 07/10/1995

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| ADDED | L 1063 03 93 | SCHEDULE OF COVERED AUTOS |
| REPLACE | CA9944 12 93A | LOSS PAYABLE CLAUSE FOR: JERSEY SHORE STATE BANK |

ENDORSEMENT TOTAL 3,265-

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET
SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 8/01/95

SYOUNG

L...COLN GENERAL INSURANCE COM..NY
3350 WHITEFORD ROAD
YORK, PA 17402

8/01/95

JERSEY SHORE STATE BANK
300 MARKET STREET
WILLIAMSPORT PA 17701

Re: Policy Number: PAP 1857700495
Insured......: JHM ENTERPRISES, INC.

Gentlemen:

Please be advised that the unit described below has been DELETED from the subject policy effective 07/10/1995:

| Unit# | Mdl Yr | ---Make--- | ---Type--- | ------Serial Number----- |
|---|---|---|---|---|
| 14 | 1986 | FREIGHTLIN | TRACTOR | 1FUPYDYB9GP287269 |

Therefore, your interest is NULL and VOID effective 07/10/1995.

Sincerely
LINCOLN GENERAL INSURANCE COMPANY

UNDERWRITING DEPARTMENT

cc: SUSQUEHANNA INS. ASSOC., INC.

LGIC LP REM 1

Insureds Name: JHM ENTERPRISES, INC

SCHEDULE OF COVERED AUTO CHANGE
(Per Endorsement No: 4 )

LIABILITY COVERAGE AFFORDED TO A SCHEDULED POWER UNIT A L S O APPLIES TO A N Y ATTACHED TRAILER O R SEMI-TRAILER S U B J E C T TO ALL CONDITIONS AND OTHER TERMS OF THE POLICY.

| UNIT# | Year | Trade Name | Body Type | | Serial Number | Bus Use | GVW GCW | Codes Dis | Class | Pc | St | Cnty | City | Terr | Garaging City |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 | 1969 | FRUEHAUF | TRAILER | -S | UNJ325401 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 8 | 1974 | TRLMOBILE | TRAILER | -S | K41316 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 9 | 1974 | TRLMOBILE | TRAILER | -S | K41317 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 10 | 1974 | TRLMOBILE | TRAILER | -S | K41318 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 14 | 1986 | FREIGHTLIN | TRACTOR | | 1FUPYDYB9GP287269 | C | 50000 | IN | 50521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 18 | 1980 | FRUEHAUF | TRAILER | -S | OHT004309 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |
| 19 | 1980 | GREAT DANE | TRAILER | -S | B17876 | C | 50000 | IN | 67521 | 380 | PA | 81 | | 10 | WILLIAMSPORT |

Continued on next page

Policy # PAP 185770 0495 Insureds Nam. JIM ENTERPRISES, INC. Page: 2

---- COVERAGE and PREMIUM BREAKDOWN
(Per Endorsement No: 4 )

| Company Unit Number | 6 | | 8 | | 9 | | 10 | | 14 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Insureds Unit Number | 8 CHANGE | | 10 CHANGE | | 11 CHANGE | | 12 CHANGE | | DELETED | |
| LIABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | UNHOOKED | 94- | UNHOOKED | 94- | UNHOOKED | 94- | UNHOOKED | 94- | 750,000 | 2968- |
| Personl Injury Protection | COVERAGE | | COVERAGE | | COVERAGE | | COVERAGE | | 5,000 | 44- |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | | | | | | | | | 5,000 | 7- |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | | | | | | | | | 35,000 | 5- |
| UNDERinsured Motorist | | | | | | | | | 35,000 | 2- |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | 65 | | 65 | | 63 | |
| Rating Factor % | | | | | | | | | | |
| Zo-- Group/Trailer Discnt | 1 N | | 1 N | | 1 N | | 1 N | | 1 N | |
| L LITY TOTAL -----> | | 94- | | 94- | | 94- | | 94- | | 3,026- |
| PHYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
| Cost New | 20,000 | | 25,000 | | 25,000 | | 25,000 | | 55,000 | |
| Estimated Value | 4,000 | | 5,000 | | 5,000 | | 5,000 | | 19,000 | |
| Depreciated Value | 5,099 | | 6,374 | | 6,374 | | 6,374 | | 21,275 | |
| Dumping Code | N | | N | | N | | N | | N | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | 65 | | 65 | | 63 | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | | Y 00-00 | |
| Owned/Hired | OWNED | | OWNED | | OWNED | | OWNED | | OWNED | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | | | | | | | | | | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (r--m. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Comprehensive | 1,000 | | 1,000 | | 1,000 | | 1,000 | | 1,000 | 310- |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | | 115- | | 128- | | 128- | | 128- | 1,000 | 595- |
| PHYSICAL DAMAGE TOTAL -> | | 115- | | 128- | | 128- | | 128- | | 905- |
| Premium to Value % | 1.83 | | 1.86 | | 1.86 | | 1.86 | | 6.16 | |
| PREMIUM TOTAL per UNIT -> | | 209- | | 222- | | 222- | | 222- | | 3931- |
| State Surchg/Tax - Code | | | | | | | | | | |
| Co. Surchg/Tax - Code | | | | | | | | | | |
| City Surchg/Tax - Code | | | | | | | | | | |
| TOTAL per UNIT -> | | | | | | | | | | |

----- Continued on next page -----

Policy # PAP 185770 0495 Insureds Nam IM ENTERPRISES, INC. Page: 3

---- COVERAGE and PREMIUM BREAKDOWN
(Per Endorsement No: 4 )

| | UNITS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Company Unit Number | 18 | | 19 | | | | | | | |
| Insureds Unit Number | ADD | | ADD | | CHANGE | | CHANGE | | DELETED | |
| LIABILITY | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium | Rating | Premium |
| Liability | UNHOOKED | 94 | UNHOOKED | 94 | | | | | | |
| Personl Injury Protection | COVERAGE | | COVERAGE | | | | | | | |
| Additional Benefits | | | | | | | | | | |
| Medical Expense | | | | | | | | | | |
| Work Loss | | | | | | | | | | |
| Accidental Death | | | | | | | | | | |
| Funeral Expense | | | | | | | | | | |
| Combined First Party | | | | | | | | | | |
| Catastrophic Medical | | | | | | | | | | |
| Medical Payments | | | | | | | | | | |
| Punitive Damage | | | | | | | | | | |
| UNinsured Motorist | | | | | | | | | | |
| UNDERinsured Motorist | | | | | | | | | | |
| Owned/Hired | OWNED | | OWNED | | | | | | | |
| Property Dmg Deductible | | | | | | | | | | |
| PD Deductible Factor | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | | | | | | |
| Rating Factor % | | | | | | | | | | |
| Zo-- Group/Trailer Discnt | 1 N | | 1 N | | | | | | | |
| L LITY TOTAL -----> | | 94 | | 94 | | | | | | |

| PHYSICAL DAMAGE | Rating | | Rating | | Rating | | Rating | | Rating | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cost New | 16,000 | | 11,000 | | | | | | | |
| Estimated Value | 15,000 | | 9,000 | | | | | | | |
| Depreciated Value | 4,079 | | 2,805 | | | | | | | |
| Dumping Code | N | | N | | | | | | | |
| Dumping Deductible | | | | | | | | | | |
| Seating Capacity | | | | | | | | | | |
| Rating Code/Line Code | 65 | | 65 | | | | | | | |
| Rating Factor % | | | | | | | | | | |
| Stated Amount/Zones | Y 00-00 | | Y 00-00 | | | | | | | |
| Owned/Hired | OWNED | | OWNED | | | | | | | |
| | Amount | | Amount | | Amount | | Amount | | Amount | |
| Loss of Use | 3,000 | | 3,000 | | | | | | | |
| Rental Reimbursement | | | | | | | | | | |
| Tarps/Chains (cost new) | | | | | | | | | | |
| CB/Telephone Value | | | | | | | | | | |
| (r--em. included in comp) | | | | | | | | | | |
| | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium | Deductible | Premium |
| Comprehensive | 1,000 | 264 | 1,000 | 163 | | | | | | |
| Specified Causes of Loss | | | | | | | | | | |
| Collision | 1,000 | 539 | 1,000 | 387 | | | | | | |
| PHYSICAL DAMAGE TOTAL -> | | 803 | | 550 | | | | | | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Premium to Value % | 6.93 | | 7.91 | | | | | | | |
| PREMIUM TOTAL per UNIT -> | | 897 | | 644 | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| State Surchg/Tax - Code | | | | | |
| Co. Surchg/Tax - Code | | | | | |
| City Surchg/Tax - Code | | | | | |
| TOTAL per UNIT -> | | | | | |

LINCOLN GENERAL INSURANCE COMPANY
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

PAGE: 1

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent here with, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 5
Endorsement Effective: 08/10/1995

******************************************************* DRIVER(S) DELETED *******************************************************

FORM L1025 IS REPLACED ON THE POLICY BECAUSE OF THE DELETION OF ACTIVE DRIVER:

DRIVER DELETED - SEQ # 0032

| DRIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| ROBERT BROWN | 12/20/32 | RD309311 | OH | | N |

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| ADDED | L 1025 02 92 | DRIVER SCHEDULE |

ENDORSEMENT TOTAL 0

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET
SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 8/22/95

SYOUNG

HOME OFFICE COPY

LINCOLN GENERAL INSURANCE COMPANY
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

PAGE: 1

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent herewith, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 6
Endorsement Effective: 09/19/1995

DRIVER(S) DELETED

FORM L1025 IS REPLACED ON THE POLICY BECAUSE OF THE DELETION OF ACTIVE DRIVER:

DRIVER DELETED - SEQ # 0009

| DRIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| RICHARD A FREDERICKS | 3/22/31 | 06835773 | PA | | R |

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| ADDED | L 1025 02 92 | DRIVER SCHEDULE |

ENDORSEMENT TOTAL 0

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET
SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 9/27/95

SYOUNG

HOME OFFICE COPY

LINCOLN GENERAL INSURANCE COMPANY
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

PAGE: 1

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent herewith, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996

Endorsement Number...: 7
Endorsement Effective: 09/19/1995

DRIVER(S) DELETED

FORM L1025 IS REPLACED ON THE POLICY BECAUSE OF THE DELETION OF ACTIVE DRIVER:

DRIVER DELETED - SEQ # 0034

| DRIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| RICHARD E FREDERICK | 12/16/53 | 16331001 | PA | | R |

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| ADDED | L 1025 02 92 | DRIVER SCHEDULE |

ENDORSEMENT TOTAL 0

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET
SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 10/02/95

SYOUNG

LINCOLN GENERAL INSURANCE COMPAN
3350 WHITEFORD ROAD
YORK, PA 17402

GENERAL CHANGE ENDORSEMENT

This endorsement is subject to the declarations, conditions, and other terms of the policy which are not inconsistent herewith, and when countersigned by an authorized representative of the company, forms a part of the policy described herein.

Insured:
JHM ENTERPRISES, INC.
1200 VALLAMONT DRIVE, N.W.
WILLIAMSPORT PA 17701-0000

Policy Prefix........: PAP
Policy Number........: 1857700495
Policy Period........: 04/18/1995 to 04/18/1996
Endorsement Number...: 8
Endorsement Effective: 09/19/1995

DRIVER(S) ADDED

FORM L1025 IS ADDED OR REPLACED IN THE POLICY TO INCLUDE THE FOLLOWING DRIVERS:

OP---R ADDED - SEQ # 0043

| DRIVER NAME | BIRTH DATE | OPERATOR NUMBER | STATE | SOC.SEC.NO. | MVR |
|---|---|---|---|---|---|
| RICHARD A FREDERICKS | 3/22/31 | 06835773 | PA | | N |

ENDORSEMENT SCHEDULE CHANGES

| | NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|---|
| ADDED | L 1025 02 92 | DRIVER SCHEDULE |

ENDORSEMENT TOTAL 0

Agent: 5520/0000
SUSQUEHANNA INS. ASSOC., INC.
6 E. 18TH STREET
SELINSGROVE PA 17870

Authorized Representative

Endorsement Issued: 10/12/95

DMUMMERT

HOME OFFICE COPY

Attached to and forming part .icy Number PAP 1857700495 EFF 04/18/1995 TO 04/18/1996
ISSUED TO: JHM ENTERPRISES, I.C.

ENDORSEMENT SCHEDULE

| NUMBER | FORM / ENDORSEMENT DESCRIPTION |
|---|---|
| PAP 0002 08 93 | DECLARATION PAGE |
| L 1063 03 93 | SCHEDULE OF COVERED AUTOS |
| L 1025 02 92 | DRIVER SCHEDULE |
| CA 99 28 06 92 | STATED AMOUNT INSURANCE |
| CA00121293A | TRUCKERS COVERAGE FORM |
| L 1091 05 93 | LOSS OF USE COVERAGE |
| OMB 3120 00 86 | ENDMT FOR MOTOR CARRIER ... UNDER SECTION 10927, TITLE 49 ... |
| IRB 3538A 0492 | FORM F - UNIFORM MOTOR CARRIER ... INSURANCE ENDORSEMENT |
| OMB 2125 00 74 | ENDMT FOR MOTOR CARRIER ... UNDER SECTION 29 AND 30 ... ACT OF 1980 |
| CA 22 37 12 92 | PENNSYLVANIA BASIC FIRST PARTY BENEFIT |
| CA 22 38 07 90 | PENNSYLVANIA ADDED AND COMBINED FIRST PARTY BENEFITS ENDORSEMENT |
| CA 21 92 07 90 | PENNSYLVANIA UNINSURED MOTORIST COVERAGE - NOT STACKED |
| CA 21 93 07 90 | PENNSYLVANIA UNDERINSURED MOTORIST COVERAGE - NOT STACKED |
| L 1003 06 92 | PUNITIVE, EXEMPLARY AND EXTRACONTRACTUAL DAMAGE EXCLUSION |
| CA 23 05 01 87 | WRONG DELIVERY OF LIQUID PRODUCTS |
| IL 00 21 11 85 | NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT |
| L 1087 06 92 | CHANGES - OTHER INSURANCE HIRED AUTO PHYSICAL DAMAGE COVERAGE |
| IL 00 17 11 85 | COMMON POLICY CONDITIONS |
| IL 02 46 06 89 | PENNSYLVANIA CHANGES - CANCELLATION AND NONRENEWAL |
| CA 01 80 07 90 | PENNSYLVANIA CHANGES |
| IL 09 10 01 81 | PENNSYLVANIA NOTICE |
| IM 10 73 05 91 | MOTOR TRUCK CARGO INSURANCE/TRANSIT AND LOCATION COVERAGE (BROAD FORM) |
| IM 100 84 | AGREEMENT - INLAND MARINE GENERAL TERMS |
| CL 100 84 | COMMON POLICY CONDITIONS |
| L 7020 02 92 | NOTICE OF RIGHT TO INSPECTION |
| L 1064 07 91 | ENDORSEMENT SCHEDULE |

**Exhibit B**

**Northland Insurance Companies**

# TRUCKERS COVERAGE PART DECLARATIONS

Check here if PART 2 is attached

Coverage is provided in Company checked
NORTHLAND INSURANCE COMPANY
NORTHLAND CASUALTY COMPANY
NORTHFIELD INSURANCE COMPANY
St. Paul, MN 55120
STOCK COMPANIES

9-25-95

## ITEM ONE — NAMED INSURED AND ADDRESS

Coolever Brothers Transportation, Inc.
P.O. Box 156
Montoursville, PA 17754

B03-4

37/053

Garaging address if different:
50 Jordon Ave., Montoursville, PA

Acct TF209307 M/g01

Policy Period
From 9/01/95
To 9/01/96
12:01 A.M. Standard Time at Named "Insured's" Garaging address

Individual
Partnership (17)
X Corporation
Joint Venture
Other F2 06

Business of Named "Insured": Truckmen

Commodities hauled: Building Materials, Steel, Railroad Ties

F2 99 F4 12

POLICY NO. T F209197
PREVIOUS POLICY NO. New
AGENCY NO. 308499 308000
BRANCH | SOURCE

## ITEM TWO — SCHEDULE OF COVERAGES AND COVERED AUTOS

This policy provides only those coverages where a charge is shown in the premium column below. Each of these coverages will apply only to those "autos" shown as Covered "Autos." "Autos" are shown as Covered "Autos" for a particular coverage by the entry of one or more of the Symbols listed in Section 1A of the Truckers Coverage Form next to the name of the coverage.

| | Covered "Autos" | COVERAGES | LIMITS OF LIABILITY | PREMIUM |
|---|---|---|---|---|
| LIABILITY | 43 | (1) BODILY INJURY-BI | $ each person $ each "accident" | $ |
| | | (2) PROPERTY DAMAGE-PD | $ each "accident" | $ |
| | | COMBINED (1) AND (2)-CSL | $ 2,000,000 each "accident" | $ |
| | 43 | PERSONAL INJURY PROTECTION-PIP (or equivalent No-Fault coverage) | Separately Stated in each PIP endorsement | $ |
| | | ADDED PIP (or equivalent No-Fault coverage) | Separately Stated in each added PIP endorsement | $ |
| | | PROPERTY PROTECTION-PPI (Michigan Only) | Separately Stated in PPI endorsement | $ |
| LIABILITY ENDORSEMENT | | "AUTO" MEDICAL PAYMENTS | $ | $ |
| | 43 | UNINSURED MOTORISTS-UM BI | $ 35,000 each person $ 35,000 each "accident" | $ |
| | | PD | $ each "accident" | $ |
| | | CSL | $ each "accident" | $ |
| | 43 | UNDERINSURED MOTORISTS-UIM BI | $ 35,000 each person $ 35,000 each "accident" | $ |
| | | PD | $ each "accident" | $ |
| | | CSL | $ each "accident" | $ |
| | | CARGO | $ each covered "auto", less the deductible | $ |
| | | | | $ |
| DAMAGE | | COMPREHENSIVE | Stated Amount, Actual Cash Value or Cost of Repairs, whichever is less minus the deductible. | $ |
| | | SPECIFIED PERILS | | $ |
| | | COLLISION | | $ |
| | | | | $ |
| ADDITIONAL PREMIUM PER ENDORSEMENTS: | | | | $ |

FORMS AND ENDORSEMENTS CONTAINED IN THIS POLICY AT ITS INCEPTION:
T001,T001,T217,T237,CA0012,CA2237,CA0180,CA2192,CA2193
N2292 N2350, N2037 N2054

ESTIMATED TOTAL PREMIUM (Refer to Section 5B of the Truckers Coverage Form for explanation) $ SEE ITEM TEN

## ITEM THREE — HIRED AUTO LIABILITY INSURANCE

ESTIMATED COST OF HIRE $

| Rate per $100 Cost of Hire | | Minimum Premium | | Advance Premium (incl. in ITEM TWO LIABILITY) | |
|---|---|---|---|---|---|
| $ | BI | $ | BI | $ | BI |
| $ | PD | $ | PD | $ | PD |
| $ | CSL | $ | CSL | $ | CSL |

Cost of hire means the total cost you incur for the hire of "autos" you don't own. (See covered "auto" symbol 47.)

## ITEM FOUR — SCHEDULE OF COVERED AUTOS YOU OWN

| | Year, Model, Trade Name, Body Type | Identification Number | Loss Payee |
|---|---|---|---|
| 1 | See Attached Schedule - Form #T-001 | | |
| 2 | | | |

| | LIABILITY PREMIUMS BI/CSL | PD | PIP | PPI | UM | OTHER | STATED AMOUNT | PHYSICAL DAMAGE PREMIUMS Comp S.P. | DED. | COLL. | DED. | CARGO RATE | PREM. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | See | #T-001 | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | |

OCT 02 1995 U/W

## ITEM FIVE — NAMED LESSEE(S) AND ADDRESS

Countersigned mv mv 9/13/9 19 5 By

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE FORMS(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.

Includes copyrighted material of Insurance Services Office, with its permission. Copyright, Insurance Services Office, 1990

MEMORANDUM OF INSURANCE

TYPIST: SET TYPEWRITER TABS AS SHOWN

# SUPPLEMENTARY TRUCKERS COVERAGE PART DECLARATIONS PART 2

POLICY NO T

## ITEM SIX – ADDITIONAL SYMBOLS (Refer to Truckers Coverage Form – Section 1A for symbols 41 – 50)

Liab 64762 .9830
PIP 955 .0145
OM 126 .0019
UIM 42 .0006
65885

## ITEM SEVEN – SCHEDULE FOR NON-OWNERSHIP LIABILITY

| Estimated Number of Employees | ADVANCE PREMIUM (This item is included in ITEM TWO LIABILITY) | Rating B |
|---|---|---|
| | | BODILY INJU |
| | | PROPERTY I |
| | | COMBINED S |

## ITEM EIGHT – SCHEDULE OF HIRED COVERED AUTO COVERAGE

PHYSICAL DAMAGE INSURANCE

| COVERAGES | LIMIT OF LIABILITY | RATE | | |
|---|---|---|---|---|
| COMPREHENSIVE | $ ____, Actual Cash Value or Cost of Repairs, whichever is less minus the deductible | $ | | |
| SPECIFIED PERILS | | $ | $ | $ |
| COLLISION | | $ | $ | $ |
| | | TOTAL: | $ | $ |

PHYSICAL DAMAGE INSURANCE for covered "autos" you hire or borrow is excess unless indicated below by an "☒". ☐ If this box is checked, PHYSICAL DAMAGE COVERAGE applies on a direct primary basis and for purposes of the condition entitled OTHER INSURANCE, any covered "auto" you hire or borrow is deemed to be a covered "auto" you own.

Liab 64762
PIP 955
OM 126
UIM 42
109

## ITEM NINE – TRAILER INTERCHANGE INSURANCE

| COVERAGES | LIMIT OF LIABILITY | RATE | MINIMUM PREMIU |
|---|---|---|---|
| COMPREHENSIVE | $ ____, Actual Cash Value or Cost of Repairs, whichever is less minus the deductible | $ | $ |
| SPECIFIED PERILS | | $ | $ |
| COLLISION | | $ | $ |
| | | TOTAL: | $ |

## ITEM TEN – MONTHLY REPORTING POLICIES

Rating Basis: ☐ Gross Receipts ☒ Mileage ☐ Value of equipment ☐ Rate per owner-operator

| COVERAGES | Rating Basis | Estimated Annual | Minimum Annual | Minimum Monthly |
|---|---|---|---|---|
| Liability, Basic PIP, Basic OM/UIM | 3.66 per 100 miles per month | $ 65885 | 59297 | 4914 (5374) |
| | | $ | | |
| Cargo | .194 per 100 miles per month | $ 3492 | 3143 | 262 |
| | | $ | | |

DEPOSIT PREMIUM: 9344.00; $ 8000.00 letter of credit; 17344.

MINIMUM PREMIUM $ ____

☒ Monthly ☒ Annually

Estimated annual gross receipts $ ____
mileage 1,800,000
value of equipment $ ____
number of owner-operators ____

$ 69,377. TOTAL ESTIMATED ANNUAL PREMIUM

For physical damage coverage the deductibles are:
$ ____ Comprehensive
$ ____ Specified Perils
$ ____ Collision

See separate endorsements for reporting conditions and definitions.



Policy No.:

Issued to:

# SCHEDULE OF AUTOMOBILES
(forming part of DECLARATIONS)

## ITEM FOUR SUPPLEMENT

| NO. | YEAR MODEL, TRADE NAME, BODY TYPE | ID NUMBER | LOSS PAYEE – LP | ADDITIONAL INSURED – AI |
|---|---|---|---|---|
| 1 | 1983 Mack Tractor | 084695 | | |
| 2 | 1978 International Tractor | SH9464PA | | |
| 3 | 1985 Freightliner Tractor | P270395 | | |
| 4 | 1989 Freightliner Tractor | 370461 | | |
| 5 | 1990 Freightliner Tractor | 389238 | | |
| 6 | 1991 White Tractor | 637664 | | |
| 7 | 1984 Peterbilt Tractor | 171623 | | |
| 8 | 1982 Freightliner Tractor | 206459 | | |
| 9 | 1987 Freightliner Tractor | 303672 | | |
| 10 | 1973 White Tractor | 073921 | | |
| 11 | 1978 Mack Tractor | T18760 | | |
| 12 | 1986 Freightliner Tractor | 291318 | | |
| 13 | 1988 White Tractor | 601032 | | |
| 14 | 1985 Freightliner Tractor | 256601 | | |
| 15 | 1988 International Tractor | 014548 | | |
| 16 | 1977 Mack Tractor | T13891 | | |
| 17 | 1985 International Tractor | CA12452 | | |
| 18 | 1972 Mack Tractor | T29173 | | |

| NO. | LIABILITY PREMIUMS | | | | | | | STATED AMOUNT | PHYSICAL DAMAGE PREMIUMS | | | | CARGO | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | CSL | BI | PD | PIP | MED PAY | UM | OTHER | | ☐ COMP ☐ S.P. | DED. | COLL | DED. | DED. | RATE | PREM. |
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | |

# TRUCKERS COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to SECTION VI - DEFINITIONS.

## SECTION I - COVERED AUTOS

ITEM TWO of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

A. DESCRIPTION OF COVERED AUTO DESIGNATION SYMBOLS

SYMBOL DESCRIPTION

41 = ANY "AUTOS".

42 = OWNED "AUTOS" ONLY. Only the "autos" you own (and for Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those "autos" you acquire ownership of after the policy begins.

43 = OWNED COMMERCIAL "AUTOS" ONLY. Only those trucks, tractors and "trailers" you own (and for Liability Coverage any "trailers" you don't own while connected to a power unit you own). This includes those trucks, tractors and "trailers" you acquire ownership of after the policy begins.

44 = OWNED "AUTOS" SUBJECT TO NO-FAULT. Only those "autos" you own that are required to have No-Fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the No-Fault law in the state where they are licensed or principally garaged.

45 = OWNED "AUTOS" SUBJECT TO A COMPULSORY UNINSURED MOTORISTS LAW. Only those "autos" you own that, because of the law in the state where they are licensed or principally garaged, are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement.

46 = SPECIFICALLY DESCRIBED "AUTOS". Only those "autos" described in ITEM THREE of the Declarations for which a premium charge is shown (and for Liability Coverage any "trailers" you don't own while attached to any power unit described in ITEM THREE).

47 = HIRED "AUTOS" ONLY. Only those "autos" you lease, hire, rent or borrow. This does not include any "private passenger type auto" you lease, hire, rent or borrow from any member of your household, any of your employees, partners or agents or members of their households.

48 = "TRAILERS" IN YOUR POSSESSION UNDER A WRITTEN TRAILER OR EQUIPMENT INTERCHANGE AGREEMENT. Only those "trailers" you do not own while in your possession under a written "trailer" or equipment interchange agreement in which you assume liability for "loss" to the "trailers" while in your possession.

49 = YOUR "TRAILERS" IN THE POSSESSION OF ANYONE ELSE UNDER A WRITTEN TRAILER INTERCHANGE AGREEMENT. Only those "trailers" you own or hire while in the possession of anyone else under a written "trailer" interchange agreement. When Symbol "49" is entered next to a Physical Damage Coverage in ITEM TWO of the Declarations, the Physical Damage Coverage exclusion relating to "loss" to a "trailer" in the possession of anyone else does not apply to that coverage.

50 = NONOWNED "AUTOS" ONLY. Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "private passenger type autos" owned by your employees or partners or members of their households but only while used in your business or your personal affairs.

 Copyright, Insurance Services Office, Inc., 1993

B. OWNED AUTOS YOU ACQUIRE AFTER THE POLICY BEGINS

1. If symbols 41, 42, 43, 44 or 45 are entered next to a coverage in ITEM TWO of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if symbol 46 is entered next to a coverage in ITEM TWO of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

   a. We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

   b. You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

C. CERTAIN TRAILERS, MOBILE EQUIPMENT AND TEMPORARY SUBSTITUTE AUTOS

If Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto".

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

   a. Breakdown;

   b. Repair;

   c. Servicing;

   d. "Loss"; or

   e. Destruction.

## SECTION II - LIABILITY COVERAGE

A. COVERAGE

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

1. WHO IS AN INSURED

The following are "insureds":

   a. You for any covered "auto".

   b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

      (1) The owner or anyone else from whom you hire or borrow a covered "private passenger type auto".

      (2) Your employee or agent if the covered "auto" is a "private passenger type auto" and is owned by that employee or agent or a member of his or her household.

      (3) Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

      (4) Anyone other than your employees, partners, a lessee or borrower or any of their employees, while moving property to or from a covered "auto".

      (5) A partner of yours for a covered "private passenger type auto" owned by him or her or a member of his or her household.

Copyright, Insurance Services Office, Inc., 1993, 1994

c. The owner or anyone else from whom you hire or borrow a covered "auto" that is a "trailer" while the "trailer" is connected to another covered "auto" that is a power unit, or, if not connected:

(1) Is being used exclusively in your business as a "trucker"; and

(2) Is being used pursuant to operating rights granted to you by a public authority.

d. The owner or anyone else from whom you hire or borrow a covered "auto" that is not a "trailer" while the covered "auto":

(1) Is being used exclusively in your business as a "trucker"; and

(2) Is being used pursuant to operating rights granted to you by a public authority.

e. Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

However, none of the following is an "insured":

a. Any "trucker" or his or her agents or employees, other than you and your employees:

(1) If the "trucker" is subject to motor carrier insurance requirements and meets them by a means other than "auto" liability insurance.

(2) If the "trucker" is not insured for hired "autos" under an "auto" liability insurance form that insures on a primary basis the owners of the "autos" and their agents and employees while the "autos" are being used exclusively in the "truckers" business and pursuant to operating rights granted to the "trucker" by a public authority.

b. Any rail, water or air carrier or its employees or agents, other than you and your employees, for a "trailer" if "bodily injury" or "property damage" occurs while the "trailer" is detached from a covered "auto" you are using and:

(1) Is being transported by the carrier; or

(2) Is being loaded on or unloaded from any unit of transportation by the carrier.

2. COVERAGE EXTENSIONS

a. Supplementary Payments. In addition to the Limit of Insurance, we will pay for the "insured":

(1) All expenses we incur.

(2) Up to $250 for the cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

(3) The cost of bonds to release attachments in any "suit" we defend, but only for bond amounts within our Limit of Insurance.

(4) All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $100 a day because of time off from work.

(5) All costs taxed against the "insured" in any "suit" we defend.

(6) All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" we defend; but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

b. Out-of-State Coverage Extensions.

While a covered "auto" is away from the state where it is licensed we will:

(1) Increase the Limit of Insurance for Liability Coverage to meet the limit specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

(2) Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

Copyright, Insurance Services Office, Inc., 1993

**EXCLUSIONS**

This insurance does not apply to any of the following:

1. **EXPECTED OR INTENDED INJURY**

   "Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

2. **CONTRACTUAL**

   Liability assumed under any contract or agreement. But this exclusion does not apply to liability for damages:

   a. Assumed in a contract or agreement that is an "insured contract" provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

   b. That the "insured" would have in the absence of the contract or agreement.

3. **WORKERS' COMPENSATION**

   Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

4. **EMPLOYEE INDEMNIFICATION AND EMPLOYER'S LIABILITY**

   "Bodily injury" to:

   a. An employee of the "insured" arising out of and in the course of employment by the "insured"; or

   b. The spouse, child, parent, brother or sister of that employee as a consequence of paragraph a. above.

   This exclusion applies:

   (1) Whether the "insured" may be liable as an employer or in any other capacity; and

   (2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

   But this exclusion does not apply to "bodily injury" to domestic employees not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract".

5. **FELLOW EMPLOYEE**

   "Bodily injury" to any fellow employee of the "insured" arising out of and in the course of the fellow employee's employment.

6. **CARE, CUSTODY OR CONTROL**

   "Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

7. **HANDLING OF PROPERTY**

   "Bodily injury" or "property damage" resulting from the handling of property:

   a. Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

   b. After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

8. **MOVEMENT OF PROPERTY BY MECHANICAL DEVICE**

   "Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

9. **OPERATIONS**

   "Bodily injury" or "property damage" arising out of the operation of any equipment listed in paragraphs 6.b. and 6.c. of the definition of "mobile equipment".

10. **COMPLETED OPERATIONS**

    "Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

    In the exclusion, your work means:

    a. Work or operations performed by you or on your behalf; and

    b. Materials, parts or equipment furnished in connection with such work or operations.

    Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in paragraphs a. or b. above.

    Your work will be deemed completed at the earliest of the following times:

    (1) When all of the work called for in your contract has been completed.

Copyright, Insurance Services Office, Inc., 1993

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**11. POLLUTION**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:

(1) Being transported or towed by, handled, or handled for movement into, onto or from, the covered "auto";

(2) Otherwise in the course of transit by or on behalf of the "insured"; or

(3) Being stored, disposed of, treated or processed in or upon the covered "auto";

b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

(1) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(2) The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. WAR**

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

**13. RACING**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. LIMIT OF INSURANCE**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined, resulting from any one "accident" is the Limit of Insurance for Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

 Copyright, Insurance Services Office, Inc., 1993

## SECTION III - TRAILER INTERCHANGE COVERAGE

### COVERAGE

1. We will pay all sums you legally must pay as damages because of "loss" to a "trailer" you don't own or its equipment under:

   a. Comprehensive Coverage. From any cause except:

      (1) The "trailer's" collision with another object; or

      (2) The "trailer's" overturn.

   b. Specified Causes of Loss Coverage. Caused by:

      (1) Fire, lightning or explosion;

      (2) Theft;

      (3) Windstorm, hail or earthquake;

      (4) Flood;

      (5) Mischief or vandalism; or

      (6) The sinking, burning, collision or derailment of any conveyance transporting the "trailer".

   c. Collision Coverage. Caused by:

      (1) The "trailer's" collision with another object; or

      (2) The "trailer's" overturn.

2. We have the right and duty to defend any "insured" against a "suit" asking for these damages. However, we have no duty to defend any "insured" against a "suit" seeking damages for any "loss" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends for a coverage when the Limit of Insurance for that coverage has been exhausted by payment of judgments or settlements.

3. COVERAGE EXTENSIONS

   Supplementary Payments. In addition to the Limit of Insurance, we will pay for you:

   a. All expenses we incur.

   b. The cost of bonds to release attachments, but only for bond amounts within our Limit of Insurance.

   c. All reasonable expenses incurred at our request, including actual loss of earnings up to $100 a day because of time off from work.

   d. All costs taxed against the "insured" in any "suit" we defend.

   e. All interest on the full amount of any judgment that accrues after entry of the judgment; but our duty to pay interest ends when we have paid, offered to pay, or deposited in court the part of the judgment that is within our Limit of Insurance.

### B. EXCLUSIONS

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   a. Nuclear Hazard.

      (1) The explosion of any weapon employing atomic fission or fusion; or

      (2) Nuclear reaction or radiation, or radioactive contamination, however caused.

   b. War or Military Action.

      (1) War, including undeclared or civil war;

      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

      (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for loss of use.

3. Other Exclusions.

   We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

   a. Wear and tear, freezing, mechanical or electrical breakdown.

   b. Blowouts, punctures or other road damage to tires.

### C. LIMIT OF INSURANCE AND DEDUCTIBLE

The most we will pay for "loss" to any one "trailer" is the least of the following amounts minus any applicable deductible shown in the Declarations:

1. The actual cash value of the damaged or stolen property at the time of the "loss".

2. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

3. The Limit of Insurance shown in the Declarations.

 Copyright, Insurance Services Office, Inc., 1993

## SECTION IV - PHYSICAL DAMAGE COVERAGE

### A. COVERAGE

1. We will pay for "loss" to a covered "auto" or its equipment under:

   a. Comprehensive Coverage. From any cause except:

      (1) The covered "auto's" collision with another object; or

      (2) The covered "auto's" overturn.

   b. Specified Causes of Loss Coverage. Caused by:

      (1) Fire, lightning or explosion;

      (2) Theft;

      (3) Windstorm, hail or earthquake;

      (4) Flood;

      (5) Mischief or vandalism; or

      (6) The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

   c. Collision Coverage. Caused by:

      (1) The covered "auto's" collision with another object; or

      (2) The covered "auto's" overturn.

2. **Towing - Private Passenger Autos.**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the "private passenger type" is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage - Hitting a Bird or Animal - Falling Objects or Missiles.**

   If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

   a. Glass breakage;

   b. "Loss" caused by hitting a bird or animal; and

   c. "Loss" caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

4. Coverage Extension. We will also pay up to $15 per day to a maximum of $450 for transportation expense incurred by you because of the total theft of a covered "auto" of the "private passenger type". We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes of Loss Coverage. We will pay for transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

### B. EXCLUSIONS

1. We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

   a. **Nuclear Hazard.**

      (1) The explosion of any weapon employing atomic fission or fusion; or

      (2) Nuclear reaction or radiation, or radioactive contamination, however caused.

   b. **War or Military Action.**

      (1) War, including undeclared or civil war;

      (2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

      (3) Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

2. We will not pay for "loss" to any of the following:

   a. Any covered "auto" while in anyone else's possession under a written trailer interchange agreement. But this exclusion does not apply to a loss payee; however, if we pay the loss payee, you must reimburse us for our payment.

   b. Any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to any covered "auto" while that covered "auto" is being prepared for any such contest or activity.

Copyright, Insurance Services Office, Inc., 1993

c. Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

d. Equipment designed or used for the detection or location of radar.

e. Any electronic equipment, without regard to whether this equipment is permanently installed, that receives or transmits audio, visual or data signals and that is not designed solely for the reproduction of sound.

f. Any accessories used with the electronic equipment described in paragraph e. above.

Exclusions 2.e. and 2.f. do not apply to:

a. Equipment designed solely for the reproduction of sound and accessories used with such equipment, provided such equipment is permanently installed in the covered "auto" at the time of the "loss" or such equipment is removable from a housing unit which is permanently installed in the covered "auto" at the time of the "loss", and such equipment is designed to be solely operated by use of the power from the "auto's" electrical system, in or upon the covered "auto"; or

b. Any other electronic equipment that is:

(1) Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system; or

(2) An integral part of the same unit housing any sound reproducing equipment described in a. above and permanently installed in the opening of the dash or console of the covered "auto" normally used by the manufacturer for installation of a radio.

3. Other Exclusions

We will not pay for "loss" caused by or resulting from any of the following unless caused by other "loss" that is covered by this insurance:

a. Wear and tear, freezing, mechanical or electrical breakdown.

b. Blowouts, punctures or other road damage to tires.

C. LIMITS OF INSURANCE

The most we will pay for "loss" in any one "accident" is the lesser of:

1. The actual cash value of the damaged or stolen property as of the time of "loss"; or

2. The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

D. DEDUCTIBLE

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

## SECTION V - TRUCKERS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions:

A. LOSS CONDITIONS

1. APPRAISAL FOR PHYSICAL DAMAGE LOSS

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

2. DUTIES IN THE EVENT OF ACCIDENT, CLAIM, SUIT OR LOSS

a. In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the accident or "loss". Include:

(1) How, when and where the "accident" or "loss" occurred;

(2) The "insured's" name and address; and

(3) To the extent possible, the names and addresses of any injured persons and witnesses.

 Copyright, Insurance Services Office, Inc., 1993

b. Additionally, you and any other involved "insured" must:

(1) Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

(2) Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

(3) Cooperate with us in the investigation, settlement or defense of the claim or "suit".

(4) Authorize us to obtain medical records or other pertinent information.

(5) Submit to examination at our expense, by physicians of our choice, as often as we reasonably require.

c. If there is a "loss" to a covered "auto" or its equipment you must also do the following:

(1) Promptly notify the police if the covered "auto" or any of its equipment is stolen.

(2) Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

(3) Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

(4) Agree to examination under oath at our request and give us a signed statement of your answers.

3. LEGAL ACTION AGAINST US

No one may bring a legal action against us under this Coverage Form until:

a. There has been full compliance with all the terms of this Coverage Form; and

b. Under Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

4. LOSS PAYMENT - PHYSICAL DAMAGE COVERAGES

At our option we may:

a. Pay for, repair or replace damaged or stolen property;

b. Return the stolen property at our expense. We will pay for any damage that results to the "auto" from the theft; or

c. Take all or any part of the damaged or stolen property at an agreed or appraised value.

5. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

B. GENERAL CONDITIONS

1. BANKRUPTCY

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligation under this Coverage Form.

2. CONCEALMENT, MISREPRESENTATION OR FRAUD

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

a. This Coverage Form;

b. The covered "auto";

c. Your interest in the covered "auto"; or

d. A claim under this Coverage Form.

3. LIBERALIZATION

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

 Copyright, Insurance Services Office, Inc., 1993

**4. NO BENEFIT TO BAILEE - PHYSICAL DAMAGE COVERAGES**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

**5. OTHER INSURANCE - PRIMARY AND EXCESS INSURANCE PROVISIONS**

a. This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto" while hired or borrowed from you by another "trucker". However, while a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Liability Coverage is:

(1) On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto".

(2) Excess if the power unit is not a covered "auto".

b. Any Trailer Interchange Coverage provided by this Coverage Form is primary for any covered "auto".

c. Except as provided in paragraphs a. and b. above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.

d. For Hired Auto Physical Damage coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

e. Regardless of the provisions of paragraphs a., b. and c. above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract".

f. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6. PREMIUM AUDIT**

a. The estimated premium for this Coverage Form is based on the exposures you told us you have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

b. If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Form, we cover "accidents" and "losses" occurring:

a. During the policy period shown in the Declarations; and

b. Within the coverage territory.

The coverage territory is:

a. The United States of America;

b. The territories and possessions of the United States of America;

c. Puerto Rico; and

d. Canada.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. TWO OR MORE COVERAGE FORMS OR POLICIES ISSUED BY US**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

 Copyright, Insurance Services Office, Inc., 1993

## SECTION VI - DEFINITIONS

A. "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

B. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads but does not include "mobile equipment".

C. "Bodily injury" means bodily injury, sickness or disease sustained by a person including death resulting from any of these.

D. "Covered pollution cost or expense" means any cost or expense arising out of:

1. Any request, demand or order; or
2. Any claim or "suit" by or on behalf of a governmental authority demanding

that the "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

a. That are, or that are contained in any property that is:
   (1) Being transported or towed by, handled, or handled for movement into, onto or from the covered "auto";
   (2) Otherwise in the course of transit by or on behalf of the "insured";
   (3) Being stored, disposed of, treated or processed in or upon the covered "auto"; or

b. Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

c. After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph a. above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

(1) The "pollutants" escape, seep, migrate, or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

(2) The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in paragraphs 6.b. or 6.c. of the definition of "mobile equipment".

Paragraphs b. and c. above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

(1) The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

(2) The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

E. "Insured" means any person or organization qualifying as an insured in the Who is an Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

F. "Insured Contract" means:

1. A lease of premises;
2. A sidetrack agreement;
3. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;
4. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

 Copyright, Insurance Services Office, Inc., 1993

5. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement;

6. That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your employees, of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your employees to pay for "property damage" to any "auto" rented or leased by you or any of your employees.

An "insured contract" does not include that part of any contract or agreement:

a. That indemnifies any person or organization for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing; or

b. That pertains to the loan, lease or rental of an "auto" to you or any of your employees, if the "auto" is loaned, leased or rented with a driver; or

c. That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

G. "Loss" means direct and accidental loss or damage.

H. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

1. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

2. Vehicles maintained for use solely on or next to premises you own or rent;

3. Vehicles that travel on crawler treads;

4. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

a. Power cranes, shovels, loaders, diggers or drills; or

b. Road construction or resurfacing equipment such as graders, scrapers or rollers;

5. Vehicles not described in paragraphs 1., 2., 3., or 4. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

a. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

b. Cherry pickers and similar devices used to raise or lower workers.

6. Vehicles not described in paragraphs 1., 2., 3., or 4. above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

a. Equipment designed primarily for:

(1) Snow removal;

(2) Road maintenance, but not construction or resurfacing; or

(3) Street cleaning;

b. Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

c. Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well servicing equipment.

I. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

J. "Private passenger type" means a private passenger or station wagon type "auto" and includes an "auto" of the pickup or van type if not used for business purposes.

K. "Property damage" means damage to or loss of use of tangible property.

Copyright, Insurance Services Office, Inc., 1993

"Suit" means a civil proceeding in which:

1. Damages because of "bodily injury" or "property damage"; or
2. A "covered pollution cost or expense",

to which this insurance applies, are alleged.

"Suit" includes:

a. An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" submits with our consent.

M. "Trailer" includes semitrailer or a dollie used to convert a semitrailer into a trailer. But for Trailer Interchange Coverage only, "trailer" also includes a container.

N. "Trucker" means any person or organization engaged in the business of transporting property by "auto" for hire.

Copyright, Insurance Services Office, Inc., 1993

Exhibit C

-17 18:11 WOOLEVER BROTHERS [...]NSPORTATION 717P368F 7 P.01

LEASE NUMBER 9801

# AGREEMENT OF LEASE OF MOTOR VEHICLE EQUIPMENT

This Agreement of Lease is made this 1ST day of MARCH [...]90 by and between JHM ENTERPRISES 1200 VALLAMONT DR. WILLIAMSPORT, PA. 17701 (Name) (Address) Owner and/or Lessor, and WOOLEVER BROS TRANS. INC. Lessee. [...]tor Vehicle Equipment 260 JORDAN AVE. MONTOURSVILLE, PA.

Lessor hereby leases to Lessee the following motor vehicle equipment which shall be operated by the owner thereof or by an employee or by [em]ployees of said owner:

| [Ma]ke | Year | Type | Serial No. | License No. & State |
|---|---|---|---|---|
| [FRE]IGHTLINER #12 | 79 | CABOVER | CA213HM160222 | ~~AA95090~~ AA95089 PA. |

[Te]rm

a. The term of this lease shall begin at 10 AM. o'clock on 3/1/90, and terminate at the end of thirty (30) days, or 10 A.M. o'clock 4/1/90, at which time the term of this lease is automatically extended for additional like thirty (30) day [per]iods, unless terminated by either party giving to the other party five (5) days written notice of cancellation.

or

b. The term of this lease shall begin at ______ M. o'clock on / /7 for the purpose of transportation intrastate in the [di]rection of a point which Lessor is authorized to serve.

or

c. The term of this lease shall begin at ______ M. o'clock on / /7 for the purpose of transportation interstate, in [eq]uipment regularly used in transporting commodities exempt under section 203 (b) (6) of the Interstate Commerce Act or manufactured perishable [pro]ducts therefrom or in equipment which has completed movement of commodities exempt under section 203 (b) (6) of said Act, in the general [dir]ection of the general area in which such is based, provided that, prior to the execution of this lease, Lessee receives from Lessor, or Lessor's auth[orized] representative, and retains, a signed statement certifying that the equipment so leased meets the above requirements and which specifies the [las]t commodity, origin and destination, time and date of pickup, and time and date of delivery, of such last prior shipment.

or

d. The term of this lease shall begin at ______ M. o'clock on / /7 for the purpose of transportation intrastate and/ [or inte]rstate in dump equipment for use in transporting salt and calcium chloride in bulk for ice and snow control purposes, during the period October 1 to April 30, inclusive, of each year.

[Ren]tal Rental

For use of said motor vehicle equipment during the term of this lease, Lessee shall pay to Lessor the following: (CHECK ONE)

—80— % of Gross transportation charges for use of said equipment and services of driver or drivers.

As per attached schedule for transporting salt and calcium chloride in bulk.

Lessor and Lessee agree that this agreement of lease is executed in triplicate: the original is retained by Lessee; one copy is retained by [Less]or; and one copy shall be carried upon the leased equipment specified herein during the entire period of the agreement of lease.

IN WITNESS WHEREOF the parties hereto have executed this agreement on the day and year first written.

JHM ENTERPRISES Lessor

By: [signature] Pres

WOOLEVER BROS TRANS. INC. Lessee

By: [signature]

## REPORT OF VEHICLE INSPECTION

[I] hereby certify that on (DATE) 3/1/90 I carefully inspected the equipment described herein and that [this is a] true and correct report of the result of such inspection, and that Lessee's identification placard was displayed on each side of the power unit.

[signature]

Signature of person making inspection

[(In]dicate in the proper column the result of the inspection of each item listed.)

| [I]tem | Not Defective Tractor | Not Defective Trailer | Defective Tractor | Defective Trailer | Description of Defect Tractor | Description of Defect Trailer |
|---|---|---|---|---|---|---|
| [Bod]y | ✓ | | | | | |
| [Bra]kes | ✓ | | | | | |
| [Coup]ling System | ✓ | | | | | |
| [Fu]el Line | ✓ | | | | | |
| [Eme]rgency Equipment | ✓ | | | | | |
| [Eng]ine | ✓ | | | | | |
| [Exh]aust | ✓ | | | | | |
| [Fue]l System | ✓ | | | | | |
| [...]s | ✓ | | | | | |
| [...] | ✓ | | | | | |
| [...]ke | ✓ | | | | | |
| [Pla]te (state which) | ✓ | | | | | |
| [Refl]ectors | ✓ | | | | | |
| [Spe]edometer | ✓ | | | | | |
| [Spr]ings | ✓ | | | | | |
| [Ste]ering | ✓ | | | | | |
| [...] | ✓ | | | | | |
| [...]cle | ✓ | | | | | |
| [Win]dshield Wiper | ✓ | | | | | |
| [Oth]er items [requ]iring attention | | | | | | |

[I her]eby certify that on the date stated above, the person who made [the] inspection was competent and qualified to make such inspection [and] was duly authorized to make such inspection as a representative

WOOLEVER BROS. TRANS. INC.

Name of authorized carrier

## EXEMPT CARRIER REPORT

I certify that the equipment leased hereunder meets the qualifications enumerated in section 204(F) (1) or (2) of the Interstate Commerce Act. The last shipment transported by the above described vehicles immediately prior to execution of this lease is as follows:

Exempt Commodity ______

From ______ To ______

PLAINTIFF'S EXHIBIT Sinclair 1 11-4-97 JP

PENGAD-Bayonne, N.J.

...of authorized carrier
or co-partner of officer of authorized service

E: 3/1/90

Time and Date of De...

Signed ___________ Owner or Agent

RETENTION HEREOF IS REQUIRED FOR 1 YEAR FROM LAST DATE SHOWN

LESSEE acknowledges receipt of the above described equipment on MARCH 1, 19 90 MONTOURSVILLE, PA.

Signed by [signature] LESSEE

LESSOR acknowledges return of the above described equipment on ____________ 19__ at ____________

Signed by ____________ LESSOR

| Post-it™ Fax Note 7671 | Date 11/17/95 # of pages ▸ 2 |
|---|---|
| To Gail | From Harold Sinclair |
| Co./Dept. Northland Ins | Co. Watever Bus |
| Phone # 800-328-5972 | Phone # 717-368-8011 |
| Fax # 612-688-4170 | Fax # 717-368-8847 |

**Possession, Control and Responsibility**

During the term of this lease, the motor vehicle equipment described herein shall be in the exclusive possession, control and use of Lessee and Lessee hereby assumes complete responsibility for operation thereof. Driver is authorized by Lessee to log meal and rest stops off duty during which time he is relieved of all work and responsibility for performing work. Stops limited to one hour for each 8 hours tour of duty.

**Subleasing**

During the term of this lease, Lessee is considered the owner thereof for the purpose of subleasing the same to other authorized carriers, who or which will assume the obligations otherwise owed by Lessee to Lessor.

**Insurance Coverage By Lessee**

During the term of this lease, Lessee shall furnish and pay the costs of all public liability, property damage and cargo insurance upon the motor vehicle equipment leased hereunder only when such is operated in the service of Lessee.

**Chargeable Accident**

Notwithstanding any other provision hereof, Lessee reserves the right of immediate cancellation of this lease as to any equipment hereunder when the driver thereof is involved in an accident chargeable to him as determined by Lessee's insurance carrier.

**Lessor's Responsibilities**

Lessor is solely responsible for:

a. Payment of wages of the driver or drivers including applicable deductions for social security tax; withholding tax; unemployment compensation tax, wage taxes; health, welfare and pension contributions; and any other payments as required by law.

b. Maintenance and repair of said motor vehicle equipment and emergency replacements thereof, and the sum of any advances by Lessee for such expenses shall be reimbursed to Lessee, who may deduct such amounts from the rental sum herein, provided.

c. Providing all necessary fuel, lubricants, and tires and tubes.

d. Covering all said motor vehicle equipment with bobtail and deadhead insurance, and all public liability and property damage insurance when said motor vehicle equipment is not being operated in the services of Lessee.

e Comprehensive insurance for collision, fire, theft or other occurrences for which Lessee shall not be responsible.

f. Licenses of any nature

g. Tax payments on the motor vehicle equipment or use thereof, including the preparation and filing of all reports connected therewith, or Lessor agrees that Lessee may deduct 2% of Gross transportation charges for any fuel, road, or mileage tax that Lessee may be required to pay for Lessor equipment while equipment is under lease to Lessee.

h. Fines and penalties arising out of the use of said equipment.

i. Lessor shall indemnify and save Lessee harmless of and from all losses, claims or damages arising while Lessor, owner or any driver or operator is operating said motor vehicle equipment when not exclusively carrying freight of Lessee or while Lessor is using the equipment for purposes of Lessor or other than purposes of Lessee.

j. Lessee shall indemnify and save Lessor harmless of and from any loss, claim or damage arising or resulting from any careless or negligent act of omission or commission by Lessee or employees of Lessee.

k. Lessor is responsible for any quantity weight or count of shipment signed for by the driver or drivers hereunder.

**Lessor Is Independent Contractor**

The parties hereto expressly understand and agree that Lessor's relationship to Lessee shall be at all times that of an independent contractor and not a relationship of employer-employee.

Lessor certifies that the driver of said equipment leased hereby is, or the drivers of said leased equipment are, qualified for driving said equipment under all applicable laws and regulations, and that Lessee has been notified in writing by Lessor of the hours on duty of said driver or drivers for the [illegible]

**Mechanical Failure**

In the [illegible] nt [illegible] chanical failure of the equipment herein leased, r [illegible] her [illegible] s deemed sufficient by Lessee, L [illegible] s [illegible] ve authority to transfer cargo and effect deliver, [illegible] ve [illegible] selected by Lessee. In such event, all an, [illegible] se incurred with respect to such transfer and deliver, of ca [illegible] shall be reimbursed by Lessor to Lessee, who may deduct the amount thereof from the rental sum herein provided.

Lessor agrees to be held responsible for any damages up to $250.00 to Lessee's trailer and to assume any loss or damage to cargo or equipment, but not exceeding the deductible limitations on company insurance policies, but in no event to exceed $250.00 for loss or damage to cargo or equipment.

Exhibit D

DEC-04 17:25 WOOLEVER BROTH TRANSPORTATION 717 8947 P.01

533

LEASE NUMBER W-12

# AGREEMENT OF LEASE OF MOTOR VEHICLE EQUIPMENT

This Agreement of Lease is made this 16th day of November 1995 by and between JHM Enterprises 1200 Vallamont Dr (Name) (Address) Williamsport Pa 17701, Owner and/or Lessor, and Woolever Bros Trans Inc 260 Jordan Ave Montoursville Pa 17754 Lessee.

Motor Vehicle Equipment: Lessor hereby leases to Lessee the following motor vehicle equipment which shall be operated by the owner thereof or by an employee or by employees of said owner:

| Make | Year | Type | Serial No. | License No. & State |
|---|---|---|---|---|
| Freightliner | 1979 | C-O | CA213HM160222 | AA95089 Pa |
| Budd | 1977 | Van | 141235E | XC27304 Pa |

Term

a. The term of this lease shall begin at 4:00 P M. o'clock on 11/16/95, and terminate at the end of thirty (30) days, or at 5:00 P. M. o'clock 11/17/95, at which time the term of this lease is automatically extended for additional like thirty (30) day periods unless terminated by either party giving to the other party five (5) days written notice of cancellation;

or

b. The term of this lease shall begin at ______ M. o'clock on / /19 for the purpose of transportation intrastate in the direction of a point which Lessor is authorized to serve;

or

c. The term of this lease shall begin at ______ M. o'clock on / /19 for the purpose of transportation interstate, in equipment regularly used in transporting commodities exempt under section 203 (b) (6) of the Interstate Commerce Act or manufactured perishable products therefrom or in equipment which has completed movement of commodities exempt under section 203 (b) (6) of said Act, in the general direction of the general area in which such is based, provided that, prior to the execution of this lease, Lessee receives from Lessor, or Lessor's authorized representative, and retains, a signed statement certifying that the equipment so leased meets the above requirements and which specifies the exempt commodity, origin and destination, time and date of pickup, and time and date of delivery, of such last prior shipment.

or

d. The term of this lease shall begin at ______ M. o'clock on / /19 for the purpose of transportation intrastate and/ interstate in dump equipment for use in transporting salt and calcium chloride in bulk for ice and snow control purposes, during the period of October 1 to April 30, inclusive, of each year.

Lease Rental

For use of said motor vehicle equipment during the term of this lease, Lessee shall pay to Lessor the following: (CHECK ONE)

A. 90 % of Gross transportation charges for use of said equipment and services of driver or drivers.

B. As per attached schedule for transporting salt and calcium chloride in bulk.

Lessor and Lessee agree that this agreement of lease is executed in triplicate; the original is retained by Lessee; one copy is retained by Lessor; and one copy shall be carried upon the leased equipment specified herein during the entire period of the agreement of lease.

IN WITNESS WHEREOF the parties hereto have executed this agreement on the day and year first written.

JHM Enterprises ______ Lessor

By: [signature] Pres.

Woolever Bros Trans Inc Lessee

By: [signature] Sec Treas

## REPORT OF VEHICLE INSPECTION

I hereby certify that on (DATE) 11/16/95 I carefully inspected the equipment described herein and that this is a true and correct report of the result of such inspection, and that Lessee's identification placard was displayed on each side of the power unit.

[signature] Harold Sinclair
Signature of person making inspection

(Indicate in the proper column the result of the inspection of each item listed.)

| Item | Not Defective Tractor | Not Defective Trailer | Defective Tractor | Defective Trailer | Description of Defect Tractor | Description of Defect Trailer |
|---|---|---|---|---|---|---|
| Body | | | | | | |
| Brakes | | | | | | |
| Cooling System | | | | | | |
| Drive Line | | | | | | |
| Emergency Equipment | | | | | | |
| Engine | | | | | | |
| Exhaust | | | | | | |
| Fuel System | | | | | | |
| Glass | | | | | | |
| Horn | OK | OK | | | | |
| Leaks | | | | | | |
| Lights (state which) | | | | | | |
| Reflectors | | | | | | |
| Speedometer | | | | | | |
| Springs | | | | | | |
| Steering | | | | | | |
| Tires | | | | | | |
| Wheels | | | | | | |
| Windshield Wiper | | | | | | |
| Other Items requiring attention | | | | | | |

I hereby certify that on the date stated above, the person who made the inspection was competent and qualified to make such inspection and was duly authorized to make such inspection as a representative of

Woolever Bros Trans Inc

### EXEMPT CARRIER REPORT

I certify that the equipment leased hereunder meets the qualifications enumerated in section 204(F) (1) or (2) of the Interstate Commerce Act. The last shipment transported by the above described vehicles immediately prior to execution of this lease is as follows:

Exempt Commodity ______

Hazel L. Shirk / Carl Sechrist

Signature of authoriz... or co-partner of officer of a... carrier

DATE: 11/16/85

Time and Date of Pickup

Time and Date ...livery

Signed

Owner or Agent

RETENTION HEREOF IS REQUIRED FOR 1 YEAR FROM LAST DATE SHOWN

LESSEE acknowledges receipt of the above described equipment on 11/16 85

at

Signed by Hazel L. Shirk
LESSEE

LESSOR acknowledges return of the above described equipment on 11/17 1985

at Ephrata, Pa.

Signed by
LESSOR

Post-it® Fax Note 7671 | Date 12/4 | # of pages ▶ 2

Possession, Control and Responsibility

During the term of this lease, the motor vehicle equipment described herein shall be in the exclusive possession, control and use of Lessee and Lessee hereby assumes complete responsibility for operation thereof. Driver is authorized by Lessee to log meal and rest stops off duty during which time he is relieved of all work and responsibility for performing work. Stops limited to one hour for each 8 hours tour of duty.

Subleasing

During the term of this lease, Lessee is considered the owner thereof for the purpose of subleasing the same to other authorized carriers, who or which will assume the obligations otherwise owed by Lessee to Lessor.

Insurance Coverage By Lessee

During the term of this lease, Lessee shall furnish and pay the costs of all public liability, property damage and cargo insurance upon the motor vehicle equipment leased hereunder only when such is operated in the service of Lessee

Chargeable Accident

Notwithstanding any other provision hereof, Lessee reserves the right of immediate cancellation of this lease as to any equipment hereunder when the driver thereof is involved in an accident chargeable to him as determined by Lessee's insurance carrier.

Lessor's Responsibilities

Lessor is solely responsible for.

a. Payment of wages of the driver or drivers including applicable deductions for social security tax; withholding tax; unemployment compensation tax; wage taxes; health, welfare and pension contributions; and any other payments so required by law.

b. Maintenance and repair of said motor vehicle equipment and emergency replacements thereof, and the sum of any advances by Lessee for such expenses shall be reimbursed to Lessee, who may deduct such amounts from the rental sum herein, provided.

c. Providing all necessary fuel, lubricants, and tires and tubes

d. Covering all said motor vehicle equipment with bobtail and deadhead insurance, and all public liability and property damage insurance when said motor vehicle equipment is not being operated in the services of Lessee.

e. Comprehensive insurance for collision, fire, theft or other occurrences for which Lessee shall not be responsible.

f. Licenses of any nature

g. Tax payments on the motor vehicle equipment or use thereof, including the preparation and filing of all reports connected therewith, or Lessor agrees that Lessee may deduct 2% of Gross transportation charges for any fuel, road, or mileage tax that Lessee may be required to pay for Lessor equipment while equipment is under lease to Lessee

h. Fines and penalties arising out of the use of said equipment.

i. Lessor shall indemnify and save Lessee harmless of and from all losses, claims or damages arising while Lessor, owner or any driver or operator is operating said motor vehicle equipment when not exclusively carrying freight of Lessee or while Lessor is using the equipment for purposes of Lessor or other than purposes of Lessee.

j. Lessor shall indemnify and save Lessee harmless of and from any loss, claim or damage arising or resulting from any careless or negligent act of omission or commission by Lessor or employees of Lessor.

k. Lessor is responsible for any quantity weight or count of shipment signed for by the driver or drivers hereunder.

Lessor Is Independent Contractor

The parties hereto expressly understand and agree that Lessor's relationship to Lessee shall be at all times that of an independent contractor and not a relationship of employer-employee.

Lessor certifies that the driver of said equipment leased hereby is, or the drivers of said leased equipment are, qualified for driving said equipment under all applicable laws and regulations, and that Lessee has been notified in writing by Lessor of the hours on duty of said driver or drivers for the seven (7) consecutive days previous to first employment of driving under this lease.

Mechanical Failure

In the event of mechanical failure of the equipment herein leased, or other causes deemed sufficient by Lessee, Lessee shall have authority to transfer cargo and effect delivery by vehicles selected by Lessee. In such events all expenses incured with respect to such transfer and delivery of cargo shall be reimbursed by Lessor to Lessee, who may deduct the amount thereof from the rental sum herein provided.

Lessor agrees to be held responsible for any damages up to $250.00 to Lessee's trailer and to assume any loss or damage to cargo or equipment, but not exceeding the deductible limitations on company insurance policies, but in no event to exceed $250.00 for loss or damage to cargo or equipment.

**CERTIFICATE OF SERVICE**

I, Jonathan H. Rudd, Esquire, hereby certify that on this 2nd day of August, 2001, a true and correct copy of the foregoing document was served by first-class, United States mail, postage prepaid, upon the following:

David Ira Rosenbaum, Esq.
Ruthrauff & Armbrust, P.C.
1601 Market Street, 16th Floor
Philadelphia, PA 19103

J.H.M. Enterprises, Inc.
1200 Walmont Drive, N.W.
Williamsport, PA 17701

Vernice Lee Statts
489 East Academy Street
Hughesville, PA 17737-1805

Jonathan H. Rudd

Exh C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .

NORTHLAND INSURANCE COMPANIES,
Plaintiff

vs. No. 01-CV-763

LINCOLN GENERAL INSURANCE COMPANY, J.H.M. ENTERPRISES, INC., et al.,
Defendants

. . . . . . . . . . . . . .

Deposition of: TRACI E. SLANE

Taken by : Defendant

Date : January 9, 2002; 1:05 p.m.

Place : Klett Rooney Lieber & Schorling
240 North Third Street
Harrisburg, Pennsylvania

Before : Therese M. Valente
Reporter - Notary Public

APPEARANCES:

SCHINDEL, FARMAN & LIPSIUS, LLP
By: IRA S. LIPSIUS, ESQ.

For - Plaintiff

McNEES WALLACE & NURICK, LLC
By: JONATHAN H. RUDD, ESQ.

For - Defendants

INDEX

WITNESS

| | Examination |
|---|---|
| TRACI E. SLANE | |
| By Mr. Rudd | 3 |
| By Mr. Lipsius | - |

EXHIBITS

| Slane Deposition Exhibit Numbers | | Page |
|---|---|---|
| 1 | Letter to D. Rosenbaum, Esq. from J. Rudd, Esq., dated 8-3-01. | 99 |

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and all objections except as to the form of the question are reserved to the time of trial.

TRACI E. SLANE, called as a witness, being duly sworn, testified as follows:

EXAMINATION

BY MR. RUDD:

Q. Ms. Slane, my name is Jonathan Rudd. I represent Lincoln General in this matter.

I want to try to go pretty quick, but I want to go through a little bit of your background.

A. Sure.

Q. Can you tell me your current employment and work backwards from there?

A. I'm currently working with Northland Insurance Company as a senior claims supervisor.

Q. How long have you been in that position?

A. About one year now. Since February of 2001.

Q. What was your position before that?

A. It was senior claims adjuster.

Q. How long were you in that position?

A. A couple of years. I have been with Northland

since '91, and have worked my way up from a claims trainee with no experience through to the senior adjuster, and now senior claims supervisor.

Q. Before Northland, did you have any employment?

A. No. That was my first job out of college.

Q. Where did you graduate college?

A. Winona State University, Winona, Minnesota.

Q. Did you go to some training school when you started with Northland, or before you started?

A. I started with Northland in August of '91, and it was a six month trainee program, before I started actually handling claims.

Q. In terms of the training program, did it focus on any specific type of claims or was it just a general course?

A. It was a general insurance background. Basically, a general claims background, and then we had six week rotations through each of the claims department; that being, commercial auto, person lines and specialty lines.

Q. Where did you eventually end up when you went through your different jobs at Northland? Which claims department?

A. Commercial auto.

Q. And you have been there the whole time, other than your training?

A. Correct.

Q. In commercial auto tell me just generally what type of claims you would have been handling when you were, I guess, a senior claims adjuster?

A. We insure long-haul trucks, charter buses and limousines, and it would have been the most series of injuries, fatalities and complex coverage issues.

Q. I'm not sure what your status was during the pendency -- your involvement with what we're referring to as the Woolever claim or the J.H.M. claim. Were you a senior claims adjuster the whole time?

A. Um-hum.

MS. VALENTE: That's a yes?

A. Yes. I'm sorry.

BY MR. RUDD:

Q. Just ballpark, if you can, as a senior claims adjuster, how many claims would you have handled over your tenure, during that time period? Are we talking hundreds, thousands?

A. Well, I would get -- I carried a pending of about 300 claims, 300 hundred claim files.

I'm sorry, that's wrong. 300 claim units, which would translate to about 150 to 175 files.
Q. Okay.
A. And that was an ongoing -- on an ongoing basis. I would get anywhere from probably 30 to 50 new claims a month.
Q. Now, did you have people you were supervising during this whole time period?
A. As a senior claims adjuster?
Q. Yes.
A. No.
Q. As a senior claims supervisor, obviously there must be some supervisory role. Do you still do any hands-on claims adjusting?
A. I do some.
Q. What percentage of your time is just spent with claims adjusting?
A. Depends on how many people quit. As people quit and there are transfer files, I'd say possibly ten percent of my time.
Q. In your job description, though, you are not supposed to be spending time doing claims adjusting; you are supposed to be supervising?
A. Most, yes.
Q. On this file, your counsel has pointed out that

you are the person with settlement authority. Is there a claims adjuster or a senior claims adjuster who's actually handling this file at this point?

A. No.

Q. So, are there some files that you have continued with and you continue to handle the adjustment of them?

A. Yes.

Q. Is that part of the ten percent?

A. Yes.

Q. Do you have an supervisor at this point?

A. Our claims manager.

Q. Who is that?

A. Mike Dempsey.

Q. When you were a senior claims adjuster, did you have a supervisor?

A. Yes.

Q. Who was that?

A. Jerry Parker.

Q. Is Jerry Parker still with the company?

A. Yes, he is.

Q. What is his position now?

A. He is also a senior claims supervisor.

Q. He's your same level at this point?

A. Yes.
Q. At some point in time you took over this file from Jerry Parker?
A. I did.
Q. Was Jerry Parker a senior claims adjuster and got promoted then to a senior claims supervisor?
A. Yes.
Q. At that time you inherited the file?
A. Correct.
Q. Had you had any involvement with the file before then?
A. No, I-- No.
Q. Tell me what you do when you first inherit a file?
A. Review it.
Q. What exactly do you review? Is there a hard-- I mean, we obviously have a computerized printout.
A. Right.
Q. And your counsel has sent me also a hard copy of documents also that I assume came from Northland's file. I'm not sure where they originated.

MR. LIPSIUS: We will represent that they came Northland's file, what they furnished to us.

BY MR. RUDD:

Q. Would you review both the hard copy and the computer diary?

A. Absolutely.

Q. Would you have any type of meetings with Jerry Parker to discuss any pending issues, any of his thoughts and so forth?

A. Yes.

Q. And you recall doing that?

A. Yes.

MR. RUDD: Ira, do you have a copy for her?

MR. LIPSIUS: We have the marked copy. Why don't you give her the marked copy.

MR. RUDD: That's fine.

BY MR. RUDD:

Q. November 1st, 1999, which is on Page 5 of the claims diary appears to be where you reviewed the file.

A. Yes.

Q. Do you recall any-- There's no entries here. Do you have any independent recollection of any involvement before that time?

A. No, I don't. I may have heard about the file, but no.

Q. There seems to be a gap of quite a number of months between April 20th, 1999 when Jerry Parker

last entered and when you entered on November 1st, and I didn't know if there was something that happened in the interim which is not documented.

A. Not that I know of.

Q. Now, in terms of your handling of this claim, obviously there's coverage issues involving Northland and Lincoln General and there's also the underlying tort claims. Were you handling both of those issues?

A. Yes.

Q. Is there any type -- obviously not for this case, but is there any type of separation at Northland between coverage adjusters and adjusters who handled the underlying cases?

A. There can be.

Q. In what instances do you have separate adjusters involved?

A. I guess when you would get into a conflict situation, maybe the insurance company's position on coverages is not in the best interest of the insured, you would have one adjuster represent the insured and one handle the coverage.

Q. Now, we know that there were-- Let me back up. I am sort of jumping ahead, I guess, trying to

expedite it.

We know that there were reservation of rights letters, and your counsel has produced those to me. If you have a reservation of rights situation, does that automatically require separate adjusters?

A. No.

Q. At what point do you perceive that there would be a potential conflict with you and your insured?

MR. LIPSIUS: Are you talking in general or with this file?

MR. RUDD: In general, where you would have separate adjusters.

A. If you are taking a position of no coverage, yet there's still a duty to defend.

BY MR. RUDD:

Q. At least it was your understanding when you took over this file, that Northland wasn't taking a position of no coverage with Woolever?

A. That was my understanding.

MR. LIPSIUS: Just ask a question here of you: Are we getting into-- I thought we were avoiding those coverage issues at this deposition.

MR. RUDD: Oh, yes. I am just trying to get

some background of what she did, her role from a coverage standpoint versus a claim standpoint.

BY MR. RUDD:

Q. After you got involved, and I haven't looked through this in great detail, but I know you made a couple of references to talking to Jerry Parker, but I think most of these entries are your entries.

Would a supervisor generally put entries into the same claims diary about contacts he might have had with the claims adjusters?

A. You mean if I-- I guess I'm not--

Q. If you talked to Jerry Parker, you put your entry down what you think you talked about; would he normally put his entry down what he thought you talked about?

A. No.

Q. Generally, this is a claims adjuster log, and if we want to get any supervisor's input, we would have to look elsewhere?

A. Well, I don't know that there is, because if I am going to conference with him and we decide on a plan of action, it's up to me to document the file as to our plan of action.

Q. Because I didn't see any notes, handwritten notes

of communications that Jerry Parker had with you. Would you know whether he would normally keep notes of such conversations?

A. No, I don't.

MR. LIPSIUS: We will represent that there is no other computer entry log for Jerry Parker on this file. And we will further represent that, at least in the file we have been provided -- we believe our client has provided us with a full file -- there are no Jerry Parker notes, other than the ones that were provided to you. There were a few Jerry Parker notes that were provided to you in the documentation.

So, I will represent this should be the complete file.

BY MR. RUDD:

Q. In terms of the primary issue, why we're here today, about the alleged settlement, did Jerry Parker have any involvement in that?

A. Regarding the settlement?

Q. Regarding what Northland contends was a settlement with Lincoln General?

A. No.

Q. I will start in your claims diary at Page 9 on the entry dated December 28, 1999.

A. Okay.

Q. For purposes of having a record that sounds somewhat accurate, we've been just trying to conversationally speak what we believe are your abbreviations. If we are wrong, let us know.

A. Sure.

Q. But in this entry on December 28, 1999, at 8:40 a.m., it appears that you returned Lou Bricklin's call.

A. Correct.

Q. And had some conversations with him?

A. Yes.

Q. He apparently had been speaking with Mike Pipa, who we know was the counsel Lincoln General hired to defend J.H.M. and Bernice Statts. That was your understanding?

A. That was my understanding

Q. Apparently, you write, they will agree, and I assume you are talking about Lincoln General will agree?

A. Correct.

Q. To tender their 750,000 dollars if we agree, and I assume you're talking about Northland?

A. Correct.

Q. Agree in writing to arbitrate-- Is that what

a-r-b stands for, arbitrate?

A. Correct.

Q. If all claims settle under 1.5 million and within 60 days of underlying claims being resolved.

And then it says, Agreed that was fine and he will get out letter out.

A. Correct.

Q. When you said, Agreed that was fine, there is no indication that at that point in time you communicated with anybody else before making that decision?

A. No. I think that had always been our plan of action is if we could agree that that's what we would do.

Q. So, you probably, at least at that point in time, it was acceptable to Northland for Lincoln General just to tender their policy limits of 750,000; Northland and Lincoln General would then arbitrate the coverage issue?

A. Correct.

Q. Did you expect then Mr. Bricklin then to send a letter out confirming your agreement to that?

A. Correct.

Q. If you go to the next page of the claims diary, Page 10. If you look at the entry on January

13th, 2000.

A. Okay.

Q. And I'm not sure if this is a continuation of some prior entry, but it just states, She had faxed letter. Is that a continuation of apparently your call with Moira?

A. No. I don't think so.

Q. Tell me, when you say she had faxed letter, who are you referring to?

A. That would be a letter that I had received from Moira.

Q. And that's Moira Duggan?

A. Correct.

Q. She worked with Lou Bricklin?

A. Correct.

Q. Anyway, she had faxed apparently to you? Is that what she's saying?

A. Um-hum.

Q. Is that a yes?

A. Yes. Sorry.

MR. RUDD: Ira, do you know whether you provided that letter to us, because I didn't see it?

MR. LIPSIUS: I will look in our files, if we did not. I believe we had produced everything,

but it's possible she's mistaken as to whether she got the letter. I have no idea.

MR. RUDD: That's what I'm wondering about.

MR. LIPSIUS: If it is in the Northland file, and I could not bring the full file with me, if you want, we can put a note in the transcript and I will check our record and if it's not been provided, we will get you a copy, no problem.

MR. RUDD: So, you will check on it.

A. I'm assuming it came from Moira.

BY MR. RUDD:

Q. Okay.

A. There's a lot of paper in that file.

Q. In any event, it says, She had faxed letter whether Northland is willing to agree to arbitrate whether its policy may be primary as opposed to concurrent or excess. Indicates they cannot commit to change until have authority from us.

Do you have explanation for why she would be sending you a letter seeing if they have authority from us, when it seemed like back on December 28th, you had already agreed that that was acceptable to Northland?

A. The only thing I can say is, based on the

conversation below that note with Moira, there was an issue as to whether we were going to arbitrate if we were primary; and it was my understanding we were going to just arbitrate whether we were concurrent or excess, not whether we were primary, and that's where the problem was coming in.

Q. So, on December 28th you had agreed to arbitrate?

A. Correct.

Q. But at that point was any distinction even made between primary, concurrent or excess issues?

A. I don't recall.

Q. But in any event, it appears that Moira had sent you a letter requesting your authorization because she didn't feel she could commit to that without you first approving it; is that correct?

A. Correct.

Q. Apparently, you had a conversation after receiving the letter where you called Moira. Told her I did not have a problem arbitrating if we were primary as opposed to concurrent or excess. Seemed like that is what we had agreed to. She will get ball rolling on that.

I understand from that comment that you were agreeable to arbitrating the totality of the

issues as to whether Northland or Lincoln General were primary, concurrent or excess?

A. I don't really recall at that point. I know what that says.

Q. We will get to Jerry Parker's involvement next, but I want to find out--

A. I may have agreed to that before I discussed it with Jerry, but I don't recall. I'm really-- Because I know what we finally, what the final resolution of it was and what we wanted to do.

I may have off the cuff told her it was not a problem if we arbitrated all the coverage issues and then spoke with Jerry Parker.

Q. The statement, She will get the ball rolling on that, did you feel that that would then give her authorization to move forward with what had been proposed?

A. That would be my understanding.

Q. Now, was it your understanding, though, that before this would happen, there would be some type of written confirmation by Lincoln General and Northland agreeing to the terms of this arbitration?

A. I'm sorry. Say that again.

Q. Did you believe that there would be some written

agreement outlining the terms of this arbitration between Northland and Lincoln General?

A. There usually is in any arbitration that I agree to.

Q. You had been involved in this type of situation before where two insurance carriers have agreed to arbitrate coverage disputes?

A. Some. Not many.

Q. But in those instances, it's been your experience that there was some written agreement setting forth the parameters?

A. Um-hum.

Q. Is that a yes?

A. Yes.

Q. Did you feel that until there was a written agreement as to arbitrating this dispute with Lincoln General, that either Northland or Lincoln General could change their minds and decide not to go forward with it?

A. Well--

MR. LIPSIUS: I think you're asking a legal conclusion. You can answer the question of what you believe.

A. Well, not necessarily. I think until we have the parameters set out and both sides have agreed to

it, I don't think it necessarily has to be in writing, but until both sides have agreed to the parameters of the arbitration. I have had many arbitrations fall through because you can't agree on the parameters of them.

BY MR. RUDD:

Q. It seems at least one of the parameters that was a major parameter was whether Northland was agreeing to arbitrate whether it was potentially primary or concurrent, as well as excess. And it appears to me that you had agreed to that parameter based on your conversation with Moira on January 13, 2000; is that correct?

A. We may have. Between her and I, but she hadn't communicated that to anybody.

Q. But you told her to get the ball rolling on that right away; correct?

A. I did.

Q. But until there was actually a written agreement, you didn't feel that either Northland or Lincoln General would be bound to go ahead and arbitrate?

A. Well, I mean, with any arbitration you have to have the parameters of the arbitration worked out before it's-- And until that time, either party can back out. And we at that point did not have

the parameters worked out with Lincoln General.

Q. And then, going on later, it doesn't say on January 13th, 2000 at what time you discussed this with Jerry Parker, but presumably this is chronological?

A. Correct.

Q. So, sometime after you talked with Moira?

A. I talked to her at 10:15. I am assuming between 10:15 and when I called her back at 10:40, I spoke with Jerry.

Q. Is there a reason you would have talked to Jerry Parker about this issue?

A. Just because he was my supervisor.

Q. Well, going back to the file from when you took it over, November of 1999 -- I guess we're only talking a couple months -- but it didn't appear that you had a whole lot of discussions, if any, with Jerry Parker. I'm not sure you had any; there could be some. Is there a reason this is the type of thing you would want to talk to Jerry Parker about?

A. Well, because the arbitration is going to bind Northland, and I'm always wary of arbitrating coverage issues, especially big coverage issues, because a lot of times you will get a bad result

with an arbitration, as opposed to a dec. action. And it's just something that I wanted a second -- I just wanted to pick his brain and get maybe validation that we were doing the right thing.

Q. First of all, let's go through your answer. You had some limited prior experience with arbitrations. It's your testimony that those prior experiences had resulted in what you felt were bad decisions?

A. Not just for myself, but for cases throughout the department.

Q. Is there a reason that you had not talked to Jerry Parker before you told Moira to get the ball rolling on that?

A. No, because I thought I knew-- No, there really isn't.

Q. Okay. You felt comfortable arbitrating the primary, concurrent and excess issues when you first talked to Moira, but then you wanted to see what Jerry Parker felt?

A. Correct.

Q. And you don't recall specifically why you would have had concern enough to even talk to Jerry Parker about it?

A. He's my supervisor.

Q. How often do you talk to Jerry Parker about your cases? At the time, I should say.

A. Whenever events were happening on them that I felt he needed to be keep abreast of.

Q. Did you have authority to commit certain amount of funds to a settlement when you were a senior claims adjuster?

A. Did I have a dollar amount of authority?

Q. A dollar amount.

A. A hundred thousand.

Q. Above that, you would have to go to Jerry Parker or to someone else?

A. To Jerry.

Q. What was Jerry's level of authority, do you know?

A. 150.

Q. And then he would have to go to Mike Dempsey?

A. Yep.

Q. What was his level of authority?

A. Back in '99, it was policy limits.

Q. It's changed since then, you're saying?

A. Yes.

MR. LIPSIUS: I am going to ask for a one minute break.

MR. RUDD: Sure.

(Recess taken)

BY MR. RUDD:

Q. Anyway, at that point in time you talked to Jerry and Jerry's conversation, I guess it's apparent what he said. He did not want to arbitrate whether Northland was primary and Lincoln General was excess, because of the difference in your policy limits.

A. Right.

Q. That's what you had said about a bad result?

A. Right.

Q. Apparently then, you called Moira and then passed it on to her?

A. Yes.

Q. And really, after that point in time, is it fair to say there was limited, if any, discussion about arbitration and that issue went to the wayside?

A. It pretty much fell apart.

Q. And eventually, Northland proceeded with deciding just to file a declaratory judgment action; is that correct?

A. Correct.

Q. I'm going to go onto Page 15. The very bottom entry, May 5th, 2000. Apparently, Mike Pipa had called you and you returned Mike Pipa's call.

A. Correct.

Q. Was there a reason that you were talking directly with Mike Pipa about this case?

A. Well, Northland traditionally retains -- their adjuster retains settlement authority, even though the file is being litigated, and it's not uncommon for adjusters to contact other attorneys directly, even though the case is being litigated.

Q. So, your handling of this matter was such that you didn't rely on Lou Bricklin and Moira Duggan to necessarily contact the other attorneys; you did it yourself?

A. Exactly.

Q. Apparently, he must have told you something such that you called Mike McGovern?

A. Yes. At the last -- the top entry said, he referred me -- he said he would call Lincoln General and have the adjuster contact me directly.

Q. So, he basically told you, you are going to have to deal with Lincoln General directly on these issues to get answers?

A. Correct.

Q. Then, apparently, on May 5th, 2000, you did talk

to Mike McGovern?

A. Correct.

Q. In that conversation, apparently Mike McGovern told you that they, being Lincoln General, would consider agreeing to settling the cases and litigating declaratory judgment action. He gave you his address and asked you to send him a letter. Said to get letter outlining what we are thinking and then he will review and get back to me.

Is that common that you would normally send letters out to the other counsel or the other party you are dealing with setting forth what you were proposing?

A. Such as splitting the case and litigating?

Q. Right.

A. Yes.

Q. I mean, did you find Mike McGovern's request that you send him a letter to be unreasonable in any manner?

A. No.

Q. What did you do then about -- I know you sent a letter, but between his request on May 5th, 2000 to send a letter and when you actually sent it on May 10th, what did you do to come up and put

together Northland's proposal to Lincoln General?

A. It was just very simple because it was just a proposal that we split the cases 50/50 on settlement and then litigate the coverage later.

Q. Had you already told that to Mike McGovern in your conversation, what your proposal was?

A. Yes.

Q. He just wanted to see it in writing?

A. Evidently.

Q. Did he indicate to you in any manner that he'd have to review it with any of his superiors?

A. No.

Q. We have already marked as McGovern #3 what I believe is your letter to Mike McGovern. If you could just confirm that.

A. Yes. That is my letter.

Q. And as you said, it's pretty simple. You say that you were following up on your telephone conversation on May 5, 2000. And then your proposal was, however, we would like to resolve the underlying claims at the same time. We propose that each pay half of the settlements of the underlying claims and proceed to dispose of the coverage issues with the declaratory judgment action that is being filed. Please review and

call me to discuss at your earliest convenience.

Was there any more terms to your proposal than that?

A. No.

Q. When you say half of the settlement of the underlying claims, were you suggesting that Lincoln General pay more than its policy limits of 750,000?

A. No.

Q. So, implicit although not stated, is that Lincoln General would pay half up to its policy limits?

A. Correct.

Q. Is there a reason you wouldn't have set that forth clearly as one of the terms?

A. Probably because I didn't think the settlements were going to exceed their 750 -- 750 from each of us.

Q. At the time did you know that the Plaintiffs, and I saw references in your log to them demanding 4 million dollars at one time, something like that.

A. Um-hum.

MR. LIPSIUS: That's a yes?

A. Yes. Sorry.

BY MR. RUDD:

Q. At the time you had no assurance that this case

would settle for less than 1.5 million, did you?

A. No.

Q. But your proposal was in essence that Lincoln General contribute up to 750,000. Was there any proposal about how much Northland would pay to settle the case?

A. No. At that point we just agreed 50 percent of the underlying cases.

Q. Was it an implicit term that the most the two insurance companies would pay to settle the cases was 1.5 million?

A. No. It was just my understanding that Lincoln General would not -- I mean, I didn't state that they wouldn't pay more than 750, but as a claims professional, why would they pay more than their policy limits?

Q. All right. So, that was implicit, but you hadn't committed to Lincoln General how much Northland would pay of its policy limits and whether it would pay more than 750,000?

A. No.

Q. That was not discussed with Mike McGovern?

A. No.

Q. Apparently, Mike McGovern did get back to you on May 18th, 2000. It says, They are willing to do

50/50 split.

A. Yes.

Q. Not sure 1.5 million is going to do it, but good start.

Did you understand from that statement that at least Mike McGovern felt that maybe Northland was going to have to pay more than 750 to get it settled?

A. Yes.

Q. Did Mike McGovern tell you in the, I guess, ten days between when you sent the letter and he got back to you on the 18th, whether he had reviewed this with anybody else at Lincoln General?

A. No.

Q. Did you understand that Mike McGovern did have some supervisor there?

A. I did not.

Q. What did Mike McGovern tell you about his status at Lincoln General?

A. Frankly, we never discussed it.

Q. Did you know he was an attorney?

A. No.

Q. He never communicated to you what his position was?

A. No.

Q. Did Mike McGovern ever even send you a letter at any time during your involvement with this case?

A. Not that I recall.

Q. You never saw his signature and how he signed his name and what he identified himself at his title?

A. I couldn't tell you.

Q. Well, did you believe he was the head of the claims department or anything like that?

A. I just-- Mike Pipa referred to him as an adjuster. You'll have to talk with the adjuster at Lincoln General. I assumed he was an adjuster, just like myself.

Q. And you assumed then as an adjuster just like yourself who reported to Jerry Parker, that there might be someone Mike McGovern was reporting to?

A. It never really crossed my mind.

Q. And I'm not sure what adjusters say between themselves, but you had certain settlement authority. You said a hundred thousand dollars?

A. Yes.

Q. Did you ever communicate to Mike McGovern what the limit of your settlement authority was?

A. No.

Q. And I assume the decision here, the proposal that you made, which would involve paying up to

750,000 or more, you needed to get authority for doing that from somebody above you?

A. Most likely, yes.

Q. And Jerry Parker's authority at 150,000 wouldn't even cover it; you would have had to go to Mike Dempsey and get him to agree that you'd pay up to 750,000?

A. Yes.

Q. But in terms of what Mike McGovern had to do, he never told you and you never asked what he had to do to get authority?

A. No.

Q. I want to move ahead to June 6, 2000. On Page 20 is where I want to focus, but the background appears that--

MR. LIPSIUS: There are multiple entries for June 6th.

MR. RUDD: Right. There is one that starts at the very top of the page.

BY MR. RUDD:

Q. Is that a continuation or a new one?

A. It's a new one.

Q. I'm assuming that these little symbols, these number signs on the left-hand side indicate where a new entry starts?

A. Correct.

Q. And it looks to me that you can almost put as much information in an entry as you want; it's not like you're limited to a certain number of words?

A. No.

Q. It says, Counsel called, Lou. PM, I assume, is phone mail?

A. Yes.

Q. It says, Talked to Pipa's secretary.

Now, is this all something that was conveyed to you by Lou Bricklin, or is talked to Pipa's secretary something you're putting in?

A. No, because if you go back to the entry before, the last line of that entry is, He will check with Pipa and get back to me. We were talking about the pretrial, and he left a message on my voice mail that he had talked to Pipa's secretary and that there will be another adjuster.

Q. You said, Counsel called, Lou. So, Lou left a message on your phone mail?

A. On my phone mail, correct.

Q. It wasn't that Lou left a message on someone else's phone mail, I got you.

A. No.

Q. So, apparently, Lou talked to Pipa's secretary. Said there's another adjuster who has authority and will be handling either the adjustment?

A. Adjuster, yeah.

Q. Will be handling either the adjuster or Pipa will be calling me.

MR. LIPSIUS: Adjustment, I think she said.

BY MR. RUDD:

Q. Adjustment? That's what I'm trying to figure out. What does ADJ mean there?

A. Adjuster.

MR. LIPSIUS: Adjuster?

A. Yes.

MR. LIPSIUS: I'm sorry.

BY MR. RUDD:

Q. At that point in time you at least knew there was someone else besides Mike McGovern who had some authority from Lincoln General's standpoint?

A. I just knew he was out of the office.

Q. And then apparently this Sandy Ykema had called. You returned her call, so maybe she must have called you?

A. She would have left me a message, right. I returned her call.

Q. And she said that they're willing to put up their

policy limits tomorrow then resolve the coverage issues. She will be around all day, if need to discuss. And you told her what Mulligan would settle for?

A. Right.

Q. First of all, did Sandy Ykema identify who she was?

A. No. She told me she was calling in Mike McGovern's absence.

Q. She didn't tell you if she was supervisor or she worked for him? Nothing like that?

A. No.

Q. All she told us is that they would put up their policy limits tomorrow. What does that mean?

A. Well, there was a pretrial in front of the Judge, and we thought we had a chance to settle the cases at that time. We thought the Judge would be ruling from the bench and pushing it as a mediation. And so, they were willing to tender their policy limits at the pretrial the following day.

Q. In terms of this agreement, though, that you had with Lincoln General that you would split it 50/50, if Lincoln General says we're going to put in our policy limits, that would almost force

and I had authority up to 750 on the death claims and up to 375 on the Mulligan claim.

Q. All right. That's the total amount for settlement; not just Northland's half; correct?

A. I think we were looking at that as full values of the claims, yes.

Q. So then, if you take 750 and 375 -- Ira is probably a math whiz.

MR. LIPSIUS: One million 125.

BY MR. RUDD:

Q. One million 75; and then half of that under your agreement--

MR. LIPSIUS: 1 million 125.

MR. RUDD: Did I say that wrong?

MR. LIPSIUS: I thought I said it right. It doesn't matter.

BY MR. RUDD:

Q. Okay. One million 125, and then half of that would then be 560,750; is that what it is?

A. Something like that.

MR. LIPSIUS: 562,5000.

BY MR. RUDD:

Q. 562,5000, that was your authority at the time?

A. Correct.

Q. And to change that you would have to go back to

someone else, Mike Dempsey, I assume, and get an increase in authority?

A. Correct.

Q. So, when Sandy Ykema said that they might be offering 750,000, you didn't have authority even to match that at the time?

A. No.

Q. And you didn't feel that Northland would be committed to paying 750,000 simply because that's what Lincoln General decided to offer?

A. Like I said, we were going in on a combined offer. The offers were all made though Lou, and it was a combined offer. So, I was confident that-- You know, if the offer got above my authority, I would have to talk to my authority, and they weren't going to just walk in and offer their 750 and expect us to do the same.

Q. You didn't say anything to Sandy Ykema to indicate you had authority just to increase your offer up to 750,000?

A. No.

Q. You would have communicated your authority to Lou Bricklin, so he knew what the level of your authority was?

A. Right.

Q. And you didn't expect him to offer globally ore than what your authority would allow to be paid?

A. Correct. And I was available by phone for that.

Q. Apparently, certain offers were made, because on July 5th, 2000 -- that's Page 22 -- there is a reference in the entry, which is 10:45. It says, Return counsel call, Lou. There's a reference at the bottom that apparently the Mulligan's had been offered 125,000 dollars at least.

A. It appears that way.

Q. Because then the entry says, Mulligan attorney has asked us to send the release for 125,000. Not sure if it is settled. So they have asked him in cover letter if case is actually settled or not.

Well, first of all, I want to break that down. It says, Not sure if it is settled. At that point had the attorney responded to somebody and said, We are willing to accept 125,000?

A. The 125,000 was the figure from the Judge after the pretrial.

MR. LIPSIUS: I don't think you answered the question. Why don't you repeat the question?

A. I haven't-- Just give me a second. I'm starting with that. That was the recommendation from the

Judge that it should settle for 125,000.

BY MR. RUDD:

Q. Let me back up a little bit. Let's go to Page 21. June 26th, 2000, where you say, Counsel has made 125,000 offer on Mulligan. Plaintiff attorney has said he will talk to his client, but seems to have no control over her.

After that entry, I don't see anything about the Mulligan matter until the entry on July 5th, 2000, that we just read, but maybe you can discern something.

A. What we had done is, on that June 5th entry, we had offered the 125,000.

Q. June 26th, is that what you meant?

A. Yes. On June 26th we had offered the 125,000. Her attorney had asked us to send over the release. At that point we were not sure if the case was actually settled.

Q. Let me back up here. On June 26, 2000, you made this offer?

A. Correct.

Q. When did the attorney ask you to send over the release? You put that down on July 5th, 2000?

A. That is what Lou had told me on July 5th, that the Mulligan attorney had asked us to send over

the release. I don't know when that request came in because that was being handled between Lou and Mulligan's attorney.

Q. Do you know if the attorney, the Mulligan's attorney, indicated that his client was willing to accept it or indicated anything about his client's reaction to this offer?

A. We were not clear at that point if it was settled. He had asked for the release, and it was my understanding he wanted the release to try and push the settlement to his client.

So, we were not sure if the case was actually settled. So, I had asked Lou in the cover letter of sending over the release to ask him if the case was actually settled or not, because he was asking for the release.

Q. So, whatever orally Mulligan's attorney said to Lou Bricklin didn't give you a great deal of assurance that this case was actually settled?

A. No.

Q. You wanted to see a signed release and then you knew it was settled?

A. He had asked for the release, and it was my understanding it was to try and persuade his client to settle the case.

MR. LIPSIUS: He means the attorney for the Mulligans?

A. Correct.

BY MR. RUDD:

Q. Let me just jump down a little bit. July 14th you have a call, a conversation with Mike McGovern, and you told him -- told him we had release out on Mulligan claim. Not sure if it appeared that one was going to settle.

Who actually prepared the release and sent it out to the Mulligan attorney?

A. Lou Bricklin.

Q. Did you have to review the release before it was sent out?

A. No.

Q. Have you worked with Lou Bricklin in the past before this matter?

A. Many times.

Q. Did you have a standard release that Lou had used previously in Northland claim?

A. Yes.

Q. So, Mr. Bricklin would have known what was acceptable to the Northland and just sent that release out?

A. Correct.

Q. Is that typical that he does not send to you for your review before it goes out a copy of the release?

A. Correct.

Q. Had you worked with Mr. Bricklin before?

A. Yes, I had.

Q. Had he ever sent you a proposed release before it was sent out?

A. No.

Q. Has any attorney ever sent you a proposed release before it's gone out?

A. Very, very rarely have I seen releases from our attorneys before they're sent out.

Q. So, there's no way for you to make sure that the amount set forth in the release is accurate, because you haven't even seen it before it goes out?

A. I trust that he knows what the case has settled for.

Q. You're hoping that there is no miscommunication between all the parties when he sent that release out?

A. I rely on him.

Q. Do you normally like to see at least a letter from somebody confirming the amount before you

have the release sent out?

A. Well, we'd have a letter from the Judge confirming the amount and that's what our offer was based on, and that's what I had authority to settle it for.

Q. Then you told Mike McGovern it appeared that it was going to settle, but since you hadn't gotten the release back, you couldn't confirm that it was settled; is that correct?

A. Correct.

Q. Then on July 19th, apparently, you talked to Moira. She said Mulligan case settled. Has release.

So, once you got the release, you knew the case had settled?

A. Correct.

Q. Move over to Page 24, the entry on August 10th, 2000.

A. Okay.

Q. Apparently, you talked to Mike McGovern on that date.

A. Um-hum.

Q. He says he felt that the last offer -- and it says lost offer, but I assume that means last offer?

A. Yes.

Q. Last offer was take or leave it, and since they left it, we should proceed. And I think last offer, was that 1,250,000?

I'm just looking up the entry on August 8th, 2000.

MR. LIPSIUS: Just to move it along, I think that was the Plaintiff's bottom line, a million 250. I think the offer of the parties was a little less than that.

MR. RUDD: All right.

MR. LIPSIUS: Somewhere here I saw it.

A. I believe it was just -- I want to say it was a million plus half of the delay damages.

BY MR. RUDD:

Q. I'm looking at August 2nd. Apparently, it says, Received formal offer 1,287,500 to settle the claim. Then you talked apparently to Mike McGovern. It says he would consider splitting the delay damages with them in trying to get the case resolved.

Apparently, you discussed something with Jerry Parker to split the difference.

A. Mike said he was fine with splitting the difference, too, and I think at that point, I

believe we were at a million then, because we had offered what the Judge--

Q. Okay.

A. We had offered the million that the Judge had recommended.

Q. Whatever you offered, apparently they refused it. Mike McGovern calls you August 10th, 2000, and says he feels we should just proceed.

And then, apparently, you said, We, Northland, felt we need to settle the case, and I had authority to settle it.

What do you mean by that?

A. That I felt that this was a case we needed-- They had given us a bottom line, and it was a case that needed to settle, and we did not want to proceed to trial with this case.

Q. You said, I had authority to settle it. What did you mean by that?

A. It means I had the authority to go ahead and get this resolved.

Q. I mean, did you have authority at that point to go up to the policy limits?

A. No. I didn't need it, because the demand was well within.

Q. Okay. So, you had authority to pay half of the

1,287,500?

A. No. I had authority to pay half of the 1.25 million.

MR. LIPSIUS: Of the entry of August 8th. The Plaintiff's bottom line was 1.25.

A. Their bottom line was 1.25, and at that point--

BY MR. RUDD:

Q. And they wouldn't split the difference with us, it says?

A. Right.

Q. So, you had half of that authority?

A. I had half of that authority, right.

Q. So, you already paid out what? I think you said 125, so you paid out half?

A. Correct.

Q. 62,500? You had paid that out already?

A. Correct.

Q. On Mulligan, and you had authority to pay out 625,000 more on Cliffords; is that right?

A. That sounds right.

Q. And you told that to Mike.

What did he tell you-- It says, He will talk to his people and let me know if they are willing to go half.

Did he tell you in that conversation on

August 10th what the level of his authority was?

A. No.

Q. And what perplexes me here is that apparently you had a conversation with Sandy Ykema before where she said they were willing to tender 750,000. So, did you ask Mike what he was talking about in terms of talking to other people, because his firm had already seemingly committed 750,000?

A. I didn't. He said he would talk to his people, and I said fine.

Q. You didn't argue with him that he had already committed this money; he couldn't back out now?

A. No.

Q. Did you feel that somehow he was trying to back out of this earlier commitment of 750,000?

A. It didn't really cross my mind, no.

Q. Did you believe you had authority under the agreement, which is memorialized at least by your May 10, 2000 letter, that you could simply commit Lincoln General's funds up to 750,000, whether they liked it or not?

A. No.

Q. So, you felt you did need to have a response from Mike McGovern saying, I agree, that we'll now put in 625,000?

A. Right, because he had-- I guess we had been negotiating back and forth based on the offers that were being made, the demands that were being made and the offers that were being made, so it didn't seem unreasonable to me that he needed to talk to someone.

Q. All right. When he says, he will talk to his people, did he tell you who he was referring to?

A. No.

Q. Did he say his people, or did he give you -- say, my supervisor?

A. He just said, I need to talk to my people.

Q. Who did you think his people were?

A. I didn't really know. I didn't ask.

Q. Being an adjuster yourself, you must have some understanding that most insurance companies probably work similarly, that adjusters have a certain level of authority? Is that your common understanding?

A. You know, I've only worked for Northland, and so, I don't really have a strong understanding of how other companies are structured.

Q. In all your dealings with other adjusters you have never had conversations about how their level of authority is created and who they have

to go to?

A. No.

Q. So, you didn't know when he said his people, whether it was a group of people or whether it was his boss, or who it was?

A. No idea.

Q. Then you said, You told Mike McGovern they could give us the rest of their limits, and then we would make up the difference to settle the Clifford's case, and then we would dismiss declaratory judgment, and it would be done.

What did you mean about they would give the rest of their limits? The rest of their limits, I guess, would have been what, 600 and--

MR. LIPSIUS: 687,500.

BY MR. RUDD:

Q. 687,500, and you would make up the difference. If they gave you 687,500 and you knew you could settle the case for 1,250,000 -- I don't have my calculator here, but Ira's like a human calculator -- I'm sure he'll tell us that the amount you would pay is less than 687,500?

A. Right.

Q. Why were you proposing that if you had already agreed to split it 50/50?

A. Because if we did it that way, then the dec. action would be dismissed, the case would be closed and settled, and we could move on to other things.

Q. So, you were proposing to change the terms of the agreement at this point in order to resolve the declaratory judgment action?

A. I figured if they wanted to pay their policy limits and walk away, I would be just as willing to do that and we would all be done.

Q. Well, you knew if they paid their policy limits, the dec. action would be moot because you couldn't force them to pay any more?

A. (Nodding head)

MR. LIPSIUS: Was that a yes?

A. Yes, that was a yes. I'm sorry.

BY MR. RUDD:

Q. Who did you talk to before making that proposal that you wanted them to pay the policy limits?

A. I didn't speak with anyone.

Q. Then apparently, he said, They, Lincoln General, want their money back from us. I assume Northland?

A. Yes.

Q. And not willing to do that. I assume he's not

willing to pay his policy limits and just drop the dec. action?

A. Correct.

Q. He really thinks they will prevail on the declaratory judgment and we will owe them back everything. Mike McGovern is telling you that?

A. That was his belief.

Q. You told him, I do not agree, but if not interested, let's settle Clifford and litigate the coverage. He will get back to me.

When you left that conversation, what was your understanding of what was the proposal on the table?

A. That he was going to talk to his people and see if they were willing to go half on the Plaintiff's bottom line and litigate the coverage later.

Q. So, you understood when you talked to him that he wasn't even going to propose your offer, that they pay the limits, and then you would drop the dec. action?

A. He rejected that out-of-hand. I didn't think he's-- He rejected it out-of-hand, so..

Q. You weren't expecting him to go back to his supervisor, propose it, and then come back to you

later on and say that's not acceptable?

A. No. We had beaten that dead horse before, so.

Q. All right. Was there a reason, was there some turn of events that made you think that Mike McGovern now would be more willing to accept this proposal than he had in the past?

A. It never hurts to ask.

Q. But there wasn't something that happened that you felt gave you a better position?

A. No.

Q. At that point in time?

A. No, not at all.

Q. Did Mike ever respond to you that we already have an agreement; we are just going to split it 50/50 and he wasn't going to pay more than that?

A. No.

Q. Then he comes back, apparently, it looks like the same day, later on in the day. He called you?

A. Um-hum.

Q. Said they will go one-half up to the 1.25 million. They want to proceed with declaratory judgment. Are not interested in tendering the rest of their limits.

A. Yes.

Q. Even though you said it was a dead horse,

apparently, he must have discussed it with somebody because he's coming back and saying, we are not involved in tendering the rest of their limits?

A. Our limits.

MR. LIPSIUS: I am going to object. I think you mischaracterized that. The dead horse was the tender the rest of the limits, and the second part of the offer is go up to the 1.25 and continue with the DJ action; and the response is, they will go ahead with the second of the two offers.

I don't want to put testimony in her words, but I think that's what is there.

MR. RUDD: What I'm inquiring into here is, she had said he dismissed it out-of-hand in her first conversation, the concept of Lincoln General paying the balance of its policy limits.

BY MR. RUDD:

Q. Apparently, he at least talked to you about it again, so it didn't seem to be a dead issue for him, because he said they were not interested in tendering the rest of their limits.

A. He may have. I mean, he may have discussed that. I don't know.

Q. That's what I was asking you. Did he tell you, I have talked to our people, and number one -- I know it's not in the order of the way you put it, but number one, they're not interested in tendering the rest of their limits? Did he tell you that?

A. That wasn't the first thing he told me.

Q. I understand that, but at some point he told you that?

A. Correct. I wouldn't have typed it in unless he told me again.

Q. And you understood it wasn't just him saying it, because he had already told you this himself, but now it was coming from somebody else?

A. Correct.

Q. And he also told you that they would go up to half of the 1.25 million, which if they would do that, presumably should settle the case, because that's what the Plaintiff's offer was?

A. Correct.

Q. Now, in terms of wanting to proceed with the declaratory judgment action, I'm not sure how familiar you were with the status of that case, but at that point in time were you aware that Lincoln General hadn't even filed a claim against

Northland?

A. I'm not following you.

Q. Did you understand that the declaratory judgment action was filed by Northland against Lincoln General in the Federal District Court in the Eastern District of Pennsylvania?

A. Correct.

Q. Lincoln General had filed a motion involving a venue issue, had not filed any type of counterclaim against Northland at that point in time?

A. Correct.

Q. Did you understand that?

A. Yes.

Q. So, even though he said they want to proceed with the declaratory judgment, did you understand that they hadn't even filed a claim yet in the declaratory judgment?

A. I guess what I knew at that point is we had filed it and there was a venue issue, and that was as far as it had gone.

Q. Did it concern you that Lincoln General had not yet even asserted a claim against Northland?

A. I don't know that I was even aware that they hadn't at that point.

Q. Let me move on then. We will get to this in the next entries. Let's move on to Page 27.

In the interim, obviously, the Plaintiffs did accept the offer and I think actually you saved 25,000 dollars, because they accepted, wasn't it 1,225,000 or something like that?

A. Yeah. 1.25.

Q. I don't know if it says it in your notes or not.

A. Yeah. 1.225.

Q. So, it was 25,000 less than what had been previously demanded?

A. Correct.

Q. Then, apparently, on November 20th, 2000, you have a call with Moira?

A. Um-hum.

Q. And you say, Said Lincoln General will be sending their checks direct to the Plaintiff. Told her I need to know when that is received, so we can dismiss the declaratory judgment. She will let me know.

First of all, why would you dismiss the declaratory judgment at that point in time if Lincoln General had only contributed 50 percent of the settlement?

A. Because at that point we decided we wanted to

dismiss it.

Q. Well, Mike McGovern had told you before he wanted to pursue it?

A. Yes, he did.

Q. Did you believe that you could just go ahead and dismiss it if Mike McGovern and Lincoln General wanted to pursue it?

A. Well, they could file one-- Presuming had we dismissed it, they could have filed it if they had wanted to pursue it.

Q. At that point in time you were willing to dismiss your claim against Lincoln General before you had any type of assurance or release from them that they would not pursue you in some type of other forum?

A. Correct.

Q. Had you talked to anybody, Jerry Parker or Mike Dempsey, about this before you told Moira to go ahead?

A. That would have been a decision made by myself, and Jerry and Mike.

Q. Do you know where that would show up in your claims diary?

A. I don't know if that would show up in my claims diary.

Q. That's what I was wondering.

A. I don't see it in there, and it may not be there.

Q. But you're saying, this would not be a decision you would have made on your own?

A. No.

Q. Then you sort of confirm that again on November 20th, 2000. You apparently talked to Moira again that day.

A. Yes.

Q. I'm looking for, when was it that everything finally, including the Clifford case -- I'm not sure of you have an entry where the Court then approved the settlement?

A. December 8th. The precipe to discontinue was sent to the Court.

Q. So, apparently, it's around that time?

A. January 16th I paid their final billing.

Q. So, sometime in the December 8th - January 2001, the Clifford's action was totally complete, and Lincoln General apparently did pay the Plaintiffs their half.

A. Yes.

Q. You had said before to Moira that you were going to go ahead and dismiss the declaratory judgment action. What did you do to carry out what you

had previously said?

MR. LIPSIUS: That gets into the attorney-client privilege.

Can we go off the record a second?

MR. RUDD: All right.

(Discussion held off the record)

MR. RUDD: Back on the record.

BY MR. RUDD:

Q. After Lincoln General paid its settlement checks, is it fair to say that you still intended to carry forward with what Mike Dempsey, Jerry Parker and you had decided previously, which was you were going to -- Northland was going to discontinue the declaratory judgment action?

A. Correct.

Q. And then you left it up to your attorneys how to go about doing that?

A. Correct.

Q. And you had no further involvement at that point in how the declaratory judgment would be dismissed; is that correct?

A. Correct.

Q. And at some point in time did you assume that had been done?

A. No.

Q. I don't see any reference up to this point in time where you had even proposed getting some type of release from Lincoln General that they wouldn't file their own declaratory judgment or indemnity action against Northland; is that correct?

A. Correct.

Q. Now, the first entry I have about your dealings with Mike McGovern on the alleged settlement are April 2nd, 2001; is that correct?

A. Correct.

Q. Mr. McGovern in his claims diary-- Let me ask you. Have you even Mr. McGovern's claims diary?

A. Yes, I have.

MR. LIPSIUS: I will just note that that's Exhibit #1 to the McGovern deposition.

MR. RUDD: Right.

BY MR. RUDD:

Q. Mr. McGovern had two entries before April 2nd. Both of those entries he says that he called you and left a message. You don't indicate, and you can look at this, but you don't indicate having received any calls from Mike McGovern before April 2nd, 2001.

Do you know if you had received just a

message from Mike McGovern that said please call, would you necessarily document that in your claims diary?

A. Not necessarily.

Q. So, that could be an explanation why you have no record of Mike McGovern having called on, I think it was February 15th and March 26th, is it?

MR. LIPSIUS: February 15th and March 12th.

MR. RUDD: March 12th.

A. No. Normally, I would document those, but I don't-- There are times that those calls don't get documented.

BY MR. RUDD:

Q. And I assume you must get a lot of voice mail messages?

A. I did, yes.

Q. You did or you still do?

A. I don't as a supervisor.

Q. But you did? If you had 150, 175 active claims, I presume you could be getting 20, 30, 40 calls a day?

A. Very possible.

Q. And how do you physically actually-- Are you just sitting at your computer with a headset on and you're typing as people are talking?

A. Correct.

Q. When you go through your voice mail messages, do you just sequentially try to pull up a claim file and you type stuff down in term of the voice mail message, or you write it down on a pad and then enter it later?

A. I would normally go through my messages, write them all down on a pad of paper, and then, as I return them, I would pull the claim file up and enter notes into the file.

Q. So, if you had received a call from Mike McGovern, you might have just wrote down, Received call from Mike McGovern; call him back? If you didn't call him back that day, you might never have entered it into the system?

A. I may not have.

Q. But, clearly, if Mike McGovern had proposed in one of these voice mail messages of February 15 or March 12th something as significant as settling the case, I would think you would have documented that; correct?

A. Yes.

Q. So, is it fair to say based on your own procedure, that those two calls of February 15th or March 12th did not contain any substantive

discussion of his settlement proposal?

A. That would be fair to say.

Q. So, the first substantive discussion appears that you had was on April 2nd, 2001, where what you wrote down is, He called, asked if there was any interest in walking away. And you say, Told him we were interested, but needed their consent to dismiss the lawsuit.

So, this conversation just came out of the blue, that Mike asked if there was any interest in walking away?

A. Correct.

Q. You had not had any further contact with him indicating that you had already planned to drop the declaratory judgment action?

A. No.

Q. So, this was just good news to you?

A. Absolutely.

Q. He says he will let his counsel know. Did he say who his counsel was?

A. No.

Q. Did he tell you in what case he was talking about?

A. I'm not following.

Q. All right. You had dealt with Mr. Pipa before?

A. Correct.

Q. Did you believe he was talking about Mr. Pipa or someone else? Or didn't he indicate one way or another?

A. He didn't indicate one way or the other.

Q. He just said he will let his counsel know that will probably happen and call me to confirm once he talks to their accounting people.

Well, first of all, you write probably down?

A. Um-hum.

Q. Was there anything-- First of all, tell me what Mr. McGovern told you about the reason he was calling you now to suggest walking away, when before he had refused to do that?

A. You know, insurance companies change their mind all the time. I don't know. He called to ask if we were interested in walking away, and that's what we wanted to do. So, I guess I didn't really go into his reasoning behind why. It didn't make any difference to me. I just wanted to drop the DJ..

Q. So, you never questioned him what caused him to change his position?

A. No.

Q. Did you ever question him whether his supervisor

or anybody else had even approved this yet, that he call you?

A. No.

Q. But he did tell you he would have to talk to his accounting people? Is that what that means?

A. Yeah. That would be what that means. That's in my notes.

Q. You think he must have used the term accounting people?

A. If that's what I typed, that's what he said.

Q. Do I know what type of accounting people work at insurance companies?

A. We have got a complete accounting department at our company.

Q. Do they control claims decisions?

A. No. Not at our company.

Q. Did you find it odd that he said he would have to talk to his accounting people?

A. Again, it was something that I wanted. And I didn't care who he had to talk to; I just wanted to make it happen at that point.

Q. But you knew he had to talk to somebody to get approval?

A. That's what-- He said he would call me to confirm once he talked to their accounting

people.

Q. He didn't tell you whether he had talked to them in advance of calling you?

A. No.

Q. And you never questioned him whether this was something originating from him or some other person at Lincoln General?

A. No.

Q. Then, you don't have any other entries before April 11th, 2001.

Did you talk to anybody in the interim, though, from Northland's standpoint about whether Northland was still agreeable--

A. No.

Q. --to walk away?

A. This is what we wanted. This is what we were trying to accomplish.

Q. So, you didn't need to go back to someone to find out if Northland's position might have changed?

A. No.

Q. And if you had talked to Jerry Parker or Mike Dempsey about it, would that necessarily be reflected in your notes?

A. It may or may not. As my supervisor, Jerry and I would probably have many off-the-cuff type

conversations about files in passing; hey, this is what's going on; this is what's going on, not necessarily documented.

Q. Okay. Then, apparently, on April 11th, 2001, you have 2:15 p.m. Mike McGovern at Lincoln General called. Left message on phone mail.

A. Correct.

Q. What type of phone mail system do you have? Is there is a name to it?

A. That's a good question.

Q. Like there's Audix? You hear Audix a lot, people you call up.

A. I have no idea.

Q. Did your phone mail system tell you what time someone called?

A. Yes, it does.

Q. It would have said Mike McGovern called-- It would say, You got a message at 2:15 p.m. and then when you played it, it would say, This is Mike McGovern?

A. Yeah. Message received at 2:15 p.m. It would be, Hi, this is Mike McGovern at Lincoln General.

Q. And would you be writing down stuff then?

A. Correct.

Q. First of all, I have never seen your notes of any

of these conversations. Do you discard them after you put them in the computer?

A. What notes?

Q. Of all your voice mail messages.

A. I just keep a little pad of paper--

Q. Right.

A. And jot them down.

Q. Once you're done jotting that down, you later enter it into the computer?

A. Yes.

Q. What do you do with that piece of paper that you jotted it down?

A. They get tossed.

Q. So, you discarded all of those?

A. Correct.

Q. So, we can't get the actual note of what you wrote down that Mike McGovern said in his conversation?

A. This would be it.

Q. Is this verbatim? These are exact words or is this somehow you're paraphrasing?

A. That looks to me like it was pretty much verbatim from his message.

Q. It says, They are in agreement to walk away from declaratory judgment and close files?

A. Correct.
Q. Nothing more that he said?
A. No.
Q. He didn't tell you there's any other terms, like we want some money or anything like that?
A. No.
Q. And, again, you didn't talk to him live, but this is what he said in his voice mail message?
A. Correct.
Q. So, apparently, you called him back and you left a message on his phone mail; is that right?
A. Correct.
Q. You say, Asking him to have his counsel call Ira and agree to voluntarily dismiss suit.

MR. LIPSIUS: This.

BY MR. RUDD:
Q. Voluntarily dismiss this, I'm sorry. I was adding the suit. This.
A. Correct.
Q. It doesn't appear that you ever talked to Mike McGovern live about any of this, on April 11th?
A. No.
Q. How much time does your voice mail message system allow?
A. Hmmm, I think it's--

MR. LIPSIUS: Don't guess.

A. I'd be totally speculating. I don't know. There is a finite period of time. It will tell you after you have left so much time on the message that you have 15 seconds left, and then it cuts you off.

BY MR. RUDD:

Q. You don't recall whether this was a long or short message from Mike McGovern?

A. Mike McGovern's messages were always short. He was always a very short-- I mean, there wasn't a lot of fluff to his conversations.

Q. Okay.

A. Voice mail or otherwise.

Q. And then, apparently, there's some a redacted entry below that.

(Phone interruption)

(Discussion held off the record)

BY MR. RUDD:

Q. There's a redacted entry there, but we apparently know what's not redacted April 24th, 2001, you called Ira and you left message -- LMTC -- left message to call on phone mail.

So, you apparently asked Ira to call you back?

A. Right. As I usually do.

(Discussion held off the record)

BY MR. RUDD:

Q. You had apparently left a message for Mike McGovern to call Ira, but then you followed up with Ira yourself on that same subject?

A. Correct.

Q. So, clearly this was not something where his counsel, being Mike McGovern's counsel, had called up Ira and Ira wouldn't have been just in the dark, and say, I don't know anything about it; what are you talking about it?

A. Right.

Q. You wanted Ira to know what had happened?

A. Correct.

Q. Now, is it fair to say that you never followed up any of these conversations with Mike McGovern with a letter?

A. Correct.

Q. Did you expect that you would be sending or your attorney would be sending a document to Lincoln General or its counsel that would somehow memorialize any type of mutual releases?

A. No.

Q. Did you believe that Lincoln General was going to

release Northland, or was it just agreeing to the discontinuance of the declaratory judgment action?

A. It was my understanding we were going to dismiss the DJ, that neither one of us wanted to pursue it anymore.

Q. Did you understand at that point in time Lincoln General had still not filed a claim against Northland in the declaratory judgment action?

A. No, I did not know that.

Q. So, this note here, they are in agreement to walk away from DJ, the only claim asserted in the DJ was the Northland claim. So, he didn't say anything in his note apparently or anything in his conversation with you about releases?

MR. LIPSIUS: I'm just going to object because it's being read out of-- It says walk away from DJ and close files.

You can answer the question.

MR. RUDD: He just left that at close files.

MR. LIPSIUS: Right.

BY MR. RUDD:

Q. You didn't ask him what files he was talking about?

A. Well, it was my understanding from out previous

conversations that they had no interest in pursuing the dec. and neither did we.

Q. But did you understand at the time that the only thing pending in the declaratory judgment action was your claim against Lincoln General, that Lincoln General had never asserted a claim against Northland?

A. No, I wasn't aware of that.

Q. Would that have changed how you handled this whole thing if you knew that?

A. No, because I thought we were in mutual agreement to walk away, and that nobody was going to pursue a dec. action.

Q. But nowhere in your note does it say anything that Lincoln General agreed it would not file its declaratory judgment action against us?

A. It was my understanding they didn't want to pursue anything.

Q. Your understanding is apparently based on these exchanged voice mail messages; correct?

A. Well, and the April 2nd call.

Q. April 2nd call, you knew he had at that point in time to go back to his accounting people and get approval for this?

A. Right.

Q. His April 11th call, he doesn't tell you what his accounting people told him, did he, in the message?

A. No.

Q. You said it was a short message. He doesn't tell you what his accounting people decided about whether Lincoln General would pursue its own declaratory judgment action?

A. No.

Q. He doesn't mention, at least you don't write down in your message, anything about mutual releases?

A. It was my understanding we were both walking away from the DJ and both closing our files. That is why files is plural.

Q. Did you understand that if Northland simply dismissed its declaratory judgment action against Lincoln General, that that would have no effect on Lincoln General's ability to file another declaratory judgment action against Northland in some other proceeding?

A. It was my understanding we were both walking away rom filing a dec.

Q. But your note just says, Ask him to have his counsel call Ira and agree to voluntarily dismiss this?

A. That's because we had filed the dec. and we needed their consent to dismiss this.

Q. But the question is, at the time did you have an understanding, one way or another, whether Lincoln General had filed it own claim back against Northland?

A. I was not aware at that point if they had or not.

Q. Why didn't you follow any of this up with a letter similar to when you followed up your prior agreement about splitting the settlement with a letter?

MR. LIPSIUS: I'll just object. It's speculation, but you can answer the question.

A. Because I assumed Mike would make good on his word and dismiss the DJ and we would be done with it. It never crossed my mind that I should send a follow-up letter memorializing the conversation.

BY MR. RUDD:

Q. You didn't believe that the nature of the conversations which were by phone message warranted at least some confirmatory letter or at least a live conversation to make it clear what he was agreeing to?

A. No.

Q. Had you ever settled a case before with the exchange of phone mail messages without any live conversations or a letter confirming the conversation by one of the other parties?

A. I would have to say I have done it hundreds of times.

Q. Hundreds of times?

A. Between trying to get a hold of attorneys and other adjusters, you play phone mail, you fax -- not necessarily faxing back and forth, but you're leaving phone mail messages back and forth, sending releases based on that, and I guess I've just never had a problem before.

Q. So, in this context, even though you have an exchange of phone mails, you wouldn't send a fax or an e-mail confirming what you talked about?

A. Sometimes I may; this time I didn't.

Q. Now, you said sending releases. I thought you said that you rely on your attorneys to send releases?

A. I am talking about cases where it's a Plaintiff's attorney and I'm -- a claim not in suit, a claim not in litigation.

Q. So, in those cases you would send a release to that Plaintiff's attorney, which would confirm

what you had talked about in your exchange of conversations?

A. I need them to sign a release in order to settle the claim, yes.

Q. Right. So, you would do that on your own?

A. Yes.

Q. And that would be your confirmatory document, would be the release?

A. Sure.

Q. Have you ever had cases where someone came back and said, no, this is not acceptable; we are not agreeing to these terms of the release?

A. Sure.

Q. And so, you understand that until you actually get the signed release back, the case isn't settled?

A. Not necessarily, no.

Q. Well, in the Mulligan case you had some uncertainty whether it was settled and you were looking for that release; is that correct?

A. Well, that was because the Plaintiff's attorney himself told us that he didn't know if he could settle it for 125 and requested a release to try and persuade his client to settle it.

Q. Well, you must have had some assurance that his

client would take it, because you said it will probably -- or, I think you actually said, It appeared it would settle?

A. That was-- The 125,000 was a number that the Plaintiff's attorney himself had come up with, so I was confident that since he had come up with that number and the Judge had come up with that same number, that with a release that he would settle it. He was trying to get his client to take it.

Q. All right. So, even though you felt that there might be some agreement in principle, until you got that release in hand, you weren't confident the case was settled?

MR. LIPSIUS: Object. That's not what she said.

A. That case was not settled when we sent the release. There was no agreement; there was no settlement when that release was sent, and that was the way that we got that case to settle.

BY MR. RUDD:

Q. I thought you said that the Plaintiff's attorney himself had proposed the 125,000?

A. He had at one point, but he didn't have authority from his client to do it.

Q. And he told you that?
A. He had proposed that number.
Q. But he specifically said, I am proposing this number, but I don't have authority?
A. Correct.
Q. In this context, it appears based on-- Your notes are sort of short, they're not that extensive, but nothing in your notes indicate that Mike McGovern told you he had authority to settle anything?
A. He was the person I had dealt with from day one. He was the only person, other than Sandy Ykema that I had dealt with from Lincoln General.
Q. Well, on April 2nd, he tells you, in essence, he didn't have authority because he had to check with his accounting people; correct?
A. Right.
Q. In the April 11th note, he doesn't indicate one way or another whether this was authorized by the accounting people or whoever?
A. I have no idea.
Q. At some point in time you were aware that no release was sent out; is that correct?
A. On the dec. action?
Q. That's right.

A. Okay. Yes, because I had been in contact with Ira.

Q. Was there a reason that mutual releases were never sent to Lincoln General?

A. My last message to Mike was to have his counsel call Ira to confirm that they would voluntarily dismiss this, and I left it up to his counsel and Ira to resolve the remaining issues.

Q. So, you were still looking for some confirmation for a number of months?

A. Yes.

Q. At some point did you have some concern that maybe there was a problem with this because you never got that confirmation?

A. No. I just figured that things were moving slowly; it was in litigation; people are busy.

Q. How slowly did you think this case was moving at that point in time?

MR. LIPSIUS: Object as to form.

BY MR. RUDD:

Q. Let me ask you, how many months were you willing to wait before you got some type of confirmation that this case was really going to be settled?

A. As you can see, I was following up with Ira to see where we were moving and getting this

resolved, so I could get the file closed.

Q. Were you getting any correspondence from anybody indicating that Lincoln General had even agreed to these terms?

A. No, but I was assuming that it was being worked out, Lincoln General's counsel was working it out with Ira.

Q. So, you thought that counsel were going to work out the terms of this settlement; and that once it was all worked out, someone would let you know that it had all been done?

A. Correct.

Q. And you had no interest in seeing what those terms were?

A. I wouldn't say I had no interest, but I was relying on Ira. That's why I hired him.

Q. Did you expect to receive copies of any proposed releases or confirmatory memoranda before you saw the executed document?

A. Not necessarily.

Q. So, you were expecting to receive some executed document at some point in time by Lincoln General, which then you would execute on Northland's behalf?

MR. LIPSIUS: If you had any idea what you

were going to receive.

A. I had no idea what I would receive. I just assumed at some point in time I would receive a letter from Ira indicating that this matter had been resolved.

BY MR. RUDD:

Q. Did you expect there were going to be mutual releases signed?

A. I didn't really know what to expect.

Q. Well, you understood that if there were mutual releases, someone from Northland would have to sign it; correct?

A. Like I said, I wasn't sure what to expect.

Q. Apparently, on July 11th, 2001, you had a conversation with a man who you identified at the bottom as Al Miller?

A. Correct.

Q. Did he apparently identify himself as general counsel?

A. Yes.

Q. Did you ask him who he was or did he just identify himself?

A. I believe he identified himself when I got conferenced in on the call.

Q. Was that the first time you had talked to Mr.

Miller?

A. Correct.

Q. It says 3 P.M., Ira called on conference call with in-house counsel for Lincoln General. It says, Transfer has occurred, but nothing else on litigation.

You understood that the case had been transferred from one Court to another?

A. That was my understanding, yes.

Q. And someone must have told you that, or did you know that independently?

A. I don't really recall.

Q. Well, let's go back up to June 27, 2001. It says, Waiting on dismissal.

A. Correct.

Q. It doesn't say where you got that from?

A. Well, based on my conversations and traded voice mails on April 11th, I was waiting on the dismissal of the DJ.

Q. That's what I want to ask. You talked to somebody, it probably was Ira, that's why you redacted it, on May 24th, 2001.

MR. LIPSIUS: I will stipulate that the 4-11 and the 5-24 were both conversations with me.

MR. RUDD: Well, I assumed they were.

BY MR. RUDD:

Q. So, over a month after you talked to Ira on May 24, 2001, you still say, Waiting on dismissal.

A. Yes.

Q. It doesn't appear that you talked to Ira and he conveyed that, or you probably would have had some redacted entry there.

A. Correct.

Q. Is this something that comes up on some type of diary control every month and you have to put something in?

A. Yes. It would come up on my diary periodically, whatever I set the date, and it probably came up on diary at that point.

Q. Does that show-- I have seen some insurance companies where they actually will show the dates that it's diaried for. Do you have a computer printout that shows all your diary control entries?

A. No.

Q. Is it the same program that you use to enter this information, or is it a separate program?

A. It's out of the same program.

Q. So, you would have diaried this for sometime probably June 27th, 2001?

A. Probably.
Q. When you got to that point, what would you have done?
A. Taken a look at the file, seeing what was going on. At that point I noted we were waiting on the dismissal and probably re-diaried it.
Q. So, you would have pulled out the file, looked at it and saw nothing has happened since at least May 24th, 2001, and assumed you were waiting on dismissal?
A. Correct.
Q. Dismissal from who?
A. Dismissal on the dec. action.
Q. You were looking for an Order from the Court?
A. I was looking for whatever documents were necessary to end the litigation on this file.
Q. Then on July 11th, 2001, we were talking about that entry.
A. Correct.
Q. About the transfer occurred. Did you ever suggest that this case -- that at least the Court be notified about the discontinuance of this action?
A. That's what I hire Ira for. I was leaving it up to Ira and Lincoln General's counsel.

Q. Apparently Al says he knows nothing of McGovern's agreement to dismiss, claiming they have never talked to McGovern about this.

First of all how, long did this conversation last?

A. Good question. I wouldn't say it lasted very long.

Q. What did you tell Mr.-- Let me ask you: How did it happen? Ira calls you. Obviously, I don't think it's privileged because Mr. Miller is on the phone.

MR. LIPSIUS: That is why I did not redact that entry.

MR. RUDD: I understand.

BY MR. RUDD:

Q. What did Ira tell you why he was even calling?

A. I believe he called me because they were discussing whether or not there was an agreement to dismiss, would be my recollection of that.

Q. Did Ira even tell you why he was talking to a Al Miller?

A. I believe he mentioned that Al had been talking to somebody else in their office and had asked to be transferred to him. But that is my recollection.

Q. Did he explain why Al Miller was talking to someone else in his office?
A. I don't really know.
Q. So, he didn't mention that, Al Miller is someone we dealt with on other files; he has some questions?
A. I don't really recall and I don't want to speculate.
Q. All right. So, Ira said-- Did he tell you why Al was wanting to talk to you?
Let me back up. Did he even say that Al wanted to talk to you?
A. You know, I don't really remember how the conversation started.
Q. Ira didn't explain to you why he was even calling you?
A. Well, I'm assuming when he says he's got house counsel for Lincoln General on the phone that he is talking about Woolever Brothers, because that would be my only case involving Lincoln General.
Q. Did Mr. Lipsius explain to you that he had some confusion himself about what happened and wanted to get you involved to answer some questions?
MR. LIPSIUS: Object. You're characterizing a conversation. There's no such testimony.

MR. RUDD: I am asking anything to that extent.

A. Not that I recall.

BY MR. RUDD:

Q. At the time he called did you believe there was an any reason that Ira would not have full knowledge of what happened in terms of this alleged settlement such that he could answer Mr. Miller's questions?

A. I wouldn't-- Say that again.

Q. Let me back it up. Did you believe as of July 11th, 2001 that Ira had not been given sufficient information such that he would be able to answer Mr. Miller's questions about this alleged settlement?

MR. LIPSIUS: Do you understand the question?

A. I'm not sure that I do.

BY MR. RUDD:

Q. Let me just say for example, if Ira knew all the terms of this settlement and all he had to do was complete the paperwork and get it done, would there be anything that Ira wouldn't have in his possession to be able to answer questions that Mr. Miller might ask about this alleged settlement?

A. That, I can't really-- I don't know.
Q. All right. So, you can't explain why Ira would have to conference you in to answer any questions Mr. Miller had?
A. All I know is, it's Ira's practice usually to conference us in on cases.
Q. How often does he call you with the opposing attorney on the phone to ask a question about settlement?
A. I don't know. Well, I mean, I haven't had that many cases where settlement has been an issue, but a lot of times Ira will conference us in to keep us involved in the case.
Q. Did Ira indicate in this conversation that there was certain information he didn't know and that he needed you to answer Mr. Miller's questions?
A. I don't really recall if that was stated by him.
Q. All right. Because, apparently, Al said he knew nothing of the agreement, so I assume you were talking about what had been discussed between you and Mr. McGovern; is that correct?
A. Correct.
Q. What did you tell Mr. Miller about what had been discussed between you and Mr. McGovern?
A. I went back to my April 11th note and read him

verbatim what my note said, between the voice mails between Mike McGovern and myself.

And I believe I probably even went back to the April 2nd note, because at that point it wasn't very fresh in my mind either.

I knew it was settled and I knew I was waiting on a dismissal, but I went back into my notes and read him verbatim from the April 2nd and April 11th entries.

Q. And then you put down here, He, being Al Miller, will go back and talk to his supervisor and let him know what has transpired and see about getting an agreement to dismissing the declaratory judgment and walking away and closing files.

Now, Mr. Miller says he'll see about, or go back to his supervisor to see about. Did you say anything at that point in time that this has already happened, and you guys are bound to walk away from this?

A. No. I was going to let him have that conversation. I wasn't going to get into an argument about it, whether or not it was resolved.

Q. At that point in time you felt it still was an

open issue and he needed to check with his supervisor whether they wanted to go forward with walking way?

A. No, I did not feel it was an open issue, and I felt that if he pressed that it was not settled, that I was going to have Ira moving forward to enforce the settlement that Mike McGovern and myself had reached. There was no doubt in my mind it was settled.

Q. You didn't tell that to Al Miller at the time?

A. I wasn't going to get into an argument with Al about whether or not it was settled. I had never spoken to the man before. He was going to talk to his people and see what they wanted to do, and if they didn't agree to dismiss, I was going to have Ira move forward with enforcing the settlement.

Q. That is something that you did not confirm in your note, though, what your plan of action was? You were going to wait and see what happened?

A. Well, I figured there was no reason getting into an argument about whether or not it was settled. Obviously, Mike McGovern was no longer there and they were claiming there was no settlement.

Q. So, Al did claim there was no settlement?

A. Well, he said that he knew nothing about it.

Q. How hard did you argue your case that you felt that there was a settlement and they better stand behind it or there was going to be further litigation on that issue?

A. I didn't argue with him because he was going to talk to his people and get back to us and let us know what their course of action was going to be. And my course of action was going to be, if they reneged on the settlement, to move forward to enforce it through the Court.

Q. Okay.

A. Because we had a settlement.

Q. It appears that after that date you didn't have any more conversations with Al Miller?

A. No. That has been the one and only time I have ever spoken with him.

Q. Is it fair to say that you didn't have any more information from Lincoln General about what their position was regarding the settlement?

A. Nope.

Q. You wanted to know whether Lincoln General reneged on the agreement, but you never got an answer to that; is that correct?

A. Well, it was my understanding thereafter that

they had filed an answer to the declaratory judgment action and were moving forward.

Q. So, you felt that was the answer you were looking for?

A. That was my answer that they weren't going to stand up to the settlement.

Q. When you found that out, that they filed an answer and counterclaim, and I'm not sure if I know the exact date.

MR. RUDD: Do you have that, Ira?

MR. LIPSIUS: No.

MR. RUDD: Well, I've got a letter of August 3, 2001, that I sent David Rosenbaum, who was your local counsel, that I am serving him with our Answer, Affirmative Defenses, Crossclaim and Counterclaim.

BY MR. RUDD:

Q. That was around August 3. Presumably, you received it somewhere thereafter; is that correct?

A. Correct.

Q. I don't see any reference to it, but there are some redacted entries which could indicate you received it, but do you recall if you ever received a copy of that document?

A. I believe I did.

Q. After you received it, you knew that Lincoln General was not honoring what you felt was the settlement?

A. Correct.

Q. Did you then do anything about having Ira, or you do it yourself, send a letter saying, You guys have reneged on this agreement; we're going to enforce it? Did you do anything like that?

A. I believe I told Ira to move forward with enforcing it through the Court's, because it was obvious to me-- We had had a conversation about it. It was obvious to me they weren't going to stand by what they had said.

Q. Did you believe at that point in time it was appropriate to try to document some of what had occurred?

A. I thought my file spoke for itself, that it was settled back on April 11th.

Q. All right. But you still didn't feel it was necessary to confirm any of these exchanged voice mail messages with Mike McGovern?

A. Well, there's not much I can do when he's no longer there.

Q. Because from your note on July 11th, it doesn't

even appear that you confirmed to Al what had happened on April 11th. Although you might have done it, it doesn't say here that you had done it.

A. Well, he said he would go back to his supervisor and let him know what has transpired; i.e., that I am claiming that we had settled the case with Mike McGovern and agreed to walk away.

MR. RUDD: Why don't we mark this Slane Exhibit #1.

(Slane Deposition Exhibit #1 marked for identification)

BY MR. RUDD:

Q. Slane Exhibit #1 is a letter that I had sent to David Rosenbaum on August 3, 2001, transmitting Lincoln General's Answer, Affirmative Defenses, Crossclaim and Counterclaim, as well as the Third Party Complaint.

You said you did get the document. Would you have received a copy of this letter?

A. Yes, I did.

Q. I'm not going to read the whole letter, but is it fair to say that there's nothing in the letter to indicate at all anything about this settlement, this alleged settlement? This letter does not

address the alleged settlement, does it?

A. No, it does not.

Q. Did you have any concern when you received this letter that maybe Lincoln General's attorney didn't even know about this alleged settlement?

A. The thought never crossed my mind. I just assumed this was my answer that they were not going to stand by the settlement and we were going to have to proceed to try and enforce it.

Q. So, even though the letter says nothing that we are backing out of the settlement, we want to proceed, you just assumed that Lincoln General's attorney knew about it, and was just imply-edly rejecting that there had been a settlement?

A. The act of filing an Answer, Affirmative Defenses and Cross and Counterclaim to me was a rejection of the argument that the case was settled.

Q. There was a reason that you didn't respond to this letter of August 3, 2001, or have your attorney do it, either way, and say, We're rejecting your settlement demand because this case has already been settled?

A. I believe Ira responded to that letter.

Q. That's what I was going to ask you about, because I see in your entry -- this on Page 30 -- where

it says, August 16th. Received e-mail copy of Ira's response to Lincoln General.

It was your understanding that Mr. Lipsius was going to respond to this letter?

A. Correct.

Q. And you saw his response to Lincoln General. Was that before he sent it?

A. That might-- He e-mails me everything. It might have been concurrent with it being sent. We discussed it.

Q. Because I have never seen that response and that's what I was wondering about, what response we're talking about.

It was a letter, though, you believe that was going to be sent to Lincoln General?

It says to Lincoln General; it doesn't say to their attorney.

A. Well, Lincoln General in my notes would-- I mean, that encompasses.

It was my understanding that there was a letter sent.

Q. To their attorney or to Lincoln General themselves?

A. I don't actually recall, because I don't have the letter in front of me, who it was actually

addressed to. I would assume it would be in response to your letter.

MR. LIPSIUS: Any draft letter of any sort we would take the position is a privileged document between attorney and client.

An e-mail refers to a letter, the letter itself. The e-mail draft of what went between Northland and our office is a privileged document.

MR. RUDD: I understand, but if it was actually sent out to somebody--

MR. LIPSIUS: Then you would have it, that's correct. But the e-mail draft was not what was sent. This was an e-mail copy. If the actual letter was sent--

MR. RUDD: That's what I'm trying to-- She thinks it was actually sent, so I'm trying to figure out--

BY MR. RUDD:

Q. What do you recall that this letter said? Did it respond to our settlement demand?

MR. LIPSIUS: Well, to the extent that it was not sent, then--

MR. RUDD: She hasn't confirmed that it's not sent.

MR. LIPSIUS: She doesn't know if it was sent or not; so therefore-- I don't even know if she remembers what it said, but to the extent that it may not have been sent, then that would be a privileged document, if it was a draft of any sort.

A. I don't recall if it was sent, and right now without the letter in front of me, I don't recall what it said.

BY MR. RUDD:

Q. Did you believe a letter would be sent in response to the settlement demand rejecting the settlement demand?

A. That would be my understanding.

Q. And that's normal practice; isn't that correct?

A. Absolutely.

Q. And you would believe in response to a settlement demand, one of the key responses would be, This case has already been settled and we're going to reject your demand outright?

A. Correct.

Q. And then after that, I guess over on September 19th, 2001, you said, E-mailed Ira asking for update.

I think around September 17th or thereabouts

is my recollection was when Northland filed its rely to Lincoln General's Counterclaim. I don't see any reference to you having received that. Do you know if you got that document?

A. I'm sure I probably did.

Q. In that document there was a defense raised -- There were very few defenses, but one of the defenses says there was an accord and satisfaction. Do you know what that means?

A. I'm not-- I have heard it before, but...

Q. Do you know if there ever were any signed documents between Northland and Lincoln General settling this case?

A. As far as signed documents, I don't believe there were.

Q. So, as of today, you're not aware of any signed documents. Are you aware of any even being offered by Lincoln General or by Northland to settle the case?

A. No.

Q. So, at this point you've never seen any type of proposed agreement to settle this case?

A. Well, the agreement to settle the case was done orally on April 11th.

Q. Right. But you have never seen any written

document from either side that would outline any of those terms or include any other additional terms?

A. No.

Q. You said that you have been involved in a few instances where there's been disputes over settlement?

A. Sure. It happens.

Q. What has been the context of those? Have they been coverage disputes?

A. Not normally, no.

Q. What type of cases were they?

A. Injury claims where either the attorney didn't have the authority to settle the case, or once the case was settled, the Plaintiff or the Claimant decides that it's not enough money. That type of thing.

Q. What has happened in those contexts where the Claimant has decided it's not enough money?

A. Well, there are times we move to enforce the settlement, and there are times that we-- You know, my position is that it's settled; their position is it's not settled; and oftentimes to avoid lengthy litigation, we will compromise on it. But there are times that we move to enforce

those settlements.

Q. And these are cases where there was just oral discussions and nothing in writing?

A. It's happened where there's been things written.

Q. Have you had any, though, where there's been oral discussions, nothing in writing, where you have gone and tried to enforce the settlement?

A. Yes.

Q. And was that a case where the Claimant decided it wasn't enough money?

A. I don't remember all the particulars at this point.

Q. What has been the outcome of those cases?

A. Like I said, a lot of times to avoid lengthy litigation and a lot of litigation costs, we will compromise and settle the case.

Q. So, you don't have any Court decisions ruling on this one way or another that you're aware of?

A. Not that I recall off the top of my head, no.

Q. The same thing dealing with whether the attorney was authorized to settle the case? You compromise those and they haven't gone through a full decision?

A. Not that I recall, no.

MR. RUDD: That's all I have.

MR. LIPSIUS: I have no questions.

(The deposition concluded at 3:00 p.m.)

COMMONWEALTH OF PENNSYLVANIA )
) ss.
COUNTY OF LANCASTER )

I, Therese M. Valente, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Lancaster, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

TRACI E. SLANE

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Gap, Pennsylvania this 18th day of January, 2002.

NOTARIAL SEAL
THERESE M. VALENTE, Notary Public
Salisbury Twp., Lancaster County
My Commission Expires Dec. 13, 2003

Therese M. Valente
Reporter - Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

# LAWYER'S NOTES

| PAGE | LINE | |
|---|---|---|

SLANE
DEPOSITION EXHIBIT # 1
1-9-02 TnV
PENGAD 1-800-631-6989

McNEES WALLACE & NURICK LLC
ATTORNEYS AT LAW

100 PINE STREET
P. O. BOX 1166
HARRISBURG, PA 17108-1166
TELEPHONE (717) 232-8000
FAX (717) 237-5300

http://www.mwn.com

JONATHAN H. RUDD
DIRECT DIAL: (717) 237-5405
E-MAIL ADDRESS: JRUDD@MWN.COM

August 3, 2001

David Ira Rosenbaum, Esq.
Ruthrauff & Armbrust, P.C.
1601 Market Street, 16th Floor
Philadelphia, PA 19103

RE: U.S.M.D. No. 1:01-CV-763
Northland Insurance Company v. Lincoln General Insurance Company, J.H.M. Enterprises, Inc. et al.
Our Client No. 15711-0011

Dear David:

Enclosed and served upon you is Lincoln General's Answer, Affirmative Defenses, Crossclaim and Counterclaim, as well Lincoln General's Third Party Complaint against Woolever Brothers.

Lincoln General has given a great deal of thought to its settlement position in this matter. As you will note from the Counterclaim, if Lincoln General is successful, it will recover approximately $766,000 from Northland. In contrast, if Northland is successful, it will only recover $126,000 from Lincoln General. Lincoln General believes it has a very good claim for fraud against J.H.M. and Woolever, which will allow it to void the policy, thereby requiring Woolever to pay the full amount of the settlement and all defense costs. However, even if the Court does not void the policy, Lincoln General has very good arguments as to why Northland should be primary, or at a minimum, the parties share on an equal basis. If the parties share on an equal basis, Northland would end up paying Lincoln $360,000 for the amount Lincoln General has paid in excess of its proportionate share. Lincoln General believes it is very unlikely that it will recover less than $360,000. In a good faith effort to resolve this matter now without the need of further expense by either party, Lincoln General is willing to accept $450,000 in full and final settlement of all claims it has against Northland, Woolever, J.H.M. and Statts. This is greater than a $300,000 reduction in its total damage claim. Hopefully, Northland will recognize that this is a very reasonable demand. Northland should realize that this demand is not simply a

springboard for some lower demand. If that was the case, Lincoln General would have demanded $650,000. I do not believe that sophisticated businesses need to go through the prolonged settlement process involved in many personal injury cases where the initial demand bears no relationship to the party's true settlement position. In this case, $450,000 is Lincoln General's true settlement position. This offer will remain open from 20 days of receipt of this letter, which is when you are required to respond to the counterclaim. Please realize that Lincoln General's settlement position will only go up if the litigation continues, especially if it receives favorable rulings on its claim for voiding the policy, which will obviously materially affect the allocation issues between Northland and Lincoln General.

We look forward to your response to this demand.

Very truly yours,

McNEES WALLACE & NURICK LLC

By [signature]
Jonathan H. Rudd

JHR/jp
Enclosures
C: Albert Miller, Esq. (w/encls.)

Exh D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NORTHLAND INSURANCE COMPANIES,
Plaintiff

vs.

LINCOLN GENERAL INSURANCE COMPANY, J.H.M. ENTERPRISES, INC., et al.,
Defendants

No. 01-CV-763

Deposition of: MICHAEL J. McGOVERN, ESQ.

Taken by : Plaintiff

Date : January 9, 2002; 10:20 a.m.

Place : Klett Rooney Lieber & Schorling
240 North Third Street
Harrisburg, Pennsylvania

Before : Therese M. Valente
Reporter - Notary Public

APPEARANCES:

SCHINDEL, FARMAN & LIPSIUS, LLP
By: IRA S. LIPSIUS, ESQ.

For - Plaintiff

McNEES WALLACE & NURICK, LLC
By: JONATHAN H. RUDD, ESQ.

For - Defendants

I N D E X

WITNESS

| | Examination |
|---|---|
| MICHAEL J. McGOVERN, ESQ. | |
| By Mr. Lipsius | 4, 80, 93, 94 |
| By Mr. Rudd | 31, 88, 94 |

EXHIBITS

| McGovern Deposition Exhibit Numbers | | Page |
|---|---|---|
| 1 | M. McGovern's Activity Log Sheets. | 18 |
| 2 | Northland Insurance Companies' Claim File Notes. | 31 |
| 3 | Fax from Northland Insurance Companies to M. McGovern, dated 5-10-00. | 42 |

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and all objections except as to the form of the question are reserved to the time of trial.

MICHAEL J. McGOVERN, ESQ., called as a witness, being duly sworn, testified as follows:

MS. VALENTE: Will there be the usual stipulations?

MR. RUDD: First of all, I want to put something on the record in terms of this deposition.

Number one, we're here to take the deposition of Mike McGovern and later Traci Slane on issues regarding whether there was a settlement. It is not my understanding, and I'm not prepared to go forward with a full-fledged deposition on all issues involving coverage.

MR. LIPSIUS: I'm sorry. You are not or are?

MR. RUDD: I am not, on all issues regarding coverage between these parties, and I would reserve the right to depose either Mr. McGovern or Ms. Slane at a later point in time on the coverage issues if that becomes necessary once

we're further into discovery.

Is that acceptable to you?

MR. LIPSIUS: That is my understanding as well.

MR. RUDD: Okay. Number two, without getting into a lot of details, Mr. Lipsius and I have exchanged correspondence involving some conflict of issues between his firm and Lincoln General. I don't want to get into it in detail, but I am not waiving, and I don't want you to consider my participation today as a waiver of any of our positions on that issue.

Is that acceptable?

MR. LIPSIUS: I understand that.

MR. RUDD: Other than that, I would like to have Mr. McGovern read and sign his deposition, but in terms of objections, usual stipulations are fine.

EXAMINATION

BY MR. LIPSIUS:

Q. Please state your name.

A. Michael J. McGovern.

Q. Do you want to give us an address where you can be reached? I don't need your home address, if you don't want to give that.

A. I will give you my business address because that will be easier during the day.

Office of Chief Counsel, Pennsylvania Department of Corrections, 55 Utley, U-t-l-e-y, Drive, Harrisburg, PA, 17011.

Q. And your phone number?

A. I'm sorry. Camp Hill, PA, 17011.

Q. And your phone number, please?

A. (717) 731-0444.

Q. Am I correct you are no longer an employee of Lincoln General Insurance Company?

A. That is correct.

Q. Are you represented by counsel at this deposition?

A. No.

Q. Am I correct you are an attorney?

A. That's correct.

Q. As a bit of an introduction -- I'm not going to give the lengthy introduction that would be given to a non-attorney -- but in this unique situation, as you are not represented by counsel, and therefore, assumedly representing yourself, as you are aware, objections can be made with regard to questions I may ask, and I may make objections to questions that Mr. Rudd may ask.

Normally, I would tell the witness if their attorney tells them not to answer, they should not answer. In this case, as you are representing yourself, you will have to make that determination as to whether you want to answer or not answer a question, but neither myself nor Mr. Rudd can direct you not to answer a question. Do you understand that?

A. Yes.

Q. Have you ever attended a deposition?

A. Yes.

Q. Have you ever had your deposition taken?

A. No.

Q. Have you ever taken a deposition?

A. Yes.

Q. So, you understand the rules of a deposition; the reporter takes everything down; she can only take done one person at a time. If there's an objection, stop, let us resolve the issue on the objection, and then ultimately you will make that decision whether to answer. And all the other normal preliminaries can I pass over at this time because you understand what depositions are all about. Would that be fair?

A. Yes.

Q. And you understood what I just said?
A. Yes.
Q. To keep things moving and make it go a little quicker, if you could just tell me your education.
A. I graduated form the Pennsylvania State University with a bachelor's degree in history in 1974; I attended graduate school at the Pennsylvania State University from 1978 to 1980, with a master's degree in public administration. I attended the Dickinson School of Law from September 1985 until June of 1988 and was awarded a Juris Doctorate degree.
Q. Are you admitted to the bar of the State of Pennsylvania?
A. Yes, I am.
Q. Are you admitted to any other state bars?
A. I am admitted to the state bar of the State of New York and the state bar of the State of Maryland.
Q. Are you admitted to the federal bar?
A. I am admitted to the Middle District of Pennsylvania, the Western District of Pennsylvania, and the Third Circuit Court of Appeals.

Q. Again, to make things move, instead of asking you each piece at a time, could you give me your employment history, starting with most recent first?

A. I currently am employed by the Governor's Office of General Counsel, assigned to the Pennsylvania Department of Corrections. I have been employed there since late June of 2001.

Prior to that, I was employed at Lincoln General Insurance in York, Pennsylvania. I was employed there from November 1993 until late June of 2001.

Prior to that, I was employed at the law firm of Peters and Wasilefski in Harrisburg, Pennsylvania. And I was employed there from September of 1989 to either late October or early November of 1993.

Prior to that, I was employed by the law firm of Gary Lightman in Harrisburg, Pennsylvania. I started working there as a law clerk while still in law school in June of 1987, and continued working there after I graduated from law school and was admitted to the bar, and stayed there until either late August or early September of 1989.

Q. I don't need prior employment.

What was your position at Lincoln General? Start at the time you left and go backwards, if you can.

A. I was employed as an attorney the entire time I was there.

Q. Did you litigate files on behalf of Lincoln General?

A. Yes, I did.

Q. Is that Defense work?

A. Yes. And Plaintiff's work.

Q. Plaintiff's meaning you represented Lincoln General in cases?

A. Yes.

Q. Was it done in the name of a law firm or was it done in the name of Lincoln General?

A. From 1993, when I arrived until July of 1997, it was in the name of Lincoln General. From July of 1997 until July of 1998, it was in the name of a captive law firm. That firm was Kahlbaugh, K-a-h-l-b-a-u-g-h, McGovern & Ykema, Y-k-e-m-a. In July of 1998 the firm was dissolved and we went back to being just direct employees of Lincoln.

Q. Now, during the period of July '97 to July '98,

when the litigation was done in the name of Kahlbaugh, McGovern and Ykema, did you receive a paycheck from Kahlbaugh, McGovern and Ykema?

A. Yes.

Q. Did you also receive a paycheck from Lincoln General?

A. No.

Q. During the time you worked for Lincoln General, were you involved in the supervision of any claim files?

A. Yes.

Q. Were these files that you were not the attorney of record for in a litigation?

A. Yes.

Q. You gave me a job description as an attorney representing Lincoln General, and I think insureds; is that correct?

A. Yes.

Q. What else did you do there at Lincoln General?

A. Drafted contracts and releases, reviewed laws to advise the company on corporate compliance, represented the company internally in unemployment compensation hearings. That's about it.

Q. Did you have any formal title at Lincoln General?

A. I was, I believe it was, assistant counsel most of the time.

From the period of September or October of 1998 until early 2000, I was also Director of Claims or Co-Director of Claims.

Q. When did you cease that position or cease the title of Director of Claims?

A. That would have been, let's see, around January of 2000.

Q. From January of 2000 until your termination of employment, what was your title, if any?

A. Just--

Q. Assistant counsel?

A. Just attorney. Attorney, because we didn't have a chief counsel then.

Q. Attorney, okay. And in the beginning of this year, say 2001 -- I'm sorry, last year. In January of 2001, did Lincoln General have a claims department?

A. Yes.

Q. How many people were in that claims department?

A. I will try to add these all up in my head.

Q. Approximate is fine.

A. I'm going to say approximately 20 people, including clerical staff.

Q. Leaving out the clerical staff, what were the various titles or roles that people had? What positions were there in the department?
A. Claims adjusters and supervisory claims adjusters.
Q. Do you remember approximately how many claims adjusters?
A. Maybe a dozen, maybe 14.
Q. Supervisory?
A. I am including them in the claims adjusters.
Q. Okay.
A. Two or three supervisory.
Q. Somewhere around ten claims adjusters and two or three supervisory, somewhere in that range?
A. Somewhere around there, yes.
Q. Were any of the supervisory claims adjusters attorneys?
A. In 2001, no.
Q. Did any of the claims adjusters report to you?
A. No.
Q. Who did you report no?
MR. RUDD: We are limited to January 2001 on?
MR. LIPSIUS: That's correct.
A. And I'm answering all questions with that assumption, unless you correct me.

BY MR. LIPSIUS:

Q. Correct.

A. I reported to Timothy Kirk.

Q. What was his position?

A. Vice President of Claims.

Q. You were involved in claims; correct?

A. Yes.

Q. Were there specific types of claims you were involved in?

A. I was involved in significant claims, claims of significant injury or death. I also litigated smaller claims in the Central Pennsylvania area for the company.

Q. Now, in these claims of significant injury or death, generally would there be a claims adjuster on the file with you or would you be handling that alone?

A. Generally, if I was litigating it, there would be a claims adjuster; and if I wasn't, there wouldn't be.

Q. Did you have any level of settlement authority?

A. Yes, and I can't remember if it was 25,000 or 50,000 dollars. I'm not sure which.

Q. Above that level did you have to get approval from someone?

A. From Mr. Kirk.

Q. You're familiar with the J.H.M. Enterprises' claim that is the subject of this litigation?

A. Yes.

Q. Do you know when you initially became involved in that file?

A. Either the day of the accident or within a day or two of the accident.

Q. Was there a claims adjuster working with you on this file?

A. Initially there was, yes.

Q. Do you know who that was?

A. Jerry Conwell. To the best of my recollection.

Q. J-e-r-r-y or G-e-r-r-y?

A. J-e-r-r-y C-o-n-w-e-l-l.

Q. Do you know how long he was involved in this file?

A. No, I don't. He left the company in late 1998, but I think he was done with his involvement before then.

Q. So, at least from late 1998 until you left the company, you had no claims adjuster working with you on the file?

A. Not that I recall, no.

Q. Was Mr. Kirk your supervisor on this file?

A. Yes.
Q. Were there any round table meetings or meetings regarding this file?
A. I discussed it with Mr. Kirk when there was something to discuss.
Q. Was anyone else in on those discussions?
A. Not that I recall.
MR. LIPSIUS: Off the record.
(Discussion held off the record)
BY MR. LIPSIUS:
Q. Would you tell me the physical filing system used for the J.H.M. file? Was it put in file folders?
A. We, at that time, used the Binder-Tech system.
Q. Do you know approximately how large that file was? Are we talking about six inches, a foot?
A. Well, the Binder-Tech system is like three-ring binders, but it only used two rings, so that they hang better. And they're the size of a regular three-ring binder. And I believe this file was seven, eight or nine -- at least seven, maybe eight or nine -- of those binders.
Q. Each binder was how big? Three inches?
A. Two and a half or three inches.
Q. Was any computer system used to keep notes or information with regard to the file?

A. No. Other than the file would get printouts sometimes of expenses and things like that to keep track, but other than that, no.

Q. Did you keep any type of ongoing log of events that took place in this file?

A. I kept handwritten notes of phone calls I had made and things to do.

Q. Do you know if anybody else kept handwritten notes?

A. I don't know.

Q. If someone else had worked on this file, would they have put their handwritten notes in the section where your handwritten notes would be kept?

A. That would be the usual course of events.

Q. These handwritten notes, were they kept on a sheet of paper?

A. Yes.

Q. Would that sheet of paper have been inside the file?

A. Yes.

Q. Would it be on the first binder?

A. Everything was laid out uniformly in each of the files, so that depending on what you're looking to, you could go to that numbered section. They

were 1 through 14. And I can't remember for sure, but it was either Section 1, 2 or 3 where the handwritten notes were kept. So, it was near the front of the file.

Q. Going back to your beginning involvement in the file, which I believe was 1995; correct?

A. If that's when the accident occurred, yes. I know it was around Christmastime, but I don't know what year.

Q. I will represent to you from our files and from the Complaint, it took place in November 1995.

A. Okay.

Q. Did you ever contact anyone at Northland?

A. I had several telephone conversations over the course of the matter with Traci Slane. I am not sure if there was someone at Northland prior to her or not.

Q. If I mention the name Jerry Parker, would that sound familiar to you? We will show you your notes shortly to help you out.

A. Not really, but...

Q. Okay. Do you know if Jerry Conwell had any involvement with anyone at Northland?

A. I wouldn't know.

Q. Would it be normal for him to have had contact

with someone at Northland on this file?

A. No, I don't think it would.

Q. Would it be normal for Mr. Kirk to have involvement with someone at Northland on this file? Well, do you know if Mr. Kirk had any involvement with anyone at Northland, to the best of your recollection?

A. To the best of my recollection, no.

MR. LIPSIUS: Let's mark this as Plaintiff's Exhibit McGovern #1.

(McGovern Deposition Exhibit #1 marked for identification)

BY MR. LIPSIUS:

Q. I'd like you to look at what's been marked as McGovern Deposition Exhibit #1, and it is a seven-page document. Can you identify that document?

A. This appears to be my notes which would have been in the file.

Q. Are those the notes we just spoke about, that would be either in the first, second, or third binder?

A. That's correct.

Q. I should say first, second or third section of the binder?

A. Section of the binder, yes.

MR. RUDD: For the record, so it's clear, these notes are redacted, the copy that has been marked as an exhibit.

MR. LIPSIUS: Okay.

BY MR. LIPSIUS:

Q. Are these notes generally kept in chronological order?

A. Generally, yes.

Q. Does this refresh your recollection as to the approximate date of the accident?

A. Yes, it does.

Q. I had asked you about Jerry Parker earlier along. You'll see a note of November 22nd, Call from Jerry Parker.

A. Yes.

Q. So, does it refresh your recollection you spoke to Jerry Parker, or the note says it, so it's probably true?

A. The notes say it, so I'm assuming it was true.

Q. But you have no independent recollection of that?

A. No.

Q. I understand this was over six years ago, so I wouldn't expect that.

Now, I believe in the summer of 2000 the

underlying claims were settled; is that correct?
A. Yes.
Q. Do you recall that settlement?
A. Yes.
Q. Now, did you discuss that settlement with Traci Slane?
A. We're talking about the underlying settlement of the Plaintiffs' claims?
Q. Yes.
A. Yes, I did.
Q. Did you authorize on behalf of Lincoln General certain sums of money to be paid in that settlement?
A. Mr. Kirk would have authorized it and I would have conveyed that, yes.
Q. So, you conveyed that to Traci Slane?
A. Yes.
Q. And there were numerous conversations on that as negotiations were taking place?
A. To my recollection, yes.
Q. And at one point-- Do you recall at one point there were lower numbers and then slowly you raised the limit as to what was acceptable to be paid? Does that refresh your recollection?

Look at your notes.

A. Thank you.
Q. I don't want to put words in your mouth.
MR. RUDD: Take your time, Mike, and read them all.
BY MR. LIPSIUS:
Q. If you want, I'll give you five minutes. Why don't you go through the whole file. Will that be helpful to you?
A. Yes, it would.
Q. I was just trying to move it along, but that's fine.
(Recess taken)
BY MR. LIPSIUS:
Q. You reviewed this docket?
A. Yes.
Q. What should we call it, Activity Log? I called it a docket. Should it be called Activity Log?
A. That would be fine.
Q. Okay. I'd like you to tell me what you remember as to the negotiations of the settlement with the Plaintiffs, if anything, after reading this log?
You can go by the entries. On 8-3, I believe is the--
A. I remember it took forever to actually get a demand out of the Plaintiffs and that didn't

happen until almost the time it was scheduled for trial. And when that happened, I started dealing with Traci on those issues.

Q. Did you deal with anyone else at Northland, other than Traci, on those issues?

A. Not that I recall.

Q. Did Traci deal with anyone other than you at Lincoln General on those issues?

A. I don't believe so, but I don't know for sure.

Q. Did you and Traci agree as to an amount of money that would be paid to the Plaintiffs?

A. Yes.

Q. And did you and Traci agree as to how that money would be split?

A. Yes.

Q. Were those monies actually paid to the Plaintiffs?

A. Yes.

Q. Now, a number of things have been redacted, and you probably don't remember what's in those notes, or maybe you do. I'm not trying to pry into anything that may be a privilege; however, I'd like to at least to know the subject matter of those notes, if you have any idea of that, the redacted sections.

Do you have any recollection?

MR. RUDD: Are you talking about the first redaction on what appears to be February 15th of 2001?

BY MR. LIPSIUS:

Q. We can go back one before, and I asked the question about a round table. I see there was a round table to file dec. action on 2-2, which is not redacted, and following that a series of notes that have been redacted.

Do you know if those are issues involving the dec. action?

A. It says, Round table; file dec. action. So, I would assume they are. I don't recall that meeting, that round table.

Q. Were there any round tables to get approval to settle this case for the million, 225?

A. I don't recall any.

Q. Did you speak with Mr. Kirk about this 1 million, 225 settlement?

A. Yes.

Q. And he approved it?

A. Yes.

Q. Do you have any notes about those conversations where you obtained the approval? I assume that

would not have been in the February 2000 redacted notes; is that correct?

A. I don't know what was in them.

Q. You have no idea?

A. I have no idea.

Q. But since the settlement took place in August and you were having a problem getting a demand from the Plaintiff, it would highly unlikely that you could have discussed that demand back in February of 2000; is that correct?

A. That's correct.

Q. So, are there any notes indicating that Mr. Kirk approved this settlement for 1 million, 225?

A. I don't see any.

Q. Would you normally put such notes in your file?

A. It would depend. Usually, but not all of the time.

Q. Now, we have a redacted note of 2-15, and we have only the last line, which says, Call Northland; see if they want to just call it quits.

Do you have any idea what was in that redacted section?

A. That would have been discussions concerning the dec. action, I believe.

Q. And those discussions would have been with Mr.

Kirk or with someone else?

A. They would have been with Mr. Kirk.

Q. Would they have been with Mr. Rudd?

A. They possibly could have been involving him, too.

Q. I don't want to go into anything you discussed with him because that has a privilege, but I just want to know what they were.

Now, did you discuss with Mr. Kirk on February 15th-- Tell me what it means, Call Northland; see if they want to call it quits. What does that mean?

A. I believe that's pursuant to our discussions. We were interested at that time in mutually -- in executing mutual releases and ending the litigation.

Q. Discontinuing the declaratory judgment action; correct?

A. That's correct.

Q. That would mean that whatever had been paid, had been paid by each of the insurance companies and each would waive their right to get back money one from the other?

A. That's correct.

Q. Was that discussed with Mr. Kirk?

A. Yes.

Q. Did he approve that?
A. He approved me contacting Northland to see if they were interested in doing that, yes.
Q. This says you called Northland on 2-15.
A. Um-hum.
Q. So, to the best of your recollection, you left a message on the machine? That's what it says there.
A. Yes.
Q. Do you recall that independently?
A. I had so many contacts with Traci, I don't recall each of them independently, but I would have called, yes.
Q. So, normally, what you put there is what you did?
A. Generally.
Q. Now, on March 12th as an indication, Return call to Traci and left message?
A. Yes.
Q. Would that have been on the same issue, if you know?
A. I don't know, but I would assume it would be, but...
Q. Now, on April 2nd, there is a note here, Call from Traci. Agreed we would both pull the plug.
What did you mean by pull the plug?

A. That would mean that we would execute joint releases and discontinue the action.

Q. Exactly what you talked about a few moments ago; correct?

A. Yes.

Q. On April 10th, it said, Called Traci; left message. Do you know what your message was?

A. No.

Q. Would it have been regarding that agreement to settle the case?

A. I would assume that it would be. There would be no other reason for me to contact her at that time.

Q. Did Traci indicate to you at any time that it was acceptable for Northland to settle the case and pull the plug, so to speak?

A. I believe she did, yes.

Q. Did you take any further action regarding this?

A. No. I was just waiting for her to send the releases.

Q. So, the way you understood it was, the plug was going to be pulled, and releases had to be sent? Would this be policy releases? What do you mean by releases? I'm sorry.

A. A joint release which spells out in great detail

that each side -- what each side is doing, giving up, what they expect, et cetera, et cetera, and then discontinue the case.

Q. Did you expect these releases to be drawn by the attorneys?

A. I believe that I expected Traci to have her attorney prepare the releases, was my conversations with her.

Q. And was Mr. Kirk aware of this?

A. I believe so, yes.

Q. And he approved of this?

A. Yes. To the best of my recollection, yes.

Q. Now, the fact that there's no entry after April 10th, does that mean that nothing happened on the file, or just nothing was entered on the file after April 10th?

A. That may be the last time I did anything on the file since I left two months later.

Q. What were the circumstances of your leaving Lincoln General?

A. I got a job offer from the Commonwealth of Pennsylvania.

Q. Do you know approximately when that job offer was made?

A. End of May of 2001.

Q. And at that time did you give notice to Lincoln General?
A. Yes, I did.
Q. And your termination at Lincoln General, was that a cordial termination?
A. I believe so.
Q. And do you still speak to people at Lincoln General?
A. Occasionally, yes.
Q. With regard to this file, had you ever spoken to anyone from our firm -- my firm -- Schindel, Farman & Lipsius on this file?
A. Only when you called me originally to schedule -- to talk about it and schedule my deposition. And then someone from your firm called me with regards to serving the subpoena, and I said they could serve it by mail and that would be fine.
Q. This would all be subsequent to December of 2001?
A. Correct.
Q. In December 2001 and after?
A. Yes.
Q. But not while you were an employee of Lincoln General?
A. Correct.
Q. Did you ever inform counsel, Mr. Rudd's office,

regarding this settlement? Do you know if you informed them of this settlement?

A. I can't recall. I believe I may have, but I don't know for certain.

Q. I'm going to read to you from the notes of Traci Slane, and I just want to know if your recollection is at all changed by this or has any effect on it. Just one minor thing.

It appears that on April 11th, there's a matching entry to your April 10th date, and I don't know, it could have been she just got the message. I don't know why the date is different, but the issue seems to be the same, but I'm not going to characterize anything.

It says that Mike McGovern at Lincoln General called. They are in agreement to walk away from DJ and close files. Called Mike at Lincoln, asking him to have his counsel call Ira and agree to voluntarily dismiss this.

Does that refresh your recollection of that?

A. No. I'm sorry, it doesn't.

Q. You don't remember either way; is that correct?

A. No. I don't remember either way.

MR. LIPSIUS: Okay. I have no further questions.

EXAMINATION

BY MR. RUDD:

Q. Mike, I'm going to go through some of Traci Slane's notes with you. With all due respect to your notes, her notes were a little more comprehensive, so I think it might give us a better factual background.

MR. RUDD: Ira, do you have a copy of those notes?

MR. LIPSIUS: Yes, I do. Do you want to enter it as an exhibit?

MR. RUDD: Yes. Why don't we mark this as McGovern Exhibit #2.

MR. LIPSIUS: And by stip. we will use that at the Traci Slane and not re-mark it at Traci Slane's deposition.

MR. RUDD: That's fine.

MR. LIPSIUS: Off the record.

(Discussion held off the record)

(McGovern Deposition Exhibit #2 marked for identification)

BY MR. RUDD:

Q. Actually, if you would turn to Page 9. First of all, I assume you've never seen this document?

A. No.

Q. Ms. Slane never shared with you her computer diary during any of your dealings with her?

A. No.

Q. If you turn to Page 9, in the middle of the page, there's an entry for 12-28, 1999. Time was 8:45 a.m. It says, and I'm going to just read it conversationally, rather than using the abbreviations, Return Lou call.

Were you aware that Lou Bricklin was the attorney who Northland had hired to represent Woolever?

A. Yes.

Q. It says, He has traded messages with Pipa.

Now, Mike Pipa was the attorney that Lincoln General had hired to represent J.H.M. and Bernice Statts in underlying cases; correct?

A. That's correct.

Q. You had a lot of interaction with Mike Pipa, I assume; is that correct?

A. That's correct.

Q. And ultimately, Mike Pipa had to report to you any communications, and he got his authorizations through you; is that correct?

A. That's correct.

Q. The entry says, They will agree to tender their

750,000 if we agree in writing to arbitrate if all claims settle under 1.5 million and within 60 days of underlying claims being resolved. Dash. Agreed that was fine, and he will get letter out.

Now, do you recall discussions with both Mr. Pipa, and then also obviously Northland's representatives, about the subject that was described here by Ms. Slane about Lincoln General tendering its policy limits of 750,000; then agreeing to arbitrate the coverage issue within a certain time period?

A. I recall generally discussions along those lines, yes.

Q. So, this statement would conform with your understanding of the proposal and Lincoln General's position, at least their agreement to do that?

A. That would be, yes. That's correct.

Q. It was acceptable to you to tender your 750,000 and then arbitrate with Northland the whole issue of coverage between the two companies; correct?

A. Definitely, yes.

Q. If you would turn to Page 10. If you go down to the entry, and you can read through those, on January 5th, 2000, it says, Return counsel call,

Moira.

Was that Moira Duggan? Did you know Moira Duggan from Lou Bricklin's office?

A. The name doesn't ring a bell.

Q. I think we can agree that's who it was.

MR. RUDD: Is that acceptable to you, Ira?

MR. LIPSIUS: I do not know who Moira is. I will accept your representation, but I have never inquired as to who Moira is.

MR. RUDD: I think you will see probably a lot in your claims file that you produced to me showing her name, but let's just stick with Moira then for now.

BY MR. RUDD:

Q. It says, We have Lincoln's 750,000.

Do you remember at some point then conveying through Mr. Pipa that you were willing to tender the 750,000 under the terms that we had described about arbitrating the coverage issue?

A. Generally, yes.

Q. And then, if you look at the entry for January 13th, 2000-- Again, this is Traci Slane's entry. It says, She had faxed letter whether Northland is willing to agree to arbitrate whether the policy may be primary as opposed to concurrent or

excess. Indicates they cannot commit to change until have authority from us.

And then right below that, at 10:15 a.m., Traci Slane says, Called counsel, Moira. Told her I did not have a problem arbitrating if we were primary, as opposed to concurrent or excess. Seemed like that was what we had agreed to. She will get ball rolling on that.

Does that conform with your understanding at some point Northland had agreed to go ahead then with your proposal to contribute $750,000 and then arbitrate the coverage issue?

A. My recollection is that there were discussions along those lines, and they had generally been agreed to in principle, but that Lincoln General's position was that in an arbitration all the issues would be decided; who was primary, were they co-primary; if they weren't co-primary and one was primary, was the other one excess, and Northland just wanted -- Northland didn't want to put all the issues before the arbitrator.

Q. At least from this entry on January 13th, 2000, if you read what she says initially, is it fair to say the position -- where she says, I did not have a problem arbitrating if we were primary as

opposed to concurrent or excess; seemed like that is what we had agreed to.
A. Yeah.
Q. So, at some point, in principle, you had agreed to arbitrate who was primary, concurrent or excess between Lincoln General and Northland; is that correct?
A. I don't recall exactly. I recall that there were a lot of discussions on arbitration, and everybody agreed it was a good idea and there were some problems with the exact language of the agreement.
Q. You had said before that you felt you had agreed in principle.
A. Yes.
Q. Is it fair to say there was never a written agreement outlining all the terms?
A. To the best of my knowledge, there never was, no.
Q. As an attorney, was it your understanding that until you had that written agreement outlining all the terms, Lincoln General wouldn't be able to bind Northland to this agreement in principle to arbitrate the coverage issues?
A. That's correct.
Q. As we can see from the next page after apparently

Traci Slane had agreed to this, she talked to a JP -- I'm assuming that's Jerry Parker, but it doesn't say that.

MR. LIPSIUS: What entry are you referring to?

MR. RUDD: On 1-13-00, which at the very top says, Discussed with JP.

MR. LIPSIUS: Okay.

BY MR. RUDD:

Q. This entry then says, Do not want to arbitrate that we are primary and Lincoln is excess because we have 2 million dollar policy, and if we get bad result, then we would owe entire loss, and we know that Lincoln is primary.

And it goes on below that to say, If they want to argue we are primary, then file dec.

And at the very bottom says, Will not agree to arbitrate primary issue if Lincoln does not agree they are primary.

Which, you'll agree with me, is different than what Traci Slane said in the prior note that she had no problem arbitrating?

A. It appears to be different. That's correct.

Q. Did you have a problem with Traci Slane going back to someone at Northland, her superior or

some other person, before there was a written agreement to arbitrate and changing Northland's position?

A. No.

Q. Did you understand that until there was a written agreement outlining all the terms, that there was no meeting -- a complete meeting of the minds and that Northland was free to change its position on whether or when to arbitrate?

A. That's correct.

Q. Did you at any time ever try to bind Northland to its previous agreement in principle to arbitrate the coverage dispute?

MR. LIPSIUS: Object as to form. The witness did not testify that there was an agreement. His recollection was that there was not an agreement, just discussions.

MR. RUDD: I wrote down that he said they had agreed in principle.

MR. LIPSIUS: The record will speak for itself.

A. We had agreed in principle that it would be a lot quicker and more economical to arbitrate this matter than to go through a dec. action. And so, we had agreed to arbitrate, but we had never been

able to fully agree on the exact terms of what the arbitrator would be asked to decide, which was the issue, which is why it was never done.

BY MR. RUDD:

Q. So, even though Traci Slane seemed to have no objection to it initially, this JP did, so it never went forward?

MR. LIPSIUS: Object, same. You can answer.

A. I don't know who JP is. I know it never went forward.

BY MR. RUDD:

Q. And you never tried to enforce any agreement to arbitrate?

A. No.

Q. I want to jump ahead to the entries on Page 16 of McGovern Exhibit #2. The first entry of May 5th, 2000 at 3:45 p.m. Again, this is Traci Slane entering this information.

It says, Return Mike McGovern at Lincoln General. It gives your number. Said he has coverage counsel retained to file dec. action.

It's a declaratory judgment action, I assume; correct?

A. Yes.

Q. You're referring to our office; is that correct?

A. That's correct.

Q. They had proposed to settle the case and proposed to binding arbitration. Told him we would be willing to try and resolve the underlying cases and litigate the coverage issue.

Then it goes on to say, This is a hard coal mining county; 30 percent unemployment rate. Average age of residents is 50's.

Then it says, They would consider agreeing to settling the cases and litigating the dec. action. Apparently, that's something you communicated to Ms. Slane?

A. Yes.

Q. And then it gives your address, fax number, your e-mail. And it says, Said to get letter outlining what we are thinking and then he will review and get back to me.

I want to stop right there. Why did you want a letter outlining what Northland was thinking?

MR. LIPSIUS: Object. There has been no testimony that he wanted a letter, but...

MR. RUDD: Let me back up.

BY MR. RUDD:

Q. Based on this note, did you tell Traci Slane that you wanted a letter from her outlining what

Northland was thinking?

A. I have no specific recollection of that specific conversation, but in any dealing with any other insurance company or attorney for any party, any discussions with settlement, I always requested that they send me some sort of written document so that we were absolutely sure we were on the same page, so there weren't problems and misunderstandings later of a "he said, she said" sort of situation.

Q. That is just a general practice that you employed throughout your career as a lawyer and at Lincoln General?

A. That's correct.

Q. Was another reason that you wanted a letter so you can review it with Mr. Kirk so there was no confusion in your communication to Mr. Kirk what Northland had communicated to you?

MR. LIPSIUS: Object as to form. You can answer the question.

A. Yeah. I would review any documents that Northland sent me with Mr. Kirk, after I had reviewed them so I could discuss them intelligently with him.

BY MR. RUDD:

Q. Ultimately, would Mr. Kirk then made a decision whether to go along with whatever proposal Northland had offered?

A. That's correct.

Q. All right. And then it goes on in that May 5th, 2000 conversation: His one condition is that we resolve this claim quickly. Told him we are in process of filing dec. -- again, it's a declaratory judgment action, I assume -- and plan on proceeding with the declaratory judgment action as the tort claim progresses and get it all resolved ASAP.

Do you remember talking to Ms. Slane about getting it resolved quickly?

A. I remember general conversations with her along those lines, yes.

MR. RUDD: I'd like to mark this as McGovern Exhibit #3.

(McGovern Deposition Exhibit #3 marked for identification)

BY MR. RUDD:

Q. We have marked McGovern Exhibit #3. We were at Page 16 of the claims diary from Northland, where you had requested a letter. And this apparently was at-- It says, 3:45 p.m. you requested a

letter from Ms. Slane outlining what Northland was thinking.

We marked as Exhibit #3 a two-page document; the first page, which is a fax transaction report, which at the top says, May 10th, Wednesday, 5:13 p.m. So, it appears that in less than two hours Ms. Slane had faxed to your attention a letter. Is that fair to say? Do I have this right?

Okay. I am sorry. I am sorry. We were talking May 5th, 2000 at 3:45 p.m. and now we are May 10th. So, five days later Ms. Slane faxed to your attention a letter; is that correct?

A. That's correct.

Q. I apologize for the confusion.

On the second page of the document, which is the body of the letter, it's to your attention. Under comments it says, Mike, this is a follow-up to our telephone conversation on May 5, 2000. We are in the process of filing a declaratory judgment action regarding the above matter. However, we would like to try and resolve the underlying claims at the same time. We propose that we each pay half of the settlements of the underlying claims and proceed to dispose of the

coverage issues with the declaratory judgment action that is being filed. Please review and call me to discuss at your earliest convenience.

Is this the type of letter you were looking for from Traci Slane setting forth Northland's proposal?

A. Yes.

Q. Did you then take this letter to Mr. Kirk to then discuss what Northland was proposing?

A. I believe I would have, yes.

Q. It appears that on Page 17 of the claims diary, on May 18th, 2000, it says 9:50 a.m., Called Mike at Lincoln General.

MR. LIPSIUS: What page are you on?

MR. RUDD: Page 17.

BY MR. RUDD:

Q. I'm just looking at your activity log to see if you have any corresponding entry.

I don't see an entry on here for May 18, 2000, but it says here under the entry where she called you, They are willing to do 50/50 split. Not sure 1.5 million is going do it, but good start. Asked him about opening offer and he wants to do conference call next week with his attorney and ours, all four of us.

Now, in that time period between May 10th and May 18th when you had the subsequent call with Slane saying that you were willing to do the 50/50 split, it's your testimony you would have talked to Mr. Kirk to get that approval?

A. If I had not received that approval from him before.

Q. You might have received it based on some earlier conversations with Ms. Slane?

A. That's correct.

Q. Would you normally, though, have reviewed this letter setting forth the specific terms of what Northland was proposing with Mr. Kirk or the substance of it with Mr. Kirk?

A. I would have discussed the substance of it.

Q. And you would have made sure that Mr. Kirk was agreeable to this proposal?

A. Yes.

Q. If you turn in Exhibit #2, the Northland claims diary, to Page 22. Go down to the entry on July 5th, 2000. It says, 10:45 a.m., Returned call Lou -- Lou Bricklin, again.

I want to direct your attention to the bottom of that entry.

A. Page 23?

Q. On Page 22. July 5th, 2000.
A. My Page 22 ends at June 27th, 2000.
Q. Let me see. That's Page 21, I'm sorry.
I am looking at the top. You are right. I am looking at the computer -- not the Bates stamped number, but the computer page number at the top, Page 22. Do you see the July 5th, 2000 entry?
A. Yes.
Q. Very bottom of that entry says, Mulligan attorney, and let me just back up there. There were two actions, two primary actions. I think there was actually a third subrogation claim involving damage to one of the vehicles, but what I'm primarily talking about is the two personal injury actions. One of them involved who we called the Cliffords; is that correct?
A. That's correct.
Q. And the other one involved the Mulligans?
A. Cheryl Mulligan, yes.
Q. Cheryl, and her husband Dennis, I guess, has earned some loss of consortium claim possibly.
And these were being handled, or at least settled separately? There was not a combined offer made to both the Cliffords and Mulligans;

is that correct?

A. That's correct.

Q. You were aware that Northland was taking the lead in attempting to settle the Mulligan case?

A. I don't recall it, but I can't dispute it. It may have.

Q. Somebody apparently had made offers to the Mulligans; is that correct?

A. I'm sure we eventually did because it settled. The thing I remember is that-- The only thing I really remember about the Mulligans is that we had a great deal of trouble, all of us, in getting a demand or any response at all from her attorney, to the point where the Judge was getting rather upset with him because his failure to respond was apparently delaying settlement of all the matters.

And really, other than that, and the fact that she wasn't seriously injured is what I remember of Cheryl Mulligan.

Q. The entry says, Mulligan attorney has asked us to send the release for $125,000. Not sure if it is settled, so they have asked him in cover letter if case is actually settled or not.

And you talked about the Mulligan's attorney,

but did you believe that the Mulligan case was settled prior to when the Mulligans actually signed the release?

A. No.

Q. Did you understand that the Mulligans could back out at any time before they actually signed the release?

A. Yes.

Q. That was just background to an entry on July 14th, 2000, where at 8:40 a.m., it says, Mike at Lincoln General called. It says, Told him we had release out on Mulligan claim. Not sure, but appeared that one was going to settle.

Again, was it your understanding when you had this conversation with Traci Slane that the Mulligan case had not yet been settled because you didn't have the release back?

A. I had no specific recollection of the specific conversation, but that would generally be my feeling, yes.

Q. Okay. If Traci Slane had told you that the release was out, but had not yet been received back, your general recollection would be that the case had not yet been settled?

A. That's correct.

Q. Even if the attorney had said his clients were willing to take the 125,000?

A. That's correct.

Q. At the very bottom of that page, July 19, 2000, the entry says, Mulligan case settled. Has release.

Was it your understanding that once the releases came back signed by the Mulligans, the case then was finally settled?

A. That's correct.

Q. But had not yet been settled before then; is that correct?

A. That's correct.

Q. I want to jump ahead then to Page 24 of McGovern Exhibit #2. There are multiple entries, but the entry for August 10th, 2000, where it says, TT Mike at Lincoln General.

I assume that means talked to Mike at Lincoln General.

Let me just read this for the record, so we know what my following questions refer to. It says, He felt that the -- it says lost offer, but I think it means the last offer -- was take or leave it, and since they left it, we should proceed. Said we felt we need to settle the case

and I had authority to settle it.

Then it says, He will talk to his people and let me know if they are willing to go one-half.

First of all, let me just stop right there. When you told Ms. Slane that you would talk to your people and let her know if your people were willing to go one-half, who were you referring to?

MR. LIPSIUS: I object. This is based on notes of someone else. He has not testified that he said any of this. If his recollection is that he did, that's fine, but let him so testify.

A. I have a general recollection of Traci calling me at one point because we had given them a take it or leave it offer, and they had left it, and it was our position that once you give someone a take it or leave it offer and they have left it, then you get ready for trial.

Obviously, there are exceptions to that. So, at that point if we were going to do anything other than the take it or leave it, I would have had to confer with Mr. Kirk.

BY MR. RUDD:

Q. So, the reference to, Talk to his people, and this is her notes, but he will talk to his

people, that's a reference to you will talk to Mr. Kirk?

A. That's correct.

Q. And see if even though they left your take it or leave it offer whether you were still willing to go to one-half?

A. That's correct.

Q. That's not a decision you would have made on your own?

A. No.

Q. Continuing with her note, it says, Told him they could give us the rest of their limits and then we would make up the difference to settle the Clifford's case, and then we would dismiss DJ, declaratory judgment, and would be done.

Do you remember Traci Slane saying something to that effect to you?

A. Not independently, no.

Q. You wouldn't deny with her statement here, though?

A. No. I have no recollection either way of that.

Q. Then, apparently, you said, Said they want their money back from us and not willing to do that. He really thinks they will prevail on the declaratory judgment and we will owe them back

everything.

Then she said, Told him I did not agree, but if not interested, then let's settle Clifford and litigate the coverage. He will get back to me.

Do you recall ever telling Traci Sloane--

MR. LIPSIUS: Slane.

MR. RUDD: I'm sorry, Slane. Thank you.

BY MR. RUDD:

Q. --Traci Slane that you were not agreeable to simply dismissing the declaratory judgment action and being done?

A. At that time, yeah, because we were still trying to settle the underlying case. Yes, I do.

Q. And do you also recall telling her that you felt that Lincoln -- well, not that you felt, but telling her that Lincoln General wanted its money back?

A. I remember saying that several times. We discussed that.

Q. All right. And do you remember telling her that you were not willing to drop, dismiss the declaratory judgment action and be done because you thought that Lincoln General would prevail on the declaratory judgment and Northland would owe Lincoln General everything back?

A. We had, I think, more than one discussion on that matter, and we just eventually kind of agreed to disagree.

Q. So, let's just try to summarize here, so we're not confused. August 10th, 2000. At that point, at least, it was your feeling that, number one, Lincoln General would prevail in a coverage dispute with Northland; is that correct?

MR. LIPSIUS: Object. That was not the witness' testimony.

BY MR. RUDD:

Q. Let me ask you this: As of August 10th, 2000, or sometime around there, before the Clifford case had been settled, was it your view that Lincoln General would prevail in a coverage dispute with Northland?

A. I think it was my view that we had an excellent chance of prevailing.

Q. Would you have conveyed that view on to Mr. Kirk?

A. Yes.

Q. Was one of the factors that you were considering that Lincoln General's downside, in terms of how much more it would have to pay out if it lost the coverage dispute, was very small compared to its upside if it prevailed?

A. I don't recall specifically if that was one of the-- That wouldn't be a part of my analysis as to whether or not we were going to win. That would be afterwards.

Q. Let me just ask you this: Were you aware that Lincoln General's policy limits were 750,000 and Northland's limits were 2 million?

A. Yes, I was aware of that.

Q. And you knew that Lincoln General would never have to pay more than 750,000; is that correct?

A. That's correct.

Q. But you knew that Northland could have to pay up to 2 million?

A. That is correct.

Q. As a lawyer did that factor at any time into your decision-making whether to go along with Northland's suggestion that you just drop the declaratory judgment action and be done with the case?

A. My recollection is that we were unwilling to consider dropping the declaratory judgment action at any time prior to the final settlement and resolution and release of all of the underlying claims. And my primary concern at that time was the issue of, if we could not get this settled

and went to trial because there were two people who had died in the accident leaving, I'm not sure how many, but a number of children, it was conceivable that the jury would award in excess of the policy, combined policy limits, the two and three-quarter million dollars, so that until everything underlying was settled, we weren't willing to do anything that might in any way jeopardize any defense or offensive action we might take if the jury award exceeded the limits and we were hit with a bad faith claim. And that included keeping the dec. action open, because that was going to decide whether we were in or not. That if we had won the dec. action and they had said, you know, you are not in at all; there was no coverage, then we would not have that problem in an excess verdict.

Q. It appears that Northland had suggested back in August of 2000, just basically dropping the coverage dispute between the two of you and settling the underlaying cases for each contributing one-half, but you were not in agreement with that?

A. To the best of my recollection, that is correct.

Q. When I say you, you would have communicated with

Tim Kirk, and Tim Kirk would have ultimately made that decision; is that correct?

A. That's correct.

Q. And you would have conveyed that back to Ms. Slane?

A. Correct.

Q. Well, actually, on August 10th, later on -- it doesn't give a time when she first talked to you, where it says, Talked to Mike at Lincoln General, but towards the bottom of the page it does say 3:40 p.m. on August 10th, Mike called. It says, They will go one-half up to the 1.25 million. They want to proceed with DJ. Are not interested in tendering the rest of their limits, period.

Is that a fair statement of what you would have communicated to Ms. Slane?

A. If that's what she says, yes.

Q. Would that have been information that you would have received from Tim Kirk?

A. Yes. It's something I would have discussed with Tim Kirk as to how to proceed.

Q. And Tim would have made the decision ultimately only to offer one-half up to 1.25 million?

A. That's correct.

Q. Now, I'd like you to, because I have some

questions involving conversations in November, but if you want to just go through Ms. Slane's notes from basically where we let off, August 10th, 2000, read the next couple of pages, I want you to have looked at those before I ask you the next question.

(Discussion held off the record)

MR. RUDD: Back on the record.

BY MR. RUDD:

Q. We had been talking about the conversation you had with Ms. Slane on August 10th, 2000. At that point you had said you wanted to proceed with declaratory judgment action.

Then if you jump over to November 20th-- Would you agree that it does not appear in the intervening time between August 10th up through November 20th, that there's any entry indicating that you had changed your view on proceeding with the declaratory judgment action?

A. That's correct.

Q. On November 20th, 2000, apparently, Ms. Slane had a conversation with Moira. It says in the middle of that entry, Told her I need to know when-- Let me back up a little bit and explain what she's talking about.

First of all, Said Lincoln General would be sending their checks direct to the Plaintiff. Told her I need to know when that is received so we can dismiss the declaratory judgment. She will let me know.

Do you have an explanation why Northland would be proceeding to dismiss the declaratory judgment in November 20th, 2000, when there had been no agreement by Lincoln General to go ahead and do that?

A. No.

Q. So, if Northland had proceeded to dismiss the declaratory judgment upon receipt or upon Lincoln General sending its settlement checks to the underlying Plaintiffs, you would have been surprised?

A. Yes.

Q. Is it fair to say that would have been contrary to your understanding and discussions with Ms. Slane, if she had gone ahead and dismissed the declaratory judgment?

A. Yes.

Q. If you look again on November 20th, 2000, apparently there was a later call with Moira, five minutes later than the previous call. Here

it indicates, Has telephoned -- has talked to Plaintiff office. They talked to Pipa last week and was somewhat upset that he had not received the checks from carrier. Would hold off in dismissing the declaratory judgment for right now since Lincoln General has not issued their checks.

Once again, is it fair to say that it was not your understanding and it was not your agreement to dismiss the declaratory judgment upon Lincoln General tendering the checks to the underlying Plaintiffs?

A. That is correct.

Q. It was not your intent to do that?

A. To the best of my recollection, no.

Q. I want to compare McGovern Exhibit #1, which was your activity sheet, Activity Log Sheet, with Exhibit #2, which is Northland's computerized claims diary. Your Activity Log Sheet indicates on February 15th, 2001 -- it says, Call Traci Slane. Left message.

A. Yes.

Q. If you look at Traci Slane's log, I think you'll agree with me there is no entry for February 15th, 2001; is that correct?

A. That is correct.

Q. You agree with me that other than saying, Left message, you don't recall what specific message you left for Ms. Slane; is that right?

A. It says, Call Northland. See if they want to just call it quits. Call Traci Slane. Left message.

So, I don't know exactly what I would have said in the message to her. I probably would have just said, Call me, but other than that, I don't know what the details of the message are.

Q. So, it's possible that the message on February 15th, 2001 to Traci Slane was simply to identify who was calling and asking her to call you back?

A. That's correct. I have no recollection.

Q. You are not testifying that you left a substantive message telling her why you were calling or what your proposal was?

A. That's correct. I can't recall one way or the other.

Q. What we do know is that Traci Slane did not record anything about February 15, 2001 and you leaving any substantive message; is that correct? In her diary?

A. That is correct.

Q. Now, your next entry is on March 12th, 2001; is that correct?

A. That is correct.

Q. It says, Return call to Traci Slane. Left message.

Once again, would you agree with me that Traci Slane has no entry indicating on March 12th that the two of you talked or that you left a message?

A. That's correct.

Q. And once again, is it fair to say that you can't tell us what you might have left in that message on March 12th, 2001?

A. Other than my name and a phone number, no.

Q. You're not telling us that on March 12th you left any substantive message about Lincoln General's proposal?

A. No. Since I don't know what I left, I don't recall.

Q. So, the first date that we know that you actually talked person-to-person with Traci Slane and just didn't leave a message is on April 2nd, 2001, about this subject of a possible settlement; is that correct?

A. Yes.

Q. And both of you do have notes as of April 2nd. Yours says, on your handwritten claims entry for April 2nd it says, Call from Traci Slane. Agreed we would both pull the plug.

Now, I want to compare that to Ms. Slane's entry and see what you recall about what she recollects or has put down, at least.

First of all, her entry says, Mike McGovern at Lincoln General called. Your entry says, Call from Traci Slane. Do you have a recollection of who called who?

A. No, but if I called somebody and they called me right back, or they called me and I called them right back, I wouldn't have done a lot of entries.

Q. All right. It says, Apparently you asked-- This is her notes. You asked if there was any interest in walking away. Told him we were interested, but needed their consent to dismiss the lawsuit. He will let his counsel know that will probably happen and call me to confirm once he talks to their accounting people.

Now, based on her entry, would you agree that there was no final decision made to settle the case on April 2nd, 2001, if you still needed to

talk to your accounting people?

MR. LIPSIUS: You are asking him to interpret or make a legal conclusion -- to that extent, I object -- and to interpret her notes. If he wants to answer it based on his notes, that's fine. I don't think he should conjecture as to her notes. But you're free to answer the question any way you please.

MR. RUDD: Let me break it down then.

BY MR. RUDD:

Q. First of all, would you disagree with her statement in her claims diary that you told her that you needed to talk to your accounting people?

A. I would have told her I had to talk to someone, but I'm not sure why I would have said our accounting people. That's the only thing here that mildly confuses me because I don't know for sure what they would have had to do with it.

Q. But you would have told her you had to talk to someone--

A. Yeah.

Q. --in authority above you?

A. Yeah.

Q. So, you would have made it clear on April 2nd

that you did not have the authority at that point in time to make a final decision that this case was going to be settled?

A. No. My recollection is that I had discussed this possibility with Mr. Kirk, and he had said to speak to them, and then find out what they said, and move from there.

Q. So, once you found out what they said, you were supposed to go back to Mr. Kirk with what they said; is that correct?

A. That would be my recollection, yes.

Q. And Mr. Kirk would make the final decision what to do at that point; is that correct?

A. That's correct.

Q. So, in terms of your note that says, Agreed we would both pull the plug, is it fair to say that there was no final agreement on April 2nd, 2001 that both sides would simply walk away from this case?

A. Not until there-- No. I think at that time what we envisioned was, again, written mutual releases which would be spelling out everything to everybody's satisfaction. At that point the releases would be executed and Mr. Kirk would have to execute it on behalf of Lincoln. Then

that would settle the matter.

Q. So, it was your view that until that happened, until Mr. Kirk signed the release on behalf of Lincoln General, this case was not formally settled?

A. That's correct.

Q. And similar to what I have been going through before in the background, did you view this similar to the discussions you had with Traci Slane about agreeing to arbitrate the coverage issue, where you had an agreement in principle, but eventually things broke down and you never had a final written agreement?

A. That's correct.

Q. Did you also view it similar to the Mulligan settlement, that even though the attorney had indicated acceptance of the offer, you didn't believe the Mulligan case was settled until you had that release in your hand?

A. That's correct.

Q. So, is it fair to say that although your note is short, where it says actually, Agreed we would both pull the plug, that was simply at that point a proposal you were going to then take back to Mr. Kirk and discuss?

A. I think that's a proposal I would have-- Before I spoke to her about something of that import, I would have spoken to Mr. Kirk about that, and he would have approved my approaching them. I wouldn't have approached them with that sort of proposal without first discussing it with him. I would have discussed it with him; he would have said, Contact them and get the written agreements, releases, so that we can review them, request any changes, and then execute them.

Q. Now, apparently, there was a subsequent exchange of messages. You have April 10th, Called Traci Slane. Left message. As Mr. Lipsius pointed out, her entry indicates April 11, 2001, Mike McGovern called. I assume this means left message on phone mail, LM on PM, I think it's fair to say.

It says, They are in agreement to walk away from DJ and close files.

Now, first of all, you would agree, again, that your message on April 10th, 2001 doesn't say specifically what you left in your message?

A. That's correct.

Q. And you have no independent recollection of what you left in your message?

A. No.
Q. And was there any way that Lincoln General recorded or kept track of the messages it left on other people's voice mail?
A. Not that I'm aware of, no.
Q. So, what we're going from in terms of what message you left is what Ms. Slane put down where it says, They are in agreement to walk away from DJ and close files?
A. Yeah.
Q. And this is also the same individual who earlier on, in November of 2000, told her attorney simply to dismiss the DJ once you paid the settlement funds; is that correct?
A. That's what her notes say. I'm not privy to her conversation.
Q. Despite that, it's your testimony you never agreed back in November of 2000 to dismiss the declaratory judgment action?
A. No.
Q. Then it says in her note on April 11, 2001, Called Mike at Lincoln General. Left message on phone mail asking him to have his counsel call Ira and agree to voluntarily dismiss this.
First of all, you don't have any record of

Ms. Slane even calling you back, do you?

A. No.

Q. Based on your prior entries, wouldn't you think you would have put an entry there if Ms. Slane had called you back and left that type of message?

A. I would say it would be most likely. I can't guarantee that I would have, but it would have been highly likely.

Q. Is it possible that the voice mail system at Lincoln General was such that she might have left this on someone else's message?

A. I can't speculate as to what she might have done. The voice mail system at Lincoln, at that time if you called and you were-- You called and then you hit the person's extension, and it put you to their phone, and then their phone would say -- you recorded your own message, and it would say, This is so-and-so; I can't come to the phone now, or whatever you put, please leave a message at the sound of the tone. I will return your call as soon as possible.

At least that's how mine was and how everybody I knew was. So, mine would have said, This is Michael McGovern.

Q. Ever have any malfunctions in the voice mail system where it was overloaded and you didn't get your messages?

A. I can't ever recall having that problem. I think it kicked out at like a hundred or so, and when somebody was off for a month or so at one time, that happened, but I never experienced that, to my knowledge.

Q. Ever have a situation where you accidentally deleted a voice mail?

A. I have occasionally done that, yes.

Q. Is it possible that you would have maybe skipped over a voice mail as you were cycling through your messages?

A. That's conceivable.

Q. So, you can't say sitting here today whether you received -- not whether the system received it, but whether you, yourself received that return message from Traci Slane indicating that you were to call Ira and have-- I'm sorry. That you were to have your counsel call Ira and agree to voluntarily dismiss this?

A. I can say that I have no recollection of that message. I have no recollection of having received that message. And, to my knowledge, the

first I knew that Mr. Lipsius was involved was when he called me about this deposition. I didn't remember his involvement before then.

Q. That was in December of 2001?

A. That's correct.

Q. Way after you left Lincoln General?

A. That's correct.

Q. So, as I understand it, the last contact you had that you recall with Traci Slane is that she was to send you documents indicating Northland's proposal which you were going to review with Mr. Kirk?

A. Yes. She could have sent a letter or she could have just sent-- Sometimes people just send a release, and say, If this is fine, sign it; if not, why don't you pencil in the changes and fax it back. But, yeah, I was waiting for something.

Q. Did you ever receive any type of document from Ms. Slane or anyone else at Northland, or their attorneys confirming this alleged settlement?

A. No. Not to my recollection, no.

Q. And as we talked before, when you had asked her for a letter back in May of 2000 to set forth Northland's proposal, she did, in fact, follow up five days later with a proposal setting forth

Northland's position? That was Exhibit #3; is that correct?

A. That's correct.

Q. Did you expect something similar this time confirming what you had talked about and setting forth Northland's proposal?

A. Yes. Well, I expected, as I say, either a letter or formal release or documents to dismiss the case spelling everything out.

Q. All right.

A. I expected to receive something in that form, so it could be reviewed.

Q. And it would have to be reviewed both by you from a legal standpoint and also by Mr. Kirk from whether he wanted to go through with it?

A. That's correct.

Q. Were you aware that on April 2nd, 2001, I sent you a letter indicating that the Court had ruled favorably to Lincoln General in the declaratory judgment action with regard to its motion on venue?

MR. LIPSIUS: Are you going to produce that letter? If you're referring to it and if you are asserting privilege, then it shouldn't be addressed. If you're not asserting privilege or

waiving the privilege, it should be provided.

A. I could say I don't recall the letter. If that makes it simple, I don't recall the letter.

BY MR. RUDD:

Q. Would you agree your notes don't indicate anywhere anything about the Court's decision in the declaratory judgment action as to the venue issue?

A. That's correct. If I had received a piece of paper and I had document, I didn't have to enter it into the notes. The notes were just phone conversations.

Q. So, somewhere probably in Lincoln General's file would be, if I sent you a letter, would be the letter and it would be stamped when it was received?

A. Yes.

Q. Assuming, and I think we can produce the letter later and counsel can proceed in that regard, but assuming that there was a turn of events between April 2nd, 2001 when you talked to Traci Slane and said you would talk to your accounting people -- which she said your accounting people; you said Mr. Kirk -- and April 10th or 11th, is it possible that Lincoln General might have

changed its position because of the result in the Court proceeding?

MR. LIPSIUS: Object. It's speculation, unless he knows something definitely.

A. I can't say. Anything is possible.

BY MR. RUDD:

Q. Did you believe that Lincoln General, and specifically Mr. Kirk, was free to change his view on Northland's proposal at any time prior to when he signed that release?

MR. LIPSIUS: Objection. That's a conclusion of law. You can answer the question, but you're asking the witness to have a conclusion of law.

MR. RUDD: I'm asking, did he believe at the time he was talking to Ms. Slane that Mr. Kirk was still free to change his mind on whether to agree to the proposals to settle the case.

MR. LIPSIUS: Same objection. It's a question of law, but he can answer the question.

A. My understanding was, with this as in any matter, that we had -- I don't know if it's the right term or not -- an agreement in principle, but that until the parties had executed a release that spelled out all of their rights, their responsibilities, their duties, et cetera, that

the settlement wasn't finalized; that when you reach an agreement in principle such as that, that when you receive a document in good faith, it encompasses the things that you envisioned the document would have encompassed, et cetera, and that you review it in that light, and you don't throw in things from left field; and whatever the document says, you either sign it, or if you say there's some misunderstanding here, then you don't sign it.

BY MR. RUDD:

Q. And you agree with me, Mr. McGovern, that based on your notes, based on Ms. Slane's notes, there was no detailed discussion about all the terms you would normally find in a settlement agreement; is that correct?

A. That is correct. It was just a general, you know, where everybody was kind of interested in putting this behind them; send me something to look it and maybe we can make it go away.

Q. Is one of the reasons you have a confirming letter or you have some document that memorializes the agreement is so that there's no confusion regarding what was discussed orally between all the people involved in the settlement

process?

A. That's correct.

Q. And Mr. Kirk hasn't been deposed yet, but is it possible that there was some confusion in your conversations with Mr. Kirk such that maybe the two of you have different recollections of what was said?

A. I guess it's possible.

Q. Is it fair to say that you wouldn't know a hundred percent whether Mr. Kirk was on the same page as you and had the same beliefs and views as you until he actually signed the document setting forth whatever Northland proposed?

A. That would be generally correct, yes.

Q. And at this point, you were obviously counsel to Lincoln General. Did you view your relationship like any outside counsel who goes back to the client and gets them to sign a document to make sure that the client has agreed with what the attorney might have communicated?

A. Exactly.

Q. And did you convey that to Ms. Slane that you did not have final authority to make any decisions whether to just drop the declaratory judgment case?

A. I'm not exactly sure what I said to Ms. Slane, except that we were interested in walking away, you know, everybody just go home and would she send me some sort of document to review.

Q. Do you recall why there would have been a change in your analysis or view of the case such that you personally would have changed your views on this case, where before you communicated to Ms. Slane that you had a very good case -- and I think you said that before in this deposition, that you thought you had a very good case -- to the point where now you would be proposing to simply walk away from the case?

A. Well, let me say that I always thought that Lincoln had a good chance of prevailing in this matter. My comments to Ms. Slane would have been obviously more strongly worded than that, because you don't show weakness at that point.

Above and beyond that, to the best of my recollections, the considerations involved were the expense and time of this litigation and whether we were going to end up co-primary in any event, and I don't recall what else would have been.

Q. So, there were some economic considerations about

the costs of this litigation. Would they be primarily Mr. Kirk's concern or would they be your concern as an attorney?

A. They would be my concern in the sense that I would have to convey to Mr. Kirk what I thought the economic costs of pursuing this would be to the company, and then he would make the decision.

Q. In terms of who instituted the thought of even walking away from this, do you know if that is something that you came up with on your own or was that something that you believe came to you from someone else?

A. I believe that's something I went and proposed to Mr. Kirk myself. I can't recall for sure, but that's my belief.

Q. So, you don't think it came from Mr. Kirk down to you in the first instance; it came from you up to Mr. Kirk?

A. I believe so.

Q. And the considerations you were looking at were not whether you would prevail on the merits, but how much it would cost to get to that point?

A. Yes. I wanted to make sure we weren't looking at a pirate victory here; that it would cost more than what we could recover, or it would cost

almost what we could recover, and that we would be spending all this time, et cetera, at it.

Q. But ultimately it was Mr. Kirk's decision whether he wanted to spend the funds to pursue a recovery of the money you paid out?

A. That's correct.

Q. Now, your notes don't indicate after April 2, 2001, that you did talk to anybody in accounting or Mr. Kirk; is that correct?

A. That's correct.

Q. Is it possible that you were waiting to talk to Mr. Kirk until you got the document that you thought Ms. Slane was sending to you?

A. That would be normal, yes.

Q. So, you're not testifying that between April 2, 2001 and April 10, 2001 when you left the message for Traci Slane, that you had talked to Mr. Kirk and he had gotten back to you on his position?

A. I had talked to Mr. Kirk before approaching Ms. Slane with this general let's walk away, and my recollection is he said, Contact them; see what they want to do; see if we can get some releases.

I had spoken to her. I probably went back and said, I have spoken to her; they are generally in agreement to, and then I would have

just waited.

Q. So, is it possible that the message you left on April 10th for Ms. Slane was asking her what was the status of her getting you the documents?

A. That is possible. I don't recall what it was.

Q. It could be anything?

A. It could be anything.

Q. You have no further entries of conversations with her?

A. No.

Q. She has no further entries of conversations with you?

A. No.

Q. So, as far as you were concerned, when you left Lincoln General, there had not been any formal settlement of this claim; it was still outstanding?

A. When the file left my hands, which would have been sometime in early June of 2001, and it was transferred, I think to Mr. Miller, at that point it was my belief or understanding that the matter wasn't settled, but that settlement papers were being drawn, were going to be negotiated, whatever, and that they would be forwarded and reviewed and appropriate changes would be made

and sent back.

I don't know what happened after it left my hands in early June of 2001.

Q. There are entries in Ms. Slane's log about conversations she had with Mr. Miller. You had no further conversations with Mr. Miller after you left Lincoln General?

A. No. Well, I had conversations with him, but not about this matter.

Q. Not about this matter?

A. No.

MR. RUDD: I believe that's all the questions I have. Thank you.

MR. LIPSIUS: I have a few questions for you. Not many.

EXAMINATION

BY MR. LIPSIUS:

Q. As of April 10th, was the only item left to do the exchange of releases and discontinuance, as far as you understood?

A. Generally, yes.

Q. Next, you were not counsel of record in the declaratory judgment action; is that correct?

A. That's correct.

Q. Mr. Rudd's firm was counsel of record; is that

correct?

A. That's correct.

Q. And you were speaking to Ms. Slane not as counsel on the declaratory judgment action; correct? You were not speaking to Ms. Slane as counsel in the declaratory judgment action; is that correct?

A. That's correct.

Q. And you were not speaking to Ms. Slane as counsel in the underlaying tort claims; is that correct?

A. That's correct.

Q. Did you consider yourself counsel in this case, in any of the cases?

I mean, you are an attorney, of course. I understand. But you understand the difference between being an attorney working for an insurance company negotiating settlements or doing some work and being counsel?

A. That's correct. No, I was not counsel.

Q. Now, if you were counsel for Lincoln General, would it have been appropriate to be speaking to Ms. Slane if Northland was represented by counsel?

A. Probably not. No.

Q. And you knew Northland was represented by, whether it be our firm, some firm in the

declaratory judgment; is that correct?

A. Correct.

Q. So, you were speaking as an employee or representative of Lincoln General to Ms. Slane, similar to her role as a claims supervisor?

A. That's correct.

Q. Now, in the issue of the arbitration discussions that had taken place a few years earlier which were brought up, in that instance, though there was an agreement in principle to arbitrate, what was going to be arbitrated was never agreed upon; is that correct?

A. That's correct. The scope of the arbitration. We agreed on some issues and then some issues we didn't agree on.

Q. Okay. So, there was never an agreement of what was going to be arbitrated.

In this instance, the only thing left to do was get the appropriate documents exchanged; correct?

A. Well, it was to get the documents, review them, and make sure they were appropriate. Yes.

Q. And in your mind, on April 2nd, you had had Mr. Kirk's authority to get this matter settled on a walk-away basis; correct?

A. I had Mr. Kirk's authority to request the documents for us to review, and if the documents were appropriate, it was my understanding that everybody would walk away, yes.

Q. What did you expect to be contained in those documents?

A. What did I expect to be contained in-- I expected that it would be a mutual release, that everyone would assume liability for their own legal fees, for their Court costs, et cetera, et cetera. They would waive all rights they had against the other party, and that that would end the matter and they would file the appropriate documents with the Court to discontinue the action.

Q. So, mutual general releases with each side assuming its own costs and expenses; is that correct?

A. Generally, yes.

Q. And that's something you've done before?

A. Yes.

Q. That's something that's done all the time in settling personal injury claims; correct?

A. Correct.

Q. It would be similar to settling any other

personal injury claim of getting mutual releases and discontinuing the action; correct?

A. Technically, I'm not sure it's the same as a personal injury claim, but the process is the same, yes.

Q. Were you involved in settling personal injury cases over your tenure at--

A. Yes.

Q. And generally if you agreed to pay a certain amount of money in settlement of a personal injury claim, subject to mutual releases and a discontinuance, was that something you considered yourself bound to abide by?

A. If they executed the release.

Q. Right.

A. In a timely manner.

Q. I have one other question here for you, and you may not be able to help me on it.

If you look at McGovern Exhibit #1, go to the third page from the back.

A. Okay.

Q. And you will see the last entry is February 14th, 2000.

A. Yes.

Q. And the next entry is August 3rd, 2000. Is it

possible there's a page or two missing here?

A. It's possible. I don't recall what transpired in the interim.

Q. Because I see in Ms. Slane's log, which is Exhibit #2, there are numerous phone conversations with you during that period, none of which have entries. I was just wondering if it's possible something is missing.

A. It's possible. It would depend on what our phone conversations were about.

Q. So, you didn't enter all your phone conversations?

A. I only entered any that I thought had any substance at all. As I recall, there were-- This case started right after the accident in 1995, and it went on forever. A lot of the problems involved were getting documentation from the Clifford's attorney, and even more so getting documentation from Cheryl Mulligan's attorney.

So, my recollection is there were long lulls when almost nothing happened in this case, and I would get phone calls from Ms. Slane, What's happening? Well, nothing's happening on our end; what's happening on your end? There's no reason to put it down. Or from Mr. Pipa. He would call

me the same way.

Q. I assume you're like all of us, some days you are better than others in keeping records of your telephone conversations? Would that be fair to say?

A. That would be very fair to say.

Q. There are some periods of time where I go-- Personally I could go months where I'm really chintzy in keeping my records and other times I'm very specific on it. Is that fair to say that you work that way?

A. I try not to go months, but there are periods of time when I go, yes.

Q. So, it's possible that not all phone conversations are in here; correct?

A. It's possible.

MR. LIPSIUS: I would ask counsel to recheck the records to see if there is a page missing, and if there is, we'd appreciate it being furnished. I don't want to burden Mr. McGovern, and I will try not to have to recall him, but if, in fact, there is a page missing that is at all critical toward these issues in this case, I will subject him to recall at that time, just because of the gap there. That is a time that seems like

it had a lot of activity.

MR. RUDD: We will check again. I mean, this is what I got, but I will check with the client again to see if they have something else.

MR. LIPSIUS: I understand that's what you have. I just wanted to leave it on the record that we may need to have you again, and I will try very hard not to, but I don't think that's going to impact here.

A. Can I put something on the record then?

MR. LIPSIUS: Sure.

A. I'll be glad to cooperate and work with you gentlemen if you need me again. That's not a problem. I just got dumped in my lap yesterday, I'm going to be doing a two and a half to three and a half week federal trial through most of the month of March in Williamsport. So, if you need me, I would appreciate it if you could do it--

MR. LIPSIUS: Sooner, rather than later?

A. If you can't do it by the middle of February, postpone it until the end of March, beginning of April because I've got my own issues at that point in time.

MR. LIPSIUS: Okay. And I have no further questions.

                              EXAMINATION

BY MR. RUDD:

Q. I want to clarify a couple of things. We are going to have a lot of different versions of what you said when we go over your transcript and argue this before the Judge.

But in terms of what needed to be done after either April 2nd or April 10th, you said you needed to exchange releases and execute them; right?

A. Yes.

Q. Part of that process of what needed to be done was Mr. Kirk had to approve that release as proposed by Northland; is that right?

A. He had to sign it, yes.

Q. He had to approve it, too?

A. Yes.

Q. In terms of the terms that you expected when you went through those with Mr. Lipsius, none of those terms were communicated to Ms. Slane; is that correct?

A. My recollection of my conversation with Ms. Slane is simply that I said, We're generally interested in walking away from this. Are you? And her response in the end was yes.

And I said, Draw up the documents, draw up the papers, send me a letter, whatever, so that I have something concrete that I can review with my client, and if we have any questions, we will get back to you.

Q. Okay. That answered it.

You didn't convey your expectations? I mean, internally, as a lawyer, you have certain expectations that you wanted to make sure that she put down in the agreement?

A. Yeah. I wanted to make sure that-- My goal was to make sure that when the releases were signed, everything was done and we wouldn't be litigating this matter like you guys are now.

That was why I wanted everything in writing. That's why I always insisted on everything in writing. It just makes it simpler in the end.

Q. Now, you had also discussed about execution of releases in a timely manner. You put the timely in there.

Was it your understanding that if Northland was willing to still go forward with this, they would send you mutual releases within the next-- Well, let me ask you: What period of time did you expect these documents to be sent?

A. I don't know that I had an expectation of any specific period of time. I generally would have worked under the assumption that I would have received them within 30 to 60 days, and that in the interim, other than doing things that might be absolutely required by the Court because of deadlines, that litigation on the matter stops because you want don't want to incur any more expense. Everybody goes sort of on cruise control, and if necessary, informs the Judge, hey, can we get a little extension of time here; we are nearing a settlement, whatever.

And, as I say, I would say I usually expect it within 30 days, and if it took 60 because it was an incredibly complicated matter or one of the other attorneys was in trial -- being an attorney myself, I can understand that there are fires that need to be put out, and if this matter is going to be settled, it's not really a fire, so it may take longer.

Q. But in terms of-- Let me break down some of your answers and ask you questions.

Number one, as a litigator, has it been your practice that if you do have a case that's settled that's pending before a Court, you notify

the Court right away of the settlement?

A. That depends on--

Q. Federal Court, at least?

A. Even in a Federal Court, with me, that depends on where you are at in the matter. If there are no Court deadlines for 90 days down the road and you think you are going to have the documents in 30 days, so if something goes wrong, you still have lots of time to do what you're going to do, then I personally don't notify the Court, because just in my experience, once you have told the Court that you may have reached a settlement, whatever, then the Court latches onto that and just keeps beating you up to settle, even though you may find that you can't.

I mean, there are just too many variables to say what I would do in any given case.

Q. Once you have reached a final settlement, though, you do at some point notify the Court; is that correct?

A. Once you've executed the documents, certainly, you let them know right away.

Q. The record will speak for itself, but obviously, there were no documents sent within 30 or 60 days, or within 180 days. Would that affect your

view on whether this was a timely sending of a release? The release has never been proposed to today.

A. Well, let me say that this file passed out of my hands sometime in May, so I don't know what happened after that. But I would certainly think that, as I say, 30 to 60 days is a generous amount of time, and if no documents have been sent in that amount of time, again, 180 days, whatever, I would think there was a serious question as to whether or not there was any activity, you know, as to whether the matter was still settled in principle or not.

Depends on what the parties-- My understanding as an attorney, it also depends on what the parties are doing in the interim, that you can-- If I make an offer, it's basic contract law. You can orally accept the offer and comply with the terms; in this case that being supplying a release. You can reject the offer by saying no, or you can reject the offer by doing something that is contrary -- that would be generally accepted as contrary to the party's understanding as how you would act if there had been an acceptance of the offer.

Q. So, it would be fair to say it would be contrary to your understanding of what you discussed with Ms. Slane if they did not send proposed mutual releases within 30 to 60 days?

A. That would be fair to say.

Q. From your standpoint did you feel that Northland had the right to not go through with a settlement and not send you mutual releases?

A. Yes.

Q. So, it's your feeling that Northland wasn't bound to walk away with this; and that if Ms. Slane went back to somebody and they decided, no, we don't want to walk away with it, they were free to drop the issue and go ahead with their declaratory judgment action?

A. Before something was signed, yes.

MR. RUDD: That's all I have.

EXAMINATION

BY MR. LIPSIUS:

Q. Is that last comment a legal conclusion of yours?

A. That was a legal conclusion of mine. I thought he was asking me a legal question, so I guess that is objectionable.

It's also my personal feeling, based on my experience as an attorney, which I guess colors

everything.

EXAMINATION

BY MR. RUDD:

Q. Now, I want to clarify that, because you were involved as a lawyer and as an individual.

Your personal view, is there any reason that your personal view, that Northland would be able to walk away from this and continue with the action, would not be accurate in this case where you were dealing with Ms. Slane? Was there anything said by either of you which would change that general personal view of yours?

A. No.

MR. RUDD: That's all I have.

EXAMINATION

BY MR. LIPSIUS:

Q. Do you know of any of the facts that transpired after you left the company?

A. No.

Q. So, you would not know if there was any other extenuating events or discussion as to the settlement?

A. I have no idea. As I say, when I left the company, I expected that they were going to be receiving documents soon. And when you called me

was the first I knew that that hadn't happened.

Q. So, there could have been extenuating events that you were not aware of that would mean that Northland had not abandoned the settlement; correct? There could have been?

A. There could have been. Certainly, yes.

Q. You just don't know?

A. I don't have any idea.

MR. LIPSIUS: Thank you. No further questions.

MR. RUDD: I'm done.

(The deposition concluded at 12:30 p.m.)

COMMONWEALTH OF PENNSYLVANIA )
) ss.
COUNTY OF LANCASTER )

I, Therese M. Valente, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Lancaster, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

MICHAEL J. McGOVERN, ESQ.

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Gap, Pennsylvania this 17th day of January, 2002.

NOTARIAL SEAL
THERESE M. VALENTE, Notary Public
Salisbury Twp., Lancaster County
My Commission Expires Dec. 13, 2003

Therese M. Valente
Therese M. Valente
Reporter - Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

# LAWYER'S NOTES

| PAGE | LINE | |
|---|---|---|

# ACTIVITY LOG SHEET

CLAIM NO: 39737 POLICYHOLDER: JHM ENTERPRISES ADJUSTER:

| TIME | DATE | INITIALS | NOTES |
|---|---|---|---|
| | 11/17/95 | RD | SET UP AC FEATURE FOR $10,000 FOR 15 |
| | | | AD FEATURE FOR $10,000 FOR 9 |
| | | | AL FEATURE FOR $50,000 FOR 9 |
| | | | AL FEATURE FOR $50,000 FOR 9 |
| | 11/21 | MJM | Call Jay McCormick (717) 323-3148 |
| | 11/22 | MJM | Call Greg McCormick - leave message 12:57 pm |
| | | | Return call to Jerry Parker - Northland Ins |
| | | | 800-328-5972 left voice mail message |
| | | | 9:46 am ext 4191 |
| | | | Call from Jerry Parker - they were Woolever Bros' Trans - |
| | | | Northland Ins Co. |
| | | | PO Box 64816 |
| | | | St Paul MN 55164 |
| | | | Their Claim # TF 209197 |
| | | | They have a $2 million single limit - Truck and Tractor is not on their policy. Doesn't know if they have filings |
| | 12/05 | MJM | Return call to R. Scott Dennis Progressive Ins. |
| | | | (717) 455-9000 Their Claim # 95063392 |
| | | | left message 1:15 pm |
| | 12/06 | MJM | Call from Scott Dennis - he has UIM. |
| | | | Call Jerry Parker - Northland |
| | | | Return call to Scott at Progressive 717-394-4780 |
| | 01/04 | MJM | |
| | 07/23 | MJM | |

DMS
Actlog.frm

McGovern
DEPOSITION EXHIBIT # 1
1-9-02 TAV

# ACTIVITY LOG SHEET

| CLAIM NO: | | POLICYHOLDER: | ADJUSTER: |
|---|---|---|---|
| F[illegible] | DATE | INITIALS | NOTES |
| | 12/17/96 | KMM | file review. OK on reserve (discussed coverage issue w/ RSK - understand it's a policy limits case if we lose dispute w/ Northland). |
| | 10/20 98 | MJM | Call from Rush Township insurance |
| | 05/10 98 | MJM | |
| | 07/15 98 | MJM | |

DMS
actlog.frm

# ACTIVITY LOG SHEET

CLAIM NO: POLICYHOLDER: J. H. ADJUSTER:

| NUMBER | DATE | INITIALS | NOTES |
|---|---|---|---|
| | 07/21/96 | [illegible] | |
| | 10/12/99 | [illegible] | |
| | 10/15/99 | [illegible] | |

CMS

# ACTIVITY LOG SHEET

| CLAIM NO: | POLICYHOLDER: | ADJUSTER: |
|---|---|---|

| FEATURE | DATE | INITIALS | NOTES |
|---|---|---|---|
| | 10/15/99 | [illegible] | |
| | 10/29/99 | [illegible] | |
| | 11/10/99 | [illegible] | |
| | 12/21/99 | [illegible] | |
| | 12/23/99 | [illegible] | |
| | 01/07/00 | [illegible] | |

DMS

01/04/2002 16:02 FAX 7172375300 McNees Wallace & Nurick 008/010

ACTIVITY LOG SHEET

CLAIM NO: POLICYHOLDER: ADJUSTER:

| FEATURE | DATE | INITIALS | NOTES |
|---|---|---|---|
| | 01/11 | [illegible] | |
| | 01/19 00 | [illegible] | |
| | 01/22 00 | [illegible] | |
| | 02/02 00 | [illegible] | Round table - File Dec Action JH |
| | 02/05 00 | [illegible] | |
| | 02/11 00 | [illegible] | |
| | 02/14 00 | [illegible] | |

CMS

01/04/2002 16:05 FAX 7172575500 McNees Wallace & Nurick 009/010

CLAIM NO: POLICYHOLDER: ADJUSTER:

| ADJUSTER | DATE | INITIALS | NOTES |
|---|---|---|---|
| | 08/03/00 | [illegible] | Call from Tracy Slane @ Northland. TIs now @ $1,287,500 → $1M + $287,500 delay damages. Agreed most of the delay was TIs fault. Agreed we should offer to split the difference. $1,143,750 Take it or leave it. |
| | 08/10/(2) | [illegible] | Return call to Tracy Slane - 651-688-4746 left message. Call from Tracy Slane TI's rejected offer. She wants to go to $1,250,000. Agreed |
| | 08/29 | [illegible] | Call from Mike Pipa. Settled for $1,225,000. Northland & LGIC 50/50 |
| | 11/20 | [illegible] | Call from Nan - Mike Pipas Secy - re settlement checks. Told her checks would be issued when we got TIs attorneys Tax ID # called TIs atty - faxed W-9 to TIs atty |
| | 02/15 | [illegible] | |
| | | | Call Northland. see if they want to just call it quits. Call Tracy Slane left message |

CMS

CLAIM NO: POLICYHOLDER: ADJUSTER:

| INITIALS | DATE | MINUTES | NOTES |
|---|---|---|---|
| | 03/12 | | Return call to Tracy Stone . left message |
| | 04/02 | | Call from Tracy Stone agreed we would both pull the plug. |
| | 04/10 | | call Tracy Stone - left message |

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 1
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy.: 21 TF209197 000002 Print all claim file notes entered

## Date:11/20/1995 Entered By: GCRECELI Subject:GN #

I STARTED THIS LOSS LATE FRI THE 17TH. FOR JERRY TOMORROW. (OUT OF OFFICE). I SPOKE WITH THE DRIVER. GOOD IMPRESSION: UPSET AND CONCERNED. CLEAR LIAB: UNABLE TO GET STOPPED FOR A QUICK LIGHT AND REAR-ENDED OV1 INTO OV2. OV2 SAID NOT HURT. 2 WOMEN IN OV1 HURT--- BOTH FATALLY? I ALSO DISCUSSED AT LENGTH WITH LESSOR AND N. INSD. LESSOR HAS HIS OWN INSURANCE AND THE LOAD DRIVER WAS AFTER NOT INSD LOAD. THERE IS A PERMANENT LEASE, HOWEVER. SEE NOTES.

## Date:11/27/1995 Entered By: JPARKER Subject:GN #

see file for full details. appears as our policy stands, we have no coverage. (symbol 43, and tractor and trailer not owned.) agent now saying he should have written on a symbol 47, but it was not written on that basis. the vehicle had just delivered a load for the insure d and was dispatched to get another load not in the insd business. owner has 750,000 plicy of his own.

## Date:11/27/1995 Entered By: JPARKER Subject:DI #

Set diary of 12/27/95 - initial report due

## Date:12/11/1995 Entered By: JPARKER Subject:RS #

Set initial reserve for $ 500.00 for claimant #005
... CLIFFORD, ROBERT CVG: C.S.L. Liability (B.I. & P.D.)

## Date:12/11/1995 Entered By: JPARKER Subject:RS #

Set initial reserve for $ 500.00 for claimant #006
... MULLIGAN, CHERYL CVG: C.S.L. Liability (B.I. & P.D.)

## Date:12/11/1995 Entered By: JPARKER Subject:RS #

Set initial reserve for $ 3000.00 for claimant #004
... MULLIGAN, CHERYL CVG: C.S.L. Liability (B.I. & P.D.)

## Date:12/11/1995 Entered By: JPARKER Subject:RS #

Set initial reserve for $ 123000.00 for claimant #002
... CLIFFORD, ROBERT CVG: C.S.L. Liability (B.I. & P.D.)

## Date:12/11/1995 Entered By: JPARKER Subject:RS #

Set initial reserve for $ 123000.00 for claimant #003
... CLIFFORD, KAREN CVG: C.S.L. Liability (B.I. & P.D.)

## Date:12/11/1995 Entered By: JPARKER Subject:RC #

Completed...C/A Large Claim Report - Liab

McGovern
DEPOSITION EXHIBIT # 2
1-9-02 TmV

Policy : 21 TF209197 000002 Print all claim file notes entered

Date:12/13/1995 Entered By: GCRECELI Subject:GN #

BEGIN OVERRIDE: OWNED AUTO POLICY. TRUCK DRIVER JUST COMPLETED A LEASE TRIP FOR INSD.--GOING AFTER LOAD FOR LESSOR. CORRECTED LEASE SENT.

## Date:12/27/1995 Entered By: JPARKER Subject:GN #

letter of rep recd from atty, i have explained our position and have had no response to date. still waiting on policy to copy, underwirting working on it .. i have requested from maryanne k.

## Date:12/27/1995 Entered By: JPARKER Subject:DI #

Set diary of 01/26/96 - policy exchanged with lincoln general

## Date: 1/29/1996 Entered By: JPARKER Subject:GN #

i have advised atty we feel insured not involved in this. no response to date.

## Date: 2/27/1996 Entered By: JPARKER Subject:GN #

still no activity to speak of, lincoln general has advised that they disagree with our decision. i have had no response from the atty rep the deceased yet.

## Date: 2/27/1996 Entered By: JPARKER Subject:DI #

Set diary of 03/11/96 -
update reinsurers

## Date: 3/19/1996 Entered By: JPARKER Subject:DI #

Set diary of 04/18/96 -
update reinsurers 5-96

## Date: 4/11/1996 Entered By: JPARKER Subject:GN #

tto agent, suit recd today, he is going to fax it to me

## Date: 4/11/1996 Entered By: JPARKER Subject:DI #

Set diary of 04/12/96 -
update reinsurers 5-96

## Date: 4/12/1996 Entered By: JPARKER Subject:DI #

Set diary of 04/15/96 - suit recd?
update reinsurers 5-96

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 3
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy.: 21 TF209197 000002 Print all claim file notes entered

## Date: 4/15/1996 Entered By: JPARKER Subject:GN #

Message to: JPARKER Message from: GCRECELI
LET'S JUST SEND A SIMPLE LETTER ACKNOWLEDGING RECEIPT OF SUIT, GIVIN THEM LOU'S NAME, AND SAYING THAT ALL COVERAGE DEFENSES PREVIOUSLY LISTED REMAIN, AND WE WILL ADVISE THEM FURTHER AFTER REVIEWING COMPLAINT.
*
GAIL, I TTO LOU BRICKLIN. HE SAID IT IS POSSIBLE TO FILE A LAWSUIT WITH JUST A SUMMONS. HOWEVER THEY CANNOT DEFAULT WITH OUT A COMPLAIN HE WAS GOING TO GO AHEAD AND FORCE PLAINTIFF TO FILE A COMPLAINT AND I WILL GIVE TO YOU WHEN RECD. SHOULD I HOLD OFF ON RES OF RIGHTS UNT WE SEE THE ALLEGATIONS, OR SIMPLY REITERATE MY EARLIER ONE?

## Date: 5/29/1996 Entered By: JPARKER Subject:GN #

waiting on plaintiff to file petition, once that recd, we can better analyze coverage position.

## Date: 6/25/1996 Entered By: JPARKER Subject:GN #

petition filed , see file for full review of same.

## Date: 7/23/1996 Entered By: JPARKER Subject:GN #

see file for full details. counsel for jhm has joined 3 addl parties in allegation that traffic light was bad. will diary 30 days and do follow up review with m.d., g.c. and l.c. as there have been some developments. waiting on ira's thoughts on d.j. and also for everyone to return from vacation.

## Date: 8/30/1996 Entered By: JPARKER Subject:DI #

Set diary of 09/30/96 - review with larry colburn

## Date:11/08/1996 Entered By: JPARKER Subject:GN #

i tto lou bricklin, he has not tto ira yet, will do so and get me his opinion soon. called insured and updated.

## Date:12/11/1996 Entered By: JPARKER Subject:GN #

[redacted]

## Date: 1/13/1997 Entered By: JPARKER Subject:DI #

Set diary of 01/20/97 - FEEDBACK FROM IRA AND BRICKLIN

## Date: 2/05/1997 Entered By: JPARKER Subject:GN #

REQUESTED EVAL FROM BRICKLIN AND IRA L.

Page 3

000004

Policy.: 21 TF209197 000002 Print all claim file notes entered

## Date: 4/10/1997 Entered By: JPARKER Subject:DI #

Set diary of 06/09/97 -
DEPO SUMMARIES

## Date: 5/12/1997 Entered By: JPARKER Subject:GN #

recd eval from counsel, they rec we take some depos and then move for summary judgment. i okayed that, but one delay is that statts the driver has ongoing criminal charges pending and cannot testify until that is resolved. they do expect it may be worked out shortly

## Date:10/13/1997 Entered By: JPARKER Subject:GN #

statts has now worked out plea, so depos to go forward shortly, as soon as we rec. that, lou bricklin will give me his eval. i will update following that

## Date:10/29/1997 Entered By: JPARKER Subject:DI #

Set diary of 11/05/97 -
DEPO SUMMARIES

## Date:10/29/1997 Entered By: JPARKER Subject:GN #

DEF COUNSEL MET WITH INSD, THEY NOW ADMIT TO ALTERING THE LEASE AFTER THE ACCIDENT, OUR EXPOSURE GREATLY INCREASED HERE.

## Date:11/12/1997 Entered By: JPARKER Subject:GN #

REVIEWED WITH MD AND GC, I WILL REVIEW DEPOS, AND LIKELY PROCEED WITH MSJ ON AGENCY. WILL REVIEW COUNSEL'S EVAL ON DAMAGES

## Date:11/19/1997 Entered By: JPARKER Subject:GN #

discussed with bob dols, i updated him on this and indicated to him we will be looking at the reserve as soon as eval. recd from counsel i will let him know what we decide to do.

## Date: 2/06/1998 Entered By: JPARKER Subject:GN #

RECD EVAL. FROM LOU BRICKLIN, HE PUTS VALUE AT 750-900 WITHOUT REGAR D TO ANY PUUNITIVE DAMAGES. NO DEMAND FROM PLAINTIFF YET.

## Date: 2/17/1998 Entered By: JPARKER Subject:DI #

Set diary of 03/19/98 - COUNSEL REPORT, REVIEW RESERVE

## Date: 7/02/1998 Entered By: JPARKER Subject:GN #

PLAINTIFF NOW IDNICATES HE WOULD LIKELY TAKE 2 MILLION TO SETTLE ALL

CLAIMS. WE WILL HAVE TO WAIT FOR LINCOLN TO TENDER THEIR POLICY, AND THEN SEE IF WE CAN GET A SUITABLE POT TOGETHER WITH ALL DEF. AND GET THESE SETTLED

## Date: 2/09/1999 Entered By: JPARKER Subject:GN #

lincoln wants us to split any offer on a pro-rata basis, and then arbitrate or litigate the coverage issue. i have refused, as we clearly have coverage excess to theirs. i have asked several times for them to justify their position, but they will not. in fact their counsel told lou bricklin, he agreed with our position, i have indicated we will wait until they have exhausted their 750,000.

## Date: 4/28/1999 Entered By: JPARKER Subject:DI #

Set diary of 05/28/99 - ira's rec.
UPDATE INSD

## Date:11/01/1999 Entered By: TSLANE Subject:GN #

reviewed file
1030am called counsel, lou--lmtc

## Date:11/01/1999 Entered By: TSLANE Subject:GN #

1110am ret counsel call, lou 215-665-3400 -- lmtc

## Date:11/01/1999 Entered By: TSLANE Subject:GN #

240pm ret counsel call, lou-lmtc on pm

## Date:11/01/1999 Entered By: TSLANE Subject:GN #

340pm counsel called, lou -
he just sent ltr out over the weekend
have been asking lincoln to tender their limits for quite some time
law is clear that they should go first but lincoln has refused & wil
l not tell us why
pltf atny is moving to get the case set for trial-should get trial
date in the next couple months
we have sent them our legal reasoning -lincoln atny is telling us
that he agrees w/us but cannot get lincoln to commit
said he has just dictated on the damages issues
he is going to round table w/3-4 of the senior atny to get # on this
but he feels that case worth around 900-1.25 mil but wants to get
some input
has also asked lincoln counsel to give us their eval of damages
he will get out to me the summary of the damages in couple days &
let me know once they roundtable
mulligan depo was taken yr ago & no one noticed us but there was 5
defendants there -- said there is nothing in file -- he got the
transcript of the depo & now has gotten demand of specials from

000006

mulligans atny -- from quick review he has done so far it appears that she might have had surg - needs to go through it more thoroughly but thinks we might need an ime & do some more invest but will get that out w/ltr also
said his last conversation w/jp was to discuss that we prob need to get case resolved & not let the issue btwn us & lincoln allow the case to be tried & to get arrangement worked out w/lincoln & get case settled
said juries are all over the board on conscious pn & suff claims but usu bring big money
pltf formal demand 4mil but thinks settle for 2-3
not sure that his # would settle the case but he really does not see jury in that cty giving more than million for this case--both wd cases together

## Date:11/04/1999 Entered By: TSLANE Subject:GN #

125pm called counsel, lou-
lm on pm - told him wanted to clarify for now we want to put pressure on lincoln to tender their limits since we think they is prim not interested in 50/50 at the present time but if trial set & getting close then we may need to consider it but for rt now still feel very strongly that lincoln primary & they have not prov any proof to the contrary

## Date:11/08/1999 Entered By: TSLANE Subject:GN #

called bob dols --
updated him on coverage & damages - indicated we would be bumping reserves - not happy thought lincoln gen had accepted prim cov & explained even if they had value of cases w/conscious pn & suffering that the values would exceed their cov
wants to know when we bump the reserves

## Date:11/11/1999 Entered By: TSLANE Subject:GN #

Message to: JPARKER Message from: TSLANE

## Date:11/24/1999 Entered By: TSLANE Subject:GN #

recd detail eval of case for settlement --see file for details
counsel has asked pipa if we should subpeona the school recs of the 6 kids to determine how long they actually lived w/the cliffords as that is not clear in the depos

## Date:11/29/1999 Entered By: TSLANE Subject:GN #

did reserve analysis - total increase of $600,000
$400,000 on wrongful death claims & $200,000 on mulligan
sent ltr to reins & ga notifying of reserve increase
...recd fax from counsel -
case has been removed from trial calendar due to addtl discovery

needed on mulligan case -- will not be recert for trial until case ready to be tried

## Date:11/29/1999 Entered By: TSLANE Subject:GN #

140pm called counsel, lou-lmtc

## Date:11/29/1999 Entered By: TSLANE Subject:RC #

Completed...C/A Large Claim Report - Liab

## Date:11/30/1999 Entered By: TSLANE Subject:GN #

415PM RET COUNSEL CALL, MOIRA --
EVERYONE ORIGINALLY FELT MULLIGAN CLAIM WAS SMALL & NO ONE UPDATED THEM & LET THEM KNOW THAT SHE HAD HAD SURG
SHE HAS COMMITTEE W/2 OTHER ATNY IN OFFICE - HER CLAIM IS SUBJECTIVE
THEY THINK IT IS SIG CLAIM --- HAVE TALKED AMONGST THEMSELVES BUT DO NOT HAVE PLTF EXP REPORT - THEY EXPECTED TO HAVE REPORT BY NOW
HAS SENT FU LTR ASKING FOR IT
UNCLEAR HOW THE VOC WILL EVAL HER CLAIM - PAST & FUTURE WL TO DATE COULD BE 200-250K
MULLIGAN WAS VERY ACTIVE PRIOR TO THE AX - NOW SHE IS NOT
HAS TT PLTF ATNY RE: DEMAND BUT IS NOT AUTH TO MAKE DEMAND UNTIL EXP REPORT IS IN BUT OFF THE RECORD SAID SOMETHING ABOUT 150K
SHE HAS LOST LOT OF TIME OVER LAST YR FROM WORK & NOT EVEN SURE WHERE SHE IS WORKING AT THIS TIME
IF WE CANNOT SETTLE THEN NEED TO GET IME & POSS VOC REHAB TO REBUT THE PLTF
GOING TO BE HARD FOR PLTF TO ARGUE SHE CAN WORK 35 HR BUT NOT 45 HRS
TOLD HER ONCE HAD EXP REPORT TO LET ME KNOW - WE HOPEFULLY WILL HAVE DEMAND THEN & CAN DECIDE WHERE TO GO FROM THERE

## Date:12/02/1999 Entered By: TSLANE Subject:GN #

355pm called counsel, ira -- ext 202 -- lmtc on pm

## Date:12/03/1999 Entered By: TSLANE Subject:GN #

830am [redacted] --

000008

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 8
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy.: 21 TF209197 000002 Print all claim file notes entered

## Date:12/14/1999 Entered By: TSLANE Subject:GN #

recd fax from counsel - pltf atny for wd cases very anxious to settle -- pltf atny upset that trial has been postponed indef
he also mentioned delay damages-they are attainable 1 yr after suit filed & if no offer made w/in 25% of jury verdict then pltf can get delay damages & interest has been running at 8.25%
have new exp report on conscious pn & suffering - no new info

## Date:12/14/1999 Entered By: TSLANE Subject:GN #

850am called counsel, lou --
he did not get sense from pipa either way if they are willing to go first as pltf atny alluded to
he thinks that since lincoln general looking at these cases as 1.2-1.5 mill cases that they prob figure their money is gone esp given the mulligan case
told him i want commitment from lincoln as to what they are willing to do & see if they will tender their money & then we can decide if we want to add anything
told him i felt if we could get these cases settled for 1 mil or less we should & he said if that is poss then we should jump at it
said we have tried in past to get lincoln to put money on table but will see what happens now - they may be motivated to settle now esp given the fact their limits are gone
he will call pipa & let me know
said pltf atny still talking about the jury appeal & the brady bunch factor -- demand from pltf now 2 mil but if can get settled soon thinks he can get his clients to take sub less

Page 8

000009

Policy.: 21 TF209197 000002 Print all claim file notes entered

## Date:12/21/1999 Entered By: TSLANE Subject:GN #

210pm called counsel, lou-
has ltr coming out to me
has lm for pipa w/respect to settlement issue -- he wants to know if
northland will arb if the settlement does not exceed 1.5 mil
pipa responded w/they would put their 750 first if we agreed to arb
the primacy issue if the cases settle for less than 1.5 -- told him
we would agree to that bc i think moot issue
got voc exp report from atny kwak on mulligan -- is sending me copy
they project well over 1 mill dollars - there are 3 components --
wage loss for wage diff from 70 hrs to 40 hrs now -- over work life
exp & 2) if someone mildly disabled the stat show the work life exp
less -- she is going to work # of yrs less -- thinks it is 10 yrs
which is a large component
3) loss of value of household serv - does not maintain the house
anymore
comes up w/very large # -- will have to get our own econ to rebut
bc there are many areas to poke holes w/him
told him to go ahead & hire the econ on mulligan
he will call pipa asap & then get an offer on the table to pltf atny
to see if they can get this resolved

## Date:12/28/1999 Entered By: TSLANE Subject:GN #

845am ret lou call -
he has traded messages w/pipa
they will agree to tender their 750k if we agree in writing to arb
if all claims settle under 1.5 mil & w/in 60 days of underlying
claims being resolved - agreed that was fine & he will get ltr out
getting calls every couple days from pltf atny so serious in settlin
g -- discussed proper starting point to get where we want to settle
the case at -- will think about it & once has generals 750k we will
begin the neg
he is thinking 800-850k opening offer

## Date: 1/04/2000 Entered By: TSLANE Subject:GN #

recd econ report on mulligan
econ projects long term loss of earning capacity btwn 665k & 978k
depending on diff assumptions
loss of household serv addtl valued at $143k
there are many assumptions that we can take issue w/. ie that she
would have worked 54hrs/wk until she retired, etc
could also make argument that since she is around the house more the
re is no household serv claim

## Date: 1/04/2000 Entered By: TSLANE Subject:GN #

840am ret def counsel call, moira -- lmtc



Date: 1/04/2000 Entered By: TSLANE Subject:GN #

925am def counsel called, moira -
THEY USU USE IRENE MENDOLSEN FOR THEIR ECON BUT IS GOINGTO CK W/LOU & THEN GET IT SET UP BC THEY HAD TALKED ABOUT GETTING ECON CLOSER TO VENUE BUT IRENE IS VERY QUALIFIED
SHE WILL GET MOVING ON THAT & ALSO GET REQUESTS OUT TO UPDATE MEDS SINCE PLTF ATNY NOT COOPERATING OR GETTING US DEMAND
TOLD HER I FELT WE HAD TO MOVE AHEAD AS THOUGH WE ARE GOING TO TRY IT BC PLTF ATNY IS NOT GOING TO GIVE REALISTIC DEMAND BASED ON THE ECON REPORT HE PROD

## Date: 1/05/2000 Entered By: TSLANE Subject:GN #

counsel called, moira -- lm on pm
using jason walker as voc rehab exp & comes highly recom
also getting ime set up - william tribola & has used him b4
does not feel we can rely on pltf atny re: mulligan residuals

## Date: 1/05/2000 Entered By: TSLANE Subject:GN #

1110am ret counsel call, moira -
we have lincoln's 750k -- we have the auth to neg now so thought we should get offer out
told her not comfortable making offer on mulligan yet - not enough info
told her to go ahead & make offer 825k - both mulligan cases & they can make the apportionment -- told them at some time i might call the pltf atny directly but wanted them to make opening offer & see what happens

## Date: 1/13/2000 Entered By: TSLANE Subject:GN #

recd cv on dr walker who is the voc exp for this case

## Date: 1/13/2000 Entered By: TSLANE Subject:GN #

she had faxed ltr whether northland is willing to agree to arb whether its policy may be primary as opposed to concurrent or excess
indicates they cannot commit to change until have auth from us

## Date: 1/13/2000 Entered By: TSLANE Subject:GN #

1015am called counsel, moira -
told her i did not have a prob arb if we were primary as opposed to concurrent or excess -- seemed like that was what we had agreed to
she will get ball rolling on that
got some new med bills from pltf on mulligan -- there is ltr from short term disability carrier indicating it was her last ck bc the dr had cert to rtw full time as rn
she is subpeoning the meds on that bc that med report was not to pltf voc rehab exp

000011

said after we get updated meds may want to consider redeposing pltf to update status

## Date: 1/13/2000 Entered By: TSLANE Subject:GN #

discussed w/jp --
do not want to arb that we are prim & lincoln is excess bc we have 2 mil dollar policy & if we get bad result then we would owe entire loss & we know that lincoln is prim
will agree to arb whether we are concurrent or excess
will not arb primacy issue unless lincoln agrees they are prim
if they want to argue we are prim then file dec
ok to agree to resolve underlying case & litigate the cov issue on prim but not arb
will not agree to arb primacy issue if lincoln does not agree they are primary

## Date: 1/13/2000 Entered By: TSLANE Subject:GN #

1040am called counsel, moira -- lmtc asap

## Date: 1/13/2000 Entered By: TSLANE Subject:GN #

310pm ret counsel call, moira -
told her we will not arb the issue of northland being primary unless lincoln agrees they are primary
if lincoln does not agree then we will agree to litigate the cov issue once the underlying cases are resolved -- we want their 750k tendered & if not then we will consider filing dj
lou is back from vacation & she will prob have him call me onthis tomorrow once she talks to him

## Date: 1/18/2000 Entered By: TSLANE Subject:GN #

750am ret counsel call, lou-lmtc on pm

## Date: 1/24/2000 Entered By: TSLANE Subject:GN #

1030am called counsel, lou-lmtc on pm

## Date: 1/24/2000 Entered By: TSLANE Subject:GN #

210pm ret counsel call, lou-
conf call w/moira - has tt pipa - let him know what we wanted
wanted him to agree that we would not arb the primacy issue
said pipa said to call their people at lincoln general but lou said jerry had tried that months ago
agreed that we wanted 750k tendered by lincoln general & if they want to pursue that northland policy is primary we will only agree to do that through litigation-dj but if they want to just discuss issue of concurrent or excess cov then we will agree to arb w/in 30 days

he will discuss w/pipa & be in touch

## Date: 1/25/2000 Entered By: TSLANE Subject:GN #

1125am called ira--lmtc on pm

## Date: 1/31/2000 Entered By: TSLANE Subject:GN #

took depo of dale clemons -- nothing in that depo chgs counsel conclusion that statts was working for jhm at time of ax & that jhm owes indem to insd

## Date: 1/31/2000 Entered By: TSLANE Subject:GN #

has gotten everything over to jasen walker to do voc assess on pltf mulligan

## Date: 1/31/2000 Entered By: TSLANE Subject:GN #

recd more docs in response to prod of docs
some things missing & counsel has written asking for those
appears pltf disability carrier would no longer pay short term dis benefits past 7/20/99 bc dr mendel cert her as capable of rtw full time as rn -- do not have that report
counsel going to subpeona certain employ & med recs since getting little cooperation from pltf atny

## Date: 1/31/2000 Entered By: TSLANE Subject:GN #

pltf mulligan recd short term dis from 7/4/97-11/30/97 & then was released to rtw 12/1/97 so benefits suspended
recd total of $7,741.54
then recd short term disability from 3/18/99-7/19/99
apparently her dr then rtw full time
recd total of $6,219.71

## Date: 1/31/2000 Entered By: TSLANE Subject:GN #

Note: put Mulligan meds & other wl doc in sep expand file

## Date: 2/04/2000 Entered By: TSLANE Subject:GN #

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 13
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy : 21 TF209197 000002 Print all claim file notes entered

## Date: 2/04/2000 Entered By: TSLANE Subject:GN #

1240pm called counsel, lou-
tt moira --
pipa has never ret their calls - she is supposed to fu w/him today
they had lm on pipa voice mail detailing our position
he has met w.miller & almost positive he was deposed - said he does not dispute that the trip was solely for the benefit of jhm & that insd was not benefitting -- he agrees w/everything insd has said
will let me know when he hears from pipa

## Date: 2/14/2000 Entered By: TSLANE Subject:GN #

recd copy of the diary mulligan kept

## Date: 2/14/2000 Entered By: TSLANE Subject:GN #

mulligan voc eval ime sched for 3/3 -- sent ck for advance retainer

## Date: 2/15/2000 Entered By: TSLANE Subject:GN #

pltf mulligan sched for ime 3/1 -- need pre pay of $650 - issued ck

## Date: 2/23/2000 Entered By: PKESTNER Subject:GN #

RECEIVED ATTY BILL, AUDITED BILL AND IN LINE, ISSUED DRAFT
///////

## Date: 2/25/2000 Entered By: PKESTNER Subject:GN #

spoke with counsel and the agreemenet with other carrier fell throug h. lookslike we will have to file a dj to settle coverage dispute. u pdated jerry and he will advise mike.
///////

## Date: 2/25/2000 Entered By: PKESTNER Subject:DI #

Set diary of 03/27/00 - await response

## Date: 2/25/2000 Entered By: JPARKER Subject:GN #

reviewed with MD, ok to proceed with DJ/

Page 13

000014

[redacted]

## Date: 2/29/2000 Entered By: PKESTNER Subject:GN #

spoke with counsel and requested any depos of jmh employees, she will send them. advisd her of dec action.

## Date: 3/02/2000 Entered By: PKESTNER Subject:RS #

Set initial reserve for $ 10000.00 for claimant #007
... MULLIGAN, CHERYL CVG: C.S.L. LIABILITY (B.I. & P.D.)

## Date: 3/02/2000 Entered By: PKESTNER Subject:GN #

[redacted]

////////

## Date: 4/18/2000 Entered By: TSLANE Subject:GN #

1130am ret counsel call, moira - lmtc

## Date: 4/18/2000 Entered By: TSLANE Subject:GN #

340pm counsel called, moira -
have voc rehab report & coming to me on mulligan
discovery closing next fri & thinks everything done
pltf atny anxious to list this for trial
there will be conf & pick trial date - could have trial date as early as june
said it did not appear dj has been filed - said we need to get dj filed asap bc do not want to try the case
said maybe by filing dj lincoln will do something
told her i would fu w/cov counsel
voc rehab report on its way - told her i would touch base once recd that
report says pltf can do sedentary work which is readily avail
told her would fu & let her know what we wanted to do

## Date: 4/18/2000 Entered By: TSLANE Subject:GN #

345pm called ira -- ext 202 -- lmtc on pm

## Date: 4/19/2000 Entered By: TSLANE Subject:GN #

[redacted]

## Date: 4/24/2000 Entered By: TSLANE Subject:GN #

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 15
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy.: 21 TF209197 000002 Print all claim file notes entered

pltf has filed cert of readiness & case may go to trial in june

## Date: 4/28/2000 Entered By: TSLANE Subject:GN #

1050am called counsel, lou-
told him i was going to call pippa directly to try & get joint offer s out reserving the right to litigate cov issue after
he really has not been doing much on case & will have moira call me to discuss value of mulligan case

## Date: 5/01/2000 Entered By: TSLANE Subject:GN #

1025AM CALLED IRA-LMTC ON PM

## Date: 5/03/2000 Entered By: TSLANE Subject:GN #

250pm ret counsel call, moira-
they had done eval on this case when they eval death cases but did not have as much info on the wl & future wl claim
considering they felt the future wl claim was 200-300k they felt the case was worth 600-800k
now their appears to be no future wl claim according to our voc exp
def thinks the claim is worth 200-400k
thinks the claim that pltf saw the other pltfs die - the consciousne ss of karen clifford - she knew them & had trauma trng & could not help them - thinks that does increase the value of the claim
said that pltf mulligan will be a sympathetic witness
told her i was going to contact pipa & see if we could get something worked out so we could get some offers out & agree to litigate after the claims are resolved
told her i was going to try & work something out & then contact the pltf attnys

## Date: 5/03/2000 Entered By: TSLANE Subject:GN #

335pm called def atny, mike pipa --lmtc on pm

## Date: 5/05/2000 Entered By: TSLANE Subject:GN #

255pm ret mike pipa call - lmtc on pm

## Date: 5/05/2000 Entered By: TSLANE Subject:GN #

320pm ret mike pipa call -
told him we are interested in discussing settlement
about ready to file dec action
told him interested in getting rid of the pltfs cases & getting offers on table
told him i was looking at 800-1mil on the death cases & 150-200k on mulligan case
does not think that would get it settled but agrees that is good place to start

Page 15

000016

========================================================================

he will call lincoln general & prob have the adj call me direct

========================================================================

## Date: 5/05/2000 Entered By: TSLANE Subject:GN #

345pm ret mike mcgovern @ lincoln general 800-876-3350 ext 256
said he has cov counsel retained to file dec action
they had proposed to settle the case & proceed to binding arb
told him we would be willing to try & resolve the underlying cases &
litigate the cov issue
this is hard coal mining cty - 30% unemploy rate
avg age of residents is 50s
they would consider agreeing to settling the cases & litigating the
dec action
address: 3350 whiteford rd york, pa 17402
claim #39737
fax #717-751-0165
email: mike.mcgovern@lincolngeneral.com
said to get ltr outlining what we are thinking & then he will review
& get back to me
his 1 condition is that we resolve this claim quickly
told him we are in process of filing dec & plan on proceeding w/the
dec as the tort claim progresses & get it all resolved asap

========================================================================

## Date: 5/10/2000 Entered By: TSLANE Subject:GN #

325pm called ira -- lmtc on pm

========================================================================

## Date: 5/10/2000 Entered By: TSLANE Subject:GN #

faxed proposal to lincoln general that we split it 50/50 & then
proceed w/dj to settle the cov issue

========================================================================

## Date: 5/10/2000 Entered By: TSLANE Subject:GN #

reviewed w/md & jp
have auth to settle the 2 death claims 500-750k
mulligan claim auth to settle 300-375k

========================================================================

## Date: 5/15/2000 Entered By: TSLANE Subject:GN #

1230pm [redacted]

========================================================================

## Date: 5/15/2000 Entered By: TSLANE Subject:GN #

[redacted]

Policy.: 21 TF209197 000002 Print all claim file notes entered

## Date: 5/16/2000 Entered By: TSLANE Subject:GN #

930am called mike @ licoln general -lmtc on pm (out of office 5/17)
930am ret counsel call, moira -
wanted status of where we were on neg & w/lincoln general
told her we had proposal to split 50/50 w/linconln gen & waiting for their response
have not called pltf atny until get response from lincoln general
no trial date - case management conf not set yet & that is when we will get trial date & will be date certain & will let me know when that is sched

## Date: 5/17/2000 Entered By: TSLANE Subject:GN #

400pm ret mike call @ lincoln general -- lmtc on pm

## Date: 5/18/2000 Entered By: TSLANE Subject:GN #

950am called mike @ lincoln general --
they are willing to do 50/50 split - not sure 1.5 mil is going to do it but good start
asked him about openening offer & he wants to do conference call next wk w/his atny & ours -- all 4 of us
said he will call pipa & i can call lou & we can talk later today about time next wk to conf this

## Date: 5/18/2000 Entered By: TSLANE Subject:GN #

955am called counsel, tt lou --
said either am on mon or after 2 on tues
asked him about local counsel for ira on the dj
he will get couple people in mind & call ira w/suggestions of local counsel to use
will call him when we get conf call set up

## Date: 5/18/2000 Entered By: TSLANE Subject:GN #

1020am ret mike call @ licoln gen
pipa avail mon morn
lmtc on pm w/time but mon morn works for me & my counsel too
suggested 9am eastern time

## Date: 5/18/2000 Entered By: TSLANE Subject:GN #

1255pm ret mike call @ lincoln gen -- lm on pm
conf call set for 9am - asked him to go ahead & initiate it at 9am eastern time - asked him to call all parties
1255pm called counsel, lou-
told him conf call set for mon morn at 9am
mike mcgovern will be initiating the call

he will be there & also calling ira now w/some suggestions for local counsel

## Date: 5/22/2000 Entered By: TSLANE Subject:GN #

800am conf call w/lou b, moira & mike mcgovern --
discussed schukiyill county - very high unemployment there
discussed values of the wd claims -- mcgovern thinks if we could bring them in for 800,000 we would be doing well but thinks might have to go more like 900-950k to get it settled - does not think million dollar case
lou pointed out that nothing from pltf atny has indicated he will settle for less than 1 mil but he has never had any offers to respond to
lou said pltf atny has tried to get the case set for trial couple times but no luck
told him we thought top end more like 750
agreed starting offer $500,000
delay damages - started 1 yr from when suit filed - april 96 clifford case filed
delay damages start in april 97 (prime +1)
97-8.25
98-8.5
99-7.75
25% delay damages & by october 30%
can stop the delay damages by making qualifying offer - if verdict does not exceed verdict by 125% then only liable up to day offer made
mulligan case - he does not see jury buying the long term wl
mcgovern was lower on her case at 250k - lou was 350k
there is no demand on mulligan - thinks we should start lower at 75-100k according to lou
mcgovern said he is not afraid of tryin this case w.o the death cases bc pltf is not local & they take care of their own
no longterm wl, no demand, cerv fusion - conservative county so lou thinks we should start at 75-100k
lou will make the offers -- will start at 75-100 on mulligan & then will open 500 on death cases as lump & they decide how to distribute
he will make some phone calls & let us know

## Date: 5/22/2000 Entered By: TSLANE Subject:GN #

sent reins update

## Date: 5/31/2000 Entered By: TSLANE Subject:GN #

940am called counsel, lou-lmtc on pm

## Date: 5/31/2000 Entered By: TSLANE Subject:GN #

340pm counsel called, lou-

000019

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 19
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy.: 21 TF209197 000002 Print all claim file notes entered

has tt pltf atny about 3 times - has offered 500k
said he was not interested & said he would tt his clients then calle
d back & asked what went into our eval but said he would tt his clie
nts
has tt all the adminstrators -- formal demand 2million - said he had
some flexibility
they want to wait until the pre trial to hear what # the judge puts
on the case & they will respect that more but does not
offered 75k on mulligan - pltf faxed back ltr that they would
accept 175k -- he would recom 125k but did not think he could get
the pltf to take it unless the judge would tell her that
will see what happens w/that at the pretrial but it will clearly
settle
recd report by local path that indicates that there was no massive
head inj - no reason to believe mr clifford that he was immed
unconscious & would take 1-2 min to go unconcscious
since he broke his back he would have been paralyzed & would have
had time to appreciate the fact he was paralyzed
we do not have this report although dated 4/99 was never disclosed
although pltf atny said he disclosed this to us
he will fax me the report
have 1st report from pltf exp that said there was no conscious pn &
suffering & if not settled then we will try & retain him as our exp
wed june 7 1030am central time -- will prob not hear from them until
1 hr later if not longer -- will need to be avail by phone

Date: 6/02/2000 Entered By: TSLANE Subject:GN #

...1120am called mike @ lincoln general --
out of office until 6/12 -- lmtc on pm re: pretrial on 6/7

## Date: 6/06/2000 Entered By: TSLANE Subject:GN #

825am called counsel, moira - lmtc on pm

## Date: 6/06/2000 Entered By: TSLANE Subject:GN #

1005am ret counsel call, moira- tt helen
she is not in the office today
lm for lou tc

## Date: 6/06/2000 Entered By: TSLANE Subject:GN #

counsel called, lou
confirmed pretrial is at 1130 eastern time/1030 our time
said it will prob be closer to an hour b4 we hear from him
said he will call me when it is over to let me know what happened
told him mcgovern on vaca til next mon & not sure about auth from
lincoln to settle cases
he will ck w/pipa & get back to me

Page 19

000020

Date: 6/06/2000 Entered By: TSLANE Subject:GN #

counsel called, lou-lm on pm
tt pipa sec - there is another adj that has auth & will be handling
either the adj or pipa will be calling me

## Date: 6/06/2000 Entered By: TSLANE Subject:GN #

145pm ret sandy ikama @ lincoln general - 800-876-3350 ext 244
she said they are willing to put up their policy limits tomorrow
then resolve the cov issues
she will be around all day if need to discuss
told her mulligan will settle somewhere btwn 125-175k - well below
what any of us eval at so just matter of the death cases

## Date: 6/07/2000 Entered By: TSLANE Subject:GN #

1145am counsel called, lou -
heard contentions about the case - does not think that the punitive
damage case will fly but also does not like our defense on compensa-
tory damages that this is not a very nice family
said the conscious pn & suffering of karen clifford is going to
bring a lot of money from jury - very impressed w/her conscious pn
& suffering claim & thinks it will bring big money from jury
said pltf atny is going to claim privilege & refuse to allow the
original pathologist who test that clmt robert clifford had no
conscious pn & suffering & if successful then we are going to find
our own expert & file motion w/judge to allow late exp but clearly
even if robert had any conscious pn & suffering it was very short-
only couple minutes -- said he is going to look into the case that
would allow pltf atny to claim privilege
if does not settle then will rule on motions in limine w/regards to
punitives, etc & then would be willing to do another settlement conf
said judge is putting together ltr w/his recomendations on settlemet
values & that will be sent out in wk or so & said he will let us
know as soon as he receives
said he thinks judge will come in in low hundreds on mulligan & we
can settle that but said judge is going to be sig higher on the
death cases than we had eval them -- said he thinks the karen cliffo
rd claim is worth lot of money
will let me know asap when gets the recom from judge
trial date sometime in oct or dec so nothing in near future
said the judge was very familiar w/case & obvious he had read
everything provided to him in depth

## Date: 6/15/2000 Entered By: TSLANE Subject:GN #

910am ret counsel call, lou-
recd ltr from judge - will fax it to me
700k on karen clifford & 300k for robert clifford & 125k on mulligan
felt mulligan was straightforward - worked sig # of hours & decrease
hours & ongoing pn

eport No. DAR030 NORTHLAND INSURANCE COMPANIES Page 21
CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
olicy.: 21 TF209197 000002 Print all claim file notes entered

---

lifford claim very substantial - thinks offer serious but not enough -does not believe that pltf would get to jury on punitive but 2 people dead & delay damages
feels there would be large veh bc pltfs doing nothing more than sitting at red light & then were crushed by truck
diff btwn is the pn & suffering claim - children of mrs clifford have much greater claim than mr cliffords children
puts emphasis on the orphaned children & attakcing the parenting would prob backfire when talking of orphaned children
would recom township & emr make only nominal offer
he is going to wait couple days & then contact pltfs re: settlement
told him to dump the mulligan case for whatever we can get it
he will also fu w/pipa to make sure they are on board to get this resolved for judges figures
told him did not have auth to settle the cliffords claim for that money but felt could get it if we can get it settled
local counsel just indicated he got the stuff from ira & dj should be filed asap

---

## Date: 6/15/2000 Entered By: TSLANE Subject:GN #

discussed w.md - auth to settle for judges recom
205pm called counsel, lou
told him he had auth to settle for judges recom

---

## Date: 6/19/2000 Entered By: TSLANE Subject:GN #

trial date 10/9/00 w/jury selection on fri 10/6
the issue of punitive damages will be heard on 10/6 also & clifford pltf atny pushing hard that the jury hear about punitives

---

## Date: 6/26/2000 Entered By: TSLANE Subject:GN #

counsel has made 125k offer on mulligan - pltf atny has said he will talk to his client but seems to have no control over her

---

## Date: 6/27/2000 Entered By: TSLANE Subject:GN #

745am called counsel, lou-
spoke to clifford atny on fri - not optimistic that 1 mil is going to settle it - had tt rep of both estates - had thought judge would make lump sum & he had the reps under the assumption that it would be lump sum & split 50/50
they have sense that they will not get reason until judge rules on punitive damage claim -- if denied then might get reason after that
pltf atny first obstacle is getting over the money being split 50/50
said he would be mtg w/his clients in next 2 wks - briefs are almost due at that time & will be working on those -- pltf atny said he wou ld be back in touch in next couple wks
told him i have no prob paying settlement in lump sum & they split it up - he will let pltf know that
pltf atny also said he would prob not recom the judges # but somethi

Page 21

000022

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 22
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy : 21 TF209197 000002 Print all claim file notes entered

g more like 1.5 million -- counsel said he could recom that but we would not be willing to pay that based on judges recom
waiting to hear back from both pltf atnys

## Date: 6/28/2000 Entered By: TSLANE Subject:GN #

motions in limine due by 7/7 & briefing no later than 7/17
there is briefing sched entered on punitive claims also - counsel will be filing brief on those issues

## Date: 7/05/2000 Entered By: TSLANE Subject:GN #

1045am ret counsel call, lou--
atny for cliffords really hung up on the punitive damages
he said he would talk to his clients/recommend 1mil + delay damages
he cannot say that his clients would take it
delay damages are approx 275,000
he has not put the 1 mil on the table yet & decided he should go bac k & tell pltf we are willing to pay the judges recom & see what he says - told him i need firm number but not willing to pay the 1 mil plus the delay damages
he will tt atny on cliffords cases & let me know response
mulligan atny has asked us to send the release for $125,000 - not sure if it is settled so they have asked him in cover ltr if case is actually settled or not

## Date: 7/11/2000 Entered By: TSLANE Subject:GN #

recd counsel's motions in limine that have been filed

## Date: 7/14/2000 Entered By: TSLANE Subject:GN #

840am mike @ lincoln general called -
told him we had release out on mulligan claim - not sure but appeare d that one was going to settle
tod him clifford atny said he would recom 1 mil plus delay damages o f $275,000 & at that time we told him we would pay what the judge recom
will let him know once i hear more

## Date: 7/17/2000 Entered By: TSLANE Subject:GN #

offer of 1 mil has been made to clifford atny - waiting for response

## Date: 7/19/2000 Entered By: TSLANE Subject:GN #

1155am ret counsel call, moira - lmtc

## Date: 7/19/2000 Entered By: TSLANE Subject:GN #

230pm ret counsel call, moira --
mulligan case settled - has release & needs to get settlement ck

Page 22

000023

suggested that we might want to call lincoln general to confirm & then send cks to her - there is required settlement notice that needs to go w/them
settled for 125,000
briefing the punitive issue & does not think will settle until the punitives are ruled on
if ruled in our favor thinks they may take the million -- said that will prob not be ruled on until well into aug or poss sept
the city settled mulligan's pd claim - judge had suggested & they handled

## Date: 7/19/2000 Entered By: TSLANE Subject:GN #

called mike @ lincoln general - out of office until 7/24--lmtc on pm

## Date: 7/25/2000 Entered By: TSLANE Subject:GN #

mike mcgovern called-lm on pm
said he will send counsel ck for 1/2 but just needs ck lang & tax id #
...faxed info to lincoln general
issued settlement ck & took remaining reserve & allocated to mulligan units

## Date: 7/25/2000 Entered By: TSLANE Subject:RS #

Modified reserve to $ 337500.00 for claimant #003
... CLIFFORD, KAREN CVG: C.S.L. LIABILITY (B.I. & P.D.)

## Date: 7/27/2000 Entered By: TSLANE Subject:GN #

recd update - complaint has been filed for dj
only 1 party not served to date
venue probs -schuylkill cty has moved to middle dist from eastern dist & currently working on getting it moved to middle dist
working on service & venue issues

## Date: 8/02/2000 Entered By: TSLANE Subject:GN #

RECD FORMAL OFFER OF 1,287,500 TO SETTLE THE CLAIM
...220PM CALLED MIKE @ LINCOLN GENERAL -
HIS PROB W/DELAY DAMAGES IS THAT MOST OF THE DELAY HAS BEEN ON THEIR PART
SAID DEMAND NOT UNREASON
HE WOULD CONSIDER SPLITTING THE DELAY DAMAGES W/THEM & TRYING TO GET THE CASE RESOLVED
HE IS FINE W/SPLITTING THE DIFF
...DISCUSSED W/JP - OK TO SPLIT THE DIFF
...230PM CALLED LOU-IS
TOLD HIM WE WANT TO SPLIT THE DIFF ON THE DELAY DAMAGES
HE WILL LET THEM KNOW WE DID NOT WANT TO PAY ANYTHING MORE THAN JUDG RECOM BUT IN COMP WE WILL PAY 1/2

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 24
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy : 21 TF209197 000002 Print all claim file notes entered

WILL CALL PLTF & LET ME KNOW

## Date: 8/08/2000 Entered By: TSLANE Subject:GN #

COUNSEL CALLED, LOU-LM ON PM
PLTF BOTTOM LINE 1,250,000 - WILL NOT SPLIT THE DIFF W/US

## Date: 8/08/2000 Entered By: TSLANE Subject:GN #

CALLED MIKE @ LINCOLN GEN --
OUT OF OFFICE UNTIL 8/10 -- LMTC ON PM

## Date: 8/10/2000 Entered By: TSLANE Subject:GN #

1250pm called mike @ lincoln general - lmtc on pm

## Date: 8/10/2000 Entered By: TSLANE Subject:GN #

tt mike @ lincoln general -
he felt that the lost offer was take or leave it & since they left
it we should proceed
said we felt we need to settle the case & i had auth to settle it
he will talk to his people & let me know if they are willing to go
1/2
told him they could give us the rest of their limits & then we would
make up the diff to settle the cliffords case & then we would dimiss
dj & would be done
said they want their money back from us & not willing to do that
he really thinks they will prevail on the dj & we will owe them
back everything
told him i did not agree but if not interested then lets settle
clifford & litigate the coverage
he will get back to me

## Date: 8/10/2000 Entered By: TSLANE Subject:GN #

205pm called counsel, lou - lm on pm working w/lincoln general to
see what they wanted to do & would be back in touch when heard back
from them

## Date: 8/10/2000 Entered By: TSLANE Subject:GN #

340pm mike @ lincoln general called -
they will go 1/2 up to the 1.25 mill
they want to proceed w/dj - are not interested in tendering the rest
of their limits.

## Date: 8/10/2000 Entered By: TSLANE Subject:GN #

340pm called counsel, lou-
told him ok to 1.25 but wanted to try & get it for less
told him if it looked like we were losing settlement to just pay it

Page 24

000025

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 25
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy.: 21 TF209197 000002 Print all claim file notes entered

but to try for something less
he will call pltf & let me know

## Date: 8/16/2000 Entered By: TSLANE Subject:GN #

105pm

## Date: 8/22/2000 Entered By: TSLANE Subject:GN #

counsel called, lou-
settled for 1,225,000 - pltf atny sending confirming ltr & thinks will be equally split btwn the 2 claims
will have to be ct approved due to death claims & 1 child is still minor
will let me know when have hearing for approval & needs no cks until ct approved-thinks hearing date until september

## Date: 8/22/2000 Entered By: TSLANE Subject:GN #

805am called mike mcgovern @ lincoln general -
let him know case settled for 1,225,000 pending ct approval
no cks needed until then

## Date: 8/22/2000 Entered By: TSLANE Subject:GN #

recd update on dj - working on getting all summonses and complaints served -- addressing venue issues & dealing w/requests for dismissals from pltf atny in underlying action

## Date: 8/22/2000 Entered By: TSLANE Subject:GN #

1100am

Page 25

000026

Policy.: 21 TF209197 000002 Print all claim file notes entered

Date: 8/22/2000 Entered By: TSLANE Subject:GN #

145pm ret counsel call, moira -
paperwork in the process - pltf will have to petition the ct for approval
has tt pltf atny & are using the judges recom on the settlement btwn the 2 estates
857,500 for karen clifford
367,500 for robert clifford
will be sending releases out today

## Date: 8/28/2000 Entered By: TSLANE Subject:GN #

## Date: 8/31/2000 Entered By: TSLANE Subject:GN #

Date: 9/11/2000 Entered By: TSLANE Subject:GN #

recd order for discont on mulligan case

## Date: 9/11/2000 Entered By: TSLANE Subject:GN #

1125am ret cheryl lipsius call -- lmtc

## Date: 9/11/2000 Entered By: TSLANE Subject:GN #

## Date: 9/20/2000 Entered By: TSLANE Subject:GN #

recd final invoice on mulligan

## Date:10/04/2000 Entered By: TSLANE Subject:GN #

220pm called counsel, lou -
pltf atny has not yet filed the papers - has to get signature from all family members b4 he can file -- thinks still 30-60 days from finalizing settlement & issuing cks

Policy : 21 TF209197 000002 Print all claim file notes entered

## Date:10/09/2000 Entered By: TSLANE Subject:GN #

recd final release signed by mulligan

## Date:10/18/2000 Entered By: TSLANE Subject:GN #

recd signed releases on the cliffords claims-pltf has now filed 2
petitions for compromise of minor robert cliffords action & approval
by ct of settlement of the estate cases & distrib btwn the 2 estates
judge will sched hearing & we will be required to attend

## Date:11/20/2000 Entered By: TSLANE Subject:GN #

830am counsel called, moira --
judge just ruled on the papers so they did not have to appear for
hearing
said lincoln general will be sending their cks direct to the pltf
told her i need to know when that is recd so we can dismiss the dj
she will let me know
they will get the final dismissal - pltf had not signed the original
so she sent it back

## Date:11/20/2000 Entered By: TSLANE Subject:GN #

835am counsel called, moira --
has tt pltf office - they tt pipa last wk & was somewhat upset that
he had not recd the cks from carrier - would hold off on dimissing
the dj for rt now since lincoln general has not issued their cks

## Date:11/28/2000 Entered By: TSLANE Subject:GN #

320pm called counsel, moira - lmtc

## Date:11/28/2000 Entered By: TSLANE Subject:GN #

320pm counsel called, moira --
tt pltf atny yesterday & has not recd the cks
lincoln general had asked for pltf atny tax id # last wk
said the settlement cks should be recd soon - pltf will let her know
when he receives the cks & then she will file the final dismissal
order

## Date:11/29/2000 Entered By: TSLANE Subject:GN #

RECD ORDER TO SETTLE DISCON & END THE MULLIGAN CASE

## Date:12/01/2000 Entered By: TSLANE Subject:GN #

counsel called, moira - lm on pm
pltf has settlement cks from lincoln general - things should be
finalized soon

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 28
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE

Policy : 21 TF209197 000002 Print all claim file notes entered.

Date:12/01/2000 Entered By: TSLANE Subject:GN #

## Date:12/08/2000 Entered By: TSLANE Subject:GN #

recd copy of prec to discont sent to ct

## Date:12/08/2000 Entered By: TSLANE Subject:GN #

## Date: 1/16/2001 Entered By: TSLANE Subject:GN #

recd final billlings - pd -- waiting on final billing from ira

## Date: 1/19/2001 Entered By: TSLANE Subject:GN #

750am called counsel ira -- lmtc on pm

## Date: 1/26/2001 Entered By: TSLANE Subject:GN #

845am called ira -- lmtc on pm

## Date: 2/05/2001 Entered By: TSLANE Subject:GN #

## Date: 2/06/2001 Entered By: TSLANE Subject:GN #

920am

## Date: 3/08/2001 Entered By: TSLANE Subject:GN #

900am

Page 28

000029

Policy : 21 TF209197 000002 Print all claim file notes entered

## Date: 3/26/2001 Entered By: TSLANE Subject:GN #

[redacted]

## Date: 4/02/2001 Entered By: TSLANE Subject:GN #

130pm mike mcgovern @ lincoln general called -
asked if there was any interest in walking away - told him we were interested but needed their consent to dismiss the lawsuit
he will let his counsel know that will prob happen & call me to confirm once he talks to their acctng people

## Date: 4/11/2001 Entered By: TSLANE Subject:GN #

215pm mike mcgoven @ lincoln general called-lm on pm
they are in agreement to walk away from dj & close files
...called mike @ lincoln - lm on pm asking him to have his counsel call ira & agree to volun dismiss this

[redacted]

## Date: 4/24/2001 Entered By: TSLANE Subject:GN #

945am called ira - lmtc on pm

## Date: 5/24/2001 Entered By: TSLANE Subject:GN #

[redacted]

## Date: 6/27/2001 Entered By: TSLANE Subject:GN #

waiting on dismissal

## Date: 7/11/2001 Entered By: TSLANE Subject:GN #

300pm ira called on conf call w/in house counsel for lincoln general
al -- transfer has occurred but nothing else on litigation
he knows nothing of mcgovern's agreement to dismiss - claiming they have never talked to mcgovern about this
he will go back & tt his supervisor & let him know what has transpired & see about getting an agreement to dismissing the dj & walking away & closing files
al will let ira know if they will agree to volun dismissal - mcgovern no longer there
(al miller is the general counsel now handling)
al is in house counsel for lincoln

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 30
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE

Policy : 21 TF209197 000002 Print all claim file notes entered

Date: 8/14/2001 Entered By: TSLANE Subject:GN #

1015am

## Date: 8/15/2001 Entered By: TSLANE Subject:GN #

counsel called, lou bricklin
insd called him & very upset because they were just served w/3rd party complaint - insd wants him to defend them
hazel sinclair is now deceased
told him i have not seen the complaint & not sure we owe them defens on this but would ck into it & get back him

## Date: 8/16/2001 Entered By: TSLANE Subject:GN #

recd email copy of ira's response to lincoln general

## Date: 8/16/2001 Entered By: TSLANE Subject:GN #

## Date: 8/16/2001 Entered By: TSLANE Subject:GN #

Page 30

000031

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 31
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE
Policy.: 21 TF209197 000002 Print all claim file notes entered

920am called counsel, lou -
he has portions of the 3rd party complaint
told him we are going to defend woolever -his concern is any conflic
t he might have
hazel sinclair is now deceased & thinks he might be wit on this
he will get ext on this & then we can work out what we are going to
do

## Date: 8/16/2001 Entered By: TSLANE Subject:GN #

discussed w/md - have decided that insd needs their own counsel
cannot defend them in a lawsuit that we started

## Date: 8/16/2001 Entered By: TSLANE Subject:GN #

tt lou
let him know not defending insd
asked him to get 30 day extension for insd to find counsel & get
ans filed
told him sending insd ltr directly
will let me know if not able to get the ext

## Date: 8/16/2001 Entered By: TSLANE Subject:GN #

faxed ltr to isnd

## Date: 9/19/2001 Entered By: TSLANE Subject:GN #

emailed ira asking for update

## Date:10/17/2001 Entered By: TSLANE Subject:GN #

emailed ira for update

## Date:10/17/2001 Entered By: TSLANE Subject:GN #

## Date:11/30/2001 Entered By: TSLANE Subject:GN #

Page 31

000032

Report No. DAR030 NORTHLAND INSURANCE COMPANIES Page 32
(CXDM001/CXDM003) CLAIM FILE NOTES Date 12/05/01
Printed: TSLANE

Policy.: 21 TF209197 000002 Print all claim file notes entered

[redacted]

## Date:12/03/2001 Entered By: TSLANE Subject:GN #

[redacted]

## Date:12/05/2001 Entered By: TSLANE Subject:GN #

sent complete claim file & uw file to counsel

Page 32

000033

TRANSACTION REPORT

P.01

MAY-10-00 WED 05:13 PM

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE | M# | DP |
|---|---|---|---|---|---|---|---|---|
| MAY-10 | 05:12 PM | 917177510165 | 48" | 1 | SEND | OK | 350 | |

TOTAL : 48S PAGES: 1

Northland Insurance Companies

An Associates Company

Northland Insurance Company Northland Casualty Company Northfield Insurance Company

**Fax Number (651) 688-4170**

**Telefax Transmission - Date:** May 10, 2000

**Attention:** Mike McGovern

**Fax Number: 717-751-0165**

Re: Our Insured: Woolever Brothers Claim Number: TF209197-04
Date of Loss: 11/17/95 Your File Number: 39737

**Number of Pages (Incl. Cover):** 1

**Comments:**

Mike This is a follow up to . . .

McGovern
DEPOSITION 3
EXHIBIT
1-9-02 TmV

001771



Northland
Insurance Companies
An Associates Company

Northland Insurance Company Northland Casualty Company Northfield Insurance Company

**Fax Number (651) 688-4170**

**Telefax Transmission - Date:** May 10, 2000

**Attention:** Mike McGovern

**Fax Number: 717-751-0165**

**Re:** Our Insured: Woolever Brothers Claim Number: TF209197-04
Date of Loss: 11/17/95 Your File Number: 39737

**Number of Pages (Incl. Cover):** 1

**Comments:**

Mike - This is a follow-up to our telephone conversation on May 5, 2000.

We are in the process of filing a declaratory judgment action regarding the above matter.

However, we would like to try and resolve the underlying claims at the same time. We propose that we each pay half of the settlements of the underlying claims and proceed to dispose of the coverage issues with the declaratory judgment action that is being filed. Please review and call me to discuss at your earliest convenience.

If you have any questions, I can be reached at 651-688-4716.

By: Traci E. Slane 651-688-4716
Senior Claims Examiner

Exh E

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORTHLAND INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>LINCOLN GENERAL INSURANCE COMPANY, J.H.M. ENTERPRISES, INC., VERNICE L. STATTS, ROBERT E. KRAPF and UTE L. HETLAND CLARK, as Administrators of the Estate of Karin Clifford and ROBERT E. KRAPF and PATRICIA R. CLIFFORD, as Administrators of the Estate of Robert R. Clifford, SHERRILL J. MULLIGAN, DENIS A. MULLIGAN,<br><br>Defendants. | No. 1:01-CV-763<br><br>AMENDED<br>ANSWER TO COUNTER-CLAIM |

The plaintiff Northland Insurance Company ("Northland"), for its answer to the counterclaim of Defendant Lincoln General Insurance Company ("Lincoln General") states: As the counterclaim is dependent on the allegations contained in the cross-claims against J.H.M. Enterprises Inc ("J.H.M.") and Vernice L. Statts ("Statts"), Northland responds to those allegations as follows:

PARTIES

1. Admits the allegations contained in paragraph 1 of the cross-claim.

2. Admit the allegations contained in paragraph 2 of the cross-claim.

3. Admits the allegations contained in paragraph 3 of the cross-claim.

JURISDICTION AND VENUE

4. Admits the allegations contained in paragraph 4 of the cross-claim.

5. Admits each and every allegation contained in paragraph 5 of the cross-claim.

FACTUAL BACKGROUND

6. No response required.

7. Admits the allegations contained in paragraph 7 of the cross-claim except knowledge or information sufficient to form a belief as to whether the attached Exhibit A is a true and correct copy of the Lincoln General Policy.

8. Admits the allegations contained in paragraph 8 of the cross-claim.

9. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 of the cross-claim.

10. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 10 of the cross-claim.

11. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 11 of the cross-claim.

12. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 12 of the cross-claim.

13. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 13 of the cross-claim.

14. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 14 of the cross-claim.

15. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 of the cross-claim.

16. Denies the allegations contained in paragraph 16 of the cross-claim.

17. Denies the allegations contained in paragraph 17 of the cross-claim.

18. Denies the allegations contained in paragraph 18 of the cross-claim.

19. Denies the allegations contained in paragraph 19 of the cross-claim.

20. Denies the allegations contained in paragraph 20 of the cross-claim.

21. Denies the allegations contained in paragraph 21 of the cross-claim except states that upon information and belief, on November 17, 1995 the tractor and trailer driven by Statts was involved in an accident in Pennsylvania.

22. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22 of the cross-claim except states that upon information and belief, on November 17, 1995 the tractor and trailer driven by Statts was involved in an accident with a vehicle operated by Robert Clifford and a vehicle operated by Sherill Mulligan and that the accident resulted in the deaths of Karin Clifford and Robert Clifford.

23. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23 of the cross-claim except state that upon information and belief, as a result of the accident, Sherill Mulligan allegedly suffered personal injuries.

24. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24 of the cross-claim except state that upon information and belief, at the time of the accident Woolever's placards were affixed to the tractor.

25. Admits the allegations contained in paragraph 25 of he complaint.

26. Admits the allegations contained in paragraph 26 of he complaint.

27. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27 of the cross-claim.

28. Admits the allegations contained in paragraph 28 of he complaint.

29. Admits that the Northland policy provides $2,000,000 in liability coverage but deny its applicability to the instant matter and refers to the policy itself for all its terms, conditions and provisions.

30. Admits the allegations contained in paragraph 30 of he complaint.

31. Denies allegations contained in paragraph 31 of he complaint.

32. Denies the allegations contained in paragraph 32 of he complaint.

33. Denies the allegations contained in paragraph 33 of he complaint.

34. Denies the allegations contained in paragraph 34 of he complaint.

35. Denies knowledge or information sufficient to form a belief as to the truth of the factual allegations contained in paragraph 35 of the cross-claim, except state that upon information and belief, the Lincoln General policy provided primary coverage to JHM, Statts and Woolever.

36. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36 of the cross-claim.

37. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37 of the cross-claim.

38. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 38 of the cross-claim.

39. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 of the cross-claim.

40. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40 of the cross-claim.

41. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41 of the cross-claim.

42. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42 of the cross-claim.

43. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43 of the cross-claim.

44. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 44 of the cross-claim.

45. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45 of the cross-claim, except refer to the to the transcripts of the depositions of Jay McCormick and Hazel Sinclair.

46. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46 of the cross-claim, except refer to the to the transcripts of the depositions of Jay McCormick and Hazel Sinclair.

47. Refer to the transcripts of the deposition of Hazel Sinclair.

48. Admits that Northland received a copy of the Permanent Lease but denies knowledge or information sufficient to form a belief as to the further allegations contained in paragraph 48 of the cross-claim.

49. Denies the allegations contained in paragraph 49 of the cross-claim.

50. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50 of the cross-claim.

51. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 of the cross-claim.

52. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 52 of the cross-claim.

53. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 53 of the cross-claim.

54. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 54 of the cross-claim.

55. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 55 of the cross-claim.

56. Denies the allegations contained in paragraph 56 of the cross-claim.

57. Denies the allegation that primary liability coverage for the accident belonged to Northland and denies knowledge or information sufficient to form a belief as to the truth of the further allegations contained in paragraph 57 of the cross-claim.

58. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 58 of the cross-claim.

59. Denies the allegations contained in paragraph 59 of the cross-claim as conjecture and speculation that are inappropriate for a pleading.

60. Denies the allegations contained in paragraph 60 of the cross-claim as conjecture and speculation that are inappropriate for a pleading.

61. Denies the allegations contained in paragraph 61 of the cross-claim.

62. Denies the allegations contained in paragraph 62 of the cross-claim.

COUNTERCLAIM AGAINST NORTHLAND

63. Admits the allegations contained in paragraph 63 of the counter-claim.

64. Admits the allegation contained in paragraph 64 of the counter-claim.

JURISDICTION AND VENUE

65. Admits the allegation contained in paragraph 65 of the counter-claim.

66. Admits the allegation contained in paragraph 66 of the counter-claim.

COUNT I

67. In response to the allegations in paragraph 67, Northland repeats and re-alleges each and every response to the allegations set out in paragraphs 1 through 62 of the cross-claims.

68. Denies the allegation contained in paragraph 68 of the counter-claim.

69. Denies the allegations contained in paragraph 69 of the cross-claim.

COUNT II

70. In response to the allegations in paragraph 70, Northland repeats and re-alleges each and every response to the allegations set out in paragraphs 1 through 62 of the cross-claims.

71. No response required.

72. Admits the allegation contained in paragraph 72 of the counter-claim and refers to the policy itself for all its terms, conditions and provisions.

73. Denies the allegation contained in paragraph 73 of the counter-claim as being out of context and refers to the policy itself for all its terms, conditions and provisions.

74. Denies the allegation contained in paragraph 74 of the counter-claim.

75. Denies the allegations contained in paragraph 75 of the counter-claim.

76. Denies the allegation contained in paragraph 76 of the counter-claim as being out of context and refers to the policy itself for all its terms, conditions and provisions.

77. Denies the allegation contained in paragraph 77 of the counter-claim.

78. Denies the allegations contained in paragraph 78 of the counter-claim as being incomplete and out of context and refers to the policy itself for all its terms, conditions and provisions.

79. Denies the allegations contained in paragraph 79 of the counter-claim as being incomplete and out of context and refers to the policy itself for all its terms, conditions and provisions.

80. Denies the allegations contained in paragraph 80 of the counter-claim.

81. Denies the allegation contained in paragraph 81 of the counter-claim.

82. Denies the allegations contained in paragraph 82 of the counter-claim.

83. Denies the allegations contained in paragraph 83 of the counter-claim.

84. Denies the allegations contained in paragraph 84 of the counter-claim.

85. Denies the allegations contained in paragraph 85 of the counter-claim.

COUNT III

86. In response to paragraph 86, Northland repeats and re-alleges each and every response above to the allegations set out in paragraphs 1 through 62 of the cross-claims and paragraphs 63 through 85 of the counterclaim.

87. No response required.

88. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 88 of the counter-claim and refers questions of law to the Court.

89. Denies the allegations contained in paragraph 89 of the counter-claim.

90. Denies the allegations contained in paragraph 90 of the counter-claim.

91. Denies the factual allegations contained in paragraph 91 of the counter-claim.

COUNT IV

92. In response to paragraph 92, Northland repeats and re-alleges each and every response to the allegations set out in paragraphs 1 through 62 of the cross-claims and paragraphs 63 through 92 of the counterclaims.

93. No response required.

94. Admit that both policies contain apportionment provisions but deny their applicability to the instant matter and refers to the policy itself for all its terms, conditions and provisions.

95. Denies the allegations contained in paragraph 95 of the counter-claim.

96. Denies the allegations contained in paragraph 95 of the counter-claim.

97. Denies the allegations contained in paragraph 97 of the counter-claim.

98. Admit the allegations contained in paragraph 98 of the counter-claim.

99. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 99 of the counter-claim.

100. Denies knowledge or information sufficient to form a belief as to the truth of the allegations that Lincoln General paid any sums to defend the Clifford and Mulligan actions.

101. Denies the allegations contained in paragraph 101 of the counter-claim.

102. Denies the allegations contained in paragraph 102 of the counter-claim.

103. Denies the claim that Lincoln General is entitled to recover any sums from Northland.

AFFIRMATIVE DEFENSES

FIRST AFFIRMATIVE DEFENSE

104. Lincoln General's counterclaim fails to state a cause of action against Northland.

SECOND AFFIRMATIVE DEFENSE

105. Lincoln General's counter-claim against Northland barred by the doctrine of "Accord and Satisfaction" in that the parties agreed to resolve that claims that are asserted herein.

THIRD AFFIRMATIVE DEFENSE

106. To the extent that Lincoln General's allegations of fraud and/or material mis-representation by Woolever Brothers Transportation, Inc. and J.H.M. Enterprises, Inc. are true, then Lincoln General's claims against Northland are barred since Northland's policy provides no coverage in the case of fraud and/or material misrepresentation.

WHEREFORE, Plaintiff, Northland, demands judgment dismissing the counterclaim of defendant, Lincoln General Insurance Company, along with such other further relief as this Court may deem just and proper.

KLETT ROONEY LIEBER & SCHORLING
Attorneys for Plaintiff Northland Insurance Co.

By: ______________________

David Ira Rosenbaum (52859)
Klett Rooney Lieber & Schorling
Two Logan Square
18th And Arch Streets, 12th Floor
Philadelphia, PA 19103
215-567-7507 (office)

OF COUNSEL:

Ira Lipsius, Esquire
SCHINDEL, FARMAN & LIPSIUS LLP
225 West 34th Street
New York, New York 10122
(212) 563-1710

Attorneys for Plaintiff Northland Insurance Company

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORTHLAND INSURANCE COMPANY, Plaintiff, | : |
| v. | : No. 1:01-CV-763 |
| LINCOLN GENERAL INSURANCE COMPANY, J.H.M. ENTERPRISES, INC., VERNICE L. STATTS, ROBERT E. KRAPF and UTE L. HETLAND CLARK, as Administrators of the Estate of Karin Clifford and ROBERT E. KRAPF and PATRICIA R. CLIFFORD, as Administrators of the Estate of Robert R. Clifford, SHERRILL J. MULLIGAN, DENIS A. MULLIGAN, Defendants. | : |

**CERTIFICATE OF SERVICE**

I, David Ira Rosenbaum, certify that on October 9, 2001, a copy of an Amended Answer to Counter-Claim was served Via Federal Express upon:

Jonathan H. Rudd, Esquire
McNees, Wallace & Nurick
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108

Charles M. Miller, Esquire
Rubright, Domalakes, Troy & Miller
P.O. Box 9
Law Building
Frackville, PA 17931

Joseph R. Musto, Esquire
10 W. Fourth Street
Williamsport, PA 17701-6206

Andrew R. Spiegel, Esquire
3901 - A Main Street
Second Floor
Philadelphia, PA 19127

DAVID IRA ROSENBAUM, ESQUIRE

KRLSPHI:149218.1

**AFFIRMATION OF SERVICE**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

Lorienton N.A. Palmer, being duly admitted to practice in the courts of the state of New York, affirms:

I am an associate of the firm of Schindel, Farman & Lipsius LLP, counsel for plaintiff Northland Insurance Company with offices at 225 West 34th Street, in the City of New York, County of New York, New York.

On Thursday, May 23, 2002, I served the attached Affidavit In Support of Motion of Northland Insurance Company for Summary Judgment, Proposed Order and Statement of Undisputed Material Facts In Support of Plaintiff Northland Insurance Company's Motion for Summary Judgment on the firms:

Jonathan H. Rudd, Esq.
Attorney for Lincoln General
100 Pine Street, P.O. Box 1166
Harrisburg, PA 17108-11661

Andrew R. Spiegel, Esq.
Attorney for Woolever
3901-A Main Street 2nd Floor
Philadelphia, PA 19127

by personally delivering a true and accurate copy of the same to the custody and control of the Federal Express, in a post paid and sealed envelope addressed as above, to a representative of Federal Express at the office located at 34rd Street and Eight Avenue, within the Borough of Manhattan, New York, New York.

Dated: New York, New York
May 23, 2002

[signature]
Lorienton N.A. Palmer