

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

NORTHLAND INSURANCE COMPANY     :
      Plaintiff     :
           :
           :
      v.     :     No. 1:01-CV-763
           :
LINCOLN GENERAL INSURANCE COMPANY, :
JHM ENTERPRISES, INC., and     :
VERNICE L. STATTS,     :
      Defendants     :
           :
LINCOLN GENERAL INSURANCE COMPANY, :
      Third Party Plaintiff     :
           :
      v.     :
           :
WOOLEVER BROTHERS TRANSPORTATION     :
INC.     :
      Third Party Defendant     :     (JUDGE KANE) ✓

FILED
HARRISBURG, PA

JUN 0 4 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## DEFENDANT LINCOLN GENERAL INSURANCE COMPANY'S
## BRIEF IN OPPOSITION TO
## PLAINTIFF NORTHLAND INSURANCE COMPANIES'
## MOTION FOR SUMMARY JUDGMENT

McNEES WALLACE & NURICK LLC
Jonathan H. Rudd, Esq.
Charles T. Young, Jr., Esq.
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
Phone: (717) 237-5405
Fax: (717) 237-5300

Attorneys for
Defendant/Third Party Plaintiff
Lincoln General Insurance Company

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS ................................. ii

I.   COUNTERSTATEMENT OF FACTUAL BACKGROUND ................. 1

     A.   Coverage Dispute ............................. 1

     B.   Settlement Discussion ......................... 5

II.  ARGUMENT ......................................... 12

     A.   There Has Been No Accord And Satisfaction ...... 12

     B.   The Parties Never Agreed To The Essential
          Terms Of The Alleged Settlement ............... 14

     C.   McGovern Did Not Have Authority To Settle
          The Claim With Northland ...................... 16

III. CONCLUSION ....................................... 20

i

## TABLE OF CITATIONS

<u>Cases</u>                                                                          <u>Page</u>

Beechwood Commons Condominium Ass'n v. Beechwood
 Commons Assoc., Ltd., 580 A.2d 1 (Pa. Super. 1990) ....... 13

Constitution Bank v. Kalinowski, 38 F. Supp.2d 384
 (E.D. Pa. 1999) ...................................... 12,13

Farris v. J. C. Penney Co., Inc., 176 F.3d 706 (1999) ... 16,17,18

Fleming v. CNA Ins. Co., 52 F. Supp.2d 499 (E.D. Pa.
 1999) .................................................. 12

Konqueror Bldg. & Loan Ass'n v. G.R. Kinney Co.,
 315 Pa. 318, 172 A 719 .................................. 14

Lazzarotti v. Juliano, 469 A.2d 216 (Pa. Super. 1983) ........ 13

Mazzella v. Koken, 739 A.2d 531 (Pa. 1999) ................ 14,15

Nash v. Atlantic White Tower System, 170 A.2d 341 (Pa.
 1961) ................................................. 13,14

Nowicki Constr. Co., Inc. v. Panar Corp., N.V.,
 492 A.2d 36 (Pa. Super. 1985) .......................... 13

Paramount Aviation Corporation v. Agusta, 178 F.3d 132
 (3d Cir. 1999) ......................................... 13

PNC Bank v. Balsamo, 634 A.2d 645 (Pa. Super. 1993) .......... 12

Rothman v. Fillette, 503 Pa. 259, 469 A.2d 543 (1983) ........ 17

Tiernan v. Devoe, 923 F.2d 1024 (3d Cir. 1991) ............... 17

## I.  COUNTERSTATEMENT OF FACTUAL BACKGROUND

### A.  Coverage Dispute

Northland claims that Lincoln agreed to settle this case by
simply dropping its claim.  Lincoln disagrees, and submits that
it would not have been a prudent business move and in the best
interests of its shareholders and re-insurers to simply drop its
claim without receiving any payment from Northland.  (Kirk
Affidavit ¶8).  Lincoln believes it is necessary for the Court to
understand the facts regarding the coverage dispute in order to
fully understand the reason it would have been unreasonable for
Lincoln to simply drop its claim against Northland.

The coverage claim arises from an accident which occurred on
November 17, 1995.  At the time of the accident, both Woolever
and JHM were trucking companies involved in the business of
transporting goods for hire.  JHM owned and/or operated a number
of trucks which it leased on a permanent basis to Woolever, one
of which was involved in the accident on November 17, 1995 (the
"Truck").  JHM had entered into a permanent lease agreement with
Woolever for the Truck on March 1, 1990, which was still in
effect on November 17, 1995.  (Exhibit E).  Northland provided
insurance coverage to Woolever to cover all vehicles it owned
and/or operated in its trucking business, and Lincoln provided
coverage to JHM.  Lincoln's Policy provides that:  "This
Coverage Form's Liability Coverage is excess over any other
collectable insurance for any covered 'auto' while hired or
borrowed from you by another 'trucker.'"  See Lincoln's Policy,
Truckers Coverage Form at Section V.B.5.a.  Based on this

1

provision, Lincoln's coverage would be excess to Northland if the Truck was under lease to Woolever at the time of the accident since Woolever qualifies as a "trucker."

Woolever reported the accident to its agent and/or Northland. The agent faxed a loss notice to Northland on November 17, 1995, indicating that the insured vehicle was "leased to insured." (Exhibit F). Northland also spoke with representatives of both Woolever and JHM, who informed Northland that there was a permanent lease for the Truck. (Exhibit B at p. 1, 11/20/1995)("There is a permanent lease, however. See notes.") Northland's notes indicate that Hazel Sinclair, one of the owners of Woolever, informed Northland on November 17, 1995, that JHM "was under their authority - <u>leased to them - Woolever the lessee</u>." (Exhibit G at 992)(emphasis added). On November 17, 1995, Hazel Sinclair faxed to Northland a copy of the permanent lease between Woolever and JHM dated March 1, 1990. (Exhibit E).

On November 18, 1995, the day after the accident, Hazel and Harold Sinclair of Woolever and Jay McCormick of JHM got together and fabricated a trip lease which they back-dated to make it appear as if the Truck was only trip-leased from November 16, 1995 at 4 p.m. until November 17, 1995 at 8 a.m. (Exhibit H, Sinclair Dep.Tr. at pp. 68-73, 80). Woolever then sent the fabricated trip lease to Northland, who then provided the trip lease to all of the other parties in the litigation. Neither Woolever, JHM nor Northland disclosed the presence of the permanent lease which was in the Truck at the time of the

accident, which would have made Lincoln's coverage excess to
Northland.

In the summer of 1996, Northland's attorney filed a
crossclaim on behalf of Woolever against JHM and Statts based on
the terms of the trip lease.  (Exhibit I).  Hazel Sinclair
verified the accuracy of the crossclaim, despite that she knew
all of the allegations regarding the trip lease were fraudulent
since the trip lease was fabricated after the accident.  It is
also significant that prior to filing the crossclaim, Northland's
counsel sent Northland a draft of the proposed crossclaim.
(Exhibit J).

After filing the crossclaim, Northland's counsel once again
wrote to Northland and raised the topic of the trip lease.
Specifically, Northland's counsel stated:

> I also conducted a lengthy discussion with Hazel
> [Sinclair] to attempt to assure myself that the trip
> lease upon which Woolever is relying was the one in the
> vehicle at the time of this accident.  The file
> reflects that the state police seized the vehicle and
> its contents.  Accordingly, I impressed upon her the
> fact that if she should produce a lease different than
> the one found by the police in the vehicle, that could
> be quite embarrassing to Woolever.  She assured me that
> the "corrected lease" which is in our possession should
> have been the one in the vehicle at the time of the
> accident.

(Exhibit K) (emphasis added).  Although it appears as if
Northland's counsel had suspicions about the "corrected lease",
there is no indication in any of the documents produced by
Northland that it disclosed to its counsel that there was a
permanent lease in the Truck at the time of the accident, and the
trip lease had been fabricated after the fact.  This conclusion
is supported by the detailed letter and memorandum of law sent by

Northland's counsel to Northland on April 3, 1997, assessing its potential liability based on the existence of the trip lease which allegedly expired before the accident.  (Exhibit L).

Eventually, Northland's counsel learned of the fabrication of the trip lease when he met with Hazel Sinclair on October 29, 1997.  When Northland's counsel reported to Northland that Hazel Sinclair had disclosed the fabrication of the trip lease, Northland's claims adjuster wrote in the claims diary, "When defense counsel met with insured, <u>they now admit to altering the lease after the accident, our exposure greatly increased here.</u>" (Exhibit B at p. 4, 10/29/97)(emphasis added).  Northland also immediately advised its re-insurers that:  "Unfortunately, our insured has now admitted to altering the lease agreement which indicated the lease ended subsequent to the accident.  They admit doing this in conjunction with the co-defendant, Jay McCormick. <u>This obviously greatly increases our exposure and I will be reviewing this matter and advising you of our position in the near future.</u>"  (Exhibit M)(emphasis added).

After the disclosure by Hazel Sinclair of the fabrication of the trip lease, Northland's counsel sent another letter to Northland dated February 2, 1998, commenting on the testimony provided at the depositions by Hazel Sinclair, Jay McCormick, and Vernice Statts:

> According to Hazel, back in 1990, Woolever first started doing business with JHM Enterprises, and JHM's tractors were leased to Woolever on a permanent basis. <u>It is that permanent lease, which you have also seen</u>, which was in the tractor at the time of this accident....

Unfortunately, Jay and Hazel never got around to revising the paperwork.  It is essentially undisputed, and both Jay McCormick and Hazel testified, that at the time this accident occurred, Statts had completed his trip for Woolever and was on his way to pick up a load for JHM  At the point that he made the switch, he should have covered the Woolever placard on the tractor and - prior to the time of the accident, <u>not after</u> - a trip lease should have been prepared documenting that the lease ended when delivery was made in Ephrata. [Indeed, both Statts and McCormick testified that this was the only day when the Woolever placard was not covered, that being the case because Statts "ran out of tape" on that morning.  <u>Based on my discussions with Hazel and Harold, I think it fair to say that McCormick and Statts perjured themselves</u>.  The Woolever placard never was covered.]

Exhibit N (emphasis added).

Based on the existence of the permanent lease, and Northland's, Woolever's and JHM's deceptive conduct in attempting to hide the existence of the permanent lease from Lincoln, Lincoln believed it had (and has) an excellent chance of prevailing on the merits and recovering over $750,000, and it would have made no sense for it to simply drop its claim against Northland without receiving any payment.

**B.   Settlement Discussion.**

In December, 1999 and January, 2000, Northland and Lincoln had an number of discussions about making a joint settlement offer to settle the underlying cases.  Eventually, Northland and Lincoln agreed that each would contribute up to $750,000 toward a settlement (which was Lincoln's policy limit), and then arbitrate the issue as to who was primary, excess or possibly concurrent. (Exhibit B at p. 10, 1/13/00).  Northland subsequently decided to back out of the agreement to arbitrate whether Lincoln was excess because Northland had a "$2 million policy and if we get bad

5

results then we would owe entire loss ...." (Exhibit B at p. 11, 1/13/00).

Northland commenced the present declaratory judgment action by filing a complaint on June 22, 2001. Northland than suggested that Lincoln contribute its entire $750,000, and that Northland would then make up the difference to settle the claim and drop the declaratory judgment action. Lincoln rejected this proposal and informed Northland that it wanted its money back from Northland and believed that it would prevail on the declaratory judgment action and Northland would owe Lincoln back everything it had paid out. (Exhibit B at p. 24, 8/10/00). Lincoln's in-house attorney, Michael McGovern felt Lincoln had an excellent chance of recovering all of its payments from Northland, and conveyed this view to Timothy Kirk, the Vice President of Claims to whom McGovern reported. McGovern Dep.Tr. at 53, 55-56. Eventually, Northland and Lincoln settled the underlying cases by each contributing $675,000 with a full reservation of rights against each other.

By at least November 20, 2000, Northland had decided to dismiss the declaratory judgment action as soon as Lincoln paid the settlement amount in the underlying case. Northland was prepared to dismiss the declaratory judgment action even though it knew Lincoln had yet to file its own claim against Northland, and before it had any type of assurance or release from Lincoln that it would not pursue Northland. Slane Dep.Tr. at 60-63; Exhibit B at 27, 11/20/00.

6

In February 2001, McGovern had a conversation with Kirk about the Northland claim, as well as other claims he was handling for Lincoln. Kirk authorized McGovern to approach Northland to see if it would be interested in settling the coverage dispute and walking away from the case by making a payment to Lincoln. Kirk informed McGovern that he should try to get the best deal he could, but ultimately, Kirk would settle for a payment from Northland of $300,000 if it would avoid the payment of any additional legal fees. Kirk Affidavit ¶¶4-7. At no time did Kirk authorize McGovern to simply walk away from the claim without receiving any payment from Northland. Such a decision would not have been a prudent business move and would not have been in the best interests of the shareholders and re-insurers. Kirk Affidavit ¶8. Kirk also discussed other claims with McGovern, and in some instances where Kirk felt there was only a slight chance of recovering anything, he authorized McGovern to simply discontinue pursuit of the claim and not spend more attorney's fees. However, Northland's claim was not one of these situations. Kirk Affidavit ¶9.

McGovern apparently misunderstood his instructions from Kirk. As a result, on April 2, 2001, he allegedly called Slane and asked if there was any interest in walking away without the payment of any further amount from Northland. Slane responded that Northland was interested. McGovern testified that on April 2, 2001, he informed Slane he had to talk to someone in authority above him about the proposed agreement. McGovern intended for Northland to send him some documents setting forth exactly what

7

it was willing to do, and he would then review those documents with Kirk and Kirk would make the final decision on whether to settle the case.  McGovern Dep.Tr. at 63-65, 70-71.  Slane testified that she knew McGovern had to go back to his accounting people to get approval for the proposal he had discussed with her on April 2, 2001.  Slane Dep.Tr. at 69, 77, 83.

Slane and McGovern both testified that they knew McGovern needed authority from someone above him to agree to any settlement.  Slane and McGovern disagree as to what was to be exchanged if the settlement had gone through.  McGovern envisioned that there would detailed mutual releases.  McGovern Dep.Tr. at 27.  In contrast, Slane did not intend for there to be any document confirming this settlement, and did not intend for there to be any mutual releases.  Slane Dep.Tr. at 75.  Slane never sent any document to McGovern regarding the settlement proposal, nor a proposed mutual release.

McGovern viewed his relationship to Lincoln the same as any outside counsel who goes back to the client and gets them to sign a document to make sure that the client has agreed with what the attorney might have communicated.  McGovern Dep.Tr. at 75.  McGovern acknowledged that there could have been some confusion between him and Kirk as to settling the Northland claim, and he would not know if Kirk was in agreement until Kirk actually signed the document agreeing to Northland's proposal.  McGovern Dep.Tr. at 41, 75.  After April 2, 2001, McGovern did not talk to Kirk or anybody in accounting about the proposed settlement, because he never received the documents he thought Slane was

8

sending to him.  McGovern Dep.Tr. at 78.  McGovern then left
Lincoln's employ in June 2001.  McGovern did not believe the case
was settled when he left Lincoln.  McGovern Dep.Tr. at 79.

Slane contends that on April 11, 2001, she called Attorney
Lipsius, who was handling the declaratory judgment action, about
voluntarily dismissing the action.  As of April 11, 2001, Lincoln
had not yet responded to the declaratory judgment complaint, and
Northland could have dismissed the declaratory judgment action
by simply filing a notice of voluntary dismissal under
Fed.R.Civ.P. 41(a)(1) if it believed the case was settled.
However, Northland took no action to voluntarily dismiss its
claim against Lincoln between April 2001 and August 2001, which
is when Lincoln filed its answer and counterclaim.  (The delay in
Lincoln filing its answer and counterclaim resulted from the
transfer of venue from the Eastern District to the Middle
District.)

After McGovern left the employ of Lincoln in June 2001, Kirk
reassigned the handling of the Northland claim to Attorney Albert
Miller.  Kirk had never heard anything back from McGovern
regarding any settlement discussions with Northland, and as such,
instructed Miller to pursue the claim against Northland.  Kirk
Affidavit ¶¶10-11; Miller Affidavit ¶3.  In July 2001, the law
firm of Schindel Farman & Lipsius was representing Lincoln in a
number of insurance matters that Miller was responsible for
handling.  Miller Affidavit ¶4.  On July 11, 2001, Miller had a
telephone conversation with Larry Rabinovich, an attorney at
Schindel, about some cases in which Rabinovich was representing

Lincoln. After he concluded his business with Rabinovich, Miller mentioned to him that he had just received a case where Attorney Lipsius of his office was pursuing a claim <u>against</u> Lincoln on behalf of Northland.  (Lincoln has raised this obvious conflict of interest with Attorney Lipsius, who has refused to withdraw from this matter.  Resolution of the conflict issue will be addressed at a later point in this proceeding).  Miller asked Rabinovich to transfer him to Lipsius so that he could discuss the case with him.  Miller Affidavit ¶5.

In a subsequent discussion between Lipsius and Miller, Lipsius commented that he thought the case between Northland and Lincoln had been settled, but he was not really sure.  Lipsius then proceeded to call Slane in order to ask her if the case had been settled.  While on the telephone, Slane read some notes, and indicated that McGovern was to get back to her with approval for settlement.  Slane did not state that McGovern had ever gotten back to her and told her he had received approval to settle the case.  Miller then told Slane and Lipsius that he could see no indication in the file that McGovern had ever received approval from Kirk to settle the case and that Miller did not believe the case was settled and that Lincoln intended to pursue its claim against Northland.  When Miller made this statement, neither Lipsius nor Slane voiced any objection or disagreement.  At no point in the conversation on July 11, 2001 did Lipsius claim that he should have dismissed the action Northland filed against Lincoln because of an alleged settlement.  Miller Affidavit ¶¶6-7.

At no point after Miller's statement to both Lipsius and Slane on July 11, 2001, did Lipsius or Northland send any type of document or proposed release to Lincoln claiming that the case was settled.  The first reference to any alleged settlement is in Northland's Second Affirmative Defense to Lincoln's counterclaim wherein it claims that the counterclaim is barred "by the doctrine of 'Accord and Satisfaction'."  Even at that point, Northland never sought to enforce the settlement agreement, but waited until May 2002, over a year after the alleged settlement, to file a motion with the Court seeking summary judgment on both Lincoln General's counterclaim, as well as dismissal of its own claim.  Northland never reported to its re-insurers that the case with Lincoln was settled, despite that it routinely reported to its re-insurers on the status of the matter.  Rudd Affidavit at Exhibit A.

## II.   ARGUMENT

### A.   There Has Been No Accord And Satisfaction.

Northland contends that there has been an accord and satisfaction.  Even if there was an accord, which is denied, there has been no satisfaction.  The general elements of an accord and satisfaction are as follows:

> An accord and satisfaction is a substitute contract between a debtor and creditor for the settlement of a debt by some alternative performance other than full payment of the debt.  Because an accord is a contract, it requires the elements of a contract:  offer, acceptance and consideration.  The elements of accord and satisfaction are:  (1) a disputed debt (2) a clear and unequivocal offer of payment in full satisfaction and (3) acceptance and retention of payment by the offeree.

Fleming v. CNA Ins. Co., 52 F. Supp.2d 499, 502 (E.D. Pa. 1999)(citations omitted).  Accord PNC Bank v. Balsamo, 634 A.2d 645, 655 (Pa. Super. 1993).

An essential element of an accord and satisfaction is that there was actual performance of the accord.  If there is not actual performance, then there has been no accord and satisfaction, and either party can pursue its original claim.  In Constitution Bank v. Kalinowski, 38 F. Supp.2d 384 (E.D. Pa. 1999), the court noted that:  "'An accord is a contract under which an obligee promises to accept a stated performance in satisfaction of the obligor's existing duty.  Performance of the accord discharges the original duty.'"  Id. at 386 (quoting Restatement (Second) of Contracts § 281(1)).  The court went on to state that:  "With an accord, it is performance of the substituted duty, not its mere promise, that discharges the

original duty. 'It is the essence of an accord that the original duty is not satisfied until the accord is performed . . . .'" Id. (citations omitted). See also Paramount Aviation Corporation v. Agusta, 178 F.3d 132, 147-48 (3d Cir. 1999)(no accord and satisfaction where no evidence of payment or satisfaction according to agreement); Lazzarotti v. Juliano, 469 A.2d 216, 221 (Pa. Super. 1983)(" Moreover, the agreement arrived at in the accord must "be executed by actual payment or performance to constitute a satisfaction and not by mere promise of future performance." Accord Nowicki Constr. Co., Inc. v. Panar Corp., N.V., 492 A.2d 36, 40 (Pa. Super. 1985); Beechwood Commons Condominium Ass'n v. Beechwood Commons Assoc., Ltd., 580 A.2d 1, 5 (Pa. Super. 1990).

It is also a general rule of law that an accord is revocable until such time as there is a satisfaction. In Nash v. Atlantic White Tower System, Inc., 170 A.2d 341 (Pa. 1961), the plaintiff-wife was injured when she slipped and fell in front of defendant's restaurant. Defendant subsequently provided plaintiffs with a release which specified a payment of $1,364 as full settlement of their claim. The plaintiffs signed and returned the release. However, the defendant never sent the check. Plaintiffs subsequently proceeded to file a lawsuit against defendant. Plaintiffs ultimately were awarded verdicts in the total amount of $25,000 against defendant. Defendant argued on appeal that there was an accord and satisfaction as a result of plaintiffs' execution of the release. The Pennsylvania Supreme Court rejected this argument since defendant had never

13

made payment of the accord prior to plaintiffs' revocation of the accord.  In the course of its opinion, the court noted the general rule of law that:  "'until satisfaction, an accord is revocable at the pleasure of either party.  An unexecuted accord is not enforceable by action.'"  Id. at 344, quoting Konqueror Bldg. & Loan Ass'n v. G.R. Kinney Co., 315 Pa. 318, 172 A 719, 720.

Northland has never satisfied the alleged accord. Northland has never provided Lincoln with a release or discontinued the declaratory judgment action, despite that this was allegedly the consideration for the accord.  Further, to the extent there was an accord, Lincoln revoked the accord in July, 2001 when Attorney Miller informed both Slane and Lipsius that Lincoln did not believe there was a settlement, and intended to pursue Northland.  Lincoln then filed its Answer and Counterclaim, further evidencing its revocation of any accord. As such, Northland is not entitled to summary judgment based on any alleged accord and satisfaction.

## B.    The Parties Never Agreed To The Essential Terms Of The Alleged Settlement.

In addition to there never having been a satisfaction, there never was an accord.  In Mazzella v. Koken, 739 A.2d 531 (Pa. 1999), the court stated with respect to settlement discussions:

> ...However, before preliminary negotiations ripen into contractual obligations, there must be manifested mutual assent to the terms of a bargain.

> If all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced.  If, however, there exist "ambiguities and undetermined matters which render a settlement agreement impossible

to understand and enforce[,]" such an agreement must be set aside.

Id. at 536-37 (underlining added; citations omitted).

As is apparent from the testimony of Slane and McGovern, there never was an agreement on the material terms of the alleged settlement. McGovern testified that he was waiting for documents from Slane, which he was then going to review with Kirk, and Kirk would decide whether to go forward with any settlement. McGovern Dep.Tr. at 41-42, 63-65, 70-71, 74-75, 78. In contrast, Slane testified that she did not believe there would be any documents memorializing the settlement, and did not believe there would be any mutual releases. Slane Dep.Tr. at 75. McGovern insisted that the last contact he had with Slane was that she was to send him documents which she was going to review with Kirk. McGovern Dep.Tr. at 27, 70. Since McGovern never received any documents from Slane, he had nothing to review or talk about with Kirk. However, even if Slane had sent documents proposing that Lincoln simply drop its claim against Northland, any such document would have been rejected by Kirk. Kirk Affidavit ¶12. There never was a meeting of the minds and the parties did not agree on the material terms of the alleged settlement because neither McGovern nor Kirk ever received the proposed documents from Northland in order to review and decide whether to go through with the settlement. Further, Kirk was never in agreement with simply dropping Lincoln's claim against Northland and wanted at least a $300,000 payment from Northland to Lincoln. Kirk Affidavit ¶12.

15

### C.  McGovern Did Not Have Authority To Settle The Claim With Northland.

McGovern did not have authority to settle with Northland by simply walking away from the case without any payment from Northland. Kirk Affidavit ¶¶7-8, 12. McGovern acknowledged that the reason he would review any documents with Kirk was to make sure there was no miscommunication between him and Kirk regarding the settlement of the action. McGovern Dep.Tr. pp. 41, 75. It is unclear the reason McGovern believed Kirk would have any interest in simply walking away from this case without any further payment from Northland considering that McGovern had previously informed Kirk that he believed Lincoln had an excellent chance of prevailing against Northland. McGovern Dep.Tr. at 53. Kirk believed that Lincoln had a good chance of prevailing against Northland, and was not willing to simply walk away from a claim with a potential recovery of $675,000 or more. Kirk Affidavit ¶¶4-6. The only reasonable explanation of this miscommunication between Kirk and McGovern is that McGovern confused the Northland claim with some other claim wherein Kirk told him to simply discontinue the action. Kirk Affidavit ¶9.

Northland erroneously argues that McGovern had apparent authority to settle the case. In Farris v. J. C. Penney Co., Inc., 176 F.3d 706 (3rd Cir. 1999), plaintiff's counsel agreed with defense counsel during trial to settle a case. The court went over the terms of the settlement on the record with the plaintiff present in the courtroom. The plaintiff made no objection to the settlement. The District Court subsequently

denied plaintiff's motion to set aside the settlement on the basis that her attorney had apparent authority to settle the case.  In reversing the District Court, the Third Circuit initially commented that:  "The Pennsylvania Supreme Court has never invoked the doctrine of apparent authority to enforce a settlement entered into by an attorney who lacks actual authority to settle a matter."  Id. at 709.  The Third Circuit went on to quote the Pennsylvania Supreme Court's statement that:

> At the outset it must be understood that under the facts of this case there is no question of an implied or an apparent agency.  The law in this jurisdiction is quite clear that an attorney must have express authority to settle a cause of action of the client.[2]

----

[2] Other Pennsylvania Supreme Court cases reiterate the need for express authority.

Id. at 709, quoting Rothman v. Fillette, 469 A.2d 543 (Pa. 1983)(citations omitted).

The Third Circuit did recognize that it had previously indicated in dicta in Tiernan v. Devoe, 923 F.2d 1024 (3d Cir. 1991) that in the right case the Pennsylvania Supreme Court might recognize the doctrine of apparent authority with respect to an attorney. Id. at 711.  However, the Court stated with respect to this dicta:

> The Tiernan and Edwards decisions, taken together, establish that in order for the doctrine of apparent authority to apply, the facts must show that the plaintiffs (principals) communicated directly with defense counsel, making representations that would

> leave defense counsel to believe that the plaintiffs'
> attorney had authority to settle the case.

Id. at 712 (emphasis added).  Despite its above statement, the
Court went on to conclude that the case before it did not involve
a situation where apparent authority would be invoked:

> Taking all of these authorities into account, we
> predict that while the Pennsylvania Supreme Court
> might, in some as yet undefined case, apply the
> doctrine of apparent authority to uphold a disputed
> settlement, it would not do so here.

Id. at 713 (emphasis added).

In the instant case, Slane had no communications with anyone
at Lincoln other than Attorney McGovern.  McGovern Dep.Tr. at 18.
Slane admitted that McGovern told her that he did not have
authority to settle the case, and needed to go back and talk to
his "accounting people."  Slane Dep.Tr. at 69, 77, 83; Exhibit B
at p. 29, 4/2/01.  Accordingly, Attorney McGovern could not have
had apparent authority to settle the case.

Northland requests this Court to ignore the general rule of
law regarding an attorney needing express authority to settle a
claim because Slane was allegedly unaware that McGovern was an
attorney.  Initially, to the extent Slane was truly unaware that
McGovern was an attorney, it was solely the result of her own
failure to accurately review the file.  McGovern's first letter
to Northland identifies himself as "Legal Counsel." Exhibit C.
See also Exhibit D (Letters identifying McGovern as an attorney).
In any event, it makes no difference what Slane thought, since
McGovern clearly is an attorney.

McGovern testified that he viewed his relationship like any
outside counsel who goes back to the client and gets them to sign

a document to make sure that the client has agreed with what the attorney might have communicated.  McGovern Dep.Tr. at 75.  Accordingly, McGovern clearly viewed himself as an attorney who did not have authority to settle the case, but that the client needed to agree to the settlement.

Northland cites a number of cases involving claims adjusters.  However, not one of these cases involves a claims adjuster who was acting as an attorney.  There is no separate rule of law for in-house versus outside attorneys.  Simply because Lincoln General had an in-house attorney handling the declaratory judgment action, and had retained separate outside attorneys to enter their appearance on behalf of Lincoln General, does not change the rule of law set forth by the Third Circuit.  Northland suggests that Attorney McGovern could not have been acting as Lincoln General's counsel because he spoke directly with Slane.  However, it is important to point out that Slane initially contacted McGovern back in May, 2000 to begin a dialogue.  Slane testified that it was common for her to contact other attorneys directly even though the case was being litigated.  Slane Dep.Tr. at 26.  Accordingly, there was nothing professionally inappropriate with McGovern dealing directly with Slane since she had initiated the communications.

## III.  CONCLUSION

There has been no accord and satisfaction of the claim asserted by Lincoln against Northland.  Northland has never satisfied the alleged accord reached in April 2001.  Kirk never approved of the accord suggested by Northland, and Attorney McGovern did not have express authority to bind Lincoln to any such accord.  Accordingly, for all of the foregoing reasons, Northland's Motion for Summary Judgment should be denied.

Respectfully submitted,

McNEES WALLACE & NURICK LLC

By _____
Jonathan H. Rudd
Charles T. Young, Jr.
100 Pine Street
P. O. Box 1166
Harrisburg, PA   17108-1166
(717) 232-8000

Attorneys for Defendant Lincoln
    General Insurance Company

## CERTIFICATION PURSUANT TO LOCAL RULE 7.8(b)(2)

I, Jonathan H. Rudd, certify that this brief was prepared using Microsoft Word 2000.  Based on the word count feature of that program, there are 4,945 words in this brief.

Jonathan H. Rudd

Dated:  June 4, 2002

## CERTIFICATE OF SERVICE

I, Jonathan H. Rudd, Esquire, hereby certify that on this 4th day of June, 2002, a true and correct copy of the foregoing document was served as follows:

### VIA FEDERAL EXPRESS

Ira S. Lipsius, Esquire
Schindel, Farman & Lipsius LLP
225 West 34th Street
New York, NY 10122

### VIA FIRST CLASS MAIL

Andrew R. Spiegel, Esquire
3901-A Main Street, 2nd Floor
Philadelphia, PA 19127


Jonathan H. Rudd