JUDGE'S COPY

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

NORTHLAND INSURANCE COMPANY          :
     Plaintiff                      :
                                     :
                                     :
     v.                             :    No. 1:01-CV-763
                                     :
LINCOLN GENERAL INSURANCE COMPANY,   :
J.H.M. ENTERPRISES, INC., and        :
VERNICE L. STATTS,                   :
     Defendants                     :
                                     :
LINCOLN GENERAL INSURANCE COMPANY,   :
     Third Party Plaintiff          :
                                     :
     v.                             :
                                     :
WOOLEVER BROTHERS TRANSPORTATION      :
INC.                                 :
     Third Party Defendant          :    (JUDGE KANE)

FILED
HARRISBURG, PA

DEC 1 3 2002

MARY E. D'ANDREA, CLE
Per _____
         Deputy Clerk

**DEFENDANT LINCOLN GENERAL INSURANCE COMPANY'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

### FINDINGS OF FACT

    1.   Plaintiff Northland Insurance Company ("Northland") is
an insurance company licensed to do business in Pennsylvania with
its principal place of business at 1295 Northland Drive, St Paul,
Minnesota.

2.    Defendant and Third Party Plaintiff Lincoln General Insurance Company ("Lincoln General") is an insurance company licensed to do business in Pennsylvania with a principal place of business at 3350 Whiteford Road, P.O. Box 3709, York, Pennsylvania 17402-0136.

3.    Defendant J.H.M. Enterprises, Inc. ("JHM") is a Pennsylvania corporation with its offices located at 1200 Valmont Drive, N.W. Williamsport, Pennsylvania.  JHM is owned by Jay McCormick ("McCormick").

4.    Defendant Vernice Lee Statts ("Statts") is an adult individual residing at 489 East Academy Street, Hughesville, Pennsylvania.

5.    Third Party Defendant Woolever Brothers Transportation, Inc. ("Woolever") is a Pennsylvania corporation with its offices located at 260 Jordan Avenue, Montoursville, Pennsylvania.

6.    Lincoln General issued a Primary Auto Package insurance policy to JHM, Policy Number PAP 185770 0495 covering the period April 18, 1995 through April 18, 1996 ("Lincoln General Policy").

7.    One of the vehicles scheduled under the Lincoln General Policy is a 1979 Freightliner, Serial Number CA213HM160222 ("Tractor").

8.    The Lincoln General Policy provides $750,000 in liability coverage for each accident or loss.

9.    On March 1, 1990, JHM and Woolever entered into an "Agreement Of Lease Of Motor Vehicle Equipment" ("Permanent Lease") whereby JHM leased the Tractor to Woolever.

10.    The Permanent Lease provides that: "The term of this lease shall begin at 10 A.M. o'clock on 3/1/90, and terminate at

2

the end of thirty (30) days, or at 10 A.M. o'clock 4/1/90, at
which time the term of this lease is automatically extended for
additional like thirty (30) day periods, unless terminated by
either party giving to the other party five (5) days written
notice of cancellation."

11.  The Permanent Lease provides that: "During the term of
this lease, the motor vehicle equipment described herein shall be
in the exclusive possession, control and use of Lessee and Lessee
hereby assumes complete responsibility for operation thereof."

12.  The Permanent Lease provides that: "During the term of
this lease, Lessee shall furnish and pay the costs of all public
liability, property damage and cargo insurance upon the motor
vehicle equipment issued hereunder only when such is operated in
the services of Lessee."

13.  Northland issued a Truckers insurance policy to
Woolever covering the period from September 1, 1995 through
September 1, 1996 ("Northland Policy").

14.  The Northland Policy provides $2,000,000 in liability
coverage for each accident.

15.  The parties have agreed by Court approved Stipulation
of December 2, 2002, that the autos covered by the Northland
Policy include those autos Woolever leases, hires or borrows.

16.  On or about November 16, 1995, Statts drove the
Tractor, which was pulling a van trailer, to Watkins Glen, New
York to pick up a load of salt for Woolever.  After the van
trailer was loaded, Statts returned to his home in Pennsylvania
for the night.

17.  In the morning of November 17, 1995, Statts drove the tractor and loaded van trailer to Ephrata, Pennsylvania in order to deliver the load of salt for Woolever.

18.  After delivering the load of salt for Woolever, Statts began driving toward Berwick, Pennsylvania, where he intended to drop off the van trailer used to haul the load of salt for Woolever, and then pick up a tank wagon owned by Raisio Incorporated. ("Raisio")

19.  Raisio processes potato starch used in the paper making industry.  The raw material Raisio uses in its business is a slurry produced by various potato chip manufacturers when washing potatoes.

20.  Raisio owned two tank wagons which were converted milk trucks which were used to pick up the slurry from the potato chip manufacturers.

21.  One or two days prior to November 17, 1995, Raisio had requested either JHM or Woolever to supply a driver to pick up Raisio's tank wagon and drive it to Hanover, Pennsylvania to pick up a load of slurry at a Frito-Lay plant.

22.  On November 17, 1995, Statts was headed to Raisio's facility in Berwick to pick up one of Raisio's tank wagons.  If Statts had arrived in Berwick, Statts would have unhooked the van trailer and hooked up to one of Raisio's tank wagons.  Statts would then have traveled to the Frito-Lay plant in Hanover, Pennsylvania to pick up a load of slurry which he would then have hauled back to Raisio's facility in Berwick.

23.  On the morning of November 17, 1995, as Statts traveled toward Berwick to drop off the van trailer used to haul the load

4

of salt for Woolever, he was involved in an accident on State Route 309 in Rush Township, Schuylkill County, Pennsylvania ("Accident").

24.  Statts drove into the rear of a vehicle being driven by Robert R. Clifford, and in which Karin Clifford was a passenger. As a result of the collision, both Robert and Karin Clifford were killed.

25.  The Clifford vehicle struck a vehicle driven by Sherrill Mulligan.  As a result of the collision between the Clifford vehicle and the Mulligan vehicle, Sherrill Mulligan allegedly suffered personal injuries.

26.  There was a placard affixed to the Tractor at the time of the Accident which stated "Leased to Woolever Bros." and set forth Woolever's federal and state operating authority number. There was also a placard identifying JHM Enterprises, Inc.

27.  On November 17, 1995, after the Accident, McCormick notified Raisio that Statts had been in an accident and would not be able to pick up Raisio's tank wagon in order to pick up the load of slurry.  McCormick indicated that there would be a driver available to pick up the load the following day using Raisio's tank wagon.  The load of slurry from the Frito-Lay plant in Hanover, Pennsylvania that Statts was supposed to pick up on November 17, 1995, was picked up on November 18, 1995.

28.  McCormick reported the Accident to Lincoln General on November 17, 1995.

29.  Woolever reported the Accident to Northland on November 17, 1995.

5

30.   On November 17, 1995, Gail Crecelius, a claims supervisor for Northland at the time, interviewed Hazel Sinclair, a part owner of Woolever, Statts, and McCormick.  In this initial interview, Hazel Sinclair informed Crecelius that McCormick ran under Woolever's authority and was leased to Woolever, and Woolever was the lessee.  Hazel Sinclair informed Crecelius that McCormick sets up the loads.  McCormick informed Crecelius that he had his own ICC number, but does not really use it.

31.   On May 12, 1995, McCormick executed a Certificate of Qualification for Statts.  McCormick executed the Certificate as a Dispatcher for Woolever.  McCormick certified in the Certificate that Statts "is regularly driving a vehicle operated by the below named carrier", which was identified as "Woolever Bros Transp"

32.   On November 17, 1995, Hazel Sinclair faxed Crecelius a copy of the Permanent Lease dated March 1, 1990 between Woolever as Lessee and JHM as Lessor for the Tractor.

33.   On November 17, 1995, Woolever's insurance agent faxed to Northland a Loss Notice.  The Loss Notice identified the insured vehicle as the Tractor owned by JHM.  Crecelius wrote on the Loss Notice next to JHM's name and address that "leased to insd."

34.   Crecelius reviewed a copy of the Permanent Lease dated March 1, 1990 for the Tractor on November 20, 1995.  Crecelius noted in Northland's computerized claim file notes that there was a Permanent Lease between JHM and Woolever.

35.   On November 20, 1995, Crecelius once again spoke to Hazel Sinclair and McCormick.  Crecelius' notes indicate that they were to send a better copy of the lease.

36.   On November 29, 1995, McCormick faxed to Lincoln General a copy of a document titled "Agreement of Lease Of Motor Vehicle Equipment" dated November 16, 1995, for the Tractor involved in the Accident ("Trip Lease").

37.   The Trip Lease provides that: "The term of this lease shall begin at 4:00 P.M. o'clock on 11/16/95 and terminate at the end of thirty (30) days, or at 8:00 A.M. o'clock 11/17/95, at which time the term of this lease is automatically extended for additional like thirty (30) day periods, unless terminated by either party giving to the other party five (5) days written notice of cancellation."

38.   The Trip Lease is signed by Jay McCormick, President of JHM, and Hazel Sinclair, Secretary/Treasurer of Woolever.

39.   JHM and Woolever represented on the face of the Trip Lease that it was signed on November 16, 1995.

40.   The Trip Lease further provides a certification by Harold Sinclair, a part-owner of Woolever, that on 11/16/95, he "carefully inspected the equipment described herein and that this is a true and correct report of the result of such inspection, and the Lessee's identification placard was displayed on each side of the power unit."

41.   In accordance with the Trip Lease, it appeared as if Woolever's lease of the Tractor and van trailer ended prior to the Accident.

42.   McCormick represented to Lincoln General that the Trip Lease was the document which was in effect immediately prior to the Accident, but that it had terminated prior to the Accident.

43.   At no time did McCormick provide Lincoln General with a copy of the Permanent Lease.

44.   On November 29, 1995, Northland sent Woolever a letter regarding the Accident.  Northland states in the letter that it would appear that neither the Tractor or van trailer would be considered covered autos under the Northland Policy and coverage may not exist.  Northland asked for a few documents, and stated that upon receipt of the documents, it would further advise of Northland's reservation of rights handling and whether or not Northland feels coverage exists under the Northland Policy for Woolever, and the owner and operator of the vehicles involved in the Accident.

45.   The only basis provided by Northland in its letter of November 29, 1995 for the conclusion that coverage may not exist under the Northland Policy is that the Northland Policy purportedly covered "Owned Commercial 'Autos' Only", and the Tractor was not owned by Woolever.

46.   As of November 29, 1995, Northland knew that the intent was for the Northland Policy to covered autos leased by Woolever, and that the agent has simply made a mistake by failing to type the correct number on the Policy.  Northland also knew that Woolever was paying a premium for the leased vehicles since it was including the mileage driven by the leased vehicles in its monthly mileage reports provided to Northland which were the basis for the monthly premium.

8

47.   Northland subsequently retroactively endorsed Woolever's policy to include Hired Auto Coverage, but it only made the endorsement retroactive to January 1, 1996, such that the endorsement did not include the time period of the Accident.

48.   Woolever provided Northland with the information requested in its letter of November 29, 1995.

49.   At no time after receiving the information requested in its November 29, 1995 letter did Northland further advise Woolever, JHM, or Statts whether or not it believed coverage existed under the Northland Policy for Woolever, JHM and/or Statts on the basis that the Northland Policy did not cover leased vehicles.

50.   Northland did not further advise Woolever, JHM and Statts as to whether coverage existed under the Northland Policy for the leased Tractor until it executed the Court approved Stipulation of December 2, 2002, thereby finally indicating after more than seven years that for purposes of the present litigation the Northland Policy covered leased autos.

51.   On December 4, 1995, Hazel Sinclair called Crecelius at Northland.  Ms. Sinclair informed Crecelius that she had faxed her the wrong lease on November 17, 1995.  Ms. Sinclair indicated that the lease faxed on November 17, 1995 was an old lease used when the owner operator worked 100% for Woolever, and that they now use trip leases.  Ms. Sinclair informed Crecelius that she would send the correct paperwork.

52.   On December 4, 1995, Jerry Parker ("Parker"), a Northland claims examiner who worked under Crecelius, called Hazel Sinclair.  In this conversations, Ms. Sinclair informed

Parker that she was sending him a trip lease, and that the "old one is wrong."

53.  On December 4, 1995, Woolever faxed Northland a copy of the Trip Lease, which is the same document that McCormick had faxed to Lincoln General on November 29, 1995.

54.  As a result of the Accident, in April, 1996, the Estates of Robert and Karin Clifford filed a suit against Statts, JHM, and Woolever in the Court of Common Pleas of Schuylkill County at Docket No. S-650-1996 ("Clifford Action").

55.  Northland retained Louis Bricklin, Esquire ("Bricklin"), of Bennett, Bricklin & Saltzburg to defend Woolever.  Northland sent Bricklin an engagement letter dated April 20, 1996, wherein it informed Bricklin that he would be defending Woolever, but that he would not be involved in any coverage issues.

56.  On June 7, 1996, Bricklin prepared a memorandum to file.  In this memorandum, Bricklin states:

> Note that before we file this answer we need to clear up with Woolever the question of the two leases in the file. The earlier lease, dated March 19, 1990, appears to be for the same equipment and does not have a return date on it indicating that it is a month-to-month lease.  Was that earlier lease still in effect at the time of this accident. Jerry Parker obviously has some suspicions that the later lease may have been created after the fact.

57.  On June 7, 1996, Bricklin prepared a memorandum to a Tom Cusack of his office.  In this memorandum, Bricklin discusses the Plaintiffs' request for production of documents directed to defendant, and asks Cusack to make up a redacted copy of Northland's investigative file.  Bricklin states:  "See me before you commence this assignment, as there are a couple of issues

10

pertaining to the appropriate lease and where these materials came from, which I want to discuss with you."

58.  On June 7, 1996, Bricklin sent a letter to Woolever which included a draft of Woolever's answer, new matter, and cross-claim against JHM and Statts.  Bricklin instructed Woolever to carefully review the answer, new matter, and crossclaim, and to contact him if Woolever had any questions, comments or if there was anything inaccurate in the pleading.  Bricklin further instructed Woolever to sign and return the verification page once the pleading met with its approval.

59.  The draft crossclaim that Bricklin sent with his June 7, 1996 letter to Woolever contains the following allegations:

> 3.  By way of further answer, defendant Woolever Brothers Transportation, Inc. avers that on or about November 16, 1995, it entered into an "Agreement of Lease of Motor Vehicle Equipment" with defendant JHM Enterprises.  A true and correct copy of the "Agreement of Lease of Motor Vehicle Equipment" is attached hereto and marked Exhibit "A."

> 4.  The term of the aforesaid lease was from 4:00 p.m. on November 16, 1995, through 8:00 a.m on November 17, 1995.

> 5.  The accident described in plaintiffs' complaint as averred by plaintiffs occurred after the termination of the aforesaid agreement and at a time when the tractor trailer in question had been returned to the sole custody and control of defendants JHM Enterprises and Vernice Lee Statts.

60.  On June 17, 1996, Hazel Sinclair, as secretary/treasurer of Woolever, executed a verification indicating that the facts alleged in the crossclaim were true and correct.  Hazel Sinclair verified that:  "I understand that false statements made herein are subject to the penalties of 18 Pa.C.S. §4904 relating to unsworn falsification to authorities."

61.  In his June 7, 1995 letter to Woolever, Bricklin enclosed a set of written interrogatories from Plaintiffs, and draft answers.  Interrogatory 60 requested Woolever to "State whether a maintenance record is kept for the vehicle Defendant, Vernice Lee Statts, was operating on the day of the accident, November 17, 1995."  Hazel Sinclair provided a verified response on behalf of Woolever to interrogatory 60 which states that: "There is a maintenance record on the trip lease attached as Exhibit 'A" to answering defendant's answer, new matter and crossclaim."

62.  On June 7, 1996, Bricklin sent a letter to Parker enclosing a draft of Woolever's answer, new matter and crossclaim.  Bricklin requested Parker to let him know if he had any questions or comments concerning the draft answer, new matter and crossclaim.  Bricklin explained in his letter that "Woolever's defense will be based on the contention that this accident occurred after the lease between Woolever and JHM had expired."  Bricklin further stated:  "If it is clear that Woolever is absolved from liability in the event that the lease had terminated before the accident occurred, then I would intend to concentrate on establishing those facts for the record, with the goal of filing a motion for summary judgment."

63.  Despite his memorandum to file dated June 7, 1996 about clearing up with Woolever the question of the two leases in the file, and Jerry Parker's suspicions that the later lease dated November 16, 1995 may have been created after the fact, Bricklin did nothing prior to filing the answer, new matter and crossclaim to verify that the Permanent Lease dated March 1, 1990 was

canceled prior to the Accident, or that the Trip Lease dated November 16, 1995 had been prepared prior to the Accident.

64.    Lincoln General retained the law firm of Mette, Evans & Woodside ("Mette") to defend JHM and Statts.  Attorneys from the Mette firm met with McCormick on a number of occasion to discuss the Accident and resulting claims.  At none of these meetings did McCormick disclose that there had been a Permanent Lease for the Tractor dated March 1, 1990 which had never been canceled pursuant to its terms and was in the Tractor at the time of the Accident, nor did McCormick ever disclose the circumstances surrounding the preparation of the Trip Lease dated November 16, 1995.

65.    Mette provided McCormick with a copy of Woolever's answer, new matter and crossclaim against JHM and Statts, and requested that he verify the reply to crossclaim.  At no time did McCormick inform Mette that the crossclaim was based on a Trip Lease which had been created after the Accident, despite that he knew the falsity of Woolever's allegations regarding the Trip Lease.

66.    On July 19, 1996, Bricklin sent a letter to Parker to report several developments with respect to the case.  In his letter, Bricklin recounts a recent telephone conversation with Hazel Sinclair.  Bricklin states:

> I also conducted a lengthy discussion with Hazel [Sinclair] to attempt to assure myself that the trip lease upon which Woolever is relying was the one in the vehicle at the time of this accident.  The file reflects that the state police seized the vehicle and its contents.  Accordingly, I impressed upon her the fact that if she should produce a lease different than the one found by the police in the vehicle, that could be quite embarrassing to Woolever.  She assured me that the "corrected lease" which is in our

13

possession should have been the one in the vehicle at the time of the accident.

67.   On April 3, 1997, Bricklin sent Parker a letter providing an evaluation of Woolever's potential liability. Bricklin enclosed a memorandum prepared by one of his associates. The memorandum, as well as Bricklin's letter, were premised on the lease agreement between JHM and Woolever having terminated prior to the accident.  Bricklin states in his letter:

> From our point of view, I would suggest that you authorize me to notice the deposition of Jay McCormick (the proprietor of JHM) and Vernice Statts to establish a record to service as the basis for the motion for summary judgment.  I am relatively certain that our notices will produce a cross-notice for one or more representatives from Woolever.  If, as I expect, there are no discrepancies in the testimony offered by those witnesses with respect to the lease arrangements between Woolever and JHM, at that point we can move for summary judgment on Woolever's behalf based on the contention that the lease had terminated.

68.   As a result of the Accident, in September, 1997, the Mulligans filed a suit against Statts, JHM, and Woolever in the Court of Common Pleas of Schuylkill County at Docket No. S-1689-1997 ("Mulligan Action").

69.   Lincoln General defended JHM and Statts and Northland defended Woolever in the Mulligan Action.

70.   In October, 1997, Woolever filed an answer, new matter and crossclaim against JHM and Statts in the Mulligan Action. Woolever's crossclaim in the Mulligan Action was virtually identical to the crossclaim it filed in the Clifford Action. Both crossclaims were based on the Trip Lease dated November 16, 1995, which allegedly ended at 8:00 a.m. on November 17, 1995, a few hours prior to the Accident.  Once again, Hazel Sinclair verified the facts of the crossclaim.

71.  On October 16, 1997, Woolever served all counsel with its response to Cliffords' request for production of documents. In its response, Woolever stated that tabs 1 through 5 contain the entire claims file of Northland.  Tab 3 contained the Trip Lease dated November 16, 1995, and a Trip Report for the load of salt hauled for Woolever on November 16 and 17, 1995.  Woolever did not produce a copy of the Permanent Lease dated March 1, 1990, nor did it make any mention of the Permanent Lease in its response to the document request.

72.  On October 27, 1997, Michael Pipa, Esquire, an attorney at Mette, met with McCormick prior to McCormick's deposition. McCormick informed Pipa that he believed the Trip Lease would end when Statts left the Ephrata site where he had delivered the load of salt for Woolever.  McCormick lead Pipa to believe that the Trip Lease had been prepared prior to the Accident and was the document which controlled the relationship between JHM and Woolever for the load of salt which was delivered to Ephrata.

73.  McCormick also told Pipa at their meeting that he would only ship materials for Woolever or use one of their flatbeds approximately once a month.

74.  McCormick never disclosed to Pipa that he owned other trucks which were permanently leased to Woolever.  One such truck was a 1986 Freightliner owned by JHM and driven by Bill Danley. The 1986 Freightliner was permanently leased to Woolever by a lease dated June 10, 1993.

75.  The 1986 Freightliner was initially one of the vehicles insured under the Lincoln General Policy.  However, in July, 1995, JHM requested that the 1986 Freightliner be deleted from

15

Lincoln General's Policy because it was permanently leased to Woolever and ran under Woolever's authority, and was to be covered under Woolever's trucking policy.  JHM executed a Hold Harmless Agreement effective July 10, 1995, agreeing to fully indemnify and hold Lincoln General harmless with respect to any accident involving the 1986 Freightliner after July 1, 1995.

76.  Bill Danley made two or three trips a week with the 1986 Freightliner hauling finished product from Raisio to paper mills.

77.  All of the trips made by Bill Danley with the 1986 Freightliner wherein he was hauling Raisio's finished product were made under Woolever's operating authority and were to be covered by Woolever's trucking insurance.

78.  McCormick met with Jim Brandt, a representative of King American Ltd., on June 7, 1995.  Brandt was a transportation claims specialist who met with McCormick to review his operations for Lincoln General's underwriting department.  At this meeting, McCormick told Brandt that he was leased to Woolever.  He also told Brandt that he did no trip leasing.  He told Brandt that he leased three of his trucks to Woolever.

79.  McCormick's statement to Pipa that he only would only ship materials for Woolever or use one of their flatbeds approximately once a month is contrary to the information he provided to Brandt.

80.  Hazel Sinclair's and McCormick's depositions were scheduled for November 4, 1997.  Hazel and Harold Sinclair met with Bricklin prior to November 4, 1997 to prepare for the depositions.  Bricklin summarized what occurred at this meeting

16

in a letter to Parker dated February 2, 1998. wherein he stated that:

> With respect to Woolever's liability, I now believe that there is no chance that we will be able to avoid it. As we discussed by telephone, when I met with Hazel and Harold to prepare their deposition testimony, Hazel "came clean" with me and confirmed what we both had suspected: that the trip lease which she forwarded to us was not the lease in the truck at the time of the accident. Instead, Hazel and Jay McCormick fabricated the trip lease on the day after the accident.
>
> According to Hazel, back in 1990, Woolever first started doing business with JHM Enterprises, and JHM's tractors were leased to Woolever on a permanent basis. It is that permanent lease, which you have also seen, which was in the tractor at the time of this accident....

81. After Bricklin reported to Parker what he had learned from Hazel Sinclair about the fabrication of the Trip Lease after the Accident, Parker wrote in the claims diary, "When defense counsel met with insured, they now admit to altering the lease after the accident, our exposure greatly increased here."

82. On November 3, 1997, before Hazel Sinclair was even deposed, Parker advised Northland's re-insurers that: "Unfortunately, our insured has now admitted to altering the lease agreement which indicated the lease ended subsequent to the accident. They admit doing this in conjunction with the co-defendant, Jay McCormick. This obviously greatly increases our exposure and I will be reviewing this matter and advising you of our position in the near future."

83. Statts, McCormick, and Hazel Sinclair were deposed for purposes of the Clifford and Mulligan Actions on November 4, 1997. Statts testified first. Statts testified that he would normally tape over the Woolever placard when he had completed a

17

trip for Woolever and was going to haul a trip for JHM.  Statts
claimed that the reason the Woolever placard was not taped over
at the time of the Accident was because he had run out of tape.
McCormick agreed with Statts' testimony about taping over the
placard.  McCormick also testified that the load of salt which
was hauled by Statts immediately before the Accident was covered
by a trip lease.  He further testified that the only arrangement
he had with Woolever prior to the Accident was through trip
leases.  McCormick never mentioned at his deposition that there
was a Permanent Lease for the Tractor dated March 1, 1990, or
that JHM had entered into permanent leases with Woolever for
other vehicles.

84.  Bricklin asked McCormick a number of questions at his
deposition about the Trip Lease, despite that Bricklin knew that
the Trip Lease had been fabricated after the Accident and the
Permanent Lease was the lease in the Tractor at the time of the
Accident.

85.  At no time during Statts' or McCormick's deposition did
Bricklin disclose that he knew the Trip Lease was a fabrication
and that there was a Permanent Lease in the Tractor at the time
of the Accident.

86.  Hazel Sinclair was deposed immediately after McCormick.
Hazel Sinclair initially testified that JHM would trip lease for
Woolever.  However, as Cliffords' counsel began asking Ms.
Sinclair about the preparation of the trip leases, she eventually
confessed that the Trip Lease was fabricated the day after the
Accident and that there was a Permanent Lease in the Tractor at
the time of the Accident.

87.  During Hazel Sinclair's deposition, Clifford's attorney asked whether the Permanent Lease was the one which had been produced during discovery.  Bricklin responded that it had not been produced because it was Woolever's position that the Permanent Lease did not control what was actually going on.

88.  At no time prior to Hazel Sinclair finally confessing that she had fabricated the Trip Lease with McCormick did Bricklin or Northland disclose to Lincoln General or any of the parties in the Clifford or Mulligan Actions that the Trip Lease had been fabricated after the Accident and that there was a Permanent Lease in the Tractor at the time of the Accident.

89.  Bricklin asked Hazel Sinclair a few questions at her deposition.  Bricklin asked Ms. Sinclair what should have been done with the placards on the vehicle when a trip was being run solely for JHM.  Ms. Sinclair responded that the Woolever placard should have been crossed off.

90.  Bricklin knew when he asked Ms. Sinclair about what should have been done to the Woolever placard when a trip was being run solely for JHM that the Woolever placard was never crossed off prior to the Accident.  Bricklin stated in his April 3, 1997 letter to Parker that:

> I spoke with Hazel Sinclair at Woolever Brothers.  She told me that at the time of the accident, JHM hauled only about one out of every five of its loads under Woolever's rights. However, at no time did JHM cover the Woolever placard when it was hauling the other eighty percent of its loads. Parenthetically, it now does so as a result of this accident.  Hazel tells me that Woolever was aware of the fact that its logo was not being covered but at the time did not consider that to be improper.

19

91.   Bricklin discussed the subject of covering over the
Woolever placard in his February 2, 1998 letter to Parker.   In
this letter, Bricklin states:

> It is essentially undisputed, and both Jay McCormick and
> Hazel testified, that at the time this accident occurred,
> Statts had completed his trip for Woolever and was on his
> way to pick up a load for JHM.   At the point that he made
> the switch, he should have covered the Woolever placard on
> the tractor and - prior to the time of the accident, not
> after - a trip lease should have been prepared documenting
> that the lease ended when delivery was made in Ephrata.
> [Indeed, both Statts and McCormick testified that this was
> the only day when the Woolever placard was not covered, that
> being the case because Statts "ran out of tape" on that
> morning.   Based on my discussions with Hazel and Harold, I
> think it fair to say that McCormick and Statts perjured
> themselves.   The Woolever placard never was covered.]

92.   Despite that he believed McCormick and Statts had
perjured themselves regarding their testimony about covering up
the Woolever placard, Bricklin never disclosed this false
testimony to any of the other parties in the Clifford and
Mulligan Actions, but instead, perpetuated this false testimony
by inferring through his questioning of Hazel Sinclair that the
Woolever placard was covered when a trip was run for JHM.

93.   On April 16, 1999, Bricklin sent Cliffords' counsel a
proposed Stipulation his office had prepared regarding the
leasing arrangement between JHM and Woolever.   Prior to sending
this proposed Stipulation to Cliffords' counsel, Bricklin had
reviewed the Stipulation with Northland.   The proposed
Stipulation provides in part:

> 7.   At the time of the accident, two ICC placards
> appeared on the side of the tractor.   Once read "JHM
> Enterprises, Inc., Williamsport, Pennsylvania" and set forth
> the Pennsylvania and ICC registration numbers for JHM
> Enterprises, Inc.   The other read "Leased to Woolever
> Brothers Transportation, Inc. Montoursville, Pennsylvania"
> and set forth Woolever Brothers' ICC and PUC registration
> numbers.

8.   At the time, the tractor trailer was carrying an "Agreement of Lease of Motor Vehicle Equipment" dated March 1, 1990, pursuant to which JHM Enterprises as lessor leased the tractor in question and a driver to Woolever Brothers Transportation, Inc.  At the time the lease was executed, the lease was intended to be a permanent lease because the JHM tractor was being utilized exclusively by Woolever Brothers for its business.

9.   Between 1990 and the time of the accident, the business relationship between JHM Enterprises and Woolever Brothers changed, so that there were numerous occasions upon which the tractor was utilized by JHM Enterprises for its own business.  However, JHM Enterprises and Woolever Brothers never changed the written lease agreement despite the fact that they were required to execute a new "trip lease" pursuant to applicable federal regulations each time the vehicle was leased back to Woolever Brothers.

94.  Cliffords' counsel refused to execute Bricklin's proposed Stipulation because he was not willing to stipulate to the intentions of Hazel Sinclair and McCormick because of their past conduct in fabricating the Trip Lease after the Accident and then concealing the Permanent Lease until Ms. Sinclair finally confessed to what she had done at her deposition on November 4, 1997.

95.  On June 10, 1999, Bricklin sent a letter to Cliffords' counsel wherein he stated in part that:  "I have told you that Woolever does not seek to escape liability for Statts' actions."

96.  Lincoln General and Northland eventually agreed to each advance $675,000 (a total of $1,350,000) to settle the Clifford and Mulligan Actions, while reserving all rights to seek reimbursement from the other pending a determination of the coverage issues involved in this case.

97.  The Mulligan Action settled in July, 2000.  The Clifford Action settled in October, 2000.  Lincoln General

21

advanced its portion of the Clifford settlement to the Cliffords'
attorney on November 28, 2000.

98.   Statts qualifies as an "insured" under the Northland
Policy since he was using the Tractor with Woolever's permission.

99.   The Northland Policy defines an "insured" to include
anyone who is liable for the conduct of an "insured" described in
the Northland Policy.

100. JHM qualifies as an "insured" under the Northland
Policy since the plaintiffs in the Clifford and Mulligan Actions
claimed that JHM was liable for Statts' conduct, and Statts is an
insured under the Northland Policy.

101. JHM, Statts and Woolever all qualify as insureds under
the Lincoln General policy.   JHM is the named insured.   Statts is
an "insured" under the Lincoln General Policy since he was using
the Tractor with JHM's permission.   Woolever is an insured since
the Lincoln General Policy defines an "insured" to include anyone
who is liable for the conduct of an "insured" described in the
Lincoln General Policy.   Since the Plaintiffs in the underlying
cases alleged and Woolever eventually acknowledged that it was
liable for Statts' conduct, it qualifies as an insured under the
Lincoln General Policy.

102. The Northland Policy expressly states:

> This Coverage Form's Liability Coverage is primary
> for any covered "auto" while hired or borrowed by you
> and used exclusively in your business as a "trucker"
> and pursuant to operating rights granted to you by a
> public authority.

103. The Lincoln General Policy expressly states:   "This
Coverage Form's Liability Coverage is excess over any other

collectible insurance for any covered 'auto' while hired or
borrowed from you by another 'trucker'."

104. The Lincoln General Policy expressly states that:

> This Coverage Form is void in any case of fraud by
> you at any time as it relates to this Coverage Form.
> It is also void if you or any other "insured", at any
> time, intentionally conceal or misrepresent a material
> fact concerning:

    a.  This Coverage Form;

    b.  The covered "auto";

    c.  Your interest in the covered "auto"; or

    d.  A claim under this Coverage Form.

105. Although Northland knew that the Permanent Lease was
in effect at the time of the Accident, it concealed this
information from Lincoln General and cooperated in JHM and
Woolever's misrepresentations to Lincoln General that the Trip
Lease was in effect at the time of the Accident.

106. In addition to the Trip Lease dated November 16, 1995,
Woolever and JHM fabricated numerous other trip leases and
documents after the Accident in order to make it appear as if
there was a course of conduct of preparing trip leases between
JHM and Woolever, which was not the case. Statts participated in
this fabrication since he signed documents making it appear as if
the trip leases were all prepared prior to the loads being
hauled, when in reality, they were all prepared after the
Accident on November 17, 1995.

107. On August 16, 1996, Northland requested that a mileage
audit be performed for the policy period September 1, 1995
through September 1, 1996. Northland specifically instructed

that the mileage be split between owned units, long term permanently leased units and short term hired units.

108. On September 30, 1996, Equifax Commercial Specialists generated the mileage audit report requested by Northland. The report indicates that there were no miles driven by short term hired units in September, October, and November, 1995.

109. As of January 1, 1996, JHM permanently leased all of its tractors to Woolever.

110. JHM's Trucking Insurance Policy with Lincoln General expired on April 18, 1996. JHM did not renew its Trucking Insurance Policy with Lincoln General because it no longer needed trucking insurance since it had permanently leased all of its vehicles to Woolever and was no longer using its own operating authority.

111. McCormick completed an insurance application with Lincoln General on May 10, 1996, requesting Non-Trucking insurance. In the application, McCormick stated that all vehicles were leased to trucking concerns on a long term basis. McCormick further stated that new leases had been prepared effective January 1, 1996. McCormick stated that prior to that no units were leased.

112. McCormick's statement in his application that no units were leased prior to January 1, 1996 is false, since he had permanently leased four trucks to Woolever prior to January 1, 1996.

113. Lincoln General incurred $91,511.35 in defending Statts and JHM in the underlying actions.

114. Northland incurred $65,629.59 in defending Woolever in the underlying actions.

## CONCLUSIONS OF LAW

115. Northland has the primary obligation to defend and indemnify Woolever, Statts and JHM from all claims arising out of the Accident.

116. In accordance with the other insurance clauses in both the Northland Policy and the Lincoln General Policy, Northland's coverage for Woolever, Statts, and JHM is primary since the Tractor was hired by Woolever and used exclusively in its business as a "trucker" and pursuant to operating rights granted to Woolever at the time of the Accident.

117. JHM and Woolever committed fraud, misrepresented facts, and concealed information regarding their leasing arrangement by concealing the presence of the Permanent Lease in the Tractor at the time of the Accident, and misrepresenting that the Trip Lease dated November 16, 1995 was in the Tractor at the time of the Accident when it was not prepared until after the Accident.

118. The statements made by JHM and Woolever in the Trip Lease that it was executed on 11/16/95 are false.

119. The statement made by Woolever in the Trip Lease that Harold Sinclair carefully inspected the equipment on 11/16/95 is false.

120. JHM and Woolever knew that the statements made in the Trip Lease as to the date it was executed and the alleged careful inspection of the equipment by Harold Sinclair on 11/16/95 were false.

121. Statts, McCormick, and Hazel Sinclair all provided false testimony as to the alleged business practice of covering up Woolever's placard when the Tractor was used for JHM.

122. JHM and Woolever attempted to deceive Lincoln General into believing that there was a Trip Lease which had expired a few hours before the Accident, when they knew that there was a Permanent Lease in effect at the time of the Accident which required Woolever to provide liability coverage for the Tractor and provided that Woolever had exclusive possession and control of the Tractor for the duration of the Permanent Lease.

123. JHM's and Woolever's calculated plan to deceive Lincoln General about the nature of the lease of the Tractor was an attempt to impose on Lincoln General primary liability coverage for the Accident and relieve Woolever and Northland of any liability or responsibility to provide insurance coverage for the Accident.

124. The identity of the Permanent Lease was a material fact involving Woolever's, JHM's and Statts' claim for coverage under the Lincoln General Policy, and whether Lincoln General or Northland was required to provide primary, excess, or concurrent coverage.

125. JHM's and Woolever's deception and fraud involving their failure to disclose the existence of the Permanent Lease and misrepresentations as to the Trip Lease executed after the Accident were all part of their plan to manipulate insurance coverage and impose on JHM's liability insurance carrier responsibility for incidents that should have been covered in whole or in part by Woolever's liability insurance carrier.

26

126. The liability coverage afforded under the Lincoln General Policy is void as to JHM, Woolever and/or Statts for the claims arising out of the Accident as a result of the fraud, intentional concealment, and misrepresentations of material facts committed by JHM, Woolever, and/or Statts.

127. Northland knew of the Permanent Lease, but concealed this information from Lincoln General and the other parties in the Clifford and Mulligan Actions.

128. Northland intentionally concealed the existence of the Permanent Lease despite its suspicions that the Trip Lease had been created after the fact in order to try and obtain summary judgment on the basis that the Trip Lease had expired prior to the Accident.

129. Northland intentionally concealed the existence of the Permanent Lease because it knew that if it disclosed that the Permanent Lease was in effect at the time of the Accident, this fact would automatically make Lincoln General's Policy excess since the Tractor would have been leased to another trucker.

130. Northland is obligated to reimburse Lincoln General for all expenses it has incurred to defend Statts and JHM, and all payments it has made to claimants arising from the Accident, in the total amount of $766,511.35, since Lincoln General's coverage is void for the Accident.

131. Northland must pay Lincoln General prejudgment interest from November 28, 2000, until the date of judgment.

Alternative proposed conclusions of law in the event it is determined that Lincoln General and Northland provide coverage to JHM, Statts, and Woolever, on a concurrent basis.

132. The Lincoln General and Northland Policies contain identical provisions on the apportionment of payments if their respective policies cover a claim on an equal basis, either primary or excess. In accordance with this provision, Lincoln General and Northland agreed to apportion payments based on the proportion that the limits of insurance in each policy bears to the combined limits of insurance of the two policies.

133. The limits of insurance in the Lincoln General Policy is $750,000, and the limits of insurance in the Northland Policy is $2,000,000, for a combined limits of insurance of $2,750,000. Lincoln General's proportion of the combined limit is 27.27 percent, and Northland's proportion of the combined limit is 72.73 percent.

134. Lincoln General and Northland each paid $675,000 to settle the Clifford and Mulligan Actions, for a total of $1,350,000. Lincoln General and Northland paid a combined amount of $157,140.94 to defend JHM, Statts, and Woolever in the Clifford and Mulligan Actions. The total amount paid by Lincoln General and Northland to settle and defend the Clifford and Mulligan Actions is $1,507,140.94.

135. Northland's and Lincoln General's pro rata liability for all costs to settle and defend the underlying actions is $1,096,143.61 and $410,997.33, respectively, based on their respective percentages of responsibility of 72.73 and 27.27.

136. Lincoln General paid $355,514.02 in excess of its pro rata share of responsibility to settle the Clifford and Mulligan Actions, which it is entitled to receive from Northland.

137. Lincoln General is entitled to prejudgment interest from November 28, 2000, until the date of judgment.

Respectfully submitted,

McNEES WALLACE & NURICK LLC

By _____
Jonathan H. Rudd, Esq.
Charles T. Young, Jr., Esq.
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 237-5405

Attorneys for Lincoln General Insurance Company

Dated:   December 13, 2002

## CERTIFICATE OF SERVICE

I, Jonathan H. Rudd, Esquire, hereby certify that on this 13th day of December, 2002, a true and correct copy of the foregoing document was served by first-class, United States mail, postage prepaid, upon the following:

Ira S. Lipsius, Esquire
Schindel, Farman & Lipsius LLP
225 West 34th Street
New York, NY 10122

Andrew R. Spiegel, Esquire
3901-A Main Street, 2nd Floor
Philadelphia, PA 19127


Jonathan H. Rudd