UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORTHLAND INSURANCE COMPANY<br>        Plaintiff | : | |
| | : | |
| | : | |
| v. | : | No. 1:01-CV-763 |
| | : | |
| LINCOLN GENERAL INSURANCE COMPANY,<br>J.H.M. ENTERPRISES, INC., and<br>VERNICE L. STATTS,<br>        Defendants | : | |
| | : | |
| LINCOLN GENERAL INSURANCE COMPANY,<br>        Third Party Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| WOOLEVER BROTHERS TRANSPORTATION<br>INC.<br>        Third Party Defendant | : | (JUDGE KANE) |

**FILED**
**HARRISBURG, PA**

FEB 0 5 2003

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

**DEFENDANT LINCOLN GENERAL INSURANCE COMPANY'S POST-TRIAL PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**FINDINGS OF FACT**

1.    Plaintiff Northland Insurance Company ("Northland") is
an insurance company licensed to do business in Pennsylvania with
its principal place of business at 1295 Northland Drive, St Paul,
Minnesota.

2.    Defendant and Third Party Plaintiff Lincoln General Insurance Company ("Lincoln General") is an insurance company licensed to do business in Pennsylvania with a principal place of business at 3350 Whiteford Road, P.O. Box 3709, York, Pennsylvania 17402-0136.

3.    Defendant J.H.M. Enterprises, Inc. ("JHM") is a Pennsylvania corporation with its offices located at 1200 Valmont Drive, N.W. Williamsport, Pennsylvania.  JHM is owned by Jay McCormick ("McCormick").

4.    Defendant Vernice Lee Statts ("Statts") is an adult individual residing at 489 East Academy Street, Hughesville, Pennsylvania.

5.    Third Party Defendant Woolever Brothers Transportation, Inc. ("Woolever") is a Pennsylvania corporation with its offices located at 260 Jordan Avenue, Montoursville, Pennsylvania.

6.    Lincoln General issued a Primary Auto Package insurance policy to JHM, Policy Number PAP 185770 0495 covering the period April 18, 1995 through April 18, 1996 ("Lincoln General Policy"). (Def's Ex. 67).

7.    One of the vehicles scheduled under the Lincoln General Policy is a 1979 Freightliner, Serial Number CA213HM160222 (sometimes referred to as the "Tractor").

8.    The Lincoln General Policy provides $750,000 in liability coverage for each accident or loss.

9.    Northland issued a Truckers insurance policy to Woolever covering the period from September 1, 1995 through September 1, 1996 ("Northland Policy").  (Def's Ex. 24).

2

10.   The Northland Policy provides $2,000,000 in liability coverage for each accident.

11.   The parties have agreed by Court approved Stipulation of December 2, 2002, that the autos covered by the Northland Policy include those autos Woolever leases, hires or borrows.

12.   Woolever began operations in 1985 or 1986, and obtained its own ICC and PUC operating authority at that time.  Woolever was the successor of a company known as Woolever Transfer, which had been in operation for many years.  (Harold Sinclair's Trial Testimony).

13.   In 1989, Woolever and JHM purchased equipment from Walter Smith and Smith Truck Lines (collectively "Smith").  JHM purchased three tractors and a number of trailers from Smith.  (McCormick's and Harold Sinclair's Trial Testimony).

14.   Raisio Incorporated ("Raisio") processes potato starch used in the paper making industry.  The raw material Raisio uses in its business is a slurry produced by various potato chip manufacturers when washing and peeling potatoes.  Raisio has a facility located in Berwick, Pennsylvania.  (Pl's Ex. 32, Clemons Dep. Tr. at pp. 5 & 10).

15.   Raisio owned two tank wagons which were converted milk trucks which were used to pick up the slurry from the potato chip manufacturers.  (Pl's Ex. 32, Clemons Dep. Tr. at p. 6-7).

16.   Dale Clemons ("Clemons") was a Raisio employee who became a production supervisor in September, 1989.  As part of his duties, Clemons was responsible for scheduling the trucks which hauled the raw product to Raisio's facility, as well as the

3

finished product from Raisio's facility. (Pl's Ex. 32, Clemons Dep. Tr. at p. 5.).

17. In the fall of 1989 or very early in 1990, Clemons was informed by his superiors that he was to contact McCormick about hauling products for Raisio, and was given the toll free number for Woolever's offices. (Pl's Ex. 32, Clemons Dep. Tr. at pp. 7, 20-21.

18. At the time JHM purchased the equipment from Smith, he did not have any operating authority with the ICC or PUC. (McCormick's Trial Testimony; Pl's Ex. 31).

19. On March 1, 1990, JHM and Woolever entered into an "Agreement Of Lease Of Motor Vehicle Equipment" ("Permanent Lease") whereby JHM leased the Tractor to Woolever. (Def's Ex. 80). Bill Wise was the initial driver of the Tractor after it was leased to Woolever. (McCormick's Trial Testimony).

20. The Permanent Lease provides that: "The term of this lease shall begin at 10 A.M. o'clock on 3/1/90, and terminate at the end of thirty (30) days, or at 10 A.M. o'clock 4/1/90, at which time the term of this lease is automatically extended for additional like thirty (30) day periods, unless terminated by either party giving to the other party five (5) days written notice of cancellation."

21. The Permanent Lease provides that: "During the term of this lease, the motor vehicle equipment described herein shall be in the exclusive possession, control and use of Lessee and Lessee hereby assumes complete responsibility for operation thereof."

22. JHM permanently leased all of the tractors he purchased from Smith to Woolever at the same time. (McCormick's Trial

4

Testimony).  One of these tractors was a 1985 White/Volvo which was driven by Craig Evans.  (Def's Ex. 74).  JHM also leased another White/Volvo to Woolever which was driven by Bill Danley. (McCormick's Trial Testimony).

23.  In or about June 1993, JHM purchased a 1986 Freightliner which it permanently leased to Woolever on June 10, 1993.  (Def's Ex. 75).  Bill Danley began to drive the 1986 Freightliner after it was leased to Woolever. (McCormick's Trial Testimony).

24.  In or about December, 1994, JHM purchased a 1988 Freightliner which it permanently leased to Woolever on December 30, 1994.  (Def's Ex. 76).

25.  On February 6, 1992, JHM received its own operating authority.  (Pl's Ex. 31).

26.  From March 1, 1990 through at least the time when JHM obtained its own operating authority, the JHM tractors which were permanently leased to Woolever were used to haul products to and from Raisio's facility in Berwick.  All of these loads were hauled under Woolever's operating authority.  (McCormick's Trial Testimony;. Pl's Ex. 31).

27.  Despite that the JHM tractors were permanently leased to Woolever and Woolever's operating authority was being used, JHM billed Raisio for all loads hauled to and from Raisio for the period from March 1, 1990 through at least the time when JHM obtained its own operating authority.  (Wilking's Trial Testimony)

28.  Bill Wise continued to drive the 1979 Freightliner until at least June, 1993, when JHM purchased the 1986

Freightliner and Bill Danley began driving the 1986 Freightliner, which made the White/Volvo available for Wise to drive. (McCormick's Trial Testimony). Bill Wise frequently hauled finished product from Raisio. (McCormick's Trial Testimony; Pl's Ex. 32, Clemons Dep. Tr. at p. 19). Bill Wise drove the Tractor solely for Woolever. (Pl's Ex. 32, Hazel Sinclair's Dep. Tr. at 68).

29.  The 1986 Freightliner was initially one of the vehicles insured under the Lincoln General Policy. (Def's Ex. 67). However, in July, 1995, JHM requested that the 1986 Freightliner be deleted from Lincoln General's Policy because it was permanently leased to Woolever and ran under Woolever's authority, and was to be covered under Woolever's trucking policy. JHM executed a Hold Harmless Agreement effective July 10, 1995, agreeing to fully indemnify and hold Lincoln General harmless with respect to any accident involving the 1986 Freightliner after July 10, 1995. (Def's Ex.s 78 & 79).

30.  Bill Danley made two or three trips a week with the 1986 Freightliner hauling finished product from Raisio to paper mills. (Pl's Ex. 32, Clemons Dep. Tr. at p. 19)

31.  All of the trips made by Bill Danley with the 1986 Freightliner wherein he was hauling Raisio's finished product were made under Woolever's operating authority and were to be covered by Woolever's trucking insurance.

32.  Woolever drivers, including Art and Scott Woolever, and Barry Brown, were also used to haul loads to and from Raisio. (Pl's Ex. 32, Clemons Dep. Tr. at pp. 17, 34-36, 83, 98-99).

33.  At all pertinent times prior to November 17, 1995, JHM billed Raisio for all loads hauled by JHM's and Woolever's tractors, including all of the JHM tractors which were permanently leased to Woolever.  (Wilking's Trial Testimony).

34.  McCormick met with Jim Brandt on June 7, 1995.  Brandt was a transportation claims specialist who met with McCormick to review his operations for Lincoln General's underwriting department.  At this meeting, McCormick told Brandt that he was still leased to Woolever.  He also identified at least three of his trucks which were leased to Woolever.  (Def's Ex. 77).

35.  At no time prior to November 17, 1995, were the permanent leases for 1979 Freightliner, 1985 White/Volvo, 1986 Freightliner, and 1988 Freightliner canceled.  (Harold Sinclair's Trial Testimony).

36.  At no time prior to November 17, 1995, did JHM complete the receipt contained on the Permanent Lease acknowledging return of the equipment.  (Def's Ex. 80).

37.  At no time did Woolever sublease any of JHM's vehicles which were leased to Woolever.  (McCormick's Trial Testimony).

38.  Effective January 1, 1996, JHM entered into new permanent lease agreements with Woolever.  (Def's Ex. 105, Application at p. 3).

39.  JHM's operating authority was revoked on April 18, 1996.  (Pl's Ex. 31).

40.  JHM continued to bill Raisio for all loads hauled to or from Raisio even after April 18, 1996, when it no longer had operating authority, except for a few loads hauled by Woolever to

Virginia in 1996/1997/1998 which were billed directly by
Woolever. (Wilking's Trial Testimony).

41. Statts began to drive the 1979 Freightliner in or about
July, 1995. At the time Statts began driving the 1979
Freightliner, it did not have JHM's placard on the truck. Statts
installed the JHM placard on the 1979 Freightliner sometime after
he started to drive the Tractor. (Def's Ex. 68, Statts Dep.Tr.
at pp. 58-59).

42. At no time prior to November 17, 1995 was the Woolever
placard removed from the Tractor, nor were any steps taken to
cover the Woolever placard. (Def's Ex.s 45 and 51). Neither
McCormick nor Harold Sinclair ever told Statts to cover over the
Woolever placard. (McCormick's and Harold Sinclair's Trial
Testimony).

43. Statts' logs as originally completed in November, 1995,
identified Woolever as the motor carrier for whom he was hauling,
and made no reference to any loads being hauled for JHM or to any
trip leases. (Def's Ex. 4, and logs attached to leases at Def's
Ex.s 86-90).

44. Woolever completed the required governmental
certifications and paperwork for Statts which identified Woolever
as the motor carrier for whom Statts was driving. (Def's Ex.s 2
and 3).

45. On May 12, 1995, McCormick executed a Certificate of
Qualification for Statts. McCormick executed the Certificate as
a Dispatcher for Woolever. McCormick certified in the
Certificate that Statts "is regularly driving a vehicle operated

8

by the below named carrier", which was identified as "Woolever Bros Transp" (Def's Ex. 3 at p. 5).

46. On or about November 16, 1995, Statts drove the Tractor, which was pulling a van trailer, to Watkins Glen, New York to pick up a load of salt for Woolever. After the van trailer was loaded, Statts returned to his home in Pennsylvania for the night.

47. In the morning of November 17, 1995, Statts drove the tractor and loaded van trailer to Ephrata, Pennsylvania in order to deliver the load of salt for Woolever. Statts completed unloading sometime after 8:00 A.M. (Statts' Trial Testimony).

48. After delivering the load of salt for Woolever, Statts began driving toward Berwick, where he intended to drop off the van trailer used to haul the load of salt for Woolever, and then pick up a tank wagon owned by Raisio. If Statts had arrived in Berwick, he would have unhooked the van trailer and left it at Raisio's facility until he returned with the tank wagon, at which time he would have hooked back onto the van trailer and returned to Woolever's facility in Montoursville pulling the empty van trailer. (Statts' and McCormick's Trial Testimony).

49. One or two days prior to November 17, 1995, Raisio had requested either JHM or Woolever to supply a driver to pick up Raisio's tank wagon and drive it to Hanover, Pennsylvania to pick up a load of slurry at a Frito-Lay plant. (Def's Ex. 32, Clemons Dep.Tr. at pp. 13-15, 40-41). Harold Sinclair discussed sending a driver to Raisio with McCormick, but did not know who the driver was going to be when the request first came in from Clemons. (Pl's Ex. 33, Harold Sinclair's Dep.Tr. at 117-18).

50. On the morning of November 17, 1995, as Statts traveled toward Berwick, he was involved in an accident on State Route 309 in Rush Township, Schuylkill County, Pennsylvania ("Accident").

51. Statts drove into the rear of a vehicle being driven by Robert R. Clifford, and in which Karin Clifford was a passenger. As a result of the collision, both Robert and Karin Clifford were killed.

52. The Clifford vehicle struck a vehicle driven by Sherrill Mulligan. As a result of the collision between the Clifford vehicle and the Mulligan vehicle, Sherrill Mulligan suffered personal injuries.

53. There was a placard affixed to the Tractor at the time of the Accident which stated "Leased to Woolever Bros." and set forth Woolever's federal and state operating authority number. There was also a placard identifying JHM Enterprises, Inc. below the Woolever placard.

54. The Police Report indicates that Woolever Brothers was the motor carrier at the time of the Accident. (Police Report included in Def's Ex. 104, Tab 5).

55. McCormick reported the Accident to Lincoln General on November 17, 1995. (McCormick's and McGovern's Trial Testimony).

56. Woolever reported the Accident to Northland on November 17, 1995. (Def's Ex.s 1,5 & 6, Crecelius' Trial Testimony)

57. On November 17, 1995, Gail Crecelius, a claims supervisor for Northland at the time, interviewed Hazel Sinclair, a part owner of Woolever, and also interviewed Statts, and McCormick. In this initial interview, Hazel Sinclair informed Crecelius that McCormick ran under Woolever's authority and was

10

leased to Woolever, and Woolever was the lessee.  Hazel Sinclair informed Crecelius that McCormick sets up the loads.  Hazel Sinclair made no mention of any trip leases between JHM and Woolever.  (Def's Ex. 6; Crecelius' Trial Testimony).

58.  On November 17, 1995, in response to Crecelius' request for a copy of the lease agreement between JHM and Woolever, Hazel Sinclair faxed Crecelius a copy of the Permanent Lease dated March 1, 1990 for the Tractor.  (Def's Ex. 7).

59.  On November 17, 1995, Woolever's insurance agent faxed to Northland a Loss Notice.  The Loss Notice identified the insured vehicle as the Tractor owned by JHM.  Crecelius wrote on the Loss Notice next to JHM's name and address that "leased to insd."  (Def's Ex. 5; Crecelius' Trial Testimony).

60.  Crecelius reviewed a copy of the Permanent Lease dated March 1, 1990 for the Tractor on November 20, 1995.  (Def's Ex. 10).  Crecelius noted in Northland's computerized claim file notes that there was a Permanent Lease between JHM and Woolever. (Def's Ex. 1).

61.  On November 20, 1995, Crecelius once again spoke to Hazel Sinclair and McCormick.  Crecelius' notes indicate that they were to send a better copy of the lease.  (Def's Ex. 9).

62.  On November 29, 1995, McCormick faxed to Lincoln General a copy of a document titled "Agreement of Lease Of Motor Vehicle Equipment" dated November 16, 1995, for the Tractor involved in the Accident, although it identified a trailer that was not involved in the Accident (hereinafter frequently referred to as the "Trip Lease").  (Def's Ex.s 14 & 90).  The Trip Lease was sent to Michael McGovern ("McGovern"), who had requested

11

McCormick to send him a copy of the lease agreement between JHM
and Woolever.  (McCormick's and McGovern's Trial Testimony).

63.  The Trip Lease provides that: "The term of this lease
shall begin at 4:00 P.M. o'clock on 11/16/95 and terminate at the
end of thirty (30) days, or at 8:00 A.M. o'clock 11/17/95, at
which time the term of this lease is automatically extended for
additional like thirty (30) day periods, unless terminated by
either party giving to the other party five (5) days written
notice of cancellation."

64.  The Trip Lease is signed by Jay McCormick, President of
JHM, and Hazel Sinclair, Secretary/Treasurer of Woolever.

65.  JHM and Woolever represented on the face of the Trip
Lease that it was signed on November 16, 1995.

66.  The Trip Lease further provides a certification by
Harold Sinclair, a part-owner of Woolever, that on 11/16/95, he
"carefully inspected the equipment described herein and that this
is a true and correct report of the result of such inspection,
and the Lessee's identification placard was displayed on each
side of the power unit."

67.  JHM and Woolever entered into the Trip Lease in order
to make it appear as if Woolever's lease of the Tractor and van
trailer ended prior to the Accident.

68.  At no time did McCormick provide Lincoln General with a
copy of the Permanent Lease or explain the circumstances
surrounding the preparation of the Trip Lease.  (McCormick's
Trial Testimony).

69.  On December 4, 1995, Hazel Sinclair called Crecelius at
Northland.  Ms. Sinclair informed Crecelius that she had faxed

12

her the wrong lease on November 17, 1995. Ms. Sinclair indicated that the lease faxed on November 17, 1995 was an old lease used when the owner operator worked 100% for Woolever, and that they now use trip leases. Ms. Sinclair informed Crecelius that she would send the correct paperwork. (Def's Ex. 16).

70. On December 4, 1995, Jerry Parker ("Parker"), a Northland claims examiner who worked under Crecelius, called Hazel Sinclair. In this conversations, Ms. Sinclair informed Parker that she was sending him a trip lease, and that the "old one is wrong." (Def's Ex. 17).

71. On December 4, 1995, Woolever faxed Northland a copy of the Trip Lease, which is the same document that McCormick had faxed to Lincoln General on November 29, 1995. (Def's Ex. 18).

72. On December 18, 1995, Parker sent Woolever, JHM and Statts a letter. (Def's Ex. 23). In this letter, Parker acknowledges receipt of the "corrected lease" sent on December 4, 1995. Parker states that: "Therefore, it appears that the tractor and trailer were not in the business of Woolever Brothers Transportation at the time of this accident and that coverage under Policy TF209197 would not apply to Mr. Statts or JHM Enterprises for their accident of November 17, 1995."

73. As a result of the Accident, in April, 1996, the Estates of Robert and Karin Clifford filed a suit against Statts, JHM, and Woolever in the Court of Common Pleas of Schuylkill County at Docket No. S-650-1996 ("Clifford Action"). (Def's Ex. 32).

74. Lincoln General retained the law firm of Mette, Evans & Woodside ("Mette") to represent JHM and Statts. (Def's Ex. 92).

13

75. On January 29, 1996, McGovern sent a letter to JHM and Statts advising them that Lincoln General had retained Craig Stone of Mette to represent them, and requesting that JHM and Statts cooperate with Stone. (Def's Ex. 93). McGovern expected JHM and Statts to provide the Mette attorneys with complete and truthful information regarding the lease arrangement between JHM and Woolever at the time of the Accident. (McGovern's Trial Testimony).

76. Attorneys from the Mette firm met with McCormick on a number of occasion to discuss the Accident and resulting claims. At none of these meetings did McCormick disclose that there had been a Permanent Lease for the Tractor dated March 1, 1990 which had never been canceled pursuant to its terms and was in the Tractor at the time of the Accident, nor did McCormick ever disclose the circumstances surrounding the preparation of the Trip Lease dated November 16, 1995. (McCormick's Trial Testimony; Def's Ex.s 94 & 96).

77. Northland retained Louis Bricklin, Esquire ("Bricklin"), of Bennett, Bricklin & Saltzburg to defend Woolever. Northland sent Bricklin an engagement letter dated April 20, 1996, wherein it informed Bricklin that he would be defending Woolever, but that he would not be involved in any coverage issues. (Def's Ex. 30).

78. On June 7, 1996, Bricklin prepared a memorandum to file. In this memorandum, Bricklin states:

> Note that before we file this answer we need to clear up with Woolever the question of the two leases in the file. The earlier lease, dated March 1, 1990, appears to be for the same equipment and does not have a return date on it indicating that it is a month-to-month lease. Was that

14

earlier lease still in effect at the time of this accident.
Jerry Parker obviously has some suspicions that the later
lease may have been created after the fact.

(Def's Ex. 102).

79.  On June 7, 1996, Bricklin prepared a memorandum to a
Tom Cusack of his office.  In this memorandum, Bricklin discusses
the Plaintiffs' request for production of documents directed to
defendant, and asks Cusack to make up a redacted copy of
Northland's investigative file.  Bricklin states:  "See me before
you commence this assignment, as there are a couple of issues
pertaining to the appropriate lease and where these materials
came from, which I want to discuss with you."  (Def's Ex. 103).

80.  On June 7, 1996, Bricklin sent a letter to Woolever
which included a draft of Woolever's answer, new matter, and
cross-claim against JHM and Statts.  Bricklin instructed Woolever
to carefully review the answer, new matter, and crossclaim, and
to contact him if Woolever had any questions, comments or if
there was anything inaccurate in the pleading.  Bricklin further
instructed Woolever to sign and return the verification page once
the pleading met with its approval.  (Def's Ex. 33).

81.  The draft crossclaim that Bricklin sent with his June
7, 1996 letter to Woolever contains the following allegations:

> 3.  By way of further answer, defendant Woolever
> Brothers Transportation, Inc. avers that on or about
> November 16, 1995, it entered into an "Agreement of Lease of
> Motor Vehicle Equipment" with defendant JHM Enterprises.  A
> true and correct copy of the "Agreement of Lease of Motor
> Vehicle Equipment" is attached hereto and marked Exhibit
> "A."
>
> 4.   The term of the aforesaid lease was from 4:00 p.m.
> on November 16, 1995, through 8:00 a.m on November 17, 1995.
>
> 5.   The accident described in plaintiffs' complaint as
> averred by plaintiffs occurred after the termination of the

15

aforesaid agreement and at a time when the tractor trailer
in question had been returned to the sole custody and
control of defendants JHM Enterprises and Vernice Lee
Statts.

(Def's Ex. 34). The lease upon which Bricklin based the
crossclaim was the Trip Lease dated November 16, 1995, which had
been sent to Northland on December 4, 1995.

82. On June 17, 1996, Hazel Sinclair, as
secretary/treasurer of Woolever, executed a verification
indicating that the facts alleged in the crossclaim were true and
correct. Hazel Sinclair verified that: "I understand that false
statements made herein are subject to the penalties of 18 Pa.C.S.
§4904 relating to unsworn falsification to authorities." (Def's
Ex. 36).

83. In his June 7, 1995 letter to Woolever, Bricklin
enclosed a set of written interrogatories from Plaintiffs, and
draft answers. Interrogatory 60 requested Woolever to "State
whether a maintenance record is kept for the vehicle Defendant,
Vernice Lee Statts, was operating on the day of the accident,
November 17, 1995." (Def's Ex. 38). Hazel Sinclair provided a
verified response on behalf of Woolever to interrogatory 60 which
states that: "There is a maintenance record on the trip lease
attached as Exhibit 'A" to answering defendant's answer, new
matter and crossclaim." (Def's Ex. 40).

84. On June 7, 1996, Bricklin sent a letter to Parker
enclosing a draft of Woolever's answer, new matter and
crossclaim. Bricklin requested Parker to let him know if he had
any questions or comments concerning the draft answer, new matter
and crossclaim. Bricklin explained in his letter that: "As we

16

discussed, Woolever's defense will be based on the contention
that this accident occurred after the lease between Woolever and
JHM had expired."  Bricklin further stated:  "If it is clear that
Woolever is absolved from liability in the event that the lease
had terminated before the accident occurred, then I would intend
to concentrate on establishing those facts for the record, with
the goal of filing a motion for summary judgment."  (Def's Ex.
36).

    85.  Prior to filing Woolever's answer, new matter, and
cross-claim, Bricklin had conversations with Hazel Sinclair on
July 5 and 6, 1996.  In one of these conversations, Bricklin
questioned Hazel Sinclair at length about whether the Trip Lease
was in effect and in the Tractor at the time of the Accident.
Bricklin was attempting to assure himself that the Trip Lease was
in effect and in the Tractor at the time of the Accident because
he wanted to make sure that he was filing a truthful pleading.
Bricklin explained to Hazel Sinclair the importance of being
truthful and the consequences of filling a false pleading.  After
Bricklin impressed upon her the importance of telling the truth,
Hazel Sinclair swore to him that the Trip Lease was in effect and
in the Tractor at the time of the Accident.  (Bricklin's Trial
Testimony).

    86.  On July 18, 1996, Bricklin sent a letter to Parker to
report several developments with respect to the case.  (Def's Ex.
44).  In his letter, Bricklin recounts his recent telephone
conversation with Hazel Sinclair where they discussed the Trip
Lease.  Bricklin states with respect to this discussion:

I also conducted a lengthy discussion with Hazel [Sinclair] to attempt to assure myself that the trip lease upon which Woolever is relying was the one in the vehicle at the time of this accident.  The file reflects that the state police seized the vehicle and its contents.  Accordingly, I impressed upon her the fact that if she should produce a lease different than the one found by the police in the vehicle, that could be quite embarrassing to Woolever.  <u>She assured me that the "corrected lease" which is in our possession should have been the one in the vehicle at the time of the accident.</u>  (emphasis added).

87.    Based on Hazel Sinclair's assurances that the Trip Lease was in effect and in the Tractor at the time of the Accident, Bricklin proceeded to file the crossclaim against JHM which was based on the express terms of the Trip Lease. (Bricklin's Trial Testimony).

88.    In his letter of July 18, 1996, Bricklin also discusses a Compliance Report prepared by PennDOT after the Accident.   The Compliance Report identifies Woolever Brothers Transportation as the motor carrier at the time of the Accident.   (Def's Ex. 44). Bricklin also notes that the drug test report identifies Woolever as the employer.  (Def's Ex. 44).

89.    Mette provided McCormick with a copy of Woolever's answer, new matter and crossclaim against JHM and Statts, and requested that he verify the reply to crossclaim.  (Def's Ex. 99).  At no time did McCormick inform Mette that the crossclaim was based on a Trip Lease which had been created after the Accident, despite that he knew the falsity of Woolever's allegations regarding the Trip Lease.  (McCormick's Trial Testimony).

90.    On April 3, 1997, Bricklin sent Parker a letter providing an evaluation of Woolever's potential liability. (Def's Ex. 45).  Bricklin enclosed a memorandum prepared by one

of his associates. The memorandum indicates that one of the primary issues in the case is whether the accident occurred after the lease ended:

> Generally, pursuant to the ICC leasing regulations and applicable statutes, the carrier-lessee is vicariously liable for injuries caused to the traveling public by virtue of the negligent operation of any vehicle leased to it as the lessee has both a legal right and duty to control vehicles operated for its benefit and, in fact, the employees for the vehicle-lessor are deemed statutory employees of the lessee-carrier. <u>Accordingly, the primary issue in the instant case will be whether the accident occurred subsequent to the termination of the lease agreement</u> and, whether the failure to remove the carrier identification information will serve to vitiate the termination. (citations omitted)(emphasis added).

91. Bricklin states in his letter of April 3, 1997, that once certain depositions were taken he planned to move for summary judgment on Woolever's behalf on the basis that the lease had terminated prior to the Accident:

> From our point of view, I would suggest that you authorize me to notice the deposition of Jay McCormick (the proprietor of JHM) and Vernice Statts to establish a record to service as the basis for the motion for summary judgment. I am relatively certain that our notices will produce a cross-notice for one or more representatives from Woolever. If, as I expect, there are no discrepancies in the testimony offered by those witnesses with respect to the lease arrangements between Woolever and JHM, <u>at that point we can move for summary judgment on Woolever's behalf based on the contention that the lease had terminated</u>.

(Def's Ex. 45)(emphasis added).

92. As a result of the Accident, in September, 1997, the Mulligans filed a suit against Statts, JHM, and Woolever in the Court of Common Pleas of Schuylkill County at Docket No. S-1689-1997 ("Mulligan Action"). (Def's Ex. 71)

93. Lincoln General defended JHM and Statts and Northland defended Woolever in the Mulligan Action.

94.  In October, 1997, Woolever filed an answer, new matter and crossclaim against JHM and Statts in the Mulligan Action. Woolever's crossclaim in the Mulligan Action was virtually identical to the crossclaim it filed in the Clifford Action. Both crossclaims were based on the Trip Lease dated November 16, 1995, which allegedly ended at 8:00 a.m. on November 17, 1995, a few hours prior to the Accident.  Once again, Hazel Sinclair verified the facts of the crossclaim.  (Def's Ex. 49).

95.  On October 16, 1997, Woolever served all counsel with its response to Cliffords' request for production of documents. (Def's Ex. 104).  In its response, Woolever stated that tabs 1 through 5 contain the entire claims file of Northland.  Tab 3 contained the Trip Lease dated November 16, 1995, and a Trip Report for the load of salt hauled for Woolever on November 16 and 17, 1995.  Woolever did not produce a copy of the Permanent Lease dated March 1, 1990.  Attorney Bricklin did not include the Permanent Lease based on Hazel Sinclair's earlier assurances to him that the Trip Lease dated November 16, 1995 was the lease in the Tractor at the time of the Accident, and that the Permanent Lease had been sent to Northland by mistake.  (Bricklin's Trial Testimony).

96.  On October 27, 1997, Michael Pipa, Esquire, an attorney at Mette, met with McCormick prior to McCormick's deposition. McCormick informed Pipa that he believed the Trip Lease would end when Statts left the Ephrata site where he had delivered the load of salt for Woolever.  (Def's Ex. 101).  McCormick lead Pipa to believe that the Trip Lease had been prepared prior to the Accident and was the document which controlled the relationship

between JHM and Woolever for the load of salt which was delivered
to Ephrata.

97.  McCormick also told Pipa at their meeting that he would
only ship materials for Woolever or use one of their flatbeds
approximately once a month.  (Def's Ex. 101).

98.  McCormick never disclosed to Pipa that he owned other
trucks which were permanently leased to Woolever and used solely
by Woolever.  One such truck was the 1986 Freightliner owned by
JHM and driven by Bill Danley.  (McCormick's Trial Testimony).

99.  Hazel Sinclair's and McCormick's depositions were
scheduled for November 4, 1997.  Hazel and Harold Sinclair met
with Bricklin on October 29, 1997 to prepare for the depositions.
At this meeting, Hazel Sinclair broke down in tears and confessed
to Bricklin that she had been lying to him about the Trip Lease
and that the Trip Lease had been fabricated after the Accident.
Hazel Sinclair confessed to Bricklin that the Permanent Lease
dated March 1, 1990 was the lease in the Tractor at the time of
the Accident.  (Bricklin's Trial Testimony).

100. Bricklin summarized what occurred at his October 29,
1997, meeting with Hazel and Harold Sinclair in a letter to
Parker dated February 2, 1998:

> With respect to Woolever's liability, I now believe that
> there is no chance that we will be able to avoid it.  As we
> discussed by telephone, when I met with Hazel and Harold to
> prepare their deposition testimony, Hazel "came clean" with
> me and confirmed what we both had suspected:  that the trip
> lease which she forwarded to us was not the lease in the
> truck at the time of the accident.  Instead, Hazel and Jay
> McCormick fabricated the trip lease on the day after the
> accident.
>
> According to Hazel, back in 1990, Woolever first
> started doing business with JHM Enterprises, and JHM's
> tractors were leased to Woolever on a permanent basis.

<u>It is that permanent lease, which you have also seen,
which was in the tractor at the time of this
accident</u>....

(Def's Ex. 51)(emphasis added).

101. After Bricklin reported to Parker what he had learned
from Hazel Sinclair about the fabrication of the Trip Lease after
the Accident, Parker wrote in Northland's claims diary, "When
defense counsel met with insured, they now admit to altering the
lease after the accident, our exposure greatly increased here."
(Def's Ex. 1, page 4, entry for October 29, 1997)

102. On November 3, 1997, before Hazel Sinclair was even
deposed, Parker advised Northland's re-insurers that:
"Unfortunately, our insured has now admitted to altering the
lease agreement which indicated the lease ended subsequent to the
accident. They admit doing this in conjunction with the co-
defendant, Jay McCormick. This obviously greatly increases our
exposure and I will be reviewing this matter and advising you of
our position in the near future." (Def's Ex. 50).

103. Statts, McCormick, and Hazel Sinclair were deposed for
purposes of the Clifford and Mulligan Actions on November 4,
1997. (Def's Ex.s 68 & 69). Statts testified first. Statts
testified that he would normally tape over the Woolever placard
when he had completed a trip for Woolever and was going to haul a
trip for JHM. Statts claimed that the reason the Woolever
placard was not taped over at the time of the Accident was
because he had run out of tape. (Def's Ex. 68, p. 60).
McCormick agreed with Statts' testimony about taping over the
placard. (Def's Ex. 69, p. 35). McCormick also testified that
the load of salt which was hauled by Statts immediately before

the Accident was covered by a trip lease. He further testified that the only arrangement he had with Woolever prior to the Accident was through trip leases. (Def's Ex. 69, pp. 27-28). McCormick never mentioned at his deposition that there was a Permanent Lease for the Tractor dated March 1, 1990, or that JHM had entered into permanent leases with Woolever for other vehicles.

104. Hazel Sinclair was deposed immediately after McCormick. Hazel Sinclair initially testified that JHM would trip lease for Woolever. (Def's Ex. 69, p. 65). However, as Cliffords' counsel began asking Ms. Sinclair about the preparation of the trip leases, she eventually confessed that the Trip Lease was fabricated the day after the Accident and that there was a Permanent Lease in the Tractor at the time of the Accident. (Def's Ex. 69, pp. 66-73).

105. At no time prior to Hazel Sinclair finally confessing that she had fabricated the Trip Lease with McCormick did Bricklin or Northland disclose to Lincoln General or any of the parties in the Clifford or Mulligan Actions that the Trip Lease had been fabricated after the Accident and that there was a Permanent Lease in the Tractor at the time of the Accident.

106. Bricklin discussed whether the Woolever placard was ever covered up in his April 3, 1997 letter to Parker:

> I spoke with Hazel Sinclair at Woolever Brothers. She told me that at the time of the accident, JHM hauled only about one out of every five of its loads under Woolever's rights. However, at no time did JHM cover the Woolever placard when it was hauling the other eighty percent of its loads. Parenthetically, it now does so as a result of this accident. Hazel tells me that Woolever was aware of the fact that its logo was not being covered but at the time did not consider that to be improper.

(Def's Ex. 45)(emphasis added).

107. Bricklin discussed the subject of covering over the Woolever placard in his February 2, 1998 letter to Parker. In this letter, Bricklin states:

> It is essentially undisputed, and both Jay McCormick and Hazel testified, that at the time this accident occurred, Statts had completed his trip for Woolever and was on his way to pick up a load for JHM. At the point that he made the switch, he should have covered the Woolever placard on the tractor and - prior to the time of the accident, not after - a trip lease should have been prepared documenting that the lease ended when delivery was made in Ephrata. [Indeed, both Statts and McCormick testified that this was the only day when the Woolever placard was not covered, that being the case because Statts "ran out of tape" on that morning. Based on my discussions with Hazel and Harold, I think it fair to say that McCormick and Statts perjured themselves. The Woolever placard never was covered.]

(Def's Ex. 51)(emphasis added).

108. On April 16, 1999, Bricklin sent Cliffords' counsel a proposed Stipulation his office had prepared regarding the leasing arrangement between JHM and Woolever. The proposed Stipulation provides in part:

> 7.    At the time of the accident, two ICC placards appeared on the side of the tractor. Once read "JHM Enterprises, Inc., Williamsport, Pennsylvania" and set forth the Pennsylvania and ICC registration numbers for JHM Enterprises, Inc. The other read "Leased to Woolever Brothers Transportation, Inc. Montoursville, Pennsylvania" and set forth Woolever Brothers' ICC and PUC registration numbers.
>
> 8.    At the time, the tractor trailer was carrying an "Agreement of Lease of Motor Vehicle Equipment" dated March 1, 1990, pursuant to which JHM Enterprises as lessor leased the tractor in question and a driver to Woolever Brothers Transportation, Inc. At the time the lease was executed, the lease was intended to be a permanent lease because the JHM tractor was being utilized exclusively by Woolever Brothers for its business.
>
> 9.    Between 1990 and the time of the accident, the business relationship between JHM Enterprises and Woolever Brothers changed, so that there were numerous occasions upon

which the tractor was utilized by JHM Enterprises for its own business.  However, <u>JHM Enterprises and Woolever Brothers never changed the written lease agreement despite the fact that they were required to execute a new "trip lease" pursuant to applicable federal regulations each time the vehicle was leased back to Woolever Brothers</u>.

(Def's Ex. 60)(emphasis added).

109. Cliffords' counsel refused to execute Bricklin's proposed Stipulation because he was not willing to stipulate to the intentions of Hazel Sinclair and McCormick because of their past conduct in fabricating the Trip Lease after the Accident and then concealing the Permanent Lease until Ms. Sinclair finally confessed to what she had done at her deposition on November 4, 1997.  (Def's Ex. 62).

110. On June 10, 1999, Bricklin sent a letter to Cliffords' counsel wherein he stated in part that:  "I have told you that Woolever does not seek to escape liability for Statts' actions." (Def's Ex. 63).

111. As of June 10, 1999, Bricklin knew that Statts was going to have liability.  (Bricklin's Trial Testimony; Def's Ex. 30, Parker's letter to Bricklin of 4/20/96:  "It certainly does look like this is a clear case of liability as it pertains to Mr. Statts and his employer JHM Enterprises.")

112. The result of Woolever accepting liability for Statts' actions was that Woolever was essentially admitting liability for the Accident.

113. The change in Bricklin's position from planning to move for summary judgment on Woolever's behalf to essentially conceding liability, was the result of him finding out that the Trip Lease had been fabricated after the Accident and there was a

25

Permanent Lease for the Tractor in effect at the time of the
Accident.  (Bricklin's Trial Testimony).

114. Harold Sinclair was deposed on August 25, 1999.  (Pl's
Ex. 33).  Harold Sinclair initially testified that JHM did not do
any of its own business while at Woolever's offices, and did not
do any of its own freight hauling.  (Pl's Ex. 33, Harold
Sinclair's Dep.Tr. at pp. 91-92).  Harold Sinclair also testified
that JHM did not haul any loads which were not Woolever loads.
(Pl's Ex. 33, Harold Sinclair's Dep.Tr. at pp. 104-05).

115. After Harold Sinclair testified that JHM did not haul
any loads which were not Woolever loads, Bricklin called a recess
to "re-prepare" Harold Sinclair.  (Def's Ex. 64).  Harold
Sinclair than testified that Raisio was one of JHM's customers.
(Pl's Ex. 33, Harold Sinclair's Dep.Tr. at pp. 114-15).

116.    Lincoln General and Northland eventually agreed to
each advance $675,000 (a total of $1,350,000) to settle the
Clifford and Mulligan Actions, while reserving all rights to seek
reimbursement from the other pending a determination of the
coverage issues involved in this case.  (McGovern's Trial
Testimony).

117. The Mulligan Action settled in July, 2000.  The
Clifford Action settled in October, 2000.  Lincoln General
advanced its portion of the Clifford settlement to the Cliffords'
attorney on November 28, 2000.  (Def's Ex. 106).

118. Statts qualifies as an "insured" under the Northland
Policy since he was using the Tractor with Woolever's permission.
(Def's Ex. 24, Northland Policy, Form CA 00 12 12 93 at p. 2,
Section II.A.1.b.; Stipulation approved by the Court on December

2, 2002, wherein Northland admits the Tractor is a covered auto
if it was leased to Woolever).

119. The Northland Policy defines an "insured" to include
anyone who is liable for the conduct of an "insured" described in
the Northland Policy. (Def's Ex. 24, Northland Policy, Form CA
00 12 12 93 at p. 3, Section II.A.1.e).

120. JHM qualifies as an "insured" under the Northland
Policy since the plaintiffs in the Clifford and Mulligan Actions
claimed that JHM was liable for Statts' conduct, and Statts is an
insured under the Northland Policy.

121. JHM, Statts and Woolever all qualify as insureds under
the Lincoln General policy. (Def's Ex. 67, Lincoln General
Policy, Form CA 00 12 12 93 at pp. 2-3, Section II.A.1.a, b. & e.
JHM is the named insured. Statts is an "insured" under the
Lincoln General Policy since he was using the Tractor with JHM's
permission. Woolever is an insured since the Lincoln General
Policy defines an "insured" to include anyone who is liable for
the conduct of an "insured" described in the Lincoln General
Policy. Since the Plaintiffs in the underlying cases alleged and
Woolever eventually acknowledged that it was liable for Statts'
conduct, it qualifies as an insured under the Lincoln General
Policy.

122. The Northland Policy expressly states:

> This Coverage Form's Liability Coverage is primary
> for any covered "auto" while hired or borrowed by you
> and used exclusively in your business as a "trucker"
> and pursuant to operating rights granted to you by a
> public authority.

(Def's Ex. 24, Northland Policy, Form CA 00 12 12 93 at p. 10,

Section V.B.5.a).

27

123. The Lincoln General Policy expressly states:

This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto"' while hired or borrowed from you by another "trucker".

(Def's Ex. 67, Lincoln General Policy, Form CA 00 12 12 93 at p.

9, Section V.B.5.a).

124. The Northland and Lincoln General Policies both state

with respect to apportionment of liability that:

When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share.  Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

(Def's Ex.s 24 & 67, Form CA 00 12 12 93, Section V.B.5.)

125. The Lincoln General Policy expressly states that:

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:

a.   This Coverage Form;

b.   The covered "auto";

c.   Your interest in the covered "auto"; or

d.   A claim under this Coverage Form.

(Def's Ex. 67, Lincoln General Policy, Form CA 00 12 12 93 at p.

9, Section V.B.2).

126.  In addition to the Trip Lease dated November 16, 1995,

Woolever and JHM fabricated numerous other trip leases and

documents after the Accident in order to make it appear as if

there was a course of conduct of preparing trip leases between

JHM and Woolever prior to delivery of the load, which was not the

case.  (Def's Ex.s 72, 81 - 90).

28

127. Hazel Sinclair prepared Driver Data Sheets after the trips had already concluded which made it appear as if Statts was a new driver each time he performed one of the fabricated trip leases. Statts signed each one of the Driver Data Sheets after the Accident on November 17, 1995. (Def's Ex.s 72, 81 - 90; Harold Sinclair's Trial Testimony).

128. Statts' Driver Daily Logs for the months of November, 1995 identified Woolever as the motor carrier for all loads that he hauled, and made no reference to JHM or any trip leases. (Def's Ex.s 4, 86 - 90).

129. Statts' Driver Daily Log for the month of November, 1995 was in the Tractor at the time of the Accident and seized by the governmental officials investigating the Accident. (McCormick's Trial Testimony).

130. Statts fabricated new Driver Daily Logs for the month of October, 1995, to make it appear as if he was hauling for both JHM and Woolever. The fabricated Driver Daily Logs identified both JHM and Woolever as the motor carrier, and identified the times Statts was allegedly driving for each motor carrier. (Def's Ex.s 72, 81, 83 & 84; McCormick's Trial Testimony).

131. On August 16, 1996, Northland requested that a mileage audit be performed for Woolever for the policy period September 1, 1995 through September 1, 1996. Northland specifically instructed that the mileage be split between owned units, long term permanently leased units and short term hired units. (Def's Ex. 107).

132. On September 30, 1996, Equifax Commercial Specialists prepared the mileage audit report for Woolever requested by

Northland.   The report indicates that there were no miles driven
by short term hired units in September, October, and November,
1995, although there were significant miles driven by long term
permanently leased units.   The audited mileage report coincides
with the information contained on Woolever's monthly mileage
reports which included all miles driven by long term permanently
leased vehicles.   (Def's Ex.s 108 - 111).

133. JHM's Trucking Insurance Policy with Lincoln General
expired on April 18, 1996.   JHM did not renew its Trucking
Insurance Policy with Lincoln General because it no longer needed
trucking insurance since it had permanently leased all of its
vehicles to Woolever and no longer had its own operating
authority.   (McCormick's Trial Testimony).

134. McCormick completed an insurance application with
Lincoln General on May 10, 1996, requesting Non-Trucking
insurance.   (Def's Ex. 105).   In the application, McCormick
stated that all vehicles were leased to trucking concerns on a
long term basis.   McCormick further stated that new leases had
been prepared effective January 1, 1996.   McCormick stated that
other than the permanent leases entered into effective January 1,
1996, there had been no leases in the prior three years.   (Def's
Ex. 105 at p. 3).

135. McCormick's statement in his application that no units
were leased in the over two years prior to January 1, 1996 is not
true, since he had permanently leased four trucks to Woolever
prior to January 1, 1996, and all four leases were still in
effect during the two years prior to January 1, 1996.

136. Lincoln General incurred $91,511.35 in defending Statts and JHM in the underlying actions.  (Stipulation of the parties).

137. Northland incurred $65,629.59 in defending Woolever in the underlying actions. (Stipulation of the parties).

## CONCLUSIONS OF LAW

138. Northland has the primary obligation to defend and indemnify Woolever, Statts and JHM from all claims arising out of the Accident.

139. In accordance with the other insurance clauses in both the Northland Policy and the Lincoln General Policy, Northland's coverage for Woolever, Statts, and JHM is primary since the Tractor was hired by Woolever and used exclusively in its business as a "trucker" and pursuant to operating rights granted to Woolever at the time of the Accident.

140. In accordance with the other insurance clauses in both the Northland Policy and the Lincoln General Policy, Lincoln General's coverage for Woolever, Statts, and JHM is excess since the Tractor was hired by Woolever at the time of the Accident, and Woolever qualifies as a "trucker."

141. The Permanent Lease dated March 1, 1990, was still in effect at the time of the Accident.

142. In accordance with the terms of the Permanent Lease, Woolever had exclusive possession, control and use of the Tractor at the time of the Accident.

143. Woolever's operating authority was being used at the time of the Accident since its placard was on the vehicle indicating that the Tractor was "Leased to" Woolever at the time of the Accident.

144. The weight of the evidence supports the conclusion that the Tractor was in the business of Woolever at the time of the Accident even though JHM billed Raisio for all loads hauled by JHM and Woolever drivers. Some of the evidence supporting this

32

conclusion is that: The Driver's Daily Logs for November, 1995, which were not altered, indicated that Woolever was the motor carrier for all loads hauled by the Tractor; Hazel Sinclair initially informed Northland that JHM was leased to Woolever and ran under Woolever's authority; Even though JHM could only have been using Woolever's operating authority both before and after it had its own operating authority, it billed Raisio for all loads hauled by JHM and Woolever drivers; JHM drivers who were viewed as working exclusively for Woolever continued to haul loads to and from Raisio which were billed by JHM; and, the 1986 Freightliner which was covered exclusively by Woolever's insurance and ran under Woolever's operating authority continued to haul loads to and from Raisio which were billed by JHM.

145. JHM and Woolever committed fraud, misrepresented facts, and/or concealed information regarding their leasing arrangement by concealing the presence of the Permanent Lease in the Tractor at the time of the Accident, and misrepresenting that the Trip Lease dated November 16, 1995 was in the Tractor at the time of the Accident when they knew that it was not prepared until after the Accident.

146. The statements made by JHM and Woolever in the Trip Lease that it was executed on 11/16/95 are false.

147. The statement made by Woolever in the Trip Lease that Harold Sinclair carefully inspected the equipment on 11/16/95 is false.

148. JHM and Woolever knew that the statements made in the Trip Lease as to the date it was executed and the alleged careful

inspection of the equipment by Harold Sinclair on 11/16/95 were false.

149. JHM and Woolever committed fraud, misrepresented facts, and/or concealed information by preparing numerous trip leases after the Accident which related to loads hauled before the Accident in an attempt to make it appear as if they had a business practice of preparing trip leases when no such trip leases were prepared at any time before the Accident.

150. JHM, Woolever, and Statts committed fraud, misrepresented facts, and/or concealed information by fabricating Driver's Daily Logs after the Accident which made it appear as if loads hauled prior to the Accident had been hauled under both JHM's and Woolever's operating authority, when the original logs indicated that only Woolever's operating authority had been used.

151.  JHM, Woolever, and Statts committed fraud, misrepresented facts, and/or concealed information by fabricating Driver Data Sheets after the Accident which made it appear as if Statts had been trip leasing to Woolever prior to the Accident, when they all knew that there was a Permanent Lease for the Tractor and none of the loads hauled by Statts had been hauled pursuant to a trip lease.

152. Statts and McCormick provided false testimony as to the alleged business practice of covering up Woolever's placard when the Tractor was used for JHM despite that they knew the Woolever placard was never covered up.

153. JHM and Woolever attempted to deceive Lincoln General into believing that there was a Trip Lease which had expired a few hours before the Accident, when they knew that there was a

Permanent Lease in effect at the time of the Accident which required Woolever to provide liability coverage for the Tractor and provided that Woolever had exclusive possession and control of the Tractor for the duration of the Permanent Lease.

154. JHM's and Woolever's misrepresentations and/or concealments were intended to deceive Lincoln General as to the true nature of the lease arrangement, with the result being that Woolever and Northland could have escaped all liability and responsibility for the Accident, and Lincoln General could have been required to bear sole responsibility for the Accident.

155. The identity of the Permanent Lease was a material fact involving Woolever's, JHM's and Statts' claim for coverage under the Lincoln General Policy, and whether Lincoln General would be the only insurance company responsible to provide coverage for the Accident.

156. If Woolever had been relieved of liability as a result of its intended argument that the Trip Lease had expired prior to the Accident, Northland would have had no liability to anyone and Lincoln General would have been solely liable for all of the claims arising out of the Accident.

157. JHM's and Woolever's deception and fraud involving their failure to disclose the existence of the Permanent Lease and misrepresentations as to the Trip Lease executed after the Accident was all part of their plan to relieve Woolever and Northland from any responsibility for the Accident, and impose on Lincoln General sole responsibility for the claims arising out of the Accident.

158. The liability coverage afforded under the Lincoln General Policy is void as to JHM, Woolever and Statts for the claims arising out of the Accident as a result of the fraud, intentional concealment, and misrepresentations of material facts committed by JHM, Woolever, and/or Statts.

159. Northland knew of the Permanent Lease, but concealed this information from Lincoln General and the other parties in the Clifford and Mulligan Actions despite its suspicions that the Trip Lease had been created after the fact.

160. Northland must provide primary coverage for the claims arising out of the Accident since Lincoln General's coverage is void as to JHM, Woolever and Statts.

161. Northland is obligated to reimburse Lincoln General for all expenses it incurred to defend Statts and JHM, and all payments it has made to claimants arising from the Accident, in the total amount of $766,511.35, since Northland's coverage is primary and Lincoln General either has no coverage because its coverage is void as to JHM, Woolever and Statts, or if its coverage is not void, its coverage is excess to that of Northland.

162. Northland must pay Lincoln General pre-judgment interest from November 28, 2000, until the date of judgment, on the principal amount of $766,511.35. The interest rate is Pennsylvania's statutory interest rate of 6%, which amounts to daily interest of $126.[1]

---

[1]    Federal courts look to state interest rates for pre-judgment interest where the claims involve state law. See Benefit Trust Life Insurance Company v. Union National Bank of Pittsburgh, 776
(cont'd footnote)

36

**ALTERNATIVE PROPOSED CONCLUSIONS OF LAW IN THE EVENT IT IS DETERMINED THAT LINCOLN GENERAL AND NORTHLAND PROVIDE COVERAGE TO JHM, STATTS, AND WOOLEVER, ON AN EQUAL BASIS.**

163. The Lincoln General and Northland Policies contain identical provisions on the apportionment of payments if their respective policies cover a claim on an equal basis, either primary or excess. In accordance with this provision, Lincoln General and Northland agreed to apportion payments based on the proportion that the limits of insurance in each policy bears to the combined limits of insurance of the two policies.

164. The limits of insurance in the Lincoln General Policy is $750,000, and the limits of insurance in the Northland Policy is $2,000,000, for a combined limit of insurance of $2,750,000. Lincoln General's proportion of the combined limit is 27.27 percent, and Northland's proportion of the combined limit is 72.73 percent.

165. Lincoln General and Northland each paid $675,000 to settle the Clifford and Mulligan Actions, for a total of $1,350,000. Lincoln General and Northland paid a combined amount of $157,140.94 to defend JHM, Statts, and Woolever in the Clifford and Mulligan Actions. The total amount paid by Lincoln General and Northland to settle and defend the Clifford and Mulligan Actions is $1,507,140.94.

166. Northland's and Lincoln General's pro rata liability for all costs to settle and defend the underlying actions is

---

(continued footnote)
F.2d 1174, 1180 (3rd Cir. 1985); McDermott v. Party City Corp., 11 F.Supp. 2d 612, 632 (E.D.Pa. 1998).

37

$1,096,143.61 and $410,997.33, respectively, based on their respective percentages of responsibility of 72.73 and 27.27.

167. Lincoln General paid $355,514.02 in excess of its pro rata share of responsibility to settle the Clifford and Mulligan Actions, which it is entitled to receive from Northland.

168. Lincoln General is entitled to prejudgment interest from November 28, 2000, until the date of judgment, on the principal amount of $355,514.02. The interest rate is Pennsylvania's statutory interest rate of 6%, which amounts to daily interest of $58.44.

Respectfully submitted,

McNEES WALLACE & NURICK LLC

By _____

Jonathan H. Rudd, Esq.
Charles T. Young, Jr., Esq.
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108-1166
(717) 237-5405

Attorneys for Lincoln General Insurance Company

Dated:   February 5, 2003

38

## CERTIFICATE OF SERVICE

I, Jonathan H. Rudd, Esquire, hereby certify that on this 5th day of February, 2003, a true and correct copy of the foregoing document was served by first-class, United States mail, postage prepaid, upon the following:

Ira S. Lipsius, Esquire
Schindel, Farman & Lipsius LLP
225 West 34th Street
New York, NY 10122

_____
Jonathan H. Rudd