IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NORTHLAND INSURANCE COMPANY, <br> Plaintiff, <br> v. <br><br> LINCOLN GENERAL INSURANCE COMPANY, <br> J.H.M. ENTERPRISES, INC., and <br> VERNICE L. STATTS, <br><br> Defendants, <br><br> v. <br><br> WOOLEVER BROTHERS TRANSPORTATION INC., <br> Third-Party Defendant. | No. 1:01-CV-763 <br><br> (JUDGE KANE) <br><br> FILED <br> HARRISBURG, PA <br> FEB 07 2003 <br> MARY E. D'ANDREA, CLERK <br> Per _____ Deputy Clerk |

**PROPOSED FINDINGS OF FACTS AND LAW**

I.   **PROPOSED FINDINGS OF FACT**

1.   Northland Insurance Company ("Northland") is a Minnesota corporation with its principal place of business in Minnesota.

2.   Lincoln General Insurance Company ("Lincoln General) is a Pennsylvania corporation with its principal place of business in Pennsylvania.

3.   J.H.M. Enterprises, Inc. ("JHM") is a Pennsylvania corporation with its principal place of business in Pennsylvania.

4.   Woolever Brothers Transportation, Inc. ("Woolever") is a Pennsylvania corporation with its principal place of business in Pennsylvania.

5.   Lincoln General issued to JHM, insurance Policy Number PAP 185770 0495 (the

"Lincoln General Policy") which was in effect from April 18, 1995 to April 18, 1996. (Exhibit P-29).

6. Lincoln General insured JHM from April 18, 1992 until April 18, 1996. (Exhibit P-29).

7. A 1979 Freightliner, Serial Number CA213HM160222 (the "Tractor") plus a Great Dane Trailer (the "Trailer") were scheduled on the Lincoln General Policy. (Exhibit P-29).

8. JHM owned the Tractor and the Trailer. (McCormick).

9. Northland and Lincoln General issued policies utilizing ISO form CA 00 12 12 93. The Lincoln General Policy provides coverage for specified vehicles and hired autos. The Tractor and Trailer involved in this matter were specified vehicles under the Lincoln policy. The Lincoln policy provides $750,000 in coverage. (Exhibits P-19, P-29).

10. Northland's policy provides coverage for "hired autos". The Northland policy provides $2,000,000 in coverage. (Exhibit P-19).

11. On November 17, 1995, at 11 a.m. in Hometown, Pennsylvania, the Tractor was involved in an accident which resulted in two deaths and other injuries. (Exhibit D-32 - Exhibit D-105, Tab 5, Statts, McCormick, Hazel Sinclair, Harold Sinclair). Lawsuit resulted from that accident (the "underlying claims"). (Exhibits D-32, D-34, D-36).

12. The underlying claims were settled in November 2000. (Exhibit D-106).

13. Lincoln General contributed $675,000 towards the $1,350,000 settlement of the underlying actions. Northland contributed $675,000 towards the $1,300,000 settlement of the underlying actions.

14. Lincoln General paid $91,511.35 for the defense of Jay McCormick, JHM and

Statts in the underlying actions. Northland paid $65,629.59 for the defense of Woolever Brothers in the underlying actions.

15. At the time of the accident on November 17, 1995 the Trailer was attached to the Tractor. (McCormick, Statts; police accident report, Exhibit P-35, attached exhibit 1 to Statts deposition).

16. Sometime during 1989 or 1990 Smith Trucking sold its vehicles and sold its Pennsylvania Public Utility Commission Authority. (Hazel Sinclair, Harold Sinclair, McCormick).

17. Some of its vehicles were purchased by JHM, others by Woolever (or their shareholders). (Hazel Sinclair, McCormick, Harold Sinclair).

18. JHM purchased the Pennsylvania PUC Authority of Smith Trucking to carry loads from Berwick, Pennsylvania to Tyrone, Pennsylvania and Lock Haven, Pennsylvania (McCormick). Applications were filed to transfer the authority to JHM. This application process took time and, in the interim, JHM was granted emergency temporary operating authority and temporary operating authority. (McCormick).

19. Sometime prior to 1993, JHM received operating authority to carry shipments on behalf of Raisio, Inc. from Berwick, Pennsylvania to Tyrone, Pennsylvania and to Lock Haven, Pennsylvania. (McCormick).

20. On November 17, 1995 JHM had authority to carry the Raisio loads from Berwick Pennsylvania to Tyrone Pennsylvania under PUC # A00109158. (McCormick).

21. No testimony was elicited at trial or otherwise to indicate whether Woolever had authority to carry loads on behalf of Raisio from Berwick, Pennsylvania to Tyrone, Pennsylvania

on November 17, 1995.

22.     Woolever had limited authority to carry freight within the state of Pennsylvania. (Harold Sinclair).

23.     Lincoln General has failed to show that Woolever had authority from the Pennsylvania PUC to carry shipments on behalf of Raisio from Berwick, Pennsylvania.

24.     On November 17, 1995, at approximately 8 a.m. Vernice Statts completed the delivery of a load of salt from Watkins Glen, New York to Ephrata, Pennsylvania (the "Cargill Lease"). (Statts, McCormick, Harold Sinclair, Hazel Sinclair, Exhibit D-73).

25.     The delivery was completed using the Tractor and the Trailer. (Statts, McCormick, Hazel Sinclair, Harold Sinclair).

26.     Sometime prior to November 17, 1995, but at an undetermined date, a lease was entered into between Woolever and JHM whereby Woolever leased the Tractor from JHM ("Lease #1). Lease #1 indicated an effect date of March 1, 1990. (Exhibit P-1).

27.     The terms of Lease # 1, *inter alia*, provide as follows:

**Term**

a. The term of this lease shall begin at 10 a.m. o'clock on 3/1/90 and terminate at the end of thirty days, or at 10 a.m. o'clock 4/1/90, at which time the term of this lease is automatically extended for additional like thirty (30) day periods, unless terminated by either party giving to the other party five (5) days written notice of cancellation.

\* \* \*

**Possession, Control and Responsibility**

During the term of this lease, the motor vehicle equipment described herein shall be in the exclusive possession, control and use of the Lessee and Lessee hereby assumes complete

4

> responsibility for operation thereof. Driver is authorized by Lessee to log meal and rest stops during which time he is relieved of all work and responsibility for performing work. Stops limited to one hour for each 8 hours tour of duty.
>
> **Subleasing**
>
> During the term of this lease, Lessee is considered the owner thereof for the purpose of subleasing the same to other authorized carriers, who or which will assume the obligations otherwise owed by Lessee to Lessor.

28. Although Lease #1 contains a place for a receipt, the terms of Lease #1 do not require that the lessor provide a written receipt upon termination of the lease.

29. For a period of time prior to July 1995, the Tractor was used primarily in the business of Woolever. (Statts, McCormick).

30. Beginning in July, 1995, Vernice Statts became the primary driver of the Tractor (Statts, McCormick).

31. In or about July 1995, Statts affixed the ICC and PUC identifying markers (referred to as "Placards") of JHM to the Tractor. The placing of the JHM placards coincided with the use of the Tractor by Statts on the Raisio loads. (Statts, McCormick).

32. Sometime prior to July 1995, and probably several years prior to July 1995, the placards of Woolever were affixed to the Tractor. (McCormick, Statts).

33. On November 17, 1995, at 11 a.m. in Hometown, Pennsylvania, the Tractor was involved in an accident which resulted in two deaths and other injuries. (Exhibit D-32 - Exhibit D-105, Tab 5, Statts, McCormick, Hazel Sinclair, Harold Sinclair).

34. At the time of the accident, Statts was en route to pick up a shipment from Raisio

in Berwick, Pennsylvania. (Statts, Clemons, McCormick).

35. If Mr. Statts had traveled directly from Ephrata to Montoursville, the facility of both JHM and Woolever, the most direct route would have been via Harrisburg, not via Hometown. (McCormick).

36. If Mr. Statts went to drop off the Trailer at the Montoursville facility prior to picking up the load at Berwick, he would have traveled approximately an extra one hundred miles (Clemons).

37. Mr. Statts was going through Hometown, Pennsylvania en route from Ephrata to Berwick so that he could pick up a load of "slurry" to be carried on behalf of Raisio. (Statts, Clemons).

38. From July 1995 through November 1995 Statts picked up loads at Raisio's Berwick facility on a regular basis for delivery to Tyrone and Lock Haven, Pennsylvania, utilizing the Tractor. (Statts, McCormick, Hazel Sinclair).

39. Occasionally Statts would drive the Tractor to carry loads on behalf of Woolever. (Statts).

40. Loads were carried on behalf of Woolever, using the Tractor, approximately eleven days in the six month period prior to November 17, 1995 (Hazel Sinclair)

41. Loads were rarely carried on behalf of Woolever, using the Tractor in the period from July 1995 through the date of the accident.(Statts).

42. When the Tractor was used in the business of Woolever, Woolever would bill the customer, receive the revenue, and pay between 80% and 90% of the revenue to JHM. (McCormick, Harold Sinclair, Joyce Wilking).

43. When loads of salt were carried by Statts from Watkins Glen, New York to Ephrata, Pennsylvania, the revenues were received by Woolever. (Statts, Wilking). Woolever then tendered lease payments, consisting of 90% of the revenues to JHM. (Wilking, McCormick).

44. When loads were carried on behalf of Raisio, the revenues were received by JHM. (McCormick).

45. When loads were carried on behalf of Raisio, Woolever did not receive any of the revenues. (McCormick).

46. If Statts had not had the accident, he would have picked up a load of slurry at Raisio. JHM would have received all of the revenues from that load. Woolever would not have received any of the revenues from that load. (McCormick).

47. At the time of the accident, the placards of JHM and Woolever were displayed on the Tractor. (Exhibit D-104, Tab 1).

48. Mr. Statts testified that he normally taped over the Woolever placards when he was not in the business of Woolever. He further testified that he did not consider himself in the business of Woolever after dropping the shipment in Ephrata. (Statts).

49. Mr. Statts testified that he failed to cover over the Woolever placards after completing delivery of the Cargill shipment in Ephrata, because he ran out of duct tape. (Statts).

50. Mr. McCormick and Mrs. Sinclair testified they rarely saw the Woolever placards taped over. (McCormick, Hazel Sinclair).

51. The discrepancy can be explained by the fact that neither Mrs. Sinclair nor Mr. McCormick saw the Tractor "on the road." They primarily saw the Tractor when it was at

7

Woolever's facility. Therefore they would not have seen the placards taped over.

52. Mr. Statts left Ephrata to pick up a shipment on behalf of Raisio at approximately 8 a.m. on November 17, 1995. (Statts, Exhibit D-73).

53. The uncontroverted testimony of Mr. Statts, Mr. McCormick, Mrs. Hazel Sinclair and Mr. Harold Sinclair is that the Tractor and Trailer were operating exclusively in the business of JHM from the moment it left Ephrata.

54. En route to Berwick, the Tractor and Trailer were involved in an accident.

55. At the time of the accident, Lease #1 was contained in the Tractor's cab. (Hazel Sinclair).

56. The uncontroverted testimony of Mr. McCormick and Mrs. Sinclair is that the parties had not operated under Lease #1 for a long period of time prior to November 17, 1995. (McCormick, Statts, Hazel Sinclair).

57. Mr. McCormick testified, and no contradictory evidence has been presented, that on November 17, 1995, he did not know that Lease #1 still existed. (McCormick).

58. Neither Woolever nor JHM operated the Tractor pursuant to Lease #1. (McCormick, Hazel Sinclair, Wilking).

59. On November 18, 1995, one day after the accident, a series of leases (the "Post Accident Leases") were executed by Woolever and JHM. (Sinclair, McCormick, Exhibits D-82 to D-91).

60. It was the intent of JHM and Woolever to execute the Post Accident Leases to memorialize the actual relationship between Woolever and JHM. (McCormick, Hazel Sinclair).

61. The purpose of executing these leases was that, in the event of audit or review of

records by governmental agencies, as the result of the accident, the proper documentation would be available.

62. JHM also created driver logs and other documents post accident. (Exhibits D 82 to D 91).

63. Only one of the Post Accident Leases, the one memorializing the delivery of the Cargill load from Watkins Glen to Ephrata on November 17, 1995 (the "Cargill Lease"), was given to Northland and to Lincoln General. (Crecelius, McCormick, McGovern, Hazel Sinclair, Exhibits D-14, P-23).

64. On November 29, 1995, the Cargill Lease was faxed by JHM to Michael McGovern at Lincoln General. (Exhibit D-14, McGovern, McCormick).

65. On December 4, 1995, the Cargill Lease was faxed by Hazel Sinclair to Northland. (Exhibit P-23, Crecelius).

66. The only conversations between Mr. McGovern and any representative of JHM regarding the lease was held immediately prior to the faxing of the lease by JHM. (McCormick, McGovern).

67. Mr. McGovern could not recall any conversation with Mr. McCormick or any representations as to the date of the execution of the Cargill Lease. (McGovern).

68. On October 29, 1997, shortly before the scheduled deposition of McCormick and Hazel Sinclair in the underlying personal injury action, Northland learned that the Cargill Lease was executed after the accident (Bricklin, Crecelius).

69. On November 4, 1997, shortly before the depositions of Mr. McCormick and Mrs. Sinclair in the underlying action, Lou Bricklin, Woolever's defense counsel, advised Mike Pipa,

defense counsel appointed by Lincoln General, that the Cargill Lease was executed after the accident. (Bricklin).

70. Mr. Pipa advised Mr. McGovern of these facts shortly thereafter. (McGovern).

71. Beginning in January 1996, shortly after the accident, Lincoln General took the position that its policy provided excess coverage and that Northland's policy provided primary coverage. Northland took the opposite position. (McGovern, Crecelius, Parker).

72. Neither Northland nor Lincoln General changed its position as to the primacy of coverage as the result of the revelation that the Cargill Lease was executed after the accident. (Crecelius, Parker, McGovern).

73. At no time did Lincoln General deny coverage for the claim to JHM or Mr. Statts. (McGovern).

74. The underlying actions were settled in November 2000. (Exhibit D-106).

75. From November 1997 until November 2000, Lincoln General did not deny coverage to JHM. (McGovern).

76. Lincoln General never advised JHM that it believed that JHM concealed or misrepresented any fact or made any false or fraudulent statement. (McGovern).

77. Lincoln General did not name JHM or Mr. McCormick as a defendant in this action. (See pleadings - crossclaim and counterclaim).

78. Mr. McGovern could not have believed that JHM or Mr. Statts committed fraud or intentionally concealed or misrepresented a material fact as he failed to raise the issue from November 1995 through June 2001 when he left his employ at Lincoln General.

79. Lincoln General has never declined coverage to JHM or Mr. Statts.

80. Lincoln General failed to raise the issue of concealment or fraud at anytime prior to the assertion of its counterclaim in this action in August 2001.

81. Clearly, either no one at Lincoln General believed that JHM committed fraud or intentionally concealed anything from Lincoln General or, if they believed something was intentionally concealed, they believed it was not material.

82. The issue of fraud and intentional concealment by JHM was created by coverage counsel after its receipt of the file from Lincoln General.

83. The date of execution of the Cargill Lease was not intentionally concealed from Lincoln General.

84. The fact that the Cargill Lease was executed after the accident is not material.

85. The Cargill Lease reflected the actual transaction between the parties.

86. Lincoln General believed that the Cargill Lease was not cancelled because the receipt section was blank. As such, it believed that Woolever was the lessee at the time of the accident. (McGovern).

87. Lincoln General has conceded that at the time of the accident Mr. Statts was driving the Tractor in JHM's business. (Exhibit D-32, plaintiff's complaint at, ¶ 5, Exhibit D-47, admission of ¶ 5). Mr. McGovern, at trial, admitted that the allegation of Exhibit D-32 at ¶ 5 are true.

88. At the time of the accident, Mr. Statts was operating the Tractor exclusively in the business of JHM. (McCormick, Statts).

89. At the time of the accident, either Lease #1 had been cancelled by Novation or by the agreement of the parties, or the vehicle was subleased back to JHM.

90. It is common for motor carriers to fail to formally cancel leases. Mr. Statts had a lease with Branch Motor Freight, a large Pennsylvania carrier with thousands of vehicles. When it terminated one of its divisions, it failed to formally cancel its lease with Mr. Statts. (Statts).

91. It is common for motor carriers to operate using oral leases. (Crecelius).

92. The Lincoln General policy provided that Lincoln General received premium of $3,915 per year for insuring the Tractor. (Exhibit D-29).

93. The Northland policy provided that Northland receive premium based on the miles driven on Woolever's behalf. (Exhibit P-19).

94. As all of the Raisio shipments were carried on JHM's vehicles, Northland did not receive any premium for use of the Tractor.

95. Woolever did not report any trip lease mileage to Northland. (Exhibit D-108).

96. Raisio believed that it was doing business with JHM, not Woolever. (Clemons)

97. The survey conducted by Jim Brandt is not of relevance to the claims of Lincoln General as Mr. Brandt could not testify as to whether the words "Trip Lease" meant vehicle leased to JHM or leased from JHM. (Brandt, Exhibit P-15).

98. Mr. Brandt's report indicated that although some of JHM's vehicles were leased to Woolever, the Tractor was not considered to be leased to Woolever and therefore Lincoln General received premium for JHM's use of the Tractor. (Brandt, Exhibit P-15).

99. Approximately 25% of vehicles checked by the DOT are found to have log violation. (Brandt).

II. **PROPOSED FINDINGS OF LAW**

As a matter of law the 1990 lease ("Lease #1") was no longer in effect as the parties did not operate pursuant to that document. *First Lehigh Bank v. Haviland Grille, Inc.*, 704 A.2d 135 (Pa. Super. 1997); *Buttonwood Farms, Inc. v. Carson*, 329 Pa. Super. 312, 478 A.2d 484 (1984); *Paramount Aviation Corporation v. Agusta*, 178 F.3d 132 (3rd Cir. 1999).

The fact that the Lease #1 was not cancelled by written notice, that the placards of Woolever were displayed on the Tractor and a that a receipt was not received by Woolever at the termination of Lease #1 does not create an effective lease. *Parker v. Erixon*, 123 N.C.App. 383, 473 S.E.2d 421, Fed. Carr. Cas. P 84,039 (N.C.App.1996); *Williamson v. Steco Sales, Inc.*, 191 Wis.2d 608, 530 N.W.2d 412 (Wis.App., 1995); *In Fireman's Fund Ins. Co. v. Empire Fire & Marine Ins. Co.*, 152 F. Supp.2d 687 (E.D.Pa. 2001); *Radman v. Jones Motor Co.*, 914 F. Supp. 1193, (W.D. Pa. 1996), *aff'd*, 100 F.3d 948 (3d Cir.); *Diamond State Ins. Co. v. Ranger Ins. Co.*, 47 F. Supp.2d 579 (E.D.Pa.1999); *Occidental Fire and Cas. Co. v. Brocious*, 772 F.2d 47 (3d Cir.1985).

Federal Regulations in effect at the time do not mandate receipts at the time of termination of the lease, nor the removal of the placards by the lessee. *See* 49 C.F.R. §1057 et. seq.

The display of placards and the I.C.C. leasing regulations do not affect disputes between insurance carriers. *Fireman's Fund Ins. Co. v. Empire Fire & Marine Ins. Co.*, 152 F. Supp.2d 687, (E.D.Pa. 2001), *Radman v. Jones Motor Co.*, 914 F. Supp. 1193, (W.D. Pa. 1996), *aff'd*, 100 F.3d 948 (3d Cir.), *Diamond State Ins. Co. v. Ranger Ins. Co.*, 47 F. Supp.2d 579, (E.D.Pa.1999); *Occidental Fire and Cas. Co. v. Brocious*, 772 F.2d 47 (3d Cir.1985).

Because the Tractor and Trailer unit was en route to carry a shipment on behalf of JHM, even if the Tractor was considered to be leased to Woolever as the result of Lease #1, it was exclusively in the business of JHM despite the lease provision of "exclusive possession, control and use." *Diamond State Ins. Co. v. Ranger Ins. Co.*, 47 F. Supp.2d 579, (E.D.Pa.1999); *Franklin Stainless Steel Corporation v. Marlo Transport Corporation*, 748 F.2d 865, 868 (4th Cir. 1984)

For the purpose of the primary/excess provisions of the insurance policies the Tractor was in the business of JHM. This was admitted by JHM in the underlying actions. Lincoln General's corporate designee, Mr. McGovern, also admitted at trial that Mr. Statts was driving the Tractor Trailer unit in JHM's business.

As JHM had Pennsylvania P.U.C. authority to carry the Raisio shipments, the Tractor and Trailer, while en route to pick up the Raisio shipment, were operating under operating authority granted to JHM.

As no evidence has been presented that Woolever had authority to carry the Raisio shipment, the Tractor and Trailer could not have been operating under Woolever's authority.

If it is found that the Lease #1 was in effect, in any event, the Tractor and Trailer were not exclusively in the business of Woolever. The Tractor and Trailer were, however exclusively in the business of JHM, whether or not a there was a written sublease leasing the Tractor back to JHM. *Zamalloa v. Hart*, 31 F.3d 911 (9th Cir. 1994); *Diamond State Ins. Co. v. Ranger Ins. Co.*, 47 F. Supp.2d 579 (E.D.Pa.1999).

The Lincoln General policy provides primary coverage and the Northland policy provides excess coverage. *Diamond State Ins. Co. v. Ranger Ins. Co.*, 47 F. Supp.2d 579 (E.D.Pa.1999).

If this Court deems that both policies provide excess coverage, then by operation of law

14

the repugnant excess clauses make each policy a primary policy and the policies pay on an equal share basis. Section (V)(B)(5)(f) of the policies is inapplicable because the policies are providing primary coverage by operation of law (the repugnant excess clauses) and not by virtue of the coverage form. *Fireman's Fund Ins. Co. v. Empire Fire & Marine Ins. Co.*, 155 F. Supp. 2d 429 (E.D.Pa. 2001); *Fireman's Fund Ins. Co. v. Empire Fire & Marine Ins. Co.*, 152 F. Supp.2d 687, (E.D.Pa. 2001); *Reliance Ins. Co. v. Federal Ins. Co.*, 2000 WL 1664008 (E.D.Pa. Nov. 3, 2000); *Nationwide Ins. Co. v. Horace Mann*, 759 A. 1d 9, 11-12 (Pa. Super. 2000); *American Cas. Co. of Reading, PA. v. PHICO Ins. Co.*, 549 Pa. 682, 702 A.2d 1050 (1997); *Hoffmaster v. Harleysville Ins. Co.*, 441 Pa. Super. 490, 657 A.2d 1274 (1995).

Lincoln General has failed to meet its burden of proof that JHM committed fraud against it or intentionally concealed a material fact. *Batka v. Liberty Mutual Fire Insurance Company*, 704 F.2d 684, 687 (3rd Cir. 1983).

There has been no showing that a material fact was concealed from Lincoln General. Lincoln General can point to only one communication between it and McCormick and Lincoln General's corporate designee has no memory as to the conversation. The fact that the Cargill lease was executed after the accident is not material as it reflected what the parties believed to be the reality of their transaction. Further, the receipt of the Cargilll lease by Lincoln General did not change its position. In fact, Lincoln General believed the Cargill Lease strengthened its claim that it provided excess coverage. Lincoln General's failure to take any action after learning in 1997 that the Cargill Lease was executed after the accident, shows that it did not believe the fact that JHM did not tell it that the Cargill Lease was executed after the accident, was material.

In the subsequent four years from 1997 to 2001, Lincoln General continued to defend

15

JHM and Statts, never reserved rights, settled the claim with the plaintiff and agreed to litigate the primacy of coverage with Northland. Lincoln General never raised an issue of fraud or intentional concealment during that time. As a matter of law the belated claim of misrepresentation concerning the Cargill Lease could not have been material if not raised or even considered by Lincoln General for four years. This issue was never raised by Lincoln General and only raised by coverage counsel in the counterclaim in this action.

Lincoln General has failed to come forward with evidence that Northland acted fraudulently.

Lincoln General waived the defense of concealment and fraud by failing to raise the issue while it continued to defend JHM and Mr. Statts in the underlying action and then settling the claim. *Draft Systems, Inc. v. Alspach*, 756 F.2d 293, 296 (3d Cir.1985); *Perkoski v. Wilson*, 371 Pa. 553, 92 A.2d 189 (1952); *Lewis v. Fidelity & Casualty Co.*, 304 Pa. 503, 156 A. 73 (1931), *Titan Indemnity Company v. Cameron*, 2002 WL 242346 (E.D.Pa.); *Malley v. American Indemnity Co.*, 297 Pa. 216, 219, 146 A. 571 (1928).

This waiver could not have been raised as an affirmative defense by Northland as Northland was not the party that could assert the waiver and Northland had no idea whether a reservation of rights had been asserted. JHM and Mr. Statts, the parties who could have raised the defense were dismissed from this action prior to the filing of the counterclaim by Lincoln General wherein counsel asserted a claim for fraud and intentional concealment.

Public policy should not permit JHM, who received the benefit of the revenue from the Raisio shipments and its insurer, Lincoln General, which received almost $4,000 annual premium just for use of the Tractor, to escape liability as the result of JHM's failure to adhere to

Federal and state regulations regarding placards and leases. *Zamalloa v. Hart*, 31 F.3d 911 (9th Cir. 1994).

Dated: February 6, 2003
       New York, New York

                                SCHINDEL, FARMAN & LIPSIUS LLP
                                Attorneys for Plaintiff Northland Insurance Company

                                By: _____
                                      Ira S. Lipsius (IL5704)
                                225 West 34th Street
                                New York, New York 10122
                                (212) 563-1710
                                File No. 2015.67


                                David Ira Rosenbaum
                                KLETT, ROONEY, LIEBER & SCHORLING
                                Two Logan Square, 12th Floor
                                Philadelphia, PA 19103-2756
                                (215) 567-7505
                                Attorneys for Plaintiff Northland Insurance Co.


TO:   Jonathan H. Rudd, Esq.
       Attorney for Lincoln General
       100 Pine Street
       P.O. Box 1166
       Harrisburg, PA 17108-11661
       (717) 237-5405

       Andrew R. Spiegel, Esquire
       3901-A Main Street
       Second Floor
       Philadelphia, PA 19127

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

NORTHLAND INSURANCE COMPANY,
    Plaintiff,
  v.

No. 1:01-CV-763

LINCOLN GENERAL INSURANCE COMPANY,
J.H.M. ENTERPRISES, INC., and
VERNICE L. STATTS,

(JUDGE KANE)

    Defendants,

  v.

WOOLEVER BROTHERS TRANSPORTATION
INC.,
    Third-Party Defendant.

## CERTIFICATE OF SERVICE

I, Lorienton Palmer, certify that on February 7, 2003, a copy of the attached Proposed Findings of Fact was served Via First Class Mail upon:

Jonathan H. Rudd, Esquire
McNees, Wallace & Nurick
100 Pine Street
P.O. Box 1166
Harrisburg, PA 17108

Andrew R. Spiegel, Esquire
3901 - A Main Street
Second Floor
Philadelphia, PA 19127

_____
Lorienton Palmer