IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORTHLAND INSURANCE COMPANY, | : | |
| Plaintiff | : | CIVIL ACTION NO. 1:CV-01-0763 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| LINCOLN GENERAL INSURANCE COMPANY, | : | |
| Defendant | : | |

**MEMORANDUM AND DECISION**

This declaratory judgment action was brought by the Northland Insurance Company to clarify the scope of its coverage of a tractor-trailer involved in an accident on November 17, 1995. Northland provided coverage for this tractor-trailer on behalf of its insured, Woolever Transportation Company while the Lincoln General Insurance Company covered the same equipment on behalf of JHM Enterprises, Inc. As a result of the accident, both insurers have made payments under their policies. Each party seeks reimbursement of funds paid under their policies. The Court held a bench trial on January 27-30, 2002, and now issues this memorandum and decision. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the parties are diverse and the amount in controversy exceeds $75,000.

**I. Findings of Fact**

Plaintiff Northland Insurance Company ("Northland") is a Minnesota corporation licensed to do business in Pennsylvania, with its principal place of business in Minnesota. Defendant Lincoln General Insurance Company ("Lincoln General") is a Pennsylvania corporation with its principal place of business in Pennsylvania. J.H.M. Enterprises, Inc. ("JHM") was a Pennsylvania trucking corporation that is no longer transacting business. Woolever Brothers Transportation,

Inc. ("Woolever") is also a Pennsylvania trucking corporation. JHM and Woolever occupied the same business space in Montoursville, Pennsylvania. Moreover, even though JHM and Woolever were separately incorporated entities, the companies often used the same equipment and personnel. JHM and Woolever employees shared business responsibilities such as dispatching drivers and filing business related paperwork. Vernice Lee Statts is a truck driver who, on occasion, carried loads for both Woolever and JHM.

On November 17, 1995, Statts operated a 1979 Freightliner with the Serial Number CA213HM160222 (the "Tractor"). In Hometown, Pennsylvania, Statts caused a fatal accident resulting in claims against Woolever, JHM and Statts (the "underlying claims"). The Tractor driven by Statts was owned by JHM and scheduled on a Lincoln General Policy issued to JHM. This insurance policy, Number PAP 185770 0495 (the "Lincoln General Policy") was in effect from April 18, 1995 to April 18, 1996 and provided $750,000 in liability coverage for each accident or loss. Northland issued a Truckers insurance policy to Woolever, which was in effect from September 1, 1995 through September 1, 1996 ("the Northland Policy") and provided $2,000,000 in liability coverage for each accident involving vehicles Woolever leased, hired or borrowed.

At the time of the accident, the Tractor displayed two placards. One placard indicated that the tractor was "Leased to Woolever Bros." and set forth Woolever's federal and state operating authority number. Below the Woolever placard was a placard indicating that the vehicle was operating under the authority of JHM Enterprises, Inc. Statts testified that his usual practice was to use tape to cover the placard of whichever company was not responsible for any given load. However, on the day of the accident, Statts testified that neither placard was covered

because he had run out of tape.

The underlying claims resulting from the accident were settled for $1,350,000 in November, 2000. Northland and Lincoln General each contributed $675,000 towards the settlement of the underlying actions. In addition, Northland paid $65,629.59 for the defense of Woolever Brothers in the underlying actions and Lincoln General paid $91,511.35 for the defense of JHM, its owner Jay McCormick, and Statts.

The Northland and Lincoln General policies covering the Tractor contained identical terms, utilizing ISO form CA 00 12 12 93. Each policy contains an identical clause labeled "Other Insurance - Primary and Excess Insurance Provisions" ("other insurance clause"). These clauses state:

> a. This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a trucker and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectable insurance for any covered "auto" while hired or borrowed from you by another "trucker". However, while a covered "auto": which is a "trailer" is connected to a power unit, this Coverage Form's Liability Coverage is:
>
>> (1) On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto".
>>
>> (2) Excess if the power unit is not a covered "auto".
>
> b. Any Trailer Interchange Coverage provided by this Coverage Form is primary for any covered "auto".
>
> c. Except as provided in paragraphs a. and b. above, this Coverage Form provides primary insurance for any covered "auto" you own and excess insurance for any covered "auto" you don't own.
>
> d. For Hired Auto Physical Damage coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

    e.  Regardless of the provisions of paragraphs a., b. and c. above, this Coverage Form's Liability Coverage is primary for any liability assumed under an "insured contract".

    f.  When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share.  Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

ISO form CA 00 12 12 93, V(b)5.

    During the time period in question, Woolever frequently hauled for Cargill Salt ("Cargill"), located in Watkins Glen, New York.  Cargill used Woolever's service to arrange for transportation of salt between Watkins Glen, New York and Ephrata, Pennsylvania.  McCormick, owner of JHM, would dispatch tractors and drivers who worked for either Woolever or JHM to complete Cargill deliveries.  Woolever would then bill Cargill for the work performed.  Testimony at trial indicated that the majority of Woolever's clients required the shipping of "dry freight" such as salt which can be loaded onto a flatbed or van trailer.  Woolever had limited authority to carry freight within the state of Pennsylvania

    One of JHM's major clients was Raisio, Incorporated ("Raisio"), a company that processes potato starch used in the paper making industry.  This potato starch is extracted from the slurry produced by various potato chip manufacturers when washing and peeling potatoes.  Raisio has a facility located in Berwick, Pennsylvania and owned two tank wagons for the transportation of the slurry from the potato chip manufacturers.  JHM provided tractors and drivers for the transportation of these tank wagons.  When Rasio employees needed to schedule an appointment, they would call McCormick at a toll free number for Woolever's offices.  McCormick would then dispatch tractors and drivers using employees and equipment of both

4

Woolever and JHM depending on availability and need. JHM would then bill Rasio. Trial testimony also established that JHM's clients tended to require the delivery of "wet freight" such as slurry and required the use of tank wagons as opposed to flatbed or van trailer. On November 17, 1995, JHM had authority to carry the Raisio loads from Berwick Pennsylvania to Tyrone Pennsylvania under PUC licence number # A00109158.

On November 16, 1995, the day before the accident, Statts drove the Tractor, which was pulling a van trailer north into the State of New York New York to pick up a load of salt for Woolever. After the van trailer was loaded, Statts returned to his home near Williamsport Pennsylvania for the night. On the morning of November 17, 1995, Statts drove the Tractor and loaded van trailer from his home near Williamsport southeasterly to Ephrata, Pennsylvania and delivered the load of Cargill salt for Woolever. Thereafter Statts left Ephrata and headed north to Berwick, Pennsylvania in order to execute a Rasio delivery for JHM. Statts's intention, had he arrived in Berwick, was to unhook the van trailer used to deliver Woolever's load and leave it, temporarily, at Raisio's facility. He intended to make JHM's delivery with a Rasio tank wagon and then, after returning the tank wagon to Rasio's facility, hook back onto the empty van trailer used in Woolever's previous load and proceed to Woolever's facility in Montoursville. However, on the way to the Rasio plant, the fatal accident occurred.

At the time of the accident, Statts's logs, originally completed in November, 1995, identified Woolever as the motor carrier for whom he was hauling. The only lease document in the Tractor at that time was a March 1, 1990 "Agreement Of Lease Of Motor Vehicle Equipment" indicating that JHM leased the Tractor to Woolever. Accordingly, the Police Report produced at the accident indicates that Woolever Brothers was the motor carrier at the time of the

accident. Moreover, Woolever completed the required governmental certifications and paperwork for Statts which identified Woolever as the motor carrier for whom Statts was driving, and on May 12, 1995, McCormick, acting as the Dispatcher for Woolever, also executed a Certificate of Qualification for Statts. McCormick certified in the Certificate that Statts "is regularly driving a vehicle operated by the below named carrier," which was identified as "Woolever Bros. Transp."

On November 17, 1995, McCormick reported the accident to Lincoln General on behalf of JHM. Woolever reported the Accident to Northland that same day. Later that day, Gail Crecelius, a claims supervisor for Northland, interviewed Statts, McCormick and Hazel Sinclair, part owner of Woolever. In her interview Hazel Sinclair informed Crecelius that McCormick operated under Woolever's authority and that the Tractor was leased to Woolever. Hazel Sinclair informed Crecelius that McCormick arranges loads for Woolever. Sinclair then faxed Crecelius a copy of the March 1, 1990 "Agreement Of Lease Of Motor Vehicle Equipment" as evidence of the lease arrangement between Woolever and JHM.

On November 29, 1995, McCormick faxed to Lincoln General a document titled "Agreement of Lease Of Motor Vehicle Equipment" ("trip lease") dated November 16, 1995, for the Tractor involved in the Accident. Although this trip lease identified a trailer that was not involved in the Accident, it indicated that the Tractor was operating under the authority of JHM, not Woolever, at the time of the accident. This trip lease provided that:

> The term of this lease shall begin at 4:00 P.M. o'clock on 11/16/95 and terminate at the end of thirty (30) days, or at 8:00 A.M. o'clock 11/17/95, at which time the term of this lease is automatically extended for additional like thirty (30) day periods, unless terminated by either party giving to the other party five (5) days written notice of cancellation.

This Trip Lease was signed by McCormick, as President of JHM, and Sinclair, as Secretary/Treasurer of Woolever. Although the face of the Trip Lease indicates that it was signed on November 16, 1995, this lease, among others, were drawn up after the accident. Later, on December 4, 1995, Sinclair called Crecelius at Northland and informed Crecelius that the wrong lease was faxed on November 17, 1995. Sinclair indicated that the March 1, 1990 "Agreement Of Lease Of Motor Vehicle Equipment" was an old lease used when the owner and operator of the Tractor worked exclusively for Woolever, and no longer applies. Sinclair told Crecelius that Woolever used trip leases at the time of the accident. Sinclair then faxed Crecelius the trip leases that were drawn up after the accident as evidence of the leasing arrangement between Woolever and JHM.

Both the Northland and Lincoln General policies contain a clause labeled "Concealment, Misrepresentation or Fraud" which states:

> This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceal or misrepresent a material fact concerning:
>
>     a. This Coverage Form;
>     b. The covered "auto";
>     c. Your interest in the covered "auto"; or
>     d. A claim under this Coverage Form.

ISO Form CA 00 12 12 93 at p. 9, Section V.B.2. Lincoln General asserts that its liability for JHM, Woolever and Statts under its policy is void as a result of fraud.

## II. Discussion and Conclusions of Law

Preliminarily, the parties agree that Pennsylvania law governs this dispute as Pennsylvania

has the most significant relationship to the parties and transaction. Myers v. Commercial Union Assurance Co., 485 A.2d 1113, 1116 (Pa. 1984). Under Pennsylvania law, the interpretation of an insurance policy is a question of law. Fireman's Fund Ins. Co. v. Empire Fire & Marine Ins. Co., 155 F. Supp. 2d 429, 431 (E.D. Pa. 2001) (citing Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)). "Whether a particular loss is within the coverage of an insurance policy is such a question of law. . . ." Fireman's Fund Ins. Co., 155 F. Supp. 2d at 431 (citing Bowers v. Feathers, 671 A.2d 695, 697 (Pa. 1995)).

  Northland and Lincoln General each assert that the other is liable for the accident losses as the "primary insurer." Under the policy terms of both insurance carriers, if a tractor is "used exclusively in [a company's] business as a trucker," the insurance of that company provides primary coverage. Thus, this coverage dispute centers on whether the Tractor was, at the time of the accident in Hometown, Pennsylvania, exclusively in the business of Northland's insured or Lincoln General's. Neither policy defines the phrase.

  Both the Tractor and the trailer were specifically scheduled on Lincoln General's policy and both were owned by JHM. Statts was an employee of JHM and when the accident occurred, he was en route to pick up a load of slurry from JHM's client, Rasio. Had the Rasio load been picked up, JHM would have received the profits from the delivery. Significantly, had Statts not been driving the Tractor in the business of JHM, he would not have traveled through Hometown, Pennsylvania before returning the Tractor and trailer previously used for Woolever's delivery to the Montoursville, Pennsylvania facility. Finally, it is clear that on November 17, 1995, JHM had authority to carry the Raisio loads from Berwick Pennsylvania to Tyrone Pennsylvania under PUC licence number A00109158 and Lincoln General has failed to show that Woolever had PUC

8

authority to carry shipments on behalf of Raisio from Berwick, Pennsylvania.  Accordingly, this Court concludes that the Tractor was operating exclusively in JHM's business at the time of the accident.

Lincoln General urges the Court to find that the Tractor was exclusively in Woolever's business based primarily on the existence of the March 1, 1990 lease from JHM to Woolever. That lease was present in the Tractor at the time of the 1995 accident and there is no evidence that this open ended lease was ever formally terminated.  However, the facts support a finding that the parties had reformed this contract and abandoned the 1990 lease.  JHM leased the tractor to Woolever at a time when Woolever, but not JHM, had PUC authority.  In 1992, JHM obtained its own authority and modified its arrangement with Woolever to reflect that.  Thereafter, JHM continued to transact business transporting loads for Woolever's clients on a case by case basis. In 1995, JHM hauled for Woolever eleven days.  In apparent violation of laws and regulations, the parties transacted business without supporting documents until the fatal accident occurred. Following the accident, they attempted to memorialize their arrangement with backdated trip leases.  These leases reflect the true terms on which the parties conducted business.[1]

Under the facts of this case, this Court finds that Lincoln General provides primary coverage and Northland provides excess coverage for the underlying claims.  Section V(B)(5)(a) of Northland's policy states, in relevant part, "[T]his Coverage Form's Liability Coverage is excess over any other collectable insurance for any covered 'auto' while hired or borrowed from

---

[1] Lincoln General argues that these trip leases represent a fraudulent misrepresentation of material fact which voids coverage under Section V.B.2 of the policy.  As the Court finds that the trip leases accurately reflect the relationship between Woolever and JHM, Lincoln General's arguments that these leases represent a fraudulent misrepresentation of material fact fails.

[Woolever] by another 'trucker'." As Woolever subleased the Tractor to JHM, Woolever's insurer, Northland, provides excess coverage for the underlying claims. Section V(B)(5)(a) of Lincoln General's policy states, in relevant part "[T]his Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by [JHM] and used exclusively in [JHM's] business as a trucker and pursuant to operating rights granted to [JHM] by a public authority." As JHM was using the Tractor exclusively in its business under its PUC authority, Lincoln General, its insurer, provides primary coverage for the underlying claims. Northland, as excess insurer, is required to pay up to its policy limits only after the policy limits of Lincoln General, as primary insurer, have been exhausted. Under the facts presented here, Lincoln General must reimburse Northland the difference between what it has paid to date to settle the underlying claims ($675,000) and its policy limit of $750,000. Accordingly, Lincoln General will be ordered to pay Northland $75,000.

### III. **Order**

**AND NOW**, therefore, **IT IS ORDERED THAT** the Clerk of Court shall enter judgment for Plaintiff, Northland Insurance Company and against Defendant, Lincoln General Insurance Company, in the amount of $75,000.

                          S/ Yvette Kane
                          Yvette Kane
                          United States District Judge

Dated: August 26, 2003.